The Second Circuit has recently analyzed the *Wickman* test, holding that a death from the practice of autoerotic asphyxiation (hereinafter AEA)[12] was accidental. (*See Critchlow v. First UNUM Life Ins. Co.*, 02-7585 (2d Cir. 2004), attached as Exhibit A at 18).[13] Citing to the Fifth and Ninth Circuit Courts of Appeals, *Critchlow* found that the evidence established that deaths resulting from AEA are "statistically rare," and "ordinarily" AEA was not fatal conduct. (*See Critchlow* at 13). Therefore, the decedent's expectation of survival from such conduct was reasonable. (*Id*). Since the *Critchlow* court found the decedent's expectation to be reasonable, his death was accidental. (*Id* at 18).

The Second Circuit stated that the burden was on the insurer to demonstrate that an exclusion to a policy's coverage applied. (*Id* at 14). Moreover, the *Critchlow* court gave no weight to the insurer's argument that AEA was a risky behavior, and therefore, the decedent was unreasonable in his expectation to survive. The court noted that "[g]iven the language of the exclusion at issue here, it is not sufficient merely that a serious risk was willfully undertaken, so long as injury was not intended and, objectively, was not likely to occur." (*Critchlow* at 17). Given this binding precedent, the fact there is not an

---

[12] "[T]he practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *See Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1450 (5th Cir. 1995).
[13] Despite the binding effect of the Second Circuit opinion of *Critchlow*, including its analysis of the *Wickman* test, the defendant has, not surprisingly, failed to cite, or even mention, this opinion.

applicable exclusion, it has never been contended that Peter Glynn intended his death, and that the probability of his death was statistically rare, the decedent's death should be found to be accidental.

In *Wickman*, the decedent was discovered standing outside of a bridge's guardrail, and holding onto the guardrail with only one hand. *Wickman*, 908 F.2d at 1080. A witness stated that after checking the traffic on the bridge, and turning back to look at the decedent, he saw that the decedent was "no longer holding on to the rail but free-falling to the railroad tracks below." *Id*. The court found:

> [the decedent's] death did not constitute an accident within the terms of his group accident insurance policy. [Decedent] either subjectively expected serious injury, or the evidence was inconclusive as to his subjective expectation. Objectively, he reasonably should have expected serious injury when he climbed over the guardrail and suspended himself high above the railroad tracks below by hanging on to the guardrail with only one hand.

*Id* at 1089.

*Wickman* provides further guidance as to what factual circumstances are accidents. *Id* at 1088. In examining whether a decedent's expectation was unreasonable, the court uses "the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Id*. The court cites examples which the court implies would be accidents pursuant to its established test. *Id* (citing opinions finding an accident where man fell off top of moving car, he had performed the stunt previously, knew, and trusted the driver, was strong, and had a good grip;

21

finding an accident where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself; the death of a professional diver after diving off the Coolidge Dam where he previously completed the same dive without injury was accidental).

The *Wickman* court cites cases holding that games of "Russian Roulette"[14] are generally not accidents. Wickman 908 F.2d at 1088. The court implies that playing a game such as Russian Roulette makes the decedent's expectation of not being killed objectively unreasonable, and therefore not accidental.

Further, *Metropolitan Life Ins. v. Potter* stated that the *Wickman* test "require[d] more than mere foreseeability or increased risk," in determining whether a decedent's death resulting from a drunk driving accident was accidental. 992 F.Supp. 717, 729 (D.N.J. 1998).[15] The *Potter* court noted that the

---

[14] "A game where the participants inject one bullet in one chamber of a pistol, spin the barrel, place the pistol to their heads, and pull the trigger. A player playing by the rules will not make any effort to check if the firing chamber is empty before pulling the trigger. Thus, essentially a participant relies solely upon fate to determine if he or she will be shot." *See Wickman*, 908 F.2d at 1087, note 4.

[15] The *Potter* court found a question of fact, therefore, it denied both parties' motions for summary judgment. A genuine issue of material fact was created by the existence of an internal memo written by an employee of the insurer, which stated that the decedent's death was from a car accident. The insurer also had a police report and autopsy report that stated the death was due to an accident. Since the insurer's denial letter stated that "common sense," among other things, should have made the decedent realize that dying in such circumstances was not accidental, the court found a genuine issue of material fact. Under our present facts, there is no analogous factual dispute, the parties' disagreement is solely

RISCASSI & DAVIS, P.C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P.O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

insurer failed to present any evidence that would demonstrate that the decedent's death was "highly likely" to result from her drunk driving, and that "any other expectation would be unreasonable." *Id* at 730 ("At best, [insured's] submissions establish the undisputed proposition that alcohol consumption impairs motor functions and faculties and increases the risk of driving collisions."). The court found that it could not "[find] that death is 'highly likely to occur' as a result of drunk driving and that 'any other expectation would be unreasonable' where many drunk drivers survive (to be prosecuted or perhaps to repeat their risky conduct)." *Potter*, 992 F.Supp. at 729-30.

The Fifth Circuit found a decedent's death from his practice of AEA to be accidental. *Todd*, 47 F.3d at 1456. The *Todd* court focused its analysis on whether the decedent's expectation of not being killed while practicing AEA was unreasonable. *Id*. The court noted:

> [T]he materials before the court clearly indicated that the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage under the policy…In a treatise on autoerotic deaths, the authors observe that "[a]utoerotic or sexual asphyxia refers to the use of asphyxia to heighten sexual arousal, more often than not with a nonfatal outcome." [citation omitted] Similarly, the experts in the *Tommie* case testified that death from the practice would be considered unusual, see 619 S.W.2d at 202, and the court in the *Kennedy* case ruled that the risk of death from autoerotic practice is "not of such a nature that [the decedent] knew or should have known that it probably would result in death. Death

---

based on whether the term "accident", under an ERISA plan, is changed by federal common law so as to disallow plaintiff's benefits under the decedent's accidental death and dismemberment policy, and if so, whether the decedent's death was an "accident" under federal common law.

23

was not a normal expected result of the behavior. 401 N.W.2d at 845. In addition, an article by Jane Brody in the New York Times …observes that, according to researchers, "[i]n a small but significant number of cases" of autoeroticism, "the person dies before he can restore his oxygen supply. *Id* at 1456-57. The court expressed that "[t]he life insurance companies have ample ways to avoid judgments like this one," implying that the insurance companies could establish exclusions to such activities if they wanted to avoid paying benefits for deaths resulting from such conduct . *Id*.

*Padfield* cited *Todd*, in holding that death from AEA was accidental. 290 F.3d at 1129-30 ("we agree with the Fifth Circuit in *Todd* that the "substantially certain" test is the most appropriate one, for it best allows the objective inquiry to 'serve [ ] as a good proxy for [the insured's] actual expectation.""). "[The decedent] voluntarily engaged in actions that led to a fatal injury, but his reasonable expectation was that this behavior would not have resulted in 'injury' as that word is commonly used…having performed the act in the past without inflicting any injury, [he] had a reasonable expectation that he would be able to do so again." *Id* at 1130.

*West v. Aetna Life Ins. Co.*, 171 F.Supp.2d 856, 904 (N.D.Iowa 2001), held that a decedent's death from driving while intoxicated is an accident. The decedent in *West* was killed when the car he was driving missed a curve and flipped over. *Id* at 860. The decedent was not wearing his seatbelt, and was found to have been greater than twice the legal limit for intoxication at the time of

24

the accident. *Id.* There was not an exclusion for a death resulting from driving while intoxicated. *Id* at 861. The insurer refused to pay benefits on the policy, stating:

> [The decedent's] intentional act exposed himself to unnecessary risks which were reasonably foreseeable and such that he should have known or appreciated the consequences of his intentional acts, including the liklihood [sic] or strong possibility of death. The serious risks associated with driving while intoxicated are widely publicized.[16]

*Id* at 862. The court refused to uphold the insurer's decision to deny benefits, and further stated that the insurer's decision should not withstand "even under the most deferential [arbitrary and capricious] standard of review." "*Id* at 905.

The *West* court expressed that the "most glaring failure" of the insurer's argument was its belief that the decedent should have foreseen his death from driving with an elevated blood alcohol content. *West*, 171 F.Supp.2d at 887 (stating that "*Wickman* formulates the requirement as 'whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur as a result of the insured's intentional conduct*'." (emphasis in original)). Therefore, the standard of foreseeability

---

[16] Insurance companies, and certain courts, in making or upholding the decision to deny benefits to beneficiaries of decedents killed while driving with an elevated blood alcohol content, have pointed to the amount of news media involving such deaths as authority for the proposition that the decedent should have foreseen his death. *See, Walker v. Metropolitan Life Ins. Co.*, 24 F.Supp. 775, 781 (E.D.Mich. 1997); ("The hazards of driving while intoxicated are well-known. The public is reminded daily of the risks of driving while intoxicated both in warnings from the media and in motor vehicle and criminal laws.").

25

RISCASSI & DAVIS, P.C. • *ATTORNEYS-AT-LAW* • 131 OAK STREET • P.O. BOX 261557 • HARTFORD, CT 06126-1557 • (860) 522-1196

required by the insurer was contrary to that required under federal common law. *Id.*

The defendant in *West* argued that "nearly every federal decision applying *Wickman* to the determination of whether an intoxicated driver's death was an 'accident' within the meaning of an ERISA plan has concluded that such a driver's death was not an accident." 171 F.Supp.2d at 898. The court, citing to case law[17] holding that such accidents are not accidents, found that, although such case law "cited *Wickman*, none of them actually employed the two-pronged test." *West*, 171 F.Supp.2d at 900 (citing *Potter*, 992 F.Supp. at 729). *West* stated that those cases finding drunk driving accidents not to be accidents either provided a lower standard of foreseeability, or made an assumption that "intoxication establishes that death or injury is 'highly likely to occur', in the complete absence of any evidence establishing actual probability." 171 F.Supp.2d at 901. The *West* court states:

> As substitutes for actual proof that a drunk driver is so likely to be injured or killed that any other expectation is unreasonable, these decisions sometimes rely on "common knowledge," "the media," drunk driving

---

[17] The court cited the following: *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110-11 (7th Cir. 1998); *Mullaney v. Aetna U.S. Healthcare*, 103 F.Supp.2d 486, 493-94 (R.I. 2000); *Walker v. Metropolitan Life Ins. Co.*, 24 F.Supp.2d 775, 780-82 (E.D.Mich. 1997); *Cates v. Metropolitan Life Ins. Co., Inc.*, 14 F.Supp.2d 1024, 1027 (E.D.Tenn. 1996); *Schultz v. Metropolitan Life Ins. Co.*, 994 F.Supp. 1419, 1422 (M.D.Fla. 1997); *Nelson v. Sun Life Assurance Co. of Canada*, 962 F.Supp. 1010, 1012 (W.D.Mich. 1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F.Supp. 172, 176-77 (E.D.Mich. 1997); *Fowler v. Metropolitan Life Ins. Co.*, 938 F.Supp. 476, 480 (W.D.Tenn. 1996).

laws, or the logical, but unproved, assumption that a higher blood alcohol content necessarily increases the probability of injury or death while driving to the point that death or injury is 'highly likely,' not just *more likely*, to result.

(emphasis in original) *Id*.

The fact that an activity increases the likelihood of a result, does not mean that any other expectation is unreasonable. *See e.g. Critchlow* at 16-17. Under the de novo standard of review, which is most appropriate in reviewing the defendant's denial of the plaintiff's benefits, the burden is on the insurer to establish that the insured was unreasonable in expecting payment. Therefore, those cases upholding the insured's denial of benefits, based on the fact that the results of drunk driving are well-documented, must fail the *Wickman* test, and are therefore accidents. *West* found that the insurer's lack of evidence that the decedent's expectation of surviving his action of driving while intoxicated was not unreasonable, even examining the insurer's decision to deny benefits under the more deferential arbitrary and capricious standard of review, since the insurer did not present "any evidence" that could support its decision that there was no accident. *Id* at 902.

The *West* court focused on statistical proof[18] submitted by the beneficiary in reaching its decision. 171 F.Supp.2d at 904. The statistics, compiled by the

---

[18] *See also Critchlow* at 12-13 (quoting Padfield, 290 F.3d at 1127) ("Because death by autoerotic asphyxiation is statistically rare, his expectation of survival certainly was reasonable.").

27

Federal Bureau of Investigation stated that there were 1,033,000 arrests for driving while intoxicated. *Id.* The court noted that not every intoxicated driver is arrested for such offense "in any given year, let alone every time he or she is [driving while] intoxicated." *Id.* In the same year, there were 42,065 deaths in motor vehicle crashes, 40.9%, or 17,218 were alcohol-related. *Id.* The court further reasoned that, if driving while intoxicated were "highly likely to occur," the number of deaths should be much higher, given the extremely greater number of arrests for drunk driving. *West*, 171 F.Supp.2d at 904.

> What "common knowledge" should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol-related crash, and far more likely to arrive home than to be either arrested, injured, or killed.

*Id.* The court acknowledges, and the plaintiff agrees, that driving with an elevated blood alcohol content is "irresponsible and dangerous, because the risks that come with it are preventable by the use of proper judgment." *Id.* Death from such an activity, however, no matter how irresponsible and dangerous, is not highly likely, or even probable, and is therefore accidental under federal common law. *Id.*

The defendant has not offer any evidence, in its possession at the time it denied the plaintiff's claim, that the decedent's driving with an elevated blood alcohol content made his death highly likely or even probable.[19] Instead, Mr. Krol states that

---

[19] The plaintiff again points out that the defendant has not offered competent, admissible evidence that the decedent's blood alcohol content caused his accident and death. (*See supra* part III.)

28

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

at the time he denied the plaintiff's claim, he did not have any knowledge regarding drunk driving deaths, and, further, no statistics were involved in his decision to deny the plaintiff's claim.

> Q. You don't know what the statistics are regarding driving while intoxicated?
> A. No.
> Q. Does anyone at Bankers Life know what the statistics show with regard to driving while intoxicated? Do you know?
> A. I don't know.
> Q. Okay. And whatever the numbers show, they played no part in your decision to deny Mr. Glynn's claim, is that true?
> A. Correct.

(*See* Exhibit H at 104).

The plaintiff offers expert, statistical proof, as was offered in both *Potter* and *West*, which demonstrates the probability of the decedent being killed while driving with an elevated blood alcohol content. (*See* Exhibits I and J). Indeed, Dr. Mustoghimi's affidavit concludes that "the probability of an alcohol related fatal accident for an alcohol impaired driver and non-driver per 20 vehicle miles traveled is about one in a million for both the United States and Connecticut." (*See* Exhibit I at 2). The approximate distance traveled by the decedent prior to his accident was twenty miles. (*See* Exhibit B at 1). This demonstrates that death from driving with an elevated blood alcohol level is not highly likely, or even probable. In fact, Mr.

29

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Krol, the defendant's corporate designee, agrees that something would have to be at least more likely than not to qualify as "highly likely."[20]

> Q. Okay. And if the statistics indicated that the chance of were one in 10 million of someone driving intoxicated and dying, would that be highly likely in your opinion?
> …
> A. One in 10 million.
> Q. Would you consider that highly likely?
> A. My opinion, no.
> Q. Okay. What sort of probability would we look at to determine that something was highly likely, in your opinion?
> …
> A. Over Half.
> Q. Okay. 51-49?
> A. You can say that, I guess.

(*See* Exhibit H at 42). Further, Mr. Krol's working definition of "accident" at the time he denied the plaintiff's claim was something unforeseen or unexpected, (*Id* at 93), and he agrees that the decedent's death satisfied this definition. (*Id* at 103-04). It must be that Mr. Krol, the defendant's corporate designee, would find an event with a probability of one in a million also to not be highly likely and, therefore, accidental.

The fact is that the Peter Glynn was much more likely to arrive safely at his destination, or to be arrested, than he was to die in the manner he did. *See, West*, 171 F.Supp.2d at 904. Courts holding that deaths resulting from driving while intoxicated are not accidental have misapplied the *Wickman* test, or simply

---

[20] The plaintiff does not concede that being "more likely than not" qualifies an event as highly likely.

30

make a "moralistic conclusion" instead of conclusion based on the evidence, which demonstrates that being killed while driving intoxicated is not highly likely, or even probable. The decedent, based on the statistical probability, was not unreasonable in expecting to reach his destination on the night he was killed. Further, Mr. Krol's denial of the plaintiff's claim, stating that the decedent's death was highly likely, while not having any evidence of the statistical probability of deaths from driving with an elevated blood alcohol content, was arbitrary and capricious.

Peter Glynn's expectation of surviving his drive home on the night he was killed, despite his driving with an elevated blood alcohol content, was not objectively unrealistic or unreasonable. Although the plaintiff and father of the decedent, Philip Glynn, stated that his son "had no history of alcohol or substance abuse," he also stated that "approximately every two weeks he would note a bottle [of vodka] in the trash when he was taking it out." (*See* Exhibit E at 2). It is possible that the decedent had driven with an elevated blood alcohol level in the past. (*See* Exhibit H at 38) ("Q. Okay. Did your investigative service uncover any evidence regarding Mr. Glynn's drinking habits? A. Yes. Q. What did they find? A. He routinely consumed vodka."). Following the *Wickman* test, and the examples cited therein, having performed the dangerous activity in the past, and surviving, makes the expectation of survival more reasonable. This idea was also cited by *Critchlow*, *Padfield* and *Todd*, where it was demonstrated that the

decedent had performed AEA, and survived such activity, in the past. Since the decedents had performed the activity in the past, despite its risky nature, there expectation was to survive.

Driving with an elevated blood alcohol content cannot be analogized to playing Russian Roullette. *Wickman* states that to expect to survive Russian Roulette was not objectively reasonable. Despite the fact that the player may have expected to survive, the average person would find such expectation unreasonable, and therefore it is not accidental to die during such a game. It has been posited that a game of Russian Roullette fails the first, subjective prong of *Wickman*. *See, King v. Hartford Life and Accident Ins. Co.*, 357 F.3d 840, 845 (8th Cir. 2004), *vacated*, (April 6, 2004)[21] "[T]he better logic suggests that the Russian roulette player loses coverage at step one of the *Wickman* analysis, because the whole purpose of playing the 'game' involves facing the risk of death consciously and directly." *Id*. The defendant is not able to demonstrate that the decedent's actions rise to the level of risk involved in Russian Roulette, and therefore, such an example does not sufficiently demonstrate that the decedent's expectation of survival was unreasonable. There is no evidence that Peter Glynn intended to do anything other than to arrive at his destination.

---

[21] In the plaintiff's obligation of candor to the court, the plaintiff points out that the *King* opinion was vacated on April 6, 2004, to be reheard en banc, at an unknown date. The opinion cited held that a decedent's death involving his driving while

32

Perhaps the leading case in support of the defendant's argument that, under ERISA's federal common law, the decedent's death was not accidental is *Cozzie v. Metropolitan Life Ins. Co.* 140 F.3d 1104 (7th Cir. 1998). *Cozzie*, however, is at odds with the binding precedent of *Critchlow*, misapplies the *Wickman* test, and does not support the defendant's denial of benefits, based solely on the decedent's blood alcohol content, but not on an exclusion in the policy. 140 F.3d at 1110-1111.

In *Cozzie*, the decedent was killed in a car accident.[22] *Id* at 1106. It was later determined that the decedent was intoxicated at the time of his death. *Id*. *Cozzie*, under an arbitrary and capricious review of the plan's denial of benefits under such policy, found that the decedent's death was not accidental. *Cozzie*, 140 F.3d at 1111. The court stated "Given the extremely deferential standard of review that must govern our adjudication, we cannot say that [the insurer], as the plan fiduciary, reached an unreasonable result on the facts of this particular case. *Id*.

The *Cozzie* court, although holding that the decedent's accident was not accidental, expressed concern with its result. *Cozzie*, 140 F.3d at 1110. The court stated:

---

intoxicated was accidental pursuant to ERISA and federal common law developed under such.

33

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

> We do not mean to suggest that [the insurer] could sustain a determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law, could reasonably be construed as not accidental. States obviously have the authority to proscribe conduct that, although not inherently dangerous, is sufficiently risky that the general security is enhanced by its proscription. The plan fiduciary cannot interpret the plan in such a way as to make the coverage meaningless.

*Id.* A per se rule that any death involving an individual driving with an elevated blood alcohol content at the time of his death is arbitrary and capricious, even according to *Cozzie*. *Id.*

*Cozzie* also noted in its analysis that "the absence of an explicit exclusion must be given significant weight in any review of the reasonableness of a decision by the fiduciary to deny coverage." 140 F.3d at 1111. While holding that even where the plan did not contain an exclusion for deaths resulting from a decedent's drunk driving, because such an accident was not accidental, the court focused on the specific facts[23] involved and the that it was reviewing the denial of benefits using the more deferential arbitrary and capricious standard of review. *Id.* In fact, the *Cozzie* court warned the drafters of insurance policies about denying benefits not based on any specific exclusions in the policy, stating "[n]evertheless, we caution that plan drafters would be well advised to demonstrate significant

---

[22] Please note, that despite its holding to the contrary, the *Cozzie* court itself refers to the decedent's death as a car accident ("Mr. Cozzie was killed in a car accident.") 140 F.3d at 1106.

[23] "Mr. Cozzie had a blood alcohol level of .252%. *Cozzie*, 140 F.3d at 1106.

34

circumspection in attempting to require these general plan terms to bear too much weight." *Id* at 1111.

The defendant admits that Peter Glynn's blood alcohol level was the only relevant information to Bankers Life and Casualty Company's decision to deny benefits to the plaintiff. (*See* Exhibit H at 32) ("Q. Were there any facts at all in the information you received that you determined were relevant to the denial of the claim other than the blood alcohol content? A. No."). The defendants denial, in effect, was a per se denial of all claims, under ERISA plans, which involved a decedent killed while operating a motor vehicle with an elevated blood alcohol level at the time of his death.

*Cozzie* does not support "the determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law," are not accidents. 140 F.3d at 1110. Mr. Krol, the defendant's corporate designee, confirms the defendant's policy of denying ERISA claims in circumstances such as the decedent, while paying benefits to beneficiaries of decedents killed in the same circumstances, who have accidental death policies in non-ERISA plans.

> Q. Okay. Since this change in policy occurred seven or eight years ago, have you continued to pay non-ERISA claims involving intoxicated drivers?
> A. Yes.
> Q. Since this policy change seven or eight years ago, have you continued to pay ERISA claims involving intoxicated driver [sic]?
> A. We have never paid.
> Q. Since that seven or eight-year-time period?
> A. Yes.

35

(*See* Exhibit H at 24). The defendant, Bankers Life and Casualty Company, has not even offered competent evidence demonstrating that Peter Glynn's death was caused by his driving with an elevated blood alcohol level. (*See supra* part III.).

The defendant admits that in non-ERISA plans, the first step in deciding whether to deny benefits is to look at the exclusions of the policy, and that no exclusion for deaths resulting from driving while intoxicated was involved in the decedent's policy. (*See* Exhibit H at 91). However, the defendant fails to follow such procedure when an ERISA plan is involved.

> Q. When you had a claim come in that involved an intoxicated driver such as this one that was not an ERISA claim, would you seek the advice of legal back in the time period of 2001-2002?
> A. Depending on circumstances, sometimes yes, sometimes no.
> Q. Okay. You would be concerned that the circumstances might fall within one of the listed exceptions, correct?
> A. Yes.
> Q. Or exclusions?
> A. Yes.
> …
> Q. And is it true that none of these exclusions apply to Mr. Glynn's claims?
> A. That's correct.

(*See* Exhibit H at 90-91).

The defendant, Bankers Life and Casualty Company, through its corporate designee, admits that once it was established that the decedent had an elevated blood alcohol content, Bankers Life and Casualty Company did not consider the payment of the benefits of this accidental death policy to the plaintiff. (*See* Exhibit H at 32). In

36

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

fact, other than the blood alcohol percentage of the decedent, no other facts, including those related to the cause of the accident, were necessary in its determination, according to the defendant. (*Id*).

*Cozzie* itself, despite holding that, in that particular case the decedent's death was not accidental, does not support the actions of the defendant. The defendant currently denies claims for deaths resulting from a decedent's driving with an elevated blood alcohol content on such fact alone in ERISA plans. (*Id*). This despite the fact that no policy exclusion is included for driving while intoxicated. (*Id* at 90-91). *Cozzie* cautioned insurance companies, as the drafters of policies, against relying on exclusions not expressed in the contract for insurance. 140 F.3d at 1111. The defendant, Bankers Life and Casualty Company, denies claims, relying on an exclusion, allegedly provided by federal common law under ERISA, that is not included in the decedent's policy, which Bankers Life and Casualty Company drafted. If the defendant did not wish to pay benefits in circumstances such as this, it had the power to add an exclusion to its policies. *See, e.g., Cozzie*, 140 F.3d 1111; *Todd*, 47 F.3d at 1456-57.

Further, a direct conflict of interest existed in this case. The defendant, Bankers Life and Casualty Company, was acting as both the insurer and the administrator of the decedent's plan; therefore, the defendant had an incentive to deny the plaintiff's claim. Although the existence of a conflict of interest does not determine which standard of review to use in reviewing an administrator's denial

37

of benefits, such a conflict is a factor in determining whether there is an abuse of discretion. *See Firestone v. Bruch*, 489 U.S. at 115.

The defendant's corporate designee, at the time he denied the plaintiff's claim, defined an "accident" as something unforeseen or unexpected, (*See* Exhibit H at 93), and Mr. Krol agrees that the decedent did not intend, nor likely foresee his death on the night of his accident. (*Id* at 103-104). The defendant pays claims under the same factual circumstances as the decedent's death under policies with the same language as the decedent's policy, which are not covered by ERISA. (*Id* at 24). The defendant to this date has not offered competent evidence which demonstrates that Peter Glynn's death was caused by his elevated blood alcohol content. Further, the defendant, while acting under a direct conflict of interest, denied the plaintiff's claim for benefits without, any statistical evidence demonstrating that the probability or likelihood of the operator of a motor vehicle with an elevated blood alcohol level of being killed in a motor vehicle accident is highly likely. (*See* Exhibit H at 103-104). However, the plaintiff offered expert statistical proof that the decedent's death was about one in a million. (*See* Exhibits I and J). Further, even while agreeing that the decedent did not likely foresee his death, and without any statistical evidence that his death was highly likely or probable, the defendant denied the plaintiff's claim for benefits. The denial was based solely on the decedent's blood alcohol level. Under either standard of review, the defendant's decision cannot be upheld.

38

## VI.   CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests that the defendant's Motion for Summary Judgment be DENIED.

PLAINTIFF,

By_____
Everett H. Madin, Jr.
Federal Bar No.: CT 12297
RISCASSI & DAVIS, P.C.
131 Oak Street
Hartford, CT 06106
Ph: 860-522-1196
Fax: 860-246-5847

### CERTIFICATION

This is to certify that a copy of the foregoing was mailed via First Class Mail, postage pre-paid, on this 1st day of September, 2004 to the following counsel of record:

John Shaban, Esq.
Whitman, Breed, Abbott & Morgan
100 Field Point Road
P O Box 2250
Greenwich, CT 06830

Andrew Muscato, Esquire
Skadden, Arps, Slate, Meagher, & Flom, LLP
Four Times Square
New York, NY 10036-6522

_____
Everett H. Madin, Jr.

39