UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PHILIP GLYNN,<br>Plaintiff | :<br>:<br>: |
| v. | :      Civil No. 3:02CV1802(AVC) |
| BANKERS LIFE AND CASUALTY<br>COMPANY,<br>Defendant | :<br>:<br>:<br>:      JULY 12, 2004 |

## AFFIDAVIT

The undersigned being duly sworn, hereby deposes and says:

1. I am of legal age and I believe in the obligation of an oath or affirmation.

2. I make this affidavit based upon my personal knowledge, my technical investigation of the accident, my evaluation of physical evidence, and the opinions I have formed.

3. I have a Bachelor of Science in Mechanical Engineering, which I obtained from the University of New Haven in 1971.

4. I am a licensed Professional Engineer in the State of Connecticut.

5. I am currently a member of Spectrum Engineering Group, LLC, with offices located at 1111 South Main Street in Cheshire, Connecticut.

6. As part of my work I have conducted technical investigations of many motor vehicle collisions and accidents, and I am experienced in the area of motor vehicle accident reconstruction.

7. I have testified in numerous court and arbitration proceedings on the subject of motor vehicle collisions and accident reconstruction; I have been permitted by the court to offer my opinions as an expert witness.

8. In the above-captioned matter, I was disclosed by the plaintiff as an expert witness on October 24, 2003.

9. Prior to that date, I performed a technical investigation and evaluation of the above-captioned accident. As part of my work I reviewed numerous materials pertaining to the accident, including the Police Accident Report prepared by the Bristol Police Department and their Serious Traffic Accident Reconstruction Team. Also reviewed were photographs and a survey of the roadway with physical evidence, generated as part of the police investigation. I also reviewed climatological data, technical specifications for the 1995 Mazda Miata convertible involved in the accident, and specifications relating to the vehicle and its relative stability. I have also reviewed drawings for the roadway published by the Bristol City Engineer's office, and evaluated both horizontal and vertical geometry. Further, I have personally inspected the accident scene and evaluated such issues as line of sight, the posted speed limit and the effects of roadway geometry upon running speed. Further, I have made reference to published standards for roadway geometry relating it to design speed, as well as other publications relating to motor vehicle dynamics.

10. As a result of my technical investigation and evaluation, I prepared an "Engineer's Report" which discussed my findings and opinions. This Report was dated July 29, 2003 and was provided to the plaintiff. It is my understanding that a copy of this Engineer's Report was also provided to the defendant on or about October 24, 2003.

11. The 1995 Mazda Miata convertible, in both its standard and MX-5 models, has a published tipover stability ratio of 1.41 to 1.43; this would categorize the automobile as "stable" with respect to tipover propensity.

12. I have formed the opinion that had the tires of the involved automobile not struck the curb on the north side of Wolcott Street during the accident events, it is probable that the vehicle would not have tipped over; rather, it probably would have continued to sideslide to a position of rest.

13. I have also formed the opinion that had the automobile not overturned as a result of this curb strike, it is probable that the plaintiff's decedent's loss of control of his vehicle, and the ensuing dynamics of its movements, would have been survivable.

14. According to the investigation conducted by the Bristol Police Department, the plaintiff's decedent was belted into the vehicle with its occupant restraint system at the time the accident occurred.

15. Based upon available surveys for the roadway, along with my own inspection and test driving of the roadway, I have concluded that this portion of Wolcott Street where the accident events initiated was characterized by both horizontal and vertical geometrical characteristics

which substantially restricted the ability of a motor vehicle to be operated on this roadway at speeds even modestly in excess of the posted speed limit. For the curve that the plaintiff's decedent was attempting to traverse before physical evidence relating to the accident was produced, widely published and accepted national standards establish the "design speed" as 30 miles per hour. The roadway itself is posted for 25 miles per hour, which is a value of only 5 miles per hour less than the design speed. Irregularities in both the horizontal curvature and the vertical geometry of the roadway in this area further contribute to the difficulty a motorist experiences in negotiating the curve at even slightly higher speeds. A sight distance limitation also exacerbates the potential hazards associated with negotiating the curve at speeds which are even slightly higher than the posted speed limit.

16. Given these characteristics and limitations, then, I have formed the opinion that with even moderate incremental increases in running speed above the posted speed limit of 25 miles per hour, there is a disproportionate increase in the potential for loss of vehicular control.

17. If one is traversing a curve to the right at a speed sufficient to cause sidesliding, the ensuing "yaw" marks upon the roadway will be also curved to the right, in a clockwise direction. The yaw marks produced by the plaintiff's decedent's automobile, however, curve to the left in a counterclockwise manner. These tire marks are indicative of a hard left steering maneuver by plaintiff's decedent.

18. In that these counterclockwise yaw marks were not preceded by clockwise yaw marks indicative of an initial loss of vehicular control followed by an overcorrection, the specific cause for the plaintiff's decedent's hard left steering input necessary to produce the counterclockwise yaw marks, cannot be ascertained through technical investigation.

19. Among the potential causes for the plaintiff's decedent's hard left steering input are the presence of an object in the roadway ahead, the movement of a person or animal into the roadway ahead, and the encroachment or presence of another motor vehicle into or in the roadway ahead. It is known, for example, that there was another motor vehicle in the area where the accident occurred, approaching from the opposite direction. Among the various scenarios of possible events which led to plaintiff's decedent initiating a hard left steering input, would have been the presence of an oncoming westbound vehicle which was either in or encroaching upon plaintiff's decedent's travel lane, or perceived by plaintiff's decedent to be doing so. The unexpected presence of an approaching automobile, given the sharp nature of the curve to the right and the limitation of sight distance associated with it, could also have been a factor causing or contributing to plaintiff's decedent's decision to introduce a steering input to the left.

20. In my opinion, the initiation of a hard steering maneuver to the left in this location by plaintiff's decedent, is consistent with there having been a stimulus which prompted him to initiate a steering response of this type.

21. I have reviewed the definitions given for the term "accident" in Random House Webster's College Dictionary, copyrighted in 2000 by Random House, Inc. Published definitions for the term include "an undesirable or unfortunate happening that occurs unintentionally and usually results in injury, damage, or loss," and "any event that happens unexpectedly, without a deliberate plan or cause." These definitions are consistent with my own understanding and application of the term in my work.

22. Based upon my extensive technical investigation into the plaintiff's decedent's accident and my evaluation of the available physical evidence, I have formed the opinion that the event which led to plaintiff's decedent's loss of life was an "accident" and satisfies the definitions for this word as set forth above.

Michael F. Miller, P.E.

Subscribed and sworn to, before me, at Cheshire, CT this day of July 16, 2004.

Notary Public
My commission expires:

DIANE AUDET
NOTARY PUBLIC
MY COMMISSION EXPIRES SEP. 30, 2007