# Exhibit 1



U.S. Department
of Transportation

## National Highway
## Traffic Safety
## Administration

# Computing a BAC Estimate

Office of Program Development and Evaluation
National Highway Traffic Safety Administration
400 Seventh Street, S.W.
Washington, D.C. 20590

October, 1994

## Computing a BAC Estimate

According to a recent survey, most Americans think that drivers should not drink alcohol and then drive.
[1] Nonetheless, our legal system generally relates certain offenses to the amount of alcohol detected in a
driver's body. The amount of alcohol is usually referred to as BAC -- blood alcohol concentration --
although it is often measured in the breath where the alcohol level in the water vapor of the breath
follows the alcohol level in the blood.[2]

BAC is highly related to the amount of alcohol consumed over time. However, BAC is also influenced
by other factors and the complex relationship makes it difficult for people to easily estimate BACs. For
example, what is the BAC of a 125 pound woman, who is not an experienced drinker, who has four
beers over two hours?

When legislators debate bills that reference particular BACs, statements are often made regarding how
much drinking would be, and would not be, permitted prior to driving. Until now, expert testimony
would be required to confirm or deny such statements.

Recent work, conducted as a part of a report to Congress on alcohol limits for drivers[3], provided the
basis for a useful tool that enables anyone with access to a personal computer to look up an estimate of
BAC based on a person's weight, gender, number of drinks consumed, and time for which one is asking
that the estimate be made. It should be understood that what results is an estimate because we calculate
the BAC based on average values, for example, the amount of water in the body and in the blood, the
average metabolism rate for a population, etc. The value estimated will certainly be correct for most

individuals sharing characteristics placed into the computation, but may be greater or lesser depending on individual factors of which we do not have knowledge.

The estimate of BAC should not be used by individuals to decide whether or not to drive after drinking -- impairment can result from any amount of alcohol. However, it does provide the best available approximation of the number of drinks it takes for individuals to reach specific BACs.

## Basis for Calculating the BAC Estimate[4]

The basic formula for estimating a person's blood alcohol concentration derives from the work done by Widmark in the early 1930s[5]. Advancements in this technical area have lead to refinements in Widmark's basic calculation formula. The particular formula used here incorporates a BAC calculation procedure provided to the National Highway Traffic Safety Administration courtesy of Herbert Moskowitz, Ph.D., a noted alcohol researcher.

The basis for the calculations are the established physiological facts that alcohol distributes itself in the total water of the body, and that it is disposed of primarily by metabolism in the liver. The procedure takes into account the amount of body water in males and females, and the range of metabolic rates to be found in the population. The procedure, along with a work example, is presented below.

Alcohol concentration is defined in terms of the weight of ethanol (Ethyl alcohol) in a volume of blood or breath. In the United States the typical measure is grams of ethanol in 100 milliliters of blood or in 210 liters of breath and is reported as, for example, .10 percent or .10.[6]

The procedure by which one calculates how to convert a dose of alcohol into a probable blood alcohol concentration proceeds in several steps:

1) After absorption, alcohol is eventually distributed in the total water in the body. Begin by calculating the amount of water in the subject. On average, males have 58 percent of their body weight as water and females have 49 percent of their weight as water. To find the amount of water in an individual of given weight, one multiplies the body weight in kilograms by the gender percentage and obtains the amount of weight of the water in kilograms (one kilogram equals 2.2046 pounds). A kilogram of water occupies one liter, one can easily convert from weight to volume of water. For example, consider a 128-pound male of age 25. One hundred and twenty eight pounds divided by 2.2046 converts pounds into 58.06 kilograms, which is his kilogram weight. (The BAC Estimator program makes the conversion automatically.)

2) To find the total body water, multiply the 58.06 kilograms times .58 (58% of body weight). This equals 33.675 kilograms of water, which occupies a volume of 33.675 liters or 33,675 milliliters.

3) The next step is to inquire what concentration in water will occur when a given dose of alcohol is administered. Assume that the dose is one ounce of pure alcohol (i.e., 200 proof). One ounce of alcohol equals 29.57 milliliters. Since alcohol has a specific gravity of .79, the 29.57 milliliters will weigh 23.36 grams.

One ounce of alcohol (i.e., 23.36 grams), absorbed into a 128-pound male's total body water, produces an alcohol concentration in water of 23.36 grams divided by 33,675 milliliters, i.e., .0006937 grams alcohol per milliliter of body water.

4) We now find the alcohol concentration in the blood. On average, blood is composed of 80.6 percent water. Therefore, the .0006937 grams alcohol per milliliter of water is multiplied by .806. This results in .000559 grams alcohol per milliliter of blood (this is because each milliliter of blood only has .806 milliliters of water).

5) The result, 0.000559 grams alcohol per milliliter blood, equals 0.0559 grams alcohol per 100 milliliters blood. This is also described as grams per deciliter (i.e., per 1/10 liter of blood), or also as .0559. It should be noted that our calculations are based on average characteristics for individuals. While .58 is the mean water body weight percentage of males and .49 is the mean water weight percentage of females, individuals vary with respect to this figure. Younger people have a higher proportion of body water as a fraction of their total weight, and older people have less. Overweight individuals have a smaller proportion of their body weight as water, and lean people have a larger fraction of their body weight as water. In most cases, this variability will produce a small fraction as error in calculating BAC. Another source of variation is the amount of water in the blood which we have estimated as averaging 80.6%, but it varies as a function of several factors including the red blood cell concentration measured by the hemocrit. But again, .806 is the average value, and deviations typically are small.

Water body weight percentage is the percentage of total body weight composed of water. This is not the same as Widmark's "R" factor. The "R" factor is a complex empirical measure that takes into account both body water percentage and water concentration in blood.

6) We have calculated the theoretical instantaneous BAC for one ounce of alcohol. To adjust this calculation for the actual content of alcohol in a drink, one multiplies the number of ounces of alcohol in the drink by the figure for BAC per one ounce alcohol. An example might be a 12-ounce can of beer drunk by the 128-pound male. Assuming that the concentration of alcohol in the beverage is 4.5 percent by volume, one multiplies the 12 ounces in the beer can times .045 and determines that the can contains .54 ounces of alcohol. Therefore, the theoretically peak instantaneous BAC produced by a single can of beer in our 128-pound male would be .54 times .0559 (the BAC produced by one ounce of alcohol) equalling .0302.

7) The final factor to take into account is the metabolism or burnoff. Alcohol is metabolized from the time that ingestion begins. It takes but a few seconds for alcohol to reach the liver and for metabolism to commence after drinking. Thus, metabolism is occurring during the period that alcohol is being absorbed and distributed throughout the body. To determine the actual blood alcohol level at any given time, we must decrease the theoretical instantaneous peak BAC by the amount of alcohol metabolized from the beginning of drinking. As an example, let us take the 128-pound male who has consumed one can of beer and determine what his likely BAC level would be at the end of one hour. We have already determined that if all the alcohol that he consumed were instantaneously distributed throughout the body, he would have a blood alcohol level of .0302. Now, however, one hour has passed, during which metabolism has occurred. There is considerable variation in metabolism rate. While there are several factors that determine metabolism rate, the prime factor is the recent drinking history since the metabolism rate is determined by the production of an enzyme in the liver which generates more enzymes if over a period of time (usually several months) it is called upon to process frequent/large quantities of alcohol.

Although the average metabolism rate for moderate drinkers produces a .017 per hour decline in BAC level (here termed "Average"), and the average metabolism rate for heavy drinkers (who consume 60 drinks or more in one month) produces a .02 per hour decline (here termed "Above Average"), the range of metabolism rate in the population can go above .040 and below .010. One can either utilize in the calculation the average (.017 per hour decline) metabolism rate, or if one wished to use a very

conservative figure, (which less than 20 percent of the population would exhibit), one could use .012 per hour decline (here termed "Below Average") [Note: the BAC Estimator program provides BAC estimates for above average, average, and below average metabolism rates automatically. These three categories of metabolism rate closely approximate a drinker's recent drinking pattern, i.e., frequency and quantity of consumption.]

If we wish to be sure that we can determine when our blood alcohol concentration level has returned to zero, it might be well to use this very conservative (below average) figure. Thus we take the .0302 BAC and subtract .012 for one hour of metabolism and calculate that the estimated BAC at the end of one hour is .0182 for a 128 pound male who has drunk a 12 ounce can of beer containing 4.5 percent alcohol by volume, assuming a conservative metabolic rate of .012 per hour. (The BAC Estimator program rounds-off BAC estimates to two decimal places, thus it would report a calculated BAC of .0182 as .02.)

Example:

Find the BAC for 128 lb. male drinking 12 oz. beer (4.5 percent alcohol by volume) in one hour's time.

A. Convert pounds to kilograms: 128lbs ÷ 2.2046 = 58.06 kg.

B. Find total body water: 58.06 kg. X .58 = 33.675 liters or 33,675 milliliters water

C. Determine the weight in grams of 1 oz. alcohol:

29.57 ml/oz X .79 g/ml = 23.36 grams/oz

D. If we put 1 oz. of alcohol into the subject's total body water, we would have grams of alcohol/ml. of water, e.g.,

23.36 grams ÷ 33,675 milliliter = .0006937 grams alcohol/ml of water

E. We now want to find the alcohol concentration in the blood. Blood is composed of 80.6 percent water; therefore, .0006937 X .806 = .000559 grams alcohol/milliliter blood.

F. Instead of grams alcohol per milliliter blood, we need the figure in terms of grams per 100 milliliter, also known as grams percent. Multiply the .000559 grams alcohol/ milliliter blood by 100, i.e., .000559 grams per milliliter X 100 = .0559 grams alcohol per 100 milliliters, or .0559.

(This is the BAC which 1 oz. of alcohol would produce in a 128 lb male if there were instantaneous consumption, absorption, and distribution of the alcohol throughout the body.)

G. To adjust for the actual amount consumed, one multiplies the above figure by the amount of alcohol in the beverage consumed. Thus, if the 128 lb. male described above consumed a single 12 oz. can of beer containing 4.5 percent alcohol by volume, he would have consumed 12 oz. X .045 = .54 oz. of alcohol. Since 1 oz. of alcohol would produce a BAC of .0559 and .54 oz. of alcohol has been consumed, the actual alcohol level would be .0559 x .54 = .030 BAC for one can of beer.

H. In real life, time must pass for the consumption, absorption, and distribution of alcohol throughout the body. Therefore, we calculate what the actual BAC level would be at the end of one hour after consuming the single can of beer. During this period, the body would have disposed of alcohol through metabolism at a rate characteristic of that individual, primarily his recent frequency and quantity of

drinking. Utilizing a conservative (below average) metabolism rate of .012 per hour, we can calculate the BAC level as .0302 - .012 per hour X 1 hour = .0182 BAC at the end of one hour for our 128 lb. male who drank 1 can of beer. (As noted above, the BAC Estimator program rounds-off BAC estimates to two decimal places, thus it would report a calculated BAC of .0182 as .02.) Note that the time of metabolism is calculated from the beginning of drinking, not when the consumption is completed.

1. National Survey of Drinking and Driving Attitudes and Behavior, draft report, Department of Transportation, 1993.

2. "BAC" refers to either blood alcohol concentration, stated as grams per 100 milliliters of blood, or breath alcohol concentration, stated as grams per 210 liters of breath.

3. Driving under the Influence: A Report to Congress on Alcohol Limits. October, 1992. U.S. Department of Transportation.

4. This procedure was published in Appendix I of Driving under the Influence: A Report to Congress on alcohol limits. October, 1992. U.S. Department of Transportation.

5. Widmark, E. Die theoretischen grundiagen und die praktische verwendbarkeit der geriehtlich-medizinishen alkoholbestimmung. 1932. Berlin: Urgan and Schwarzenberg.

6. "Percent" in U.S. toxicological circles means grams per 100 milliliter; this is a weight per volume measure and does not carry the usual meaning of percentage. In this report, BAC is defined as either blood alcohol concentration, stated as grams per 100 milliliters of blood or as breath alcohol concentration, stated as grams per 210 liters of breath, and is reported without a "%" sign.

# Exhibit 2



# NJC COURSES



## DUI Primer for New Judges: Impaired Driving Case Fundamentals

### October 26 - 27, 2005
Reno, NV

How to enroll
Download applicat

Tuition: $550.00
Early Discount: $500.00 by 07/28/2005
Conference Fee: $115.00

**Course Description:**
DUI cases can often be quite complex. After attending this course, participants will be able summarize the substantive Fourth and Fourteenth Amendment questions regarding search seizure and arrest issues; identify the circumstances under which a police officer may lega stop a car, detain a driver and search the driver, passengers and vehicle; assess and rule confidently on the admissibility of evidence including pretrial statements, admissions, physical and non-verbal evidence; recognize the elements of a constitutionally valid guilty plea and administer such pleas effectively; summarize the principles and applications of pharmacology as they relate to intoxicated drivers; evaluate the results of field sobriety tes and motions to exclude them; evaluate expert testimony about pharmacology and sobriety testing; converse intelligently regarding some of the scientific principles that serve as foundations for the admissibility of evidence in impaired driving cases, such as: horizontal gaze nystagmus, retrograde extrapolation, Widmark's formula, blood/breath partition rates and infrared spectrometry; and recognize the challenges of DUI case management and develop strategies to deal with them. The course will also include a sentencing workshop i which participants will review sentencing parameters and options, including fines, incarceration, license revocation and probation conditions such as evaluation, treatment, abstinence and restitution.

**This course is offered on the following dates:**

10/26/2005   DUI Primer for New Judges: Impaired Driving Case Fundamentals*   Reno, NV

Note: * denotes course is currently displayed above.

## Sidebar

Home
Chronological Listing
2004 Courses
2005 Courses
Alphabetical Listing
General Course Info
Scholarships
Accommodations
Professional Certificate
Judicial Studies Program
Special Programs





| « | October 2004 | | | | | » |
|---|---|---|---|---|---|---|
| Su | Mo | Tu | We | Th | Fr | Sa |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |
| 31 | | | | | | |

**Reno, NV**
**79 °F / 26 °C**



Humidity: 19%
Press: 30.10 inches
Wind: SE at 6 mph
2004.10.06 2056 UTC

2003 © The National Judicial College  |  Webmaster



# Exhibit
# 3

# Loislaw Federal District Court Opinions

SPENCER v. CITY OF BAY CITY, (E.D.Mich. 2003)

JAMIE SPENCER, Plaintiff, v. CITY OF BAY CITY, Defendant

Case Number 02-10280-BC

United States District Court, E.D. Michigan

November 18, 2003

### OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT, AND DENYING DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

DAVID LAWSON, District Judge

This case involves a challenge to the constitutionality of a Bay City, Michigan ordinance that allows police officers, upon reasonable suspicion, to demand that a person who has not reached 21 years of age take a breath test, without first having obtained a search warrant. This matter is before the Court on the plaintiff's motion for partial summary judgment and on the defendant's motion to dismiss or for summary judgment. The parties agree that a preliminary breath test constitutes a "search" within the meaning of the Fourth Amendment. The Court finds that the purpose of the authorization contained in the ordinance is to gather evidence of a criminal violation, and thus concludes that the ordinance's blanket authorization of warrantless searches is repugnant to the Fourth Amendment to the Constitution. The defendant's motion to dismiss or for summary judgment, therefore, will be denied, and the plaintiff's motion for partial summary judgment will be granted.

I.

Page 2

The local ordinance that is the focus of this litigation is Section 10-57 of the Bay City Code of Ordinances (B.C. Ord. § 10-57). That ordinance makes unlawful the attempt or actual purchase, possession, and consumption of alcoholic beverages by persons under 21 years of age. The ordinance declares such conduct a misdemeanor and establishes a schedule of fines and other sanctions for first and subsequent convictions. B.C. Ord. § 10-57(a). The ordinance also punishes any person who furnishes alcohol to a minor, and directs the Michigan Secretary of State to suspend the driver's license of violators. *Id.* § 10-57(b), (d). There is also a provision requiring the notification of parents in certain circumstances, *id.* § 10-57(f), and there are exceptions set forth as well. *Id.* § 10-57(g), (i), (j), (k). The subsection called into question in this case is Subsection (e), which states:

A peace officer who has reasonable cause to believe a person less than 21 years of age has consumed alcoholic liquor may require the person to submit to a preliminary chemical breath test analysis. A peace officer may arrest a person

based in whole or in part upon the results of a
preliminary chemical breath analysis. The results
of a preliminary chemical breath analysis or other
acceptable blood alcohol tests are admissible in a
criminal prosecution to determine whether the
minor has consumed or possessed alcoholic liquor.
A person less than 21 years of age who refuses to
submit to a preliminary chemical breath test
analysis as required in this subsection is
responsible for a state civil infraction and may
be ordered to pay a civil fine of not more than
$100.00.

B.C. Ord. § 10-57(e), Pl.'s Mot. S. J., Ex. A. This subsection of
the ordinance is patterned after a similarly-worded Michigan statute,
see Mich. Comp. Laws § 436.1703(5), which the plaintiff does
not challenge here. The parties agree that a Bay City police officer
demanded that the plaintiff submit to a breath test on the authority of
the local ordinance.

At about 6:30 p.m. on August 20, 2001, the plaintiff, Jamie Spencer,
who was 19 years old at the time, left work and drove to the home of her
fiance, Van Spencer. The two discussed going to a location in Bay City to
"roller blade," and invited Ashley Ball, Van Spencer's cousin, and
**Page 3**
Timothy Kolka, the plaintiff's friend, to join them. Spencer Dep.
at 10, Pl.'s Mot. S. J., Ex. D. The plaintiff, Van Spencer, and Ball
drove to Bay City in Van Spencer's car and parked at the Veterans
Memorial Park in downtown Bay City, arriving at approximately 8:30 p.m.
Ibid. At the park they met Kolka and two of Kolka's friends,
Eric Tweddle and Matt McDaniel. Id. at 16. All six individuals
left the park and went roller blading around the city. At approximately
11:30 p.m., they returned to the park. Id. at 16-17.

Shortly thereafter, Bay City police officers Rod Schanck and Brian
Schroer were dispatched to the park after the police received a report of
a disturbance and a possible fight near the boat launch area. Schroer
Dep. at 11, Def.'s Mot. S. J., Ex. 2. Officer Schanck arrived at the park
at approximately 12:03 a.m. on August 21, 2001. Def.'s Mot. S. J., Ex. 1
(Police Report). Upon entering the park, he observed an individual on
roller blades, later identified as Eric Tweddle, standing next to two
vehicles near the park entrance. Schanck said that Tweddle appeared to be
a juvenile. He also noticed two other vehicles parked near some tennis
courts in the park and four individuals, later identified as the
plaintiff, Van Spencer, Ball, and Kolka, standing next to those vehicles.

Schanck drove around the park and, after not finding any evidence of a
disturbance, returned to the entrance way where Tweddle was still
standing. The two vehicles that were near the entrance way had departed
by this time. Schanck testified that he approached Tweddle to inform him
that the park closed at 10:00 p.m., and as he did, he "could smell a lot
of intoxicants" coming from Tweddle. Schanck asked Tweddle if he had been
drinking. Schanck Dep. at 20, Def.'s Mot. S. J., Ex. 3. Tweddle denied
that he had been drinking; Schanck then read him his preliminary breath
test
**Page 4**
(PBT) rights from a laminated card that Bay City police officers
customarily carry with them. Upon being read his rights, Tweddle agreed
to take a breath test.

Schanck explained that standard PBT protocol requires that an officer engage in a 15-minute "observation period" before taking a breath sample, during which the officer monitors the individual and checks the individual's mouth to make sure nothing is inside that would block the test or damage the machine. *Id.* at 20-21. Consequently, Schanck placed Tweddle in the back of his patrol car to wait before he administered the PBT.

While Tweddle was sitting in the back of the patrol car, Officer Schroer arrived at the park. With Schroer next to him, Schanck administered the PBT to Tweddle. The test revealed that Tweddle had a .09% blood-alcohol concentration level. *Id.* at 20. Schanck wrote Tweddle a citation for violating B.C. Ord. § 10-57(a). The officers then asked Tweddle if he knew the four individuals that were standing next to the cars parked by the tennis courts. Tweddle said that he had arrived at the park with those individuals. *Id.* at 22. The officers left Tweddle in the patrol car and walked over to the group to talk to them. Schanck testified as follows:

Q. You certainly did not believe that you had reason to believe that everybody standing in that group had consumed alcohol because Mr. Tweddle had flunked a PBT, do you?

A. Well, normally if you have a group of kids that are together and if one of them's been drinking, it's reasonable to consider that all of them may have been.

Q. You considered it a reasonable inference?

A. Yes, yes.

Q. So part of your purpose in approaching the group was simply because Eric Tweddle has said he had come with these people you intended to go over and see if there was any other evidence of alcohol among that group?

A. That was part of our reason for going over there.

Q What other part or parts did you have in approaching this group?

A. Well, we — they were in the park after the curfew. I wanted to speak to them about that. And we also wanted to inquire about if they saw the fight, if there was a fight if they were involved or anything to do with the fight.

**Page 5**

*Id.* at 23-24.

The group, consisting of the plaintiff, Van Spencer, Ball, and Kolka, told the officers that they had no knowledge of a fight. Officer Schroer testified at this deposition that "in speaking with the group I recall observing or smelling an odor of intoxicants coming from one of the

individuals or possibly the group, it was tough to tell being as it was
they were lined up in front of us and we were speaking to them." Schroer
Dep. at 15, Def.'s Mot. S. J., Ex. 2. Schroer also testified that there
was no alcohol visible. *Id.* at 19. The officers then asked the
group for identification and Officer Schroer ran their names through the
Law Enforcement Information Network (LEIN) system to check for "wants and
warrants." *Id.* at 16-17. The system reported that Timothy Kolka
had an outstanding warrant for failure to appear in court. *Id.*
at 17. The other individuals did not have any outstanding warrants.

Meanwhile, Officer Schanck read the plaintiff, Ball, and Kolka their
PBT rights. Van Spencer was not read these rights as it was determined
from his identification card that he was 21 years old. Schanck Dep. at
21, Def.'s Mot. S. J., Ex. 3. Schanck testified as follows:

> Q. Do you recall any of the people out of the
> group specifically asking you what happens if we
> refuse to take [the PBT] or what happens if we
> don't take it?
>
> A. I remember being asked that, yes. I don't
> recall which ones asked it. I think it was kind of
> a group question.
>
> Q. Okay. And when that sort of question was posed
> what answer did you give to it as to what the
> consequences were for refusing to blow into the
> PBT?
>
> A. I explained to them that they would be given a
> ticket with a civil infraction where the fines
> were up to a hundred dollars.
>
> Q. Was there any implication in your response that
> they could be arrested for fusing to take it?
>
> A. No.

*Id.* at 27-28.
**Page 6**

The plaintiff and Ball agreed to take the PBT and both "registered
negative" for alcohol consumption. *Id.* at 29. Kolka, however,
refused to take the PBT. After Schroer told Schanck that Kolka had an
outstanding warrant, the officers attempted to arrest Kolka. Kolka
resisted and Officer Schroer, in attempting to place handcuffs on Kolka,
struck Kolka in the leg with his knee several times until Kolka finally
permitted the handcuffs to be placed on him. The plaintiff and the others
in her group voiced their objections to the police officers' conduct and
Schroer took out his pepper spray in response. The group quickly calmed
down. Schroer Dep. at 25, Def.'s Mot. S. J., Ex. 2. Kolka was given
citations for refusal to take the PBT, being a minor in possession of
alcohol, and for being in the park after 10 p.m. *Id.* at 20.

After Kolka was taken into custody, the officers returned the
identification cards and told the plaintiff, Van Spencer, and Ball that
they were free to leave. The officers did not issue any citations to the
three individuals for being in the park after it closed. *Id.* at
26. The plaintiff testified that the entire encounter lasted "anywhere

from 45 minutes to an hour and 15." Jamie Spencer Dep. at 33, Pl.'s Mot.
S. J., Ex. D. Officer Schroer estimated that the entire incident lasted
20 to 25 minutes. Schroer Dep. at 21, Def.'s Mot. S. J., Ex. 2. However,
90 minutes elapsed from the time the officers arrived in the park until
they left the park. *Ibid.*

The police officers stated that the practice of demanding PBT's from
persons under 21 years of age is consistent with municipal policy.
Officer Schroer testified as to his understanding of the City's policy as
follows:

Q. And in general, what was your understanding of
the basis on which you could require an individual
whom you knew was under the age of 21 to be
required to submit to a preliminary breath test?

A. With reasonable cause of knowing the person is
under age, having reasonable cause to believe they
have consumed or possess alcohol, therefore,
you're permitted, so to speak, to offer the PBT
test.

**Page 7**

Q. And according to your training what is the
consequence of a refusal?

A. Refusing to submit to the PBT is a civil
infraction, a fine of up to one hundred dollars.

Q. And it was your understanding from your
training that there was no consequence of
arresting the individual if they refused a PBT
test?

A. They — we were not to arrest at all.

Q. Also was it the standard policy of the
department that if an individual flunked a PBT
test, or let us say registered positive for
alcohol, they were to be issued a citation?

A. Right. By you saying flunked you mean over
point zero two or higher?

Q. Yes.

A. Yes, they would be issued a citation or if they
were a juvenile they would be — we don't
issue citations to juveniles. A petition request
is completed.

Q. That would go to the probate court?

A. Yes.

*Id.* at 8-9.

The plaintiff filed her complaint in this Court on the basis of
42 U.S.C. § 1983, alleging that Section 10-57(e) of the Bay City Code of

Ordinances is unconstitutional, as is Bay City's policy and practice
requiring individuals who are twenty years old or younger to take
"breathalyzer" tests to measure alcohol consumption without first seeking
a search warrant. In addition to a declaration of the unconstitutionality
of the ordinance and the City's policy and practice, the plaintiff seeks
a declaration that her Fourth Amendment rights were violated, money
damages, and costs and attorney fees under Section 1988. The parties
filed their cross motions for dispositive relief, and the Court heard
oral argument on the motions on October 8, 2003.

II.

Both the plaintiff and the defendant have moved for summary judgment;
neither has argued that there are material facts in dispute. Rather, each
party claims entitlement to a judgment in its
**Page 8**
favor as a matter of law. "By its very nature, a summary judgment
does not involve the determination of disputed questions of fact, but is
confined to purely legal issues." *Eisenmann Corp. v. Sheet Metal
Workers Intern. Ass'n Local No. 24, AFL-CIO*, **323 F.3d 375**, 380 (6th
Cir. 2003) (citing Fed.R.Civ.P. **56**(c) (summary judgment may be granted
only if "there is no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law") and
*Celotex Corp. v. Catrett*, **477 U.S. 317**, 322 (1986)). The Court
must view the evidence and draw all reasonable inferences in favor of the
non-moving party, and determine "whether the evidence presents a
sufficient disagreement to require submission to a jury or whether it is
so one-sided that one party must prevail as a matter of law."
*Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242**, 251-52 (1986).
When the "record taken as a whole could not lead a rational trier of fact
to find for the nonmoving party," there is no genuine issue of material
fact. *Simmons-Harris v. Zelman*, **234 F.3d 945**, 951 (6th Cir.
2000). When this Court evaluates cross motions for summary judgment, it
"must evaluate each motion on its own merits and view all facts and
inferences in the light most favorable to the nonmoving party."
*Westfield Ins. Co. v. Tech Dry, Inc.*, **336 F.3d 503**, 506-07 (6th
Cir. 2003).

It is undisputed that the defendant's police officers demanded a breath
sample from Jamie Spencer in accordance with the City's policies and
practices; that policy is reflected in the ordinance, which authorizes
police officers to take breath samples from persons under 21 years of age
without first obtaining a warrant issued by a judicial officer allowing
them to do so. The City defends this practice by claiming that the
so-called "special needs" exception excuses the requirement for a search
warrant, and the searches are reasonable because they are based on
reasonable suspicion. The City also contends that the warrantless
searches called for by the ordinance are justified by exigent
**Page 9**
circumstances, due to the length of time required in Bay City to
obtain a search warrant for breath samples.

It is well established that the taking of a breath sample to test for
the presence of alcohol constitutes a search under the Fourth Amendment.
*See Skinner v. Railway Labor Executives Ass'n*, **489 U.S. 602**,
616-617 (1989) (holding that "[s]ubjecting a person to a breathalyzer
test, which generally requires the production of alveolar or `deep lung'
breath for chemical analysis, implicates similar concerns about bodily
integrity and . . . should . . . be deemed a search") (citations

omitted). As such, the search must be reasonable. U.S. Const, amend. IV
("The right of the people to be secure in their persons, houses, papers,
and effects, against unreasonable searches and seizures, shall not be
violated. . . ."); *Vernonia School Dist.* 47 *J* v. *Acton*,
**515 U.S. 646**, 652 (1995) (observing that "[a]s the text of the
Fourth Amendment indicates, the ultimate measure of the constitutionality
of a governmental search is `reasonableness'"). Although there is a
preference expressed in the Fourth Amendment that searches, to be
reasonable, be sanctioned by the issuance of a warrant by a neutral and
detached judicial officer, *see Johnson v. United States*, **333 U.S. 10**,
14 (1948), the Supreme Court has made it clear that not all searches need
be authorized by warrant issued upon probable cause. *See Vernonia School
Dist.*, 515 U.S. at 653 (concluding that "a warrant is not required
to establish the reasonableness of all government searches; and when a
warrant is not required (and the Warrant Clause therefore not
applicable), probable cause is not invariably required either").

   One exception to the search warrant requirement carved out by the
Supreme Court is found "when `special needs, beyond the normal need for
law enforcement, make the warrant and probable-cause requirement
impracticable.'" *Griffin v. Wisconsin*, **483 U.S. 868**, 873 (1987)
(quoting *New Jersey v. T.L.O.*, **469 U.S. 325**, 351 (1985)
(Blackmun, J., concurring in judgment)).
Page 10
Bay City contends that its ordinance accommodates a special need to
address the problem of underage drinking, and therefore the City is
allowed to dispense with the requirement of obtaining a search warrant
when demanding PBT samples from persons under 21 years old. This argument
calls for an examination of the origin and scope of the "special needs"
exception.

A.

   The Supreme Court first developed the special needs exception in
*New Jersey v. T.L.O.*, *supra*. That case arose in a public school
setting; a 14-year-old high school freshman challenged the legality of
the search of her purse by a school official who suspected her of smoking
in school. The search, conducted without a warrant, yielded evidence of
marijuana possession and trafficking, and led to delinquency proceedings
against the student. The Supreme Court rejected the claim that searches
by school officials must be assessed under the same standards as searches
conducted by the police during criminal investigations. Rather, the Court
found that the need of public school officials to "maintain[] security
and order in the schools requires a certain degree of flexibility in
school disciplinary procedures." *T.L.O.*, 469 U.S. at 340. The
Court concluded, therefore, that the "reasonableness" clause of the
Fourth Amendment, not its "warrants" clause, governed. Consequently, the
Court declared "that school officials need not obtain a warrant before
searching a student who is under their authority," because "the burden of
obtaining a warrant is likely to frustrate the governmental purpose
behind the search." *Ibid*. Since the "warrants" clause was not
applicable in this non-criminal context, the probable cause requirement
for search warrants did not apply either. Instead, the Court held "that
the accommodation of the privacy interests of schoolchildren with the
substantial need of teachers and administrators for freedom to maintain
order in the schools does not require strict adherence to the requirement
that searches be based on probable
Page 11
cause to believe that the subject of the search has violated or is

violating the law. Rather, the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341.

Cases that followed *T.L.O.* have expounded on the circumstances when a search by government officials may be reasonable despite the failure to obtain a search warrant. One might conclude from reviewing the decisions issued since then that "practically any proper governmental purpose, other than law enforcement, is sufficient to constitute a special need, triggering balancing between the governmental interests and the individual's privacy interests." *See International Union, United Auto., Aerospace and Agr. Implement Workers of America v. Winters,* 278 F. Supp.2d 880, 883 (W.D. Mich. 2003). For instance, "special needs" have been found to justify a public employer's search of an employee's desk, *O'Connor v. Ortega,* 480 U.S. 709 (1987); a probation officer's warrantless search of a probationer's home, *Griffin v. Wisconsin, supra;* drug testing of railroad employees involved in train accidents, *Skinner v. Railway Labor Executives' Ass`n, supra;* drug testing of employees of the Customs Service who apply for positions directly involving interdiction of illegal drugs or positions requiring the agent to carry firearms, *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656 (1989); drug testing of student athletes in an effort to prevent the spread of drugs among the student population, *Vernonia Sch. Dist. 47J v. Acton, supra;* and drug testing of students who participate in competitive extracurricular activities, *Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie County v. Earls,* 536 U.S. 822 (2002).

The Supreme Court has also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. *See e.g., New York v. Burger,* 482 U.S. 691, 702-704 (1987) (warrantless administrative inspection of

Page 12

premises of "closely regulated" business); *Michigan v. Tyler,* 436 U.S. 499, 507-509, 511-512 (1978) (administrative inspection of fire-damaged premises to determine cause of fire); *Camara v. Municipal Court of City and County of San Francisco,* 387U.S. 523, 534-539 (1967) (administrative inspection to ensure compliance with city housing code). The Court has also upheld brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens, *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976), and at a sobriety checkpoint aimed at removing drunk drivers from the road, *Michigan Dept. of State Police v. Sitz,* 496 U.S. 444 (1990). In addition, in *Delaware v. Prouse,* 440 U.S. 648, 663 (1979), the Court suggested that a similar type of roadblock with the purpose of verifying drivers' licenses and vehicle registrations would be permissible.

The Sixth Circuit has held that a school district has a special need to test for drug and alcohol consumption all applicants for all safety-sensitive positions in a school district, *Knox County Educ. Ass'n v. Knox County Ed. of Educ.,* 158 F.3d 361 (6th Cir. 1998); that a city has a special need to test its municipal bus drivers, *Tanks v. Greater Cleveland Reg'l Transit Auth.,* 930 F.2d 475 (6th Cir. 1991); and that a city has a special need to test its firemen and policemen, *Penny v. Kennedy,* 915 F.2d 1065 (6th Cir. 1990). In all of these cases, the courts have judged the search's lawfulness not by a standard characterized as "probable cause" or "reasonable

suspicion," but by "the standard of reasonableness under all of the
circumstances." *O'Connor*, 480 U.S. at 725-26. This is consistent
with the Supreme Court's general approach of determining that "[w]hat is
reasonable . . . `depends on all of the circumstances surrounding the
search or seizure and the nature of the search or seizure itself"
*Skinner*, 489 U.S. at 689 (quoting *United States v. Montoya
de Hernandez*, **473 U.S. 531**, 537 (1985)).
**Page 13**

    In none of these cases, however, has the primary purpose of the search
been the enforcement of criminal laws or the gathering of evidence. There
is nothing "special" in the need of law enforcement to detect evidence of
ordinary criminal wrongdoing; even where crime is on the rise and the
disorder and insecurity caused by criminal behavior in a community is
grave, the Supreme Court has consistently held that "the gravity of the
threat alone cannot be dispositive of questions concerning what means law
enforcement officers may employ to pursue a given purpose." *City of
Indianapolis v. Edmond*, 531 U.S. 32, 42 (2000). "Where a search is
undertaken by law enforcement officials to discover evidence of criminal
wrongdoing, th[e Supreme] Court has said that reasonableness generally
requires the obtaining of a judicial warrant." *Vernonia School
Dist.*, 515 U.S. at 654.

    Bay City contends that one of the main purposes of the ordinance is to
stem the pernicious trend of increased under-age drinking, and to protect
the public from the damage that can be caused by young people under the
influence of alcohol. The Court agrees that there is a strong interest in
preventing "harms associated with the use of alcohol by persons lacking
the maturity necessary to do so responsibly" and "to reduce underage
drinking and, by extension, the fatalities and serious injuries caused by
teenage drunk driving." *In re Stark*, **250 Mich. App. 78**, 82,
**645 N.W.2d 340**, 342 (2002) (citing Michigan House Legislative Analysis, H.B.
4136, August 16, 1995). The fact remains, however, that the principal
purpose of B.C. Ord. § 10-57(e) is to gather evidence in aid of a
criminal prosecution. That purpose is evident from the ordinance's plain
language, which states: "the results of a preliminary chemical breath
test analysis or other acceptable blood alcohol tests are admissible in a
criminal prosecution to determine whether the minor has consumed or
possessed alcoholic liquor." B.C. Ord. § 10-57(e).
**Page 14**

    That there may also be another purpose behind the law, which might be
characterized as a "special need," does not shelter the ordinance from
demands of the Fourth Amendment's warrant requirement. The Supreme Court
made clear in *Ferguson v. City of Charleston*, **532 U.S. 67**
(2001), that laudable, non-criminal purposes of a law authorizing
warrantless searches will not exempt the practice from the traditional
mandate of a warrant issued upon probable cause when an objective to
gather evidence also exists. In that case, a municipal hospital had
adopted a practice of conducting tests on urine samples of pregnant women
to look for the presence of cocaine. Positive test results were used for
diagnostic purposes, but they also were turned over to the police. The
Court held that the tests constituted unreasonable searches under the
Fourth Amendment. In answering the hospital's argument that the tests
were justified by its special need to address problems of drug abuse in
pregnant mothers, the Court stated:

    While the ultimate goal of the program may well
    have been to get the women in question into

substance abuse treatment and off of drugs, the
immediate objective of the searches was to
generate evidenced *for law enforcement
purposes* in order to reach that goal. The
threat of law enforcement may ultimately have been
intended as a means to an end, but the direct and
primary purpose of [the hospital] `s policy was to
ensure the use of those means. In our opinion,
this distinction is critical. Because law
enforcement involvement always serves some broader
social purpose or objective, under respondents'
view, virtually any nonconsensual suspicionless
search could be immunized under the special needs
doctrine by defining the search solely in terms of
its ultimate, rather than immediate, purpose. Such
an approach is inconsistent with the Fourth
Amendment. Given the primary purpose of the
Charleston program, which was to use the threat of
arrest and prosecution in order to force women
into treatment, and given the extensive
involvement of law enforcement officials at every
stage of the policy, this case simply does not fit
within the closely guarded category of "special
needs."

*Id.* at 82-84 (emphasis in original; footnotes omitted).
**Page 15**

In the same way, Bay City's ordinance cannot be justified under the
"special needs" exception to the requirement that a search of a person,
including a search and seizure of breath samples, must be authorized by a
judicial officer through the search warrant process.

B.

Bay City also contends that as a general rule, exigent circumstances
excuse the requirement of a search warrant whenever there is a need for
breath samples from persons under age 21, and that they provide a basis
upon which to uphold the ordinance. Although the existence of exigent
circumstances must be determined from the facts of each case, Bay City
insists that there is always an exigency when breath samples are sought,
and therefore this exception to the warrants requirement can be
legislatively determined and applied automatically.

The Supreme Court has consistently held that in the criminal context,
warrantless searches are *per se* unreasonable, unless they fall
within a few specifically established and well-delineated
exceptions. *Payton v. New York*, **445 U.S. 573**, 585-86 (1980);
*Mincey v. Arizona*, **437 U.S. 385**, 390 (1978); *Katz v. United
States*, **389 U.S. 347**, 357 (1967). The existence of exigent
circumstances is certainly one of those exceptions.

"Exigent circumstances are situations where real immediate and serious
consequences will certainly occur if a police officer postpones action to
obtain a warrant." *United States v. Williams*, **342 F.3d 430**, 436
(6th Cir. 2003); *see also Thacker v. City of Columbus*,
**328 F.3d 244**, 253 (6th Cir. 2003). The government bears the burden of
proving that exigent circumstances existed. *United States v. Bates*,
**84 F.3d 790**, 794 (6th Cir. 1996). The Sixth Circuit has explained that the

following situations may give rise to exigent circumstances: "(1) hot
pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the
need to prevent a suspect's escape; and (4) a risk of danger to the
**Page 16**
police or others." *United States v. Johnson*, **22 F.3d 674**,
680 (6th Cir. 1994) (internal citations omitted); *see also Minnesota
v. Olson*, **495 U.S. 91**, 100 (1990). The Sixth Circuit has also set
forth three factors that a court may use when inquiring whether "exigent
circumstances" existed: (1) whether the government has demonstrated that
the need for immediate action would have been defeated if the police had
taken the time to secure a warrant; (2) whether the government's interest
is sufficiently important to justify a warrantless search; and (3)
whether the defendant's conduct somehow diminished the reasonable
expectation of privacy he would normally enjoy. *United States v.
Rohrig*, **98 F.3d 1506**, 1518 (6th Cir. 1996).

1.

Here, Bay City contends that evidence of alcohol use and possession is
destroyed naturally over time due to a person's normal metabolic
functions, and that the length of time required to obtain a search
warrant, therefore, would preclude any meaningful utility of the PBT. The
defendant has offered no evidence of the time period over which alcohol
is metabolized, but the plaintiff posits that it is commonly known and
not subject to serious question that alcohol in the blood dissipates at
an average rate of 0.017 percent per hour, according to the "Widmark
Formula," which is about one-half the alcohol taken into the blood stream
after a 128-pound male consumes a 12-ounce can of beer. *See Michigan
Drunk Driving Law and Practice*, at 9-18 – 9-20 (Inst. of Cont.
Legal Ed., 3d ed. 1999 & Supp. 2003); *Computing a BAC
Estimate* (U.S. Dept. of Transportation/National Highway Traffic
Safety Admin.), Oct. 1994, at 3, *available at*
http://www.nhsta.dot.gov /people/injury /alcohol/bacreport.html. Shortly
before oral argument in this case, the defendant filed an affidavit of
one of its police officers claiming that three to four hours is required
to obtain a search warrant because of the need to "prepare [] the warrant
request, secure [] the approval of the
**Page 17**
Prosecutor, and then locate[] and obtain[] the approval and
signature of a Judge." Aff. of Gary Gene Hect. ¶ 4. Based on
professional experience, the Court views this claim with great
skepticism, and the plaintiff has filed a counter-affidavit by an
attorney in the Bay County public defender's office stating that a review
of court records from actual prosecutions for drunken driving offenses
discloses that once a suspect refuses to consent to give a breath sample,
the time required to procure a search warrant for the sample is 20
minutes on average. The additional facts furnished by the plaintiff, not
contradicted by the defendant on this record, are that "[t]he Bay City
Police Department regularly uses fill-in forms, telephone, and FAX
communications to expedite prompt approval of search warrant requests by
their officers in routine drunk driving cases where breath tests have
been refused." Aff. of Robert K. Hess ¶ 4.

At the summary judgment stage of the case, the Court accepts as true
the assertion that in some cases, four hours may be necessary to obtain a
search warrant. The defendant has failed to address, however, the
availability of telephone procedures, which, according to the plaintiff,
are widely used and can result in a judicial authorization to take breath
or blood samples in a relatively short time. These affidavits do not

create a disputed issue of fact; they simply address different situations
that can arise in the normal course of law enforcement.

Of course, "[t]he length of time required to obtain a warrant . . . is
a factor in determining whether circumstances are exigent."
*United States v. Radka*, **904 F.2d 357**, 363 (6th Cir. 1990). The
record in this case, however, fails to establish that the evidence sought
"would probably be destroyed within the time *necessary* to obtain
a search warrant." *United States v. Elkins*, **732 F.2d 1280**, 1284
(6th Cir. 1984) (emphasis added). Courts must consider the amount of time
necessary to obtain a warrant by telephone in determining whether exigent
circumstances exist. *See United*

Page 18

*States v. McEachin*, **670 F.2d 1139**, 1146 (D.C. Cir. 1981).
"Procuring a warrant by telephone generally will take less time than
procuring one by the traditional means of appearing before a magistrate."
*Ibid. See also Steagald v. United States*, **451 U.S. 204** (1981)
(observing that "[i]n routine search cases . . . the short time required
to obtain a search warrant from a magistrate will seldom hinder efforts
to apprehend a felon. . . . [I]f a magistrate is not nearby, a telephonic
search warrant can usually be obtained"); *United States v.
Whitfield*, **629 F.2d 136**, 142 (D.C. Cir. 1980) (finding that "with
telephonic warrants now permissible . . . the delay [in obtaining a
warrant] may not be long at all"); *United States v. Baker*,
**520 F. Supp. 1080**, 1083 (S.D. Iowa 1981) (concluding that agents had
inadequate time to travel to magistrate to get warrant but had abundant
time to obtain one by telephone). *Compare United States v.
Hackett*, **638 F.2d 1179**, 1184-85 (9th Cir. 1980), *cert.
denied*, 450 U.S. 1001 (1981) (holding that 20 to 30 minutes was
inadequate to obtain telephonic warrant where police are pursuing suspect
in a car), *with Baker*, 520 F. Supp. at 1083-84 (finding that one
hour and 15 minutes was "abundant time" to obtain warrant by telephone, a
process that takes not more than 30 minutes).

The practice of obtaining search warrants by telephone is quite common
and, according to the plaintiff's unrebutted affidavit, readily available
in Bay City. The claim made by the defendant's affiant, the Court
presumes, is not intended to suggest the typical practice or even an
average length of time, but rather is focused on the amount of time it
*could* take to obtain a search warrant in an unusual case.
Otherwise, it would be misleading. In all events, it plainly appears from
the record that the four hours the defendant claims it would take to
obtain a warrant is not the "necessary" amount of time. The time
necessary to obtain a warrant in cases that fall within the scope of the

Page 19

ordinance does not create an exigency as a matter of legislative
fact, nor does it serve to establish an automatic exemption from the
warrant requirement.

2.

The plaintiff argues that the Court should not even consider exigent
circumstances as an exception to the warrants requirement because the
sole purpose for the search was to gather evidence of a petty,
non-jailable offense. The plaintiff cites *Welsh v. Wisconsin*,
**466 U.S. 740** (1984), in support of her argument. In that case, police
officers followed a suspected drunken driver into his home to arrest him
for that offense and to obtain evidence of his blood alcohol content. The
police had neither an arrest nor a search warrant. The state court upheld

the action on the basis of exigent circumstances consisting of the hot
pursuit of a criminal suspect, the need to prevent physical harm to the
suspect and the police, and to prevent the destruction of evidence. The
Supreme Court reversed and held that "application of the
exigent-circumstances exception in the context of a home entry should
rarely be sanctioned when there is probable cause to believe that only a
minor offense, such as the kind at issue in this case, has been
committed." *Id.* at 753.

Other courts have applied the holding in *Welsh* to invalidate
arrests and searches in the face of exigent circumstance claims based on
the possible dissipation of evidence in petty, alcohol-related offense
cases. *See City of Jamestown v. Dardis,* 618 N.W.2d 495, 499
(N.D. 2000) (holding that "probable cause to believe minors were
illegally consuming alcohol was a relatively minor infraction and did not
create exigent circumstances to justify a warrantless entry into a
home"); *State v. Bessette,* 105 Wash. App. 793, 800, 21 P.3d 318,
321 (Wash. Ct. App. 2001) (holding that exigent circumstances did not
exist when police officer went into home to arrest minor he saw holding a
bottle of beer because minor in possession is a minor offense and there
was no evidence that minor
Page 20
was a threat to the safety of other individuals); *Commonwealth
of Penn. v. Roland,* 535 Pa. 595, 600-601, 637 A.2d 269, 271 (
Pa. 1994) (holding that warrantless, nighttime entry into residence by
police investigating report that there was underage drinking and
marijuana use at a party was improper; there was no danger to police that
would have necessitated immediate entry, and possibility that beer cans
seen by officers might have been removed before warrant could be obtained
would not support warrantless entry to investigate summary offense of
underage drinking).

The defendant argues that the rationale of these cases is not
controlling in the present matter because the minor nature of the
offenses in *Welsh* and the cases that followed it contributed
little weight to balance against the formidable level of the privacy
interest associated with a personal dwelling. Indeed, the Supreme Court
repeatedly has emphasized that the "physical entry of the home is the
chief evil against which the wording of the Fourth Amendment is
directed." *Payton,* 445 U.S. at 585. Nonetheless, the fundamental
principle that anchors *Welsh's* holding is that "an important
factor to be considered when determining whether any exigency exists is
the gravity of the underlying offense." *Welsh,* 466 U.S. at 753.
That sentiment was echoed by the Sixth Circuit in *Rohrig.*
*See* 98 F.3d at 1516 (stating that "the seriousness of the
underlying offense affects the weight of the governmental interest being
served by the intrusion," and that such interests are "at an ebb" when
minor offenses are involved).

Here, there is no question that the offense is relatively minor. The
maximum penalty for a person convicted of being a minor in possession of
alcohol is a $500 fine; the sanction does not include any jail time. The
Court may refer to the penalty chosen as an "expression of the [City]'s
interest" in gathering evidence to prosecute this offense. *See
Welsh,* 466 U.S. at 754. Although home entry may cause a more serious
intrusion than a stop in public for the purpose of demanding
Page 21
a breath sample, the Court believes that the right to be left alone
in public places ranks high on the hierarchy of entitlements that

citizens in a free society have come to expect — at least in the
context of citizen-police encounters — and one that is protected by
the Fourth Amendment. *See I.N.S. v. Delgado*, **466 U.S. 210**, 215
(1984) (noting that "the protection against unreasonable seizures also
extends to `seizures that involve only a brief detention short of
traditional arrest.'" (quoting *United States v. Brignoni-Ponce*,
**422 U.S. 873**, 878 (1975)); *Terry v. Ohio*, **392 U.S. 1**, 19-20
(1968) (rejecting the argument that "that the Fourth Amendment does not
come into play at all as a limitation upon police conduct if the officers
stop short of something called a `technical arrest' or a `full-blown
search,'" and holding that public encounters between police and citizens
"must be tested by the Fourth Amendment's general proscription against
unreasonable searches and seizures"). *But see Schenck v. Pro-Choice
Network Of Western New York*, **519 U.S. 357**, 383 (1997) (holding that
there is no right of a citizen to be free of unwanted speech in a public
place, since "[a]s a general matter, . . . in public debate our own
citizens must tolerate insulting, and even outrageous, speech in order to
provide adequate breathing space to the freedoms protected by the First
Amendment" (quoting *Madsen v. Women's Health Center, Inc.*,
**512 U.S. 753**, 774 (1994), and *Boos v. Barry*, **485 U.S. 312**, 322
(1988) (internal quote marks omitted))). Given the petty nature of the
offense for which the evidence was sought in this case, the Court finds
that the defendant has failed to show that its interests were
sufficiently important to justify the warrantless search.

3.

The plaintiff in this case did nothing to diminish her expectation of
privacy. *Compare Rohrig*, 98 F.3d at 1522 (approving the
warrantless entry into a home to abate a noise nuisance based in part on
the finding that the "[d]efendant here undermined his right to be left
alone by projecting

Page 22

loud noises into the neighborhood in the wee hours of the morning,
thereby significantly disrupting his neighbors' peace"). The defendant
claims nonetheless that its practice is justified because it does not
conduct random blood alcohol checks, but rather its policy allows only
suspicion-based testing. Setting aside the question of whether the
officer had sufficient information to focus his suspicion on the
plaintiff in this case, the defendant's argument is answered by the
Supreme Court's consistent holdings that absent a warrant, probable cause
alone will not suffice to sanction a search or arrest. *See, e.g.,
Kirk v. Louisiana*, **536 U.S. 635**, 636-38 (2002) (per curiam);
*Payton*, 445 U.S. at 588; *Taylor v. United States*,
**286 U.S. 1**, 6 (1932); *Agnello v. United States*, **269 U.S. 20**, 33
(1925). Probable cause must be accompanied by a warrant, exigent
circumstances, or some other exception to the warrant requirement in
order to make the search constitutional. *Kirk*, 536 U.S. at
637-38; *United States v. Lewis*, **231 F.3d 238**, 241 (6th Cir.
2000).

III.

The Court finds that the taking of breath samples to test for blood
alcohol concentration in the circumstances of this case constitutes a
search within the meaning of the Fourth Amendment. There are no special
needs that excuse the application of the warrants clause to this
practice. The purpose of obtaining the breath samples is primarily to
gather evidence of a violation of the City's criminal ordinance.

Moreover, exigent circumstances do not automatically exist that justify the failure to obtain a search warrant. To the extent that Section 10-57(e) of the Bay City Code of Ordinances authorizes warrantless searches in all cases, it is unconstitutional. No exigent circumstances have been demonstrated on the record in this case that would have excused the City's police officers from obtaining a warrant to take the breath sample from Jamie Spencer.

Page 23

Accordingly, it is **ORDERED** that the plaintiff's motion for partial summary judgment [dkt #11] is **GRANTED**.

It is further **ORDERED** that the defendant's motion to dismiss or for summary judgment [dkt #12] is **DENIED**.

It is further **ORDERED** that counsel for the parties appear for a status conference on **Thursday, December 18, 2003** at 4:30 p.m. to address a case management plan to resolve the remaining issues in the case.

Page 1

Copyright © 2004 Loislaw.com, Inc. All Rights Reserved