UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------------------------x
:
PHILIP GLYNN,                                   :     CIVIL NO. 3-02CV1802 (AVC)
                                                :
        Plaintiff,                              :
                                                :
v.                                              :
                                                :
BANKERS LIFE AND CASUALTY CO.,                  :
                                                :
        Defendant.                              :     January 18, 2005
------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PERMISSION
TO DISCLOSE REBUTTAL EXPERT WITNESS**

At the eleventh hour, Plaintiff has moved for permission to disclose John W. Soper, Ph.D. as a "rebuttal" expert to testify that "a postmortem blood alcohol level from a single specimen, by itself, does not establish the blood level from that individual prior to death." Plaintiff's Motion at 2.[1] Dr. Soper is not a rebuttal expert. Almost four years ago, on June 22, 2001, the Connecticut Medical Examiner issued its Toxicology Report that states: (1) specimens submitted for analysis included blood, urine, and vitreous samples; (2) only the blood sample was tested for the presence of ethanol; (3) "[b]lood was analyzed for the presence of ethanol [which] was found at a concentration of 0.17%"; and (4) "tissue specimens retained in this case will be destroyed one year after the date of the report." See Exhibit A. Plaintiff waited until 2005, after the destruction of the tissue

---

[1]   In opposing Plaintiff's motion, Defendant Bankers Life and Casualty Company ("Bankers") relies upon the Declaration of Andrew Muscato. Exhibits to this Declaration are referred to herein as "Exhibit ___."

specimens of the Plaintiff's decedent, Peter Glynn ("the Decedent"), before challenging the accuracy of the 2001 Toxicology Report.

The facts establish that Plaintiff had considered challenging the blood test earlier in this litigation and decided as a matter of strategy not to challenge it: during discovery, Bankers had asked Plaintiff whether he contended that the Decedent's blood alcohol levels were incorrect. In his April 17, 2003 response to that interrogatory, Plaintiff stated that he "may contend that the blood alcohol levels were incorrect as stated in the toxicology report" and that "[t]his will be the subject of expert opinion which will be disclosed in the appropriate time." See Exhibit C. The deadline for expert disclosure was extended several times and has now passed. As a matter of litigation strategy, Plaintiff chose not to disclose an expert to challenge the Toxicology Report and it would be prejudicial to Bankers to do so now.

## FACTS AND PROCEDURAL HISTORY

The Decedent died on June 8, 2001 in a single vehicle roll-over. Exhibit B, at D030, D032, D033. The Connecticut assistant medical examiner "pronounced Peter Glynn . . . deceased at the scene." Exhibit B, at D030, D035. After an autopsy was performed and six tissue samples preserved, the Director of Toxicology analyzed only the Decedent's blood and found "the presence of ethanol . . . at a concentration of 0.17%." Exhibit A. Upon receiving the Toxicology Report from the Chief Medical Examiner's office, the Bristol Police reported that "[t]he blood alcohol content for Peter J. Glynn at the time of his death was 0.17% . . . . Based on the toxicology results, there is *prima facie* evidence that Peter J. Glynn was intoxicated at the time of his accident." Exhibit B at D036. On March 4, 2002, Bankers' denied Plaintiff's claim for benefits under Group 59498

Accident Policy No. SR84,0001 (the "Policy"), stating that "[t]he medical records we have show Peter Glynn had a blood alcohol content of 0.17 at the time of his death." Exhibit C, at D087.

Plaintiff filed his initial Complaint in Connecticut Superior Court in or about September 2002. In October 2002, Bankers removed the matter to this Court on the ground that the action was governed by the Employee Retirement Income Security Act ("ERISA"). In its answer to complaint dated November 8, 2002, Bankers asserted the Decedent's intoxication as its seventh affirmative defense. By Order dated May 29, 2003, this Court permitted Plaintiff to amend his complaint to assert additional pendent state claims. Thereafter, Plaintiff moved twice more to amend his Complaint – on July 18, 2003 and November 17, 2003 – ultimately asserting an ERISA claim. By Order dated December 9, 2003, this Court granted Bankers' motion to dismiss all state claims, leaving as Plaintiff's sole claim the ERISA claim. On January 14, 2004, this Court permitted the further amendment of Paragraph 7 of the ERISA claim. On or about February 4, 2004, issue was joined when Bankers answered the Complaint as amended. As its seventh affirmative defense, Bankers stated that "Plaintiff's claims are barred because the death of Plaintiff's decedent resulted from decedent's driving while intoxicated."

On or about April 17, 2003, Bankers served interrogatories upon Plaintiff. Interrogatory No. 10 asked Plaintiff whether he contended that the Toxicology Report's blood alcohol level was incorrect:

> 10. Do you contend that the decedent's blood alcohol levels were incorrect as stated in the Toxicology Report issued by the State of Connecticut, Office of the Chief Medical Examiner, M.E. Case No. 1-07155, regarding deceased Peter Glynn, dated June 22, 2001.

59498

3

Plaintiff's response to Interrogatory No. 10 concedes that he had considered that possibility, and states that he may rely upon expert testimony to establish that the decedent's actual blood alcohol level was other than as stated, and if so, that he would disclose his expert's identity "in the appropriate time." He answered:

> The plaintiff will certainly demonstrate that the blood alcohol content of the decedent does not directly correlate to the blood alcohol content of the decedent prior to his death. This will be the subject of expert opinion which will be disclosed in the appropriate time.

Exhibit C, Plaintiff's Answer to Defendant's Interrogatory No. 10.

On May 18, 2004, Plaintiff deposed Bankers' Robert Krol regarding Bankers' denial of Plaintiff's claim. See Exhibit D. Krol's testimony made it clear that Bankers' denial was premised upon the Decedent's blood alcohol level as reported by the single blood sample. See Exhibit F, T32-3 to –7, T36-10 to –14, T40-13 to –24, T65-2 to –8; T89-17 to –24.

The initial Scheduling Order, filed two years ago on January 22, 2003, required Plaintiff to designate all trial experts by June 10, 2003. After Plaintiff answered Bankers' interrogatories, on May 15, 2003, the Court granted Plaintiff's motion to extend the time to disclose his experts. On July 7, 2003, the Court granted Plaintiff's second motion for an extension of time to name his experts. On September 23, 2003, the Court granted Plaintiff's third motion for an extension of time to October 24, 2003 to name his experts. On October 24, 2003 Plaintiff served his designation of experts and named three experts: Michael Miller, Ph.D. (an expert on engineering of the roadway and vehicle), Medhi Mostaghimi, Ph.D. (an expert on the statistical probability of an intoxicated driver being

59498

4

killed in an automobile collision in 2001), and Officer William Kenny (an expert on investigation of the Decedent's motor vehicle death). See Exhibit E. Therein, Plaintiff expressly "reserve[d] his right to disclose an expert on the practices and customs in the insurance industry including underwriting practices at a later date." Exhibit E at 3. On October 28, 2003, this Court granted Plaintiff's fourth motion for an extension of time to December 23, 2003 to disclose his experts. The Scheduling Order was ultimately amended to provide for the disclosure of experts by May 8, 2004.

Discovery has now closed.

## ARGUMENT

I.  **DR. SOPER IS NOT A REBUTTAL EXPERT BECAUSE PLAINTIFF CONSIDERED DESIGNATING THIS EXPERT IN 2003 AND CHOSE NOT TO DO SO; DESIGNATION NOW WOULD UNJUSTLY PREJUDICE BANKERS.**

Rule 26(a) of the Federal Rules of Civil Procedure mandates parties to disclose the identity of expert witnesses "at the times and in the sequence directed by the court." Fed.R.Civ.P. 26(a)(2). "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1).

The parties have litigated this case for 28 months on the unchallenged premise that the Decedent died while driving with a blood alcohol level of 0.17%. The issue at all times was the legal ramifications of the Decedent's intoxication under ERISA. With fact discovery now closed, Plaintiff seeks to challenge the accuracy of the Toxicology Report by naming yet another expert.

59498

5

A.  **Bankers Will be Unjustly Prejudiced by Disclosure of This "Rebuttal" Expert Because Plaintiff Had The Opportunity to Name This Witness and Challenge the Blood Test in 2002 and Decided Instead to Litigate this Action Based Upon the Blood Test.**

The Court of Appeals for the Second Circuit has established several factors to be considered by courts when considering a post-discovery motion to permit additional expert discovery. See Wolak v. Spucci, 217 F.3d 157, 161 (2d Cir. 2000)(holding that the district court did not abuse its discretion by precluding testimony from plaintiff's newly-named psychiatric expert); see also Eadie v. McMahon, 199 F.R.D. 45, 46 (D. Conn. 2001)(applying the Wolak factors to deny the plaintiff's post-discovery motion to allow additional expert testimony).

The Wolak court directed courts to consider the following factors:

- "the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony,"
- "the possibility of a continuance,"
- "the party's explanation for the failure to comply with the discovery order," and
- the importance of the testimony of the precluded witness.

Wolak, 217 F.3d at 161 (quoting Softel, Inc. v. Dragon Med. & Scientific Communications, 118 F.3d 955, 961 (2d Cir. 1997)(holding that the district court did not abuse its discretion by precluding the testimony of a newly-named expert)); accord, S.E.C. v. Lorin, 76 F.3d 458, 460-61 (2d Cir. 1996)(upholding the district court's preclusion of the defendant's expert testimony where the defendant had been ordered to designate an expert by a specific deadline and had failed to do so after requesting and receiving an extension, and offered no adequate excuse for the delay).

59498

6

In Wolak, the plaintiff (1) had responded to the defendant's interrogatory by stating that "she ha[d] not yet designated an expert witness in this matter, but reserve[d] the right to supplement . . . should one be retained"; (2) missed the court-imposed deadline to designate expert witnesses; and (3) announced her intention to call a psychiatric expert "three weeks before trial and almost one year after she should have disclosed the name of any experts." 217 F.3d at 159. The Wolak court concluded that "[a]nnouncing a witness at the last minute caused surprise and prejudice." Id. The court acknowledged that "the delay seems to have resulted more from neglect than bad faith," and found that "the attorney has offered no adequate reason for the delay," supporting the court's holding that "the district court acted within the limits of its discretion when it excluded [the expert's] testimony." Id.

Similarly, in Eadie v. McMahon, supra, the Connecticut district court denied the plaintiffs' request to disclose an additional expert, stating that

- the "plaintiffs failed to provide sufficient justification for their delay in seeking to disclose [another] expert"
- discovery had closed after multiple deadline extensions
- the plaintiffs could not explain "why plaintiffs could not have foreseen the need for [the] expert four or five years ago."
- the plaintiffs' actions resulted in "prejudice that defendants would suffer as a result of having to prepare for an additional . . . expert witness and a further delay of pretrial proceedings."

199 F.R.D. at 46-47.

59498

7

Here, from the outset, Plaintiff understood that one blood sample was used to analyze the Decedent's blood when he received the Toxicology Report and submitted it to Bankers. Bankers denied his claim because the blood analysis established that the Decedent was driving while intoxicated. If Plaintiff truly wanted to challenge the blood alcohol level, he should have done so at that time while the Decedent's tissue samples were still on file with the office of the Medical Examiner. Plaintiff should have requested analysis of additional tissue samples while they still existed. Plaintiff inexplicitly waited until January 2005 to challenge the Medical Examiner's 2001 findings.

Furthermore, early in the discovery process, Bankers asked Plaintiff whether he contended that the blood alcohol level was incorrect: "[d]o you contend that the decedent's blood alcohol levels were incorrect as stated in the Toxicology Report?" Exhibit C, Bankers' Interrogatory No. 10. Plaintiff's response establishes that he had considered that issue, stating that Plaintiff "will certainly demonstrate that the blood alcohol content of the decedent does not directly correlate to the blood alcohol content of the decedent prior to his death . . . [and] [t]his will be the subject of expert opinion which will be disclosed in the appropriate time." Exhibit C, Plaintiff's Answer to Interrogatory No. 10.

Despite Plaintiff's numerous motions for extensions of time to disclose his experts, Plaintiff never disclosed an expert on this issue. His failure to do so establishes his decision not to pursue this issue. He filed his summary judgment motion, and opposed Bankers' summary motion, without addressing the issue of the accuracy of the conclusion that the Decedent was intoxicated based upon a single tissue specimen, i.e. a blood sample.

59498

The parties litigated this action premised upon the fact that the Decedent had a blood alcohol level of 0.17%. Dr. Soper is not a rebuttal witness. Plaintiff is disingenuous when he asserts that his "explanation for the failure to comply with the discovery order[s]" was the testimony of Bankers' expert, claiming that it was he who raised for the first time the issue of the accuracy of a single blood sample. See Wolak, 217 F.3d at 161 (quoting Softel, Inc. v. Dragon Med. & Scientific Communications, supra.). Plaintiff's own answer to Bankers' Interrogatory No. 10 demonstrates that in 2003 he intended to name an expert to demonstrate that the blood sample inaccurately stated the Decedent's blood alcohol level at his death and failed to do so. See Exhibit C. And, later in 2003, Plaintiff named three experts, no doubt after considerable deliberation.

If Plaintiff is permitted to challenge the accuracy of the blood test that the parties have relied upon through 28 months of litigation, the prejudice to Bankers would be overwhelming. First, Plaintiff's delay has precluded Bankers from further analysis of the Decedent's then-existing tissue specimens to uphold the accuracy of the blood test.

Second, discovery would have to be reopened for additional depositions because Plaintiff "scientific literature" is based upon aircraft accidents. Because aircraft accidents can occur in remote places, the bodies of the deceased may be exposed to the elements, delaying the collection of tissue specimens, and thus alcohol results can be skewed. Plaintiff's scientific literature states that postmortem ethanol production is possible because of those delays: "Collection and shipment of specimens from these accidents are sometimes delayed and the possibility of postmortem ethanol production does exist." Plaintiff's Exhibit A at 916.

59498

9

Thus, Bankers may be required to establish that the Decedent's body was keep cool and preserved, allowing for an accurate blood test. At the very least, depositions will be needed of (1) the funeral director who picked up the Decedent's body and transferred it to the office of the Medical Examiner to elicit testimony regarding the conditions under which the body was transferred to the Medical Examiner; (2) the associate medical examiner who performed the June 9th autopsy on the Decedent, and preserved the tissue specimens, to elicit testimony on the medical examiner's procedures and practices, and the preservation of the body between the delivery to the office and the autopsy; and (3) the Director of Toxicology who analyzed the blood sample to elicit testimony on his procedures and practices, and on his decision to test only the blood sample. Moreover, Bankers may need to name another expert on the issue of post-mortem ethanol production in decedents to meet this new expert's conclusions.

Third, the summary judgment motion schedule would have to be extended to accommodate this additional issue. In fact, the entire case may have to be re-litigated because of the change in the basic premise of the case.

Because Plaintiff's inaction is to blame for this result, Plaintiff should bear the burden of his litigation strategy.

Bankers submits that the decisions in Wolak, Softel and Eadie all support denial of Plaintiff's motion. Like the plaintiff in Wolak, Plaintiff signaled to Bankers that he might retain an expert to challenge the blood test but never did so during discovery; he missed the court-imposed deadlines to designate this new expert; his intention to call this new expert is "almost one year after []he should have disclosed the name of any experts." 217 F.3d at 159. Like the plaintiff in Softel, Plaintiff's explanation for the additional

59498

10

expert is inadequate because he had considered the issue in 2003 and had failed to act upon it, designated other experts to rely upon, and most importantly, his failure to act in a timely fashion prejudiced Bankers because Bankers "would [be] forced, at a very late date in the [litigation], to accommodate potentially significant shifts in the theories being offered against it." 118 F.3d at 962. Like the plaintiff in Eadie, Plaintiff permitted discovery to close after multiple deadline extensions, failed to justify his delay in seeking to disclose this new expert, cannot explain why he did not foresee the need for the expert initially (here, he did foresee the need in 2003 but did not act on it), and prejudiced Bankers with a reopening of pretrial proceedings in order to meet the testimony of this additional expert witness. 199 F.R.D. at 46-47.

Here, a continuance would not overcome the prejudice because Bankers would have to begin again the discovery and expert processes, after 28 months of vigorous litigation, and numerous motions. As the Softel court said, "the enormous length of every step of the proceedings in this case militate[] against any more continuances." 118 F.3d at 963.

**B.    Under Connecticut Law, Only One Blood Sample Determines Intoxication.**

Connecticut law in effect in 2001 required "the investigation of any motor vehicle accident resulting in a fatality." See Conn. Gen. Stat. § 14-227c. In such instances, Connecticut law mandated the chief medical examiner, or any associate medical examiner, to "order that a blood sample be taken from the body of any operator or pedestrian who dies as a result of such accident." Id. This sample "shall be examined for the presence and concentration of alcohol . . . by the Office of the Chief Medical Examiner":

59498

11

> As part of the investigation of any motor vehicle accident resulting in a fatality, the Chief Medical Examiner, Deputy Chief Medical Examiner, an associate medical examiner, a pathologist as specified in section 19a-405, or an authorized assistant medical examiner, as the case may be, shall order that a blood sample be taken from the body of any operator or pedestrian who dies as a result of such accident.
>
> Such blood samples shall be examined for the presence and concentration of alcohol by the Division of Scientific Services within the Department of Public Safety or by the Office of the Chief Medical Examiner.

Id. Although that statute was repealed and restated effective October 1, 2003, and repealed and restated again effective October 1, 2004, the first restatement simply changed the word "fatality" to "death of a person" and denominated that paragraph as part (a) of the statute. The second restatement left part (a) unchanged. Therefore, to this day, Connecticut law retains the requirement that "a blood sample be taken from the body of any operator or pedestrian who dies as a result of such accident." Id. (emphasis supplied).

Here, the single sample of the Decedent's blood, analyzed for the concentration of alcohol, satisfies the requirement of Connecticut law to determine intoxication.

C.  **Plaintiff's Proposed Expert Designation Unduly Prejudices Bankers Because Plaintiff Allowed the Decedent's Tissue Samples To Be Destroyed; Thus, This Spoliator's Request Should Be Denied.**

Here, the Toxicology Report states that the Decedent's tissue samples would be destroyed in one-year's time, or by June 22, 2002. Plaintiff made no effort to preserve the samples for the challenge he now makes. His inaction constitutes spoliation.

"Spoliation is . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999). "It has long been the rule that spoliators should not benefit

59498

from their wrongdoing." Id. A district court has broad discretion in crafting a proper sanction for spoliation. Id. The Second Circuit recommends that "[t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence of the opposing party.'" Id.

Now, after the Decedent's tissue samples have been destroyed by the Connecticut Medical Examiner, Plaintiff wants to argue <u>theoretically</u> the accuracy of the reported blood alcohol level when he had an opportunity to <u>actually</u> analyze existing tissue samples. Plaintiff's failure to protect the tissue samples constitutes spoliation. It was Plaintiff's "erroneous judgment . . . who wrongfully created the risk," thus, as the prejudiced party, Bankers should be "restored . . . to the same position [it] would have been in absent the wrongful destruction of evidence of the opposing party."

## **CONCLUSION**

Because Plaintiff considered naming this additional expert in 2003 but did not, and cannot justify his delay in seeking to disclose this additional expert, and discovery has closed after multiple deadline extensions, and overwhelming prejudice would result to Bankers in having to prepare to meet this new testimony, Bankers respectfully requests that this Court deny Plaintiff's motion in its entirety.

59498

THE DEFENDANT
BANKERS LIFE AND CASUALTY
COMPANY

BY _____
John T. Shaban, ct14075
Whitman Breed Abbott & Morgan LLC
100 Field Point Rd.
Greenwich, CT 06830
203-869-3800 (telephone)
203-869-1951 (facsimile)
jshaban@wbamct.com

and

Andrew Muscato ct15073
Skadden, Arps, Slate, Meagher &
Flom LLP
Four Times Square
New York, New York 10036
212-735-3000 (telephone)
212-735-2000 (facsimile)

## CERTIFICATION

This is to certify that a true and correct copy of the foregoing Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Permission to Disclose Rebuttal Expert Witness was mailed via First Class Mail, postage pre-paid on this the 18th day of January, 2005, to the following counsel of record:

Everett H. Madin, Jr.
Riscassi and Davis, P.C.
131 Oak Street
Hartford, CT 06106

Counsel for Plaintiff Philip Glynn

_____
John T. Shaban

59498