UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

PHILIP GLYNN                          :
                                      :
         Plaintiff,                   :
                                      :
V.                                    :        CIVIL ACTION NO.:
                                      :        302CV1802 (AVC)
                                      :
BANKERS LIFE AND                      :
CASUALTY COMPANY,                     :
                                      :
         Defendant                    :        March 17, 2005

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT[1]**

## I.   FACTS AND PROCEDURAL HISTORY

This case arises from the defendant's, Bankers Life and Casualty

Company's, refusal to pay accidental death benefits to the plaintiff, Philip Glynn,

the sole beneficiary under such policy.  The policy was provided to the decedent,

Peter J. Glynn, as part of an employee welfare benefit offered by his employer,

Johnson & Johnson.

It must be noted that the defendant, Bankers Life and Casualty Company,

was recently criticized for its actions in its denial of another claim for accidental

death benefits under an identical policy as to that of Peter Glynn, and under

---

[1] Note that this Court denied both the plaintiff's and defendant's Motions for Summary Judgment, without prejudice, pursuant to an order dated November 9, 2004.  The plaintiff hereby re-files his Motion for Summary Judgment.

similar alleged factual circumstances, by the Federal District Court of New

Jersey. *See Precopio v. Bankers Life and Casualty Company*, 01-5721 (D.N.J.

2004) (Kugler, D.J.), attached as Exhibit R at p 45-51.[2]  In fact, Bankers Life was

found to have "made no attempt at all" to apply federal common law appropriately

to the facts of the claim and to have misstated the applicable law, instead blindly

denying that plaintiff's claim based solely on the reported blood alcohol content of

the decedent. *Id* at 45-48.  To uphold Bankers Life's denial of Philip Glynn's

claim in this case would effectively allow the defendant to create a "secret

exclusion" to its accidental death policies that applies only under its policies

covered by ERISA. *Id* at 47-48.  Indeed, to allow the defendant to operate in this

manner would pervert ERISA's intended purpose.

On June 8, 2001, the decedent, Peter Glynn, left his home located at 12

Putnam Street, in Bristol, Connecticut, and likely drove to the Brass City Mall in

Waterbury, Connecticut.  *See* Depo of Philip Glynn attached as Exhibit A at 50;

Affidavit of Philip Glynn attached as Exhibit B.  This trip was approximately

twenty miles.  Exhibit B at 1. The decedent was travelling down Wolcott Street,

---

Furthermore, this Court granted the plaintiff's Motion for Permission to File
Memorandum in Excess of Forty (40) Pages by order dated January 14, 2005.
[2] Please note that the *Precopio* opinion does not simply involve the determination
of whether that decedent's death was accidental under the applicable policy and
federal common law under ERISA, but also analyzes whether the decedent was an
employee covered by such policy at the time of death, along with that plaintiff's
allegations involving breach of fiduciary duty and failure to provide full and fair
review.

2

in Bristol, Connecticut, heading towards home, when he was involved in a single-car accident. *Id.* Peter Glynn was killed in this accident. The police report indicates that Peter was travelling down hill at approximately 42 miles per hour prior to impact. Exhibit C at D 066. The roadway in that area was a steep and winding two-lane road. Exhibit A at 74-75, Exhibit C at D 062-063. Peter's small convertible Mazda Miata flipped over after striking the curbing on the side of the road. *See* Affidavit of Michael Miller attached as Exhibit D at 3. Peter was wearing his seatbelt at the time. *See* Exhibit C at D 059. It is likely that the accident was caused when Peter swerved to avoid an animal or another vehicle. Exhibit D at 5.

The plaintiff is Philip Glynn, Peter's father and sole beneficiary. Although Mr. Glynn recently suffered a stroke, he is competent to testify. *See* Exhibit A at 9-10; Exhibit B at 1. Mr. Glynn states that his son had resided with him at 12 Putnam Street in Bristol, Connecticut since 1992, *Id* at 1; Exhibit A at 17, and was familiar with Wolcott Street. Exhibit A at 74-75; Exhibit B at 1 ("While on his return from the Mall, Peter would travel on Wolcott Street in Bristol to get to our home.").

There is no evidence of Peter Glynn consuming alcoholic beverages prior to the time of his accident. *See* Research Service Bureau, Inc. Report attached as Exhibit E; Depo of Robert Pandina, attached as Exhibit F at 62. Further, there were no bottles or cans in Peter's car, nor any other evidence of alcohol at the

3

scene of the accident.  Exhibit C.  Peter visited with his sister shortly before the accident, and did not appear, in any way, to have been intoxicated or drinking alcohol.  Depo of Theresa Jones attached as Exhibit G at 17-19.  Indeed, the defendant was unable to discover any nearby location that sold alcohol to Peter. Exhibit E at 3.

Peter was planning to work the day after his accident.  Exhibit B at 1. Peter was a valued and honored employee at Johnson and Johnson.  Exhibit A at 13 ("people came and presented him a special award that they said is very, very stringently given to—not given very often to superior people at Johnson & Johnson.  They gave him a tremendous award.").  His personnel file contains no indication that Peter had any problem with alcohol.  *See* Peter Glynn's Personnel File attached as Exhibit H.  On the night of his death, Peter was going to let his sister borrow his second vehicle to take on her vacation, but had not yet delivered that car to her.  Exhibit B; Exhibit G at 17-19.  Peter had plans to go on multiple vacations with his family; he had already purchased an airline ticket for November, 2001.  Exhibit B at 1; Exhibit A at 43-44; *see also* Exhibit E at 2. Peter was in a financially sound condition.  Exhibit B at 2.

The defendant, Bankers Life and Casualty Company, citing ERISA, has refused to make payment to the plaintiff and beneficiary of the accidental death benefits provided, Philip Glynn, solely on the basis that the medical examiner's

4

report of finding a blood alcohol level (BAC) of 0.17%.[3]  Furthermore, the defendant misrepresented that federal law under ERISA at the time it made the denial "uniformly held that death resulting from driving while intoxicated is not accidental." *See* Exhibit T.  In fact, the federal law was not uniform on this issue at the time of the defendant's denial. *See infra* note 15.  Additionally, the defendant continues to pay claims for benefits made under policies with identical language as that of the policy provided to Peter Glynn, if that policy is not "protected" by ERISA.

The defendant's sole expert in this case testified to the fact that, unless an individual is attempting suicide, an individual who is driving while impaired does not intend nor expect to be involved in an automobile accident, let alone to die in such an accident. *See* Exhibit F at 141-42.  Indeed, the defendant has never claimed that Peter Glynn intended his death. *See* Exhibit K at 38.  Furthermore, the defendant agrees that Peter did not foresee or or expect to die on the night he was killed. *Id* at 103-04.  Therefore, despite the defendant's contention to the contrary, Peter Glynn, even assuming that he was operating his vehicle impaired by alcohol at the time of his death, was killed in an accident.

Moreover, Peter Glynn's reported BAC was based upon one sample of pooled blood taken from the right side of his heart hours after his death. *See*

---

[3] At the time of Peter's death the legal limit in Connecticut was 0.10%.

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Exhibit F at 88-89; Declaration of John W. Soper,[4] attached as Exhibit I, at page

4, Paragraphs 12-13.   The medical examiner's report, however, does not

demonstrate that: (1) Peter ingested any alcohol;  (2) if he did, he was impaired at

the time of his death, or; (3) alcohol caused the accident.   It is a basic tenet of

toxicological science that "[t]he concentration of ethanol in postmortem blood, in

the absence of additional information, cannot be used with any degree of certainty

to verify the ingestion of ethanol."  *See* Exhibit I at page 7, Paragraph 28 (quoting

"Postmortem Alcohol Production in Fatal Aircraft Accidents" Canfield, D.V.,

Kupiec, T., and Huffne, E.; *Journal of Forensic Sciences* Vol. 38, (1993), pp.

914-917.  There are at least two reasons for this tenet.  First, ethanol, which is the

same as ethanol that is ingested in an alcoholic beverage, is produced in the body

through postmortem processes explained in greater detail, *infra*.  Second, ethanol

cannot impair if it has not been absorbed by the brain.  *See* Exhibit F at 21-22 ("a

blood sample under some circumstances, it may not indicate accurately the brain

level, because of the time it takes for alcohol to be fully absorbed and distributed

to the body.").  Accordingly, it is only through the use of multiple samples,

---

[4] By order of this Court dated January 21, 2005, the plaintiff was granted
permission to disclose John W. Soper, Ph.D., DABT, DABCC(CT),
DABCC(CC), as a rebuttal expert witness.  It should be noted that, despite the
fact that plaintiff's counsel contacted defendant's counsel to provide an
opportunity for the deposition of Dr. Soper, the defendant failed to do so.  The
deadline in the operative scheduling order in this case for "all discovery including
the depositions of all witnesses" terminated on February 25, 2005.  (underlining in
original)

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

including the vitreous humor, that a determination can be made regarding the level of postmortem ethanol production and the degree to which alcohol has been absorbed by the body.   Exhibit I at 5-6, Paragraphs 21-22.

Consequently, both Dr. Soper and the defendant's own expert, Dr. Pandina,  agree that no determination can be made regarding Peter's level of impairment, if any, at the time of the accident.

The plaintiff's operative complaint brings this action pursuant to the Employee Retirement Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et. seq.*, specifically under 29 U.S.C. § 1132 (a)(1)(B).

Whether or not, Peter had ingested alcohol prior to the accident, the plaintiff is entitled to summary judgment on the following bases:  (1) the accidental death policy did not contain an expressed exclusion for motor vehicle collisions involving a decedent with an elevated blood alcohol content, although it could have if the defendant intended there to be an exclusion for such cases; (2) the policy does not define an accident; (3) the defendant recognizes that automobile accidents involving intoxication are accidents within the meaning of the policy in that it pays claims involving intoxicated drivers pursuant to his policy when the policy is not provided through an employer; (4) the defendant refused to honor its policy in this case even though its corporate designee could not point to one legal basis for the denial and, in fact, misrepresented the status of the law to the plaintiff in making the denial; (5) the defendant does not have the

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

requisite discretion under the terms of the plan, although even if it did have

discretion, the defendant, acting with a conflict of interest, arbitrarily and

capriciously denied this claim; (6) pursuant to prevailing law in Connecticut, the

Second Circuit, other jurisdictions, and the defendant's sole expert, the death of

Peter Glynn was an accident;  (7) the defendant has failed to meet its burden of

demonstrating a causal connection between alcohol and the accident that caused

Peter Glynn's death, and; (8) forensic toxicology demonstrates that no conclusion

concerning alcohol impairment can be drawn from the blood alcohol content

reported by the medical examiner.


## II.     STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) states:

> [summary judgment] shall be rendered forthwith if the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any, show that there is no genuine
> issue as to any material fact and that the moving party is entitled to
> a judgment as a matter of law.

"Summary judgment is utilized to eliminate the delay and expense of a trial where

there is no issue to be tried." *Weinstock v. Wilk*, 296 F.Supp.2d 241, 245

(D.Conn. 2003) (citing *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d. Cir.

2000).  The court must "view the evidence in the light most favorable to the party

opposing summary judgment." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996).

"Still, '[t]he existence of a scintilla of evidence in support of the [defendant's]

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

position will be insufficient; there must be evidence on which the jury could reasonably find for the [defendant].'" *Dawson v. County of Westchester*, No. 03-7858 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.    LAW AND ARGUMENT

A.    THE ACCIDENTAL DEATH BENEFITS SHOULD BE PAID PURSUANT TO THE TERMS OF THE INSURANCE CONTRACT DRAFTED AND ISSUED BY THE DEFENDANT

The defendant admits that "accident" is not defined in the policy in question. *See* Accidental Death Insurance Policy attached as Exhibit J at D007; Depo of Robert Krol[5] attached as Exhibit K at 89. Like other insurance companies, the defendant could have written a provision into the decedent's accidental death policy that excluded deaths resulting from his driving while intoxicated. (*See e.g. Bishop v. National Health Ins. Co.*, 344 F.3d 305, 306 ("policy provided coverage for certain medical expenses for [the insured]. But the policy excluded coverage for 'any loss incurred while [the insured was] legally [i]ntoxicated,' defining '[i]ntoxicated' as 'a level of blood alcohol content that is specified in the laws defining [i]ntoxication in the state where the loss or cause of loss occurred.'"); *Bullard v. Daughters of Charity National Health Systems, Inc.*, 2003 WL 22213127 (E.D.Mich. 2003) ("This policy excludes any

9

loss caused in whole or in part by, or resulting in whole or in part from the Insured Person being under the influence of intoxicants…"); *Cates v. Metropolitan Life Ins. Co., Inc.*, 14 F.Supp.2d 1024, 1025 (E.D. Tenn. 1996) ("will not pay for any Covered Loss . . . *if it in any way results from, or is caused by or contributed by* . . . (e) the use of any drug or medicine.") (emphasis in original); *Smith v. Life Ins. Co. of North America*, 872 F.Supp. 482 (W.D. TN 1994) (involving a policy that stated "We agree to pay benefits for loss from bodily injuries:  a) caused by an accident….No benefits will be paid for…7. Voluntary self-administration of any drug or chemical substance not prescribed by, and taken according to the directions of, a licensed physician.").

The defendant, Bankers Life and Casualty Company, designated Robert Krol as its corporate designee.  *See* Re-Notice of Deposition attached as Exhibit L.  Mr. Krol's definition of "accident" at the time he denied the plaintiff's claim was something unforeseen or unexpected, Exhibit K at 93, and he agrees that the decedent's death satisfied this definition. *Id* at 103-04.  Further, the defendant consistently pays claims involving the death of intoxicated drivers pursuant to the language of the policy when the policy is not part of a group employee benefit plan. *Id* at 24-25.  Therefore, it must be concluded that the defendant, Bankers Life and Casualty Company believes that the decedent's death was accidental

---

[5] Note that the statements of Robert Krol the defendant's corporate designee, qualify as admissible evidence pursuant to FRE 801, and are therefore not

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

under the policy's language. There is nothing in the ERISA statutes which change the terms of insurance contracts; therefore, the plaintiff's benefits should be paid according to the contract's terms.

"The benefit provisions of an ERISA regulated [plan] must be interpreted under principles of federal substantive law." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57 (1987); *Massella v. Blue Cross & Blue Shield of Connecticut Inc.*, 936 F.2d 98, 107 (2d Cir. 1991). "A claim under § 1132(a)(1)(B), 'in essence, is the assertion of a contractual right.'" *Feifer v. Prudential Ins. Co. of America*, 306 F.3d 1202, 1210 (2d. Cir. 2002). However, "[E]RISA federal common law is largely informed by state law principles." *Lifson v. INA Ins. Co. of New York*, 333 F.3d 349, 352-353 (2d Cir. 2003).

"[F]ederal common law on the issue of insurance benefits … 'must embody common-sense canons of contract interpretation.'" *Pilot Life*, 481 U.S. at 56-57. The starting point for contract interpretation is "the terms of the policy contract itself." *Id.* These expressed terms "must be given their plain meanings, meanings which comport with the interpretations given by the average person." *Wickman v. Northwestern Nat'l Ins. Co.*, 908 F.2d 1077, 1084 (1st Cir. 1990); *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002).

---

hearsay. *See FRE* 801.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

"If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer." *Critchlow v. First UNUM Life Ins. Co.*, 378 F.3d 246, 256 (2d Cir. 2004). "This is a 'hornbook rule of contract interpretation' that applies 'particularly when [the ambiguity is] found in an exclusionary clause." *Id.* (quoting *Masella v. Blue Cross & Blue Shield of Connecticut, Inc.*, 936 F.2d 98, 107 (2d Cir. 1991).

> [T]he principle is incorporated into the federal common law governing ERISA-regulated plans in order not to "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted," a result that would be at odds with the congressional purposes of promoting the interests or employees and beneficiaries and protecting contractually defined benefits.

*Id.* (quoting *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 113-14 (1989).

According to *Pilot Life*, although the policy is part of an ERISA plan, common sense contract interpretation must be used, and, in interpreting such contract, it is the contract itself, that must be examined. The administrative materials regarding the policy and the plan in question specifically state that it is "the official plan documents or insurance contracts which govern in all cases." *See* Administrative Information attached as Exhibit M at 205. The accidental death policy states that "[t]he amount payable by reason of the accidental death of an Employee shall be paid to the beneficiary... designated in writing by the Employee." *See* Exhibit J at D 010.

12

The policy excludes the payment of benefits for six specific circumstances.[6]  The policy did not include an express exclusion for the circumstance of an insured being injured or killed while driving with a reportedly elevated blood alcohol content. Exhibit K at 91.  As demonstrated above, the defendant could have easily excluded such circumstances, but did not do so.  Also, no stated definition for "accidental" is included in the contract.  *Id* at 89.   Again, an insurer could easily provide a definition of terms included in any contract  for insurance it drafts.  Indeed, the law provides that "ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer. . . particularly when [the ambiguity is] found in an exclusionary clause."  (citations omitted) *Critchlow*, 378 F.3d at 256.

The defendant claims that under ERISA plans, "accidental" does not include motor vehicle accidents where the insured is found to have had an elevated blood alcohol content.  *See* Exhibit K at 93.  The defendant's corporate designee, however, concedes that under the same accidental policy, not provided through an ERISA eligible plan, the proceeds would have been paid to the plaintiff, despite the fact he was reported to have been driving while intoxicated:

---

[6] "This policy doesn't cover losses caused or contributed by; (1) suicide or self-destruction, whether sane or insane; (2) bodily infirmity, sickness or disease; (3) medical or surgical treatment (except medical or surgical treatment necessitated only due to an injury); (4) war or any act or war; (5) injury sustained while serving in the armed forces of any country, for which period premiums will be refunded; (6) injury sustained while engaged in or taking part in aeronautics and or aviation of any description or resulting from being in an aircraft.  *See* Exhibit J at D 010.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

Q. Okay. Have you paid death claims involving an intoxicated driver in non-ERISA cases?

A. Yes.

Q. Have you paid death claims involving intoxicated driver (sic) in ERISA cases?

A. In the past, yes.

...

Q. Okay. Since this change in policy occurred seven or eight years ago, have you continued to pay non-ERISA claims involving intoxicated drivers?

A. Yes.

Q. Since this policy change seven or eight years ago, have you continued to pay ERISA claims involving intoxicated driver (sic)?

A. We have never paid.

Q. Since that seven or eight-year-time period?

A. Yes.

...

Q. When we are talking about claims that are ERISA versus claim[s] that are not ERISA, would the policy language be the same in either instance?

A. Yes.

*See* Exhibit K at 24-25. Since the defendant pays under the same circumstances in

non-ERISA plans, it must be concluded that the defendant concedes that an alcohol

related collision qualifies as an accident under the terms of the policy, otherwise the

defendant would deny benefits for such deaths in all plans, whether or not ERISA

applies. The defendant's corporate designee states that none of the expressed

exclusions in the policy in question relate to the decedent's circumstance, and that in

14

reviewing policies in non-ERISA plans, the first step is to evaluate the existence of specific exclusions to coverage.

> Q. When you had a claim come in that involved an intoxicated driver such as this one that was not an ERISA claim, would you seek the advice of legal back in the time period of 2001-2002?
>
> A. Depending on circumstances, sometimes yes, sometimes no.
>
> Q. Okay. You would be concerned that the circumstances might fall within one of the listed exceptions, correct?
>
> A. Yes.
>
> Q. Or exclusions?
>
> A. Yes.

*See* Exhibit K at 90-91.

Bankers Life and Casualty Company does not claim that the language of the contract for accidental death insurance provided to the decedent, Peter J. Glynn, in any way defines the term "accidental," nor can the defendant disagree with the fact that the decedent's death was accidental within the language of the policy. Instead, the defendant erroneously relies on federal law to somehow change the terms of the contract and to deny the payment of proceeds solely in ERISA protected plans. Robert Krol, the defendant's corporate designee, stated that an accident is something that is unforeseen and unexpected, *See* Exhibit K at 93 ("Q. And in 2001 as a claims

specialist, what did you understand an accidental death to involve? A. Something

unforeseen and unexpected."). The defendant also agrees that the decedent did not

likely foresee or expect to die from driving while he was intoxicated.

> Q. Okay. And we have already discussed the fact that this accident was
> unforeseen to Mr. Glynn, in all probability?
>
> …
>
> Q. Correct?
>
> A. I agree with that.
>
> Q. Okay. And in all probability, the accident was unexpected by Mr. Glynn.,
> correct?
>
> …
>
> A. I agree.

*See* Exhibit K at 103-104. In fact, the medical examiner and the police both reported

that the decedent's death was an accident. *See* Death Certificate and Medical

Examiner's Report attached as Exhibit N at D 069; Exhibit C at D 058-062, 066.

Indeed, the defendant's sole expert in this matter, agrees that, unless Peter Glynn was

attempting suicide, which the defendant has never alleged, that he did not expect nor

intend his death, even assuming he was driving while impaired. *See* Exhibit F at 141-

42. Therefore, the plaintiff is not unreasonable in expecting payment on the

decedent's accidental death policy.

16

Further, the plaintiff has offered a technical investigation of the circumstances involving the decedent's death, conducted by the plaintiff's expert witness Michael Miller, which concludes that the collision was an accident. *See* Exhibit D. Mr. Miller states:

> 17.    If one is traversing a curve to the right at a speed sufficient to cause sidesliding, the ensuing "yaw" marks upon the roadway will be also curved to the right, in a clockwise direction. The yaw marks produced by the plaintiff's decedent's automobile, however, curve to the left in a counterclockwise manner. These tire marks are indicative of a hard left steering maneuver by plaintiff's decedent.

*See* Exhibit D at 4. Mr. Miller noted the absence of findings "indicative of an initial loss of vehicular control followed by an overcorrection;" therefore stating that the initial reason for the "hard left" by Peter Glynn on the night he was killed cannot be determined. *Id* at 5. Mr. Miller lists some possible causes for the decedent's hard left steering maneuver which include:

> [T]he presence of an object in the roadway ahead, the movement of a person or animal into the roadway ahead, and the encroachment or presence of another motor vehicle into or in the roadway ahead. It is known, for example, that there was another motor vehicle in the area where the accident occurred, approaching from the opposite direction...The unexpected presence of an approaching automobile, given the sharp nature of the curve to the right and the limitation of sight distance associated with it, could also have been a factor causing or contributing to plaintiff's decedent's decision to introduce a steering input to the left.

*Id.*

In fact, Mr. Miller stated that the decedent's automobile was classified as "'stable' in regards to tipover propensity," and that if the tires of the decedent's vehicle

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

had not struck the curb of the roadway, the "vehicle would not have tipped over; rather, it probably would have continued to sideslide to a position of rest." *Id* at 3. The expert also believed that "had the automobile not overturned as a result of this curb strike, it is probable that the plaintiff's decedent's loss of control of his vehicle, and the ensuing dynamics of its movements, would have been survivable." *Id.* Mr. Miller concludes that:

> Based upon my extensive technical investigation into the plaintiff's decedent's accident and my evaluation of the available physical evidence, I have formed the opinion that the event which led to plaintiff's decedent's loss of life was an "accident" and satisfies the definitions for this word as set forth above.

Exhibit D at 6.

There is no evidence, other than the medical examiner's reported blood alcohol content, which cannot establish with any degree of medical certainty, by itself, Peter's level of intoxication, if any, at the time of his death. *See infra* Part III(E). However, even assuming that Peter was intoxicated at the time of his death, given the extremely low probability of being killed while driving in that alleged condition, his death was accidental. The plaintiff's expert, Medhi Mostaghimi, Ph.D., testified with regard to the probability of a man with the characteristics of Peter Glynn being killed in an alcohol related automobile accident. Calculating such probability through the use of a method generally accepted in his field for

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

determining the probability of an event occurring,[7] and using raw data obtained from government organizations,[8] Dr. Mostaghimi calculated that the probability of a male driver, 35 years and older, with a blood alcohol concentration of 0.15% of being killed in an automobile accident was 772 out of 10 million in Connecticut, for a trip of 20 vehicle miles traveled.[9] *See* Depo of Mehdi Mostaghimi attached as Exhibit O at 33; Report entitled "Applying Poisson Probability Distribution to Calculating the Probability of an Alcohol Related Fatal Accident in the U.S. for 20 VMT attached as Exhibit P at Table 2. The approximate distance traveled by the decedent prior to his accident likely was of twenty miles. Exhibit B at 1.

Furthermore, Dr. Mostaghimi calculated the chance of Peter Glynn's death under the circumstances alleged to have existed using the relative risk established by

---

[7] Dr. Mostaghimi stated:

> Poisson [probability] distribution is a well-known probability distribution in statistics. And it is used in all areas from communication systems and to the service industry to the problem like this that you want to know the chance of the first things happened, second thing to happen. So that it is a well established probability distribution which is very much appropriate for the problem that we have here.

Exhibit O at 51.

[8] Exhibit O at 28.

[9] This calculation is based on 20 vehicle miles traveled. This calculation also uses a relative risk of 382. The government studies relied on by Dr. Mostaghimi establish a range of 208 to 702 with regard to the relative risk of an alcohol impaired driver compared to that of an operator that is not impaired of being killed in a automobile accident. Exhibit O at 38. It should be further noted that Dr. Mostaghimi found the probability of 3858 out of 10 million, and 39 out of 10

RISCASSI & DAVIS, P.C. • ATTORNEYS-AT-LAW • 131 OAK STREET • P.O. BOX 261557 • HARTFORD, CT 06126-1557 • (860) 522-1196

the defendant's expert witness, Robert J. Pandina, Ph.D.  Exhibit O at 76-77; Exhibit

P.  At his deposition, the plaintiff's counsel inquired as to Dr. Pandina's report:[10]

> Q. "Note that BACs at .15% are associated with a 25-fold risk of involvement in fatal driving accidents."
>
> A.  That's correct.
>
> Q.  Is that a true statement?
>
> A.  Yes.
>
> Q.  And that's a risk as compared to the risk of someone who is not intoxicated; is that true?
>
> A.  That's correct.

Exhibit F at 100.  Dr. Mostaghimi, using the relative risk provided by Dr. Pandina,

calculated the probability a 35 year old male driver, with a blood alcohol

concentration of 0.15% for a 20 vehicle mile traveled trip to be 50 out of 10 million

for Connecticut, and 75 out of 10 million for the United States.  Exhibit O at 40-41,

77; Exhibit P at Table 2.

Since there is no express definition of "accidental" in the policy, it is

ambiguous, and should be interpreted according to normal canons of contract

interpretation, even in an ERISA plan. *See e.g., Fay*, 287 F.3d at 104.  Especially

since an insurance contract is being interpreted, the policy should be construed

---

million for a man of the aforementioned characteristics travelling one hundred
and one vehicle mile traveled, respectively. *See* Exhibit P at Table 2.
[10] Please note that at the time of Dr. Pandina's deposition, the defendant had failed
to provide the plaintiff's counsel with any report on the findings of Dr. Pandina.

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

against Bankers Life and Casualty Company, as the drafter of the contract.  *See*

*Critchlow*, 378 F.3d at 256.  If the defendant wished to exclude coverage for driving

while intoxicated, it could have expressly done so.  Moreover, the defendant pays

claims for drunk driving death benefits under policies with the same policy language

in non-ERISA claims.  Nowhere does ERISA, or its "federal common law," state that

ERISA should be used to change the terms of insurance contracts for the benefit of

insurance companies and/or the providers of such plans.  Therefore, the contract

should be interpreted in the same manner as non-ERISA plans, giving the terms their

plain meanings.  Moreover, ERISA was originally enacted to protect the employees

and their beneficiaries, not insurance companies, *Firestone Tire & Rubber v. Bruch*,

489 U.S. 101 (1989).  Since no exclusion was expressed in the decedent's policy, and

the defendant agrees that the circumstances of the decedent's death satisfied its own

definition of accident, the death benefits should be paid to the plaintiff according to

the contract's terms.

B.  A DE NOVO STANDARD OF REVIEW IS APPROPRIATE IN REVIEWING
    DEFENDANT'S DENIAL OF ACCIDENTAL DEATH BENEFITS

  The United States Supreme Court held that decisions to deny benefits under

an ERISA plan "must be reviewed under a de novo standard unless the benefit plan

expressly gives the plan administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the plan's terms, in which cases a

deferential standard of review is appropriate." *Firestone Tire & Rubber Co. v. Bruch*,

**RISCASSI & DAVIS, P. C.**  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

489 U.S. 101 (1989); *see also Lifson v. INA Life Ins. Co. of NY*, 333 F.3d 349 (2d Cir.

2003). "The plan administrator bears the burden of proving that the arbitrary and

capricious standard of review applies, since 'the party claiming deferential review

should prove the predicate that justifies it.'" *Kinstler v. First Reliance Standard Life

Ins.*, 181 F.3d 243, 245 (2d Cir. 1999) (quoting *Sharkey v. Ultramar Energy Ltd.*, 70

F.3d 226, 230 (2d Cir. 1995)). Although the use of "[m]agic words such as

'discretion' and 'deference'" are not required, the use of such words is "certainly

helpful in deciding [which standard of review to use]." *Jordan v. Retirement Comm.

of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995).

     *Firestone* examined the history of ERISA, finding that its purpose was for

"promot[ing] the interest of employees and their beneficiaries." *Id.* The Court

expressed concern that to use less than a de novo standard of review of the decision of

an administrator of an ERISA plan, where no expressed provisions provided the

administrator with discretionary authority, would not protect the employee to the

same extent which existed prior to ERISA's enactment. *Id* at 113-114. In reaching

its decision, the Court focused on the multiple references to expressions of trust law[11]

contained in ERISA. *Firestone* 489 U.S. at 110.

---

[11] "ERISA abounds with the language and terminology of trust law. *See, e.g.,* 29
U.S.C. § 1002(7) ("participant"), 1002(8) ("beneficiary"), 1002(21)(A)
("fiduciary"), 1103(a) ("trustee"), 1104 ("fiduciary duties")…In determining the
appropriate standard of review for actions under § 1132(a)(1)(B), we are guided
by principles of trust law." *Firestone,* 489 U.S. at 110-111.

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

The defendant cannot meet its burden of demonstrating that it was granted discretionary authority; therefore, the defendant's decision to deny plaintiff's benefits should be reviewed under the de novo standard of review. The language included in the decedent's plan did not grant Bankers Life and Casualty Company discretionary authority to construe or interpret terms in its policy. The decedent's plan reads as follows:

> If you disagree with a claim decision or want to provide additional information to Bankers Life & Casualty, you can apply for a claim review. You request a review of the claim by Bankers Life & Casualty within 60 days after you receive the claim denial notice. You must state the reason you believe the claim was improperly denied, and submit any data, questions or comments you feel are appropriate on your behalf. Bankers Life & Casualty will evaluate your claim within 30 business days of the receipt of the request and send a decision to you in writing.
>
> …
>
> If your claim for a benefit is denied in whole or in part, you (or your beneficiary) will be notified in writing by the Administrator of that benefit plan.
>
> …
>
> … If you disagree with the denial, you have 60 days from the receipt of the original denial to request a review. This request would be in writing and sent to the Administrator for that benefit plan.
>
> The reviewer will issue a decision within 60 days.

*See* Defendant's Amended Response to Plaintiff's Requests for Admissions attached as Exhibit Q at 2-3. The defendant could have definitively expressed such discretionary authority, however it did not do so; therefore, the defendant's decision

to deny benefits due to the plaintiff should not be given deference by the court, and a de novo review is appropriate.

The language stating the defendant, Bankers Life and Casualty Company, will "evaluate your claim" located in its appeal process for denied claims is not an "unambiguous indication" of its discretionary authority. Exhibit Q at 2-3. This statement simply means that the defendant will re-examine the claim, with any further information that is provided by the insured or his beneficiary attempting to appeal its initial denial. Exhibit K at 54 ("A.  If anybody has any additional information that would be pertinent, we invite them to send it in and we'll evaluate.")  However, in no way does this language allow the defendant to construe or interpret terms or provisions in the policy.  For something less than de novo review to apply, the insurer must do more than grant itself the power to deny benefits. *See Masella*, 936 F.2d 98; *Kinstler* 181 F.3d 243.  As stated in *Kinstler*, "[n]o plan provides benefits when the administrator thinks that benefits should not be paid! (punctuation in original) 181 F.3d at 251.  There is nothing in the language conveying the idea that the plan administrator may interpret the terms of the policy.  Since the drafter could have used unambiguous language to grant discretionary authority to the defendant, and failed to do so, decisions made under the terms of the policy should be subject to de novo review.

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

C. USING EITHER A DE NOVO OR ARBITRARY AND CAPRICIOUS
   STANDARD OF REVIEW THE ACCIDENTAL BENEFITS SHOULD BE PAID

   i. Using a de novo standard of review the accidental death benefits should be
      paid

   Where de novo review of an ERISA plan is used, resolving ambiguities of

a contract against the drafter in favor of the insured "is an appropriate

implementation of the congressional expectation that the courts will develop a

'federal common law of rights and obligations under ERISA-regulated plans.'"

*I.V. Services of America, Inc. v. Trustees of the American Consulting Engineers

Council Ins. Trust Fund*, 136 F.3d 114, 121 (2d Cir. 1998).  Under the de novo

standard of review, a court must give the terms "their plain meanings" and

"interpretations give[n] by the average person.  *Wickman*, 908 F.2d at 1084; *Fay*,

287 F.3d at 104.  As stated previously, an insurance company which is

responsible for drafting a policy may provide clarity in the terms included, and

therefore, should not be rewarded for leaving ambiguity in such a policy.  In order

for the insurer to prevail, it must show that the insured's interpretation of the

policy is unreasonable.  *Kosakow New Rochelle Radiology Associates*, 274 F.3d

706, 738 (2d Cir. 2001).

   The defendant cannot demonstrate that the plaintiff is unreasonable in

expecting payment as the sole beneficiary of the decedent, Peter J. Glynn.[12]  The

---

[12] Note that the process of interpreting the contract's terms under a de novo
standard of review is virtually the same as that involved in the discussion in Part
III(A) above.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

policy does not define accident or accidental.  Furthermore, the defendant's

designee, after defining accidental to be something unexpected and unforeseen,

agrees that the circumstances of Peter J. Glynn's death qualify as an accident.

> Q.  You indicated to attorney Muscato that an accident is unforeseen and
> unexpected.  Is that true?
> A.  Yes.
>
> ...
>
> Q.  Okay.  And we have already discussed the fact that this accident was
> unforeseen to Mr. Glynn, in all probability?
> ...
> Q.  Correct?
> A.  I agree with that.
>
> Q.  Okay.  And in all probability, the accident was unexpected by Mr.
> Glynn, correct?
> ...
> A.  I agree.

Exhibit K at 41, 103-104.  The defendant also agrees that no such policy

exclusion was included for accidents involving an insured with an elevated blood

alcohol content, and that examining the policy's exclusions is generally the first

step in processing a claim.[13]  *Id* at 91.  Therefore, the plaintiff's interpretation and

---

[13] As stated previously, certain insurance companies have provided expressed
policy exclusions for accidents involving driving while intoxicated.  *See, Bishop
v. National Health Ins. Co.*, 344 F.3d 305, 306 ("policy provided coverage for
certain medical expenses for [the insured].  But the policy excluded coverage for
'any loss incurred while [the insured was] legally [i]ntoxicated,' defining
'[i]ntoxicated' as 'a level of blood alcohol content that is specified in the laws
defining [i]ntoxication in the state where the loss or cause of loss occurred.'");
*Bullard v. Daughters of Charity National Health Systems, Inc.*, 2003 WL
22213127 (E.D.Mich. 2003) ("This policy excludes any loss caused in whole or in

resultant expectation of payment are not unreasonable, and the benefits of the policy should be paid.

The defendant's designee agrees that the circumstances of the decedent's death satisfy the definition of accident that he was using at the time he denied the plaintiff's claim. The defendant's corporate designee admitted that, other than the fact that the decedent was reported to have been intoxicated at the time of his accident, nothing would likely have changed his mind to pay the benefits of this policy. *See* Exhibit K at 31-32 ("Q. Were there any facts at all in the information you received that you determined were relevant to the denial of the claim other than the blood alcohol content? A. No."). This despite the fact that no exclusion for driving with an elevated blood alcohol level was expressed in the policy provided to the decedent. *Id* at 91, and the fact that, generally, the first step in processing a claim was to examine the exclusions of the policy. *Id.* The plaintiff is not unreasonable in his expectation of payment on the policy; therefore, the defendant should pay the plaintiff's claim.

---

part by, or resulting in whole or in part from the Insured Person being under the influence of intoxicants…"); *Cates v. Metropolitan Life Ins. Co., Inc.*, 14 F.Supp.2d 1024, 1025 (E.D. Tenn. 1996) ("will not pay for any Covered Loss . . . *if it in any way results from, or is caused by or contributed by* . . . (e) the use of any drug or medicine.") (emphasis in original); *Smith v. Life Ins. Co. of North America*, 872 F.Supp. 482 (W.D. TN 1994) (involving a policy that stated "We agree to pay benefits for loss from bodily injuries: a) caused by an accident….No benefits will be paid for…7. Voluntary self-administration of any drug or chemical substance not prescribed by, and taken according to the directions of, a licensed physician.").

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

    ii. <u>Using the arbitrary and capricious standard of review the accidental death benefits should be paid</u>

Assuming that the court finds that the plan provides its "administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the plan's terms," a point which the plaintiff strongly contests, then "a deferential standard of review is appropriate." *Firestone* 489 U.S. 101. That deferential standard of review is to determine whether the administrator's ruling was "arbitrary and capricious." *Pagan v. Nynex Pension Plan*, 52 F.3d 438 (2d Cir. 1995). In deciding whether the decision was arbitrary and capricious, the court is not free to substitute its own judgment for that of the administrator, *id*, but may overturn such a decision if it is found to be "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999). "Certainly, even under [the arbitrary and capricious] standard, the insurance company is bound by the terms of the document." *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d at 1108.

The Federal District Court of New Jersey "[had] little trouble concluding that Bankers Life abused its discretion[14] in the process by which it reached its decision" to deny a plaintiff's claim involving a claim for benefits under a policy in an ERISA plan and involving similar factual circumstances. *See Precopio v.*

---

[14] The plaintiff does not concede that this Court should give any deference to the defendant's decision to deny benefits in this case. The defendant's denial should be reviewed de novo.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

*Bankers Life*, CV 01-5721 (D.N.J. 2004) (Kugler, D.J.) attached as Exhibit R.

The *Precopio* court stated that:

> [B]ankers Life *made no attempt at all* to show that Bankers Life even considered *any* facts other than [the decedent's] intoxication level - including whether any other cause such as road conditions, automobile trouble, or weather caused or contributed to the accident. . . no factual investigation was done regarding the circumstances of [the decedent's] death, other than a review of the police, autopsy, and toxicology reports.

(emphasis in original) *Id* at 46. Furthermore, Bankers was found to have denied

that plaintiff's claim inappropriately under federal common law. By not

investigating any other facts about the decedent's accident, Bankers Life was in

effect using a "secret exclusion" to deny the plaintiff's claim. *Id* at 48.

The defendant, through its corporate designee, admits that once it was

established that the decedent had an elevated blood alcohol content, Bankers Life and

Casualty Company did not consider the payment of the benefits of this accidental

death policy to the plaintiff. *See* Exhibit K at 31-32. In fact, other than the reported

blood alcohol percentage of the decedent, no other facts were necessary in its

determination, according to the defendant. *Id.* ("Q. Were there any facts at all in the

information you received that you determined were relevant to the denial of the claim

other than the blood alcohol content? A. No.") The defendant's designee admits that

he did not rely on any research on the statistical probability of a drunk driving deaths

at the time he denied the plaintiff's claim; instead, he denied the claim based on the

argument that individuals who drive while intoxicated are highly likely to be killed.

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Indeed, the plaintiff's expert has concluded that a male driver, 35 years and older, with a blood alcohol concentration of 0.15%, has a 772 out of 10 million chance of being killed in a fatal automobile accident in Connecticut, for a trip of 20 vehicle miles traveled.  Exhibit O at 33; Exhibit P at Table 2.  This statistic does not indicate as high a likelihood as the defendant alleges.  Furthermore, the defendant's designee states that, whatever the statistics were with regard to drunk driving accidents, they played no role in the decision to deny the plaintiff's claim.

> Q.  You don't know what the statistics are regarding driving while intoxicated?
>
> A.  No.
>
> Q.  Does anyone at Bankers Life know what the statistics show with regard to driving while intoxicated?  Do you know?
>
> A.  I don't know.
>
> Q.  Okay.  And whatever the numbers show, they played no part in your decision to deny Mr. Glynn's claim, is that true?
>
> A.  Correct.

Exhibit K at 104.  This is so despite the admitted absence of any indication in the policy that a decedent's death while having an elevated blood alcohol content would be excluded.  *See* Exhibit K at 91; Exhibit J.

Indeed, the defendant's sole expert in this case states that, unless an individual is attempting suicide, that individuals driving while impaired do not expect or intend to die by driving in such a condition.  *See* Exhibit F at 141-42.  Also, in the instant

**RISCASSI & DAVIS, P. C.**  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

case, the medical examiner, despite reporting that Peter Glynn's blood alcohol concentration was above the legal limit, still concluded that his death was caused by an accident. Exhibit N at D 069.  The police classified this occurrence as an accident. Exhibit C at D 058-062, 066.  Moreover, the plaintiff has offered an expert's opinion that such was an accident, *See* Exhibit D, which is supported by statements of an investigating police officer.  *See* Depo of Mary Glynn attached as Exhibit S at 13-14. Nonetheless, the defendant, denied the plaintiff's claim due to the decedent's reported blood alcohol level without any further investigation into the cause of this accident.

Despite the fact there is admittedly no express exclusion for alcohol related accidents, and acknowledging that for non-ERISA plans, that the first step in determining coverage is to check what exclusions exist, the defendant's corporate designee, although having no expressed exclusion applicable, denied the benefits of this policy.  This denial was processed, stating

> This Johnson & Johnson policy is governed by ERISA rules and regulations. Federal courts in applying federal common law to claims for accidental death under ERISA plans, have uniformly held that death resulting from driving while intoxicated is not accidental.

*See* Denial Letter dated March 4, 2002 attached as Exhibit T.  However, the corporate designee stated that he did not have any ERISA law and/or regulations in his possession at the time he denied the plaintiff's benefits, and did not even know that any ERISA regulations existed, yet denied plaintiff's claim on this basis nonetheless.

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Q. Are there any such [ERISA] regulations?

A. Not that I know of.

…

Q. Well, you're denying a claim here based on ERISA regulations, and yet you didn't have the regulations in front of you.

A. No.

…

Q. And you cite ERISA regulations as being a component of your decision to deny this claim, but you don't know what those regulations are, correct?

A. Correct.

Exhibit K at 60-62, 104.  Furthermore, the defendant's corporate designee, despite

denying the claim due to "uniform" ERISA law, had no personal knowledge of such

law at the time he denied the plaintiff's claim.

Q. Now, you indicated in one of your letters that we have looked at that courts have uniformly held that these cases are not accidents.  Do you recall writing that?

A. Yes.

Q. And as you wrote that letter, did you have any personal knowledge of how courts have held?

A. No, that's strictly opinions given to me by my legal department.

…

Q. [I]f you knew that courts have not uniformly held that courts have not uniformly held that accidents -- that incidents under these particular

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

circumstances are not accidents, that may have changed your opinion, do you remember that?

A. Yes.

Q. Okay. Did anyone from legal ever give you any indication that there were cases that disagreed with their position?

A. No.

...

Q. You also cite ERISA cases as being uniform in denying such claims but you do not know what any of the cases are, is that correct?

A. Correct.

Q. And all of that would have been true back in 2002 when this claim was denied, correct?

A. Correct.

Exhibit K at 63-64, 104-105. In fact, at the time that the defendant denied this claim, the available case law had not uniformly held that a decedent's death from his drunk driving was not accidental.[15]

The defendant continues to pay for deaths resulting from a decedent's actions of driving while intoxicated in plans not protected by ERISA. *Id* at 24. The defendant's designee admits to not having any ERISA law and/or regulations in his possession, nor any knowledge of such at the time he denied the plaintiff's claim; however, he denied the claim nonetheless, even though the policy lacked an applicable exclusion. Further, the defendant continues to pay benefits for deaths

33

involving drivers with an elevated blood alcohol content for policies in plans not covered by ERISA. The defendant has the power to exclude deaths resulting from driving while intoxicated; however, Bankers Life instead chooses to rely on its "secret exclusion," denying claims under ERISA plans solely on the decedent's reported blood alcohol content. Therefore, the defendant has acted arbitrarily and without reason or substantial evidence in its decision to deny benefits to the plaintiff, and such denial must be overturned.[16]

D.     THE DECEDENT'S DEATH WAS ACCIDENTAL PURSUANT TO FEDERAL COMMON LAW UNDER ERISA

The plaintiff does not, in any way, concede that Peter Glynn was operating his vehicle while intoxicated and/or after ingesting intoxicating liquor prior to his accident and death. *See infra* Part III(E). However, even if it is assumed that Peter Glynn had been intoxicated at the time of his death, such death is still accidental under federal common law under ERISA. Furthermore, the plaintiff does not believe that ERISA should be potentially used to allow the defendant to rely on, and benefit from, an ambiguous term in an insurance policy that it drafted.

---

[15] *See Metropolitan Life Ins. v. Potter*, 992 F.Supp. 717 (D. N.J. 1998); *West v. Aetna Life Ins. Co.*, 171 F.Supp.2d 856 (N.D. Iowa 2001).

[16] The plaintiff also believes that the defendant's action has been erroneous as a matter of law, in that the benefits were denied based on an erroneous application of contract interpretation and the erroneous application of federal common law pursuant to ERISA.

RISCASSI & DAVIS, P.C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P.O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196