As stated, Robert Krol, the defendant's corporate designee, at the time he denied the plaintiff's claim, defined "accident" as something unforeseen or unexpected, *See* Exhibit K at 93. Mr. Krol agrees that the decedent did not intend nor expect to die on the night of his death. *Id* at 103-104. The decedent was familiar with the particular road where his accident occurred. *See* Exhibit A at 74-75; Exhibit B at 1. The decedent was wearing his seatbelt at the time of his death. *See* Exhibit C at D 059. Nobody observed Peter Glynn consuming alcoholic beverages prior to the time of his accident. Exhibit E; Exhibit F at 62. There was no evidence at the scene of accident, for example, the presence of any alcoholic beverages and/or empty containers. Exhibit C. Furthermore, the defendant was unable to determine any nearby location where the decedent may have purchased alcohol. Exhibit E at 3.

Moreover, the decedent had plans to work on the day following his death. Exhibit B at 1. Also, Peter was allowing his sister to borrow his second vehicle to take on her vacation, Exhibit G at 17-19. Peter Glynn had purchased an airline ticket for a vacation planned for November, 2001, Exhibit A at 43-44; Exhibit B at 1. Further, he had plans for vacations in July 2001 and the Spring of 2002. Exhibit B; Exhibit E at D 022. The decedent was also in good financial condition, and had not shown any signs of depression, according to his father, who had been living with the decedent since 1992. *See* Exhibit B.

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Assuming that Peter Glynn was in fact intoxicated at the time of his accident, which the defendant has failed to prove, Peter's expectation of surviving was not unreasonable, given the low probability of being killed during such a drive. The plaintiff has offered expert testimony as to the probability of being killed during a trip such as the decedent took the night of his death, while the defendant, acting in direct conflict to the interests of the decedent and the plaintiff, denied the plaintiff's claim, despite not having any such statistics at the time the claim was denied and performing no investigation into the decedent's accident after Peter's blood alcohol content was reported to be elevated by the medical examiner. Exhibit K at 104. In fact, the defendant pays claims for deaths under the same factual circumstances under policies with the same language which are not covered by ERISA, *Id* at 24, and in effect denies deaths such as the decedent's based solely on the reportedly elevated blood alcohol level in ERISA cases, even though it lacks any reliable evidence that Peter Glynn consumed alcohol prior to his accident, or assuming he in fact ingested alcohol, that such ingestion caused his accident and/or death. The defendant's denial of benefits, under any standard of review, cannot be upheld.

*Wickman v. Northwestern National Ins. Co.*, 908 F.2d 1077 (1st Cir. 1990), *cert. denied*, 498 U.S.1013, has been frequently cited as the authority for determining whether an incident qualifies as an accident pursuant to federal common law under ERISA, and has been used by the Second Circuit. *See*

36

*Critchlow v. First UNUM Life Ins.*, 378 F.3d 246, 257 (2d Cir. 2004). *Wickman* developed a two prong test to determine whether an accident has occurred. *Wickman*, 908 F.2d at 1088. The first prong focuses on the subjective expectation of the insured. *Id.* The second prong determines whether or not the insured's expectation was objectively reasonable "from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Id.* (quoting *Wickman*, 908 F.2d at 1088). Under the *Wickman* test, as interpreted and applied by the Second Circuit Court of Appeals in *Critchlow*, Peter Glynn, even assuming that he was intoxicated at the time of his death, was killed in an accident, because he neither expected, nor intended, to die, and the probability of his death was so minimal, that his expectation of survival was reasonable.

      i.    <u>The decedent did not intend or expect to die at the time of his accident</u>

    It must first be determined whether the decedent subjectively lacked an expectation of death. *See Critchlow*, 378 F.3d at 257 (citing *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121, 1126 (9th Cir. 2002), *cert denied*, 537 U.S. 1067 (2002). The defendant's Corporate Designee, Robert Krol, agrees that the decedent, Peter Glynn, did not intend to die at the time of his accident. *See* Exhibit K at 38 ("Q. No. There's no claim here, is there, that Mr. Glynn intended his own death? A. No"). Furthermore, the defendant's sole expert in this case states that, unless an

**RISCASSI & DAVIS, P. C.** • *ATTORNEYS-AT-LAW* • 131 OAK STREET • P. O. BOX 261557 • HARTFORD, CT 06126-1557 • (860) 522-1196

individual is attempting to commit suicide, that such individuals do not generally intend nor expect to die while driving impaired. *See* Exhibit F at 141-42. Likewise, in the Second Circuit opinion of *Critchlow*, the court noted that the insurer had "never . . . disputed that [the decedent's] death was subjectively unexpected or unintended." *Critchlow*, 378 F.3d at 259. Mr. Krol defined "accident" as something unforeseen or unexpected, *See* Exhibit K at 93, and he agrees that the decedent's death satisfied that definition. *Id* at 103-104. The decedent was wearing his seatbelt, *See* Exhibit C at D 059, and was familiar with the particular road where his accident occurred. *See* Exhibit A at 74-75; Exhibit B at 1. The decedent had plans for the following day. Exhibit B. Further, Peter Glynn had purchased an airline ticket for a vacation he had planned in November, 2001, and had trips planned in July, 2001 and Spring of 2002. Exhibit B; Exhibit A at 43-44; Exhibit E at 2.

The defendant failed to appropriately determine whether, under federal common law under ERISA, the alleged circumstances of Peter Glynn's death qualified as an accident under the policy, despite its denial. *Wickman* dictates that the decedent's subjective intent must first be determined, and only after such a determination, should the second prong be analyzed. 908 F.2d at 1088. The defendant, however, denied the plaintiff's benefits solely on the fact that it was reported that he had an elevated blood alcohol level, without first determining the decedent's actual, subjective expectation. Therefore, the defendant's denial is at

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

odds with federal common law. *See Precopio*, at 45, 47; *West v. Aetna Life Ins. Co.*, 171 F. Supp.2d 856, 887 (N.D. Iowa 2001). The defendant should pay the plaintiff's claim according to the policy's terms, since the defendant agrees that Peter Glynn did not intend or expect to die on the night he was killed, and, therefore, the decedent's death was accidental. In fact, because the defendant failed to adequately apply federal common law to the plaintiff's claim, this Court need not continue its analysis. *See, e.g. Precopio*, at 45, 47. Nevertheless, the plaintiff provides the following analysis demonstrating that the decedent's subjective expectations, even assuming he was operating his vehicle while impaired, which the defendant has failed to prove, were objectively reasonable, and that Peter's death was an accident.

 ii. <u>The decedent's expectation of survival was reasonable</u>

 If it is determined that the individual "did not expect an injury similar in type or kind to that suffered, the fact-finder must then examine whether the suppositions which underlay that expectation were reasonable." *See Critchlow*, 378 F.3d at 257 (citing *Wickman*, 908 F.2d at 1088). Only if the individual's suppositions are determined to have been "unreasonable" is the event not accidental. *Wickman*, 908 F.2d at 1088.

 An insured's expectation of survival of an activity, where deaths resulting from an such an activity are "statistically rare" or where the "activity ordinarily has a nonfatal outcome," is reasonable. *See Critchlow*, 378 F.3d at 258 (quoting

RISCASSI & DAVIS, P.C. • ATTORNEYS-AT-LAW • 131 OAK STREET • P.O. BOX 261557 • HARTFORD, CT 06126-1557 • (860) 522-1196

*Padfield*, 290 F.3d at 1127). An insured's "expectation would be unreasonable if the conduct from which the insured died posed such a high risk of death that his expectation of survival was objectively unrealistic." *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir. 1995). Further, an insured's expectation is objectively reasonable "if death is not substantially certain to result from the insured's conduct." *Todd*, 47 F.3d at 1456; *see also Padfield*, 290 F.3d at 1127; *Metropolitan Life Ins. v. Potter*, 992 F.Supp. 717, 729 (D. N.J. 1998) ("[*W*]*ickman* requires more than mere foreseeability or increased risk"); *but see*, *Cozzie*, 140 F.3d at 1110 ("[A]lthough perhaps unintentional, is not an 'accident' because that result is reasonably foreseeable"). Under the *Wickman* test, if the fact-finder is unable to determine the insured's actual expectation, then the court must objectively determine "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *See, e.g.*, *Wickman*, 908 F.2d at 1088. Here, however, the parties agree that Peter Glynn's death was subjectively unintended and unexpected.

The Second Circuit, in *Critchlow*, under the *Wickman* test, held that a death from the practice of autoerotic asphyxiation (hereinafter "AEA")[17] was accidental. 378 F.3d at 260. Citing to the Fifth and Ninth Circuit Courts of

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Appeals, *Critchlow* found that the evidence established that deaths resulting from AEA are "statistically rare," and "ordinarily" AEA was not fatal. *Id* at 258. Therefore, the decedent's expectation of survival from such conduct was reasonable. *Id.* Since the *Critchlow* court found the decedent's expectation to be reasonable, his death was accidental. *Id* at 260 ("Nor do we see any evidence in the record from which a rational factfinder could find that [the decedent's] subjective intent to survive was objectively unreasonable.").

The Second Circuit further stated that the burden was on the insurer to demonstrate that an exclusion to a policy's coverage applied. *Id* at 256. The *Critchlow* court gave no weight to the insurer's argument that AEA was a risky behavior, and that, therefore, the decedent was unreasonable in his expectation to survive. The court noted that "[g]iven the language of the exclusion at issue here, it is not sufficient merely that a serious risk was willfully undertaken, so long as injury was not intended and, objectively, was not likely to occur." *Id* at 263. Given this binding precedent, the fact there is not an expressed, and applicable, exclusion, the fact that the defendant has never contended that Peter Glynn intended his death, and that the probability of his death was statistically rare, the decedent's death should be determined to have been accidental.

---

[17] "[T]he practice of limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *See Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1450 (5th Cir. 1995).

41

*Metropolitan Life Ins. v. Potter* stated that the *Wickman* test "require[d] more than mere foreseeability or increased risk," in determining whether a decedent's death resulting from a drunk driving accident was accidental. 992 F.Supp. 717, 729 (D.N.J. 1998).[18] The *Potter* court noted that the insurer failed to present any evidence that would demonstrate that the decedent's death was "highly likely" to result from her drunk driving, and that "any other expectation would be unreasonable." *Id* at 730 ("At best, [insured's] submissions establish the undisputed proposition that alcohol consumption impairs motor functions and faculties and increases the risk of driving collisions."). The court found that it could not "[find] that death is 'highly likely to occur' as a result of drunk driving and that 'any other expectation would be unreasonable' where many drunk drivers survive (to be prosecuted or perhaps to repeat their risky conduct)." *Potter*, 992 F.Supp. at 729-30.

---

[18] The *Potter* court found a question of fact, therefore, it denied both parties' motions for summary judgment. A genuine issue of material fact was created by the existence of an internal memo written by an employee of the insurer, which stated that the decedent's death was from a car accident. The insurer also had a police report and autopsy report that stated the death was due to an accident. Since the insurer's denial letter stated that "common sense," among other things, should have made the decedent realize that dying in such circumstances was not accidental, the court found a genuine issue of material fact. Under our present facts, there is no analogous factual dispute, the parties' disagreement is solely based on whether the term "accident", under an ERISA plan, is changed by federal common law so as to disallow plaintiff's benefits under the decedent's accidental death and dismemberment policy, and if so, whether the decedent's death was an "accident" under federal common law.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

The Fifth Circuit found a decedent's death from his practice of AEA to be accidental. *Todd*, 47 F.3d at 1456. The *Todd* court noted:

> [T]he materials before the court clearly indicated that the likelihood of death from autoerotic activity falls far short of what would be required to negate coverage under the policy...In a treatise on autoerotic deaths, the authors observe that "[a]utoerotic or sexual asphyxia refers to the use of asphyxia to heighten sexual arousal, more often than not with a nonfatal outcome." [citation omitted] Similarly, the experts in the *Tommie* case testified that death from the practice would be considered unusual, see 619 S.W.2d at 202, and the court in the *Kennedy* case ruled that the risk of death from autoerotic practice is "not of such a nature that [the decedent] knew or should have known that it probably would result in death. Death was not a normal expected result of the behavior. 401 N.W.2d at 845. In addition, an article by Jane Brody in the New York Times ...observes that, according to researchers, "[i]n a small but significant number of cases" of autoeroticism, "the person dies before he can restore his oxygen supply.

*Id* at 1456-57. The court expressed that "[t]he life insurance companies have ample ways to avoid judgments like this one," implying that the insurance companies could establish exclusions to such activities if they wanted to avoid paying benefits for deaths resulting from such conduct . *Id.*

*Padfield* cited *Todd*, and held that a death resulting from AEA was accidental. 290 F.3d at 1129-30 ("we agree with the Fifth Circuit in *Todd* that the "substantially certain" test is the most appropriate one, for it best allows the objective inquiry to 'serve [ ] as a good proxy for [the insured's] actual expectation.'""). "[The decedent] voluntarily engaged in actions that led to a fatal injury, but his reasonable expectation was that this behavior would not have resulted in 'injury' as that word is commonly used...having performed the act in

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

the past without inflicting any injury, [he] had a reasonable expectation that he would be able to do so again." *Id* at 1130.

*West v. Aetna Life Ins. Co.*, 171 F.Supp.2d 856, 904 (N.D.Iowa 2001), held that a decedent's death from driving while intoxicated was an accident. The decedent in *West* was killed when the car he was driving missed a curve and flipped over. *Id* at 860. The decedent was not wearing his seatbelt, and was found to have been greater than twice the legal limit for intoxication at the time of the accident. *Id*. There was no exclusion for a death resulting from driving while intoxicated. *Id* at 861. The insurer refused to pay benefits on the policy, stating:

> [The decedent's] intentional act exposed himself to unnecessary risks which were reasonably foreseeable and such that he should have known or appreciated the consequences of his intentional acts, including the liklihood [sic] or strong possibility of death. The serious risks associated with driving while intoxicated are widely publicized.[19]

*Id* at 862. The court refused to uphold the insurer's decision to deny benefits, and further stated that the insurer's decision should not withstand "even under the most deferential [arbitrary and capricious] standard of review." "*Id* at 905.

---

[19] Insurance companies, and certain courts, in making or upholding the decision to deny benefits to beneficiaries of decedents killed while driving with an elevated blood alcohol content, have pointed to the amount of news media involving such deaths as authority for the proposition that the decedent should have foreseen his death. *See, Walker v. Metropolitan Life Ins. Co.*, 24 F.Supp. 775, 781 (E.D.Mich. 1997); ("The hazards of driving while intoxicated are well-known. The public is reminded daily of the risks of driving while intoxicated both in warnings from the media and in motor vehicle and criminal laws.").

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

The *West* court expressed that the "most glaring failure" of the insurer's argument was its belief that the decedent should have foreseen his death from driving with an elevated blood alcohol content.  *West*, 171 F.Supp.2d at 887 (stating that "*Wickman* formulates the requirement as 'whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur as a result of the insured's intentional conduct*'." (emphasis in original)).  Therefore, the standard of foreseeability required by the insurer was contrary to that required under federal common law. *Id.*

The defendant in *West* argued that "nearly every federal decision applying *Wickman* to the determination of whether an intoxicated driver's death was an 'accident' within the meaning of an ERISA plan has concluded that such a driver's death was not an accident." 171 F.Supp.2d at 898.  The court, citing to case law[20] holding that such circumstances are not accidents, found that, although such case law "cited *Wickman*, none of them actually employed the two-pronged

---

[20] The court cited the following:  *Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1110-11 (7th Cir. 1998); *Mullaney v. Aetna U.S. Healthcare*, 103 F.Supp.2d 486, 493-94 (R.I. 2000); *Walker v. Metropolitan Life Ins. Co.*, 24 F.Supp.2d 775, 780-82 (E.D.Mich. 1997); *Cates v. Metropolitan Life Ins. Co., Inc.*, 14 F.Supp.2d 1024, 1027 (E.D.Tenn. 1996); *Schultz v. Metropolitan Life Ins. Co.*, 994 F.Supp. 1419, 1422 (M.D.Fla. 1997); *Nelson v. Sun Life Assurance Co. of Canada*, 962 F.Supp. 1010, 1012 (W.D.Mich. 1997); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F.Supp. 172, 176-77 (E.D.Mich. 1997); *Fowler v. Metropolitan Life Ins. Co.*, 938 F.Supp. 476, 480 (W.D.Tenn. 1996).

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

test." *West*, 171 F.Supp.2d at 900 (citing *Potter*, 992 F.Supp. at 729).[21]  *West* stated that those cases finding drunk driving accidents not to be accidents either provided a lower standard of foreseeability, or made an assumption that "intoxication establishes that death or injury is 'highly likely to occur', in the complete absence of any evidence establishing actual probability." 171 F.Supp.2d at 901.  The *West* court states:

> As substitutes for actual proof that a drunk driver is so likely to be injured or killed that any other expectation is unreasonable, these decisions sometimes rely on "common knowledge," "the media," drunk driving laws, or the logical, but unproved, assumption that a higher blood alcohol content necessarily increases the probability of injury or death while driving to the point that death or injury is 'highly likely,' not just *more likely*, to result.

(emphasis in original) *Id.*

The fact that an activity increases the likelihood of a result, does not mean that any other expectation is unreasonable.  *See e.g. Critchlow*, 378 F.3d at 262. Those cases upholding the insured's denial of benefits, based on the fact that the results of drunk driving are well-documented, misapply the *Wickman* test.  In fact, *West* found that the insurer's lack of evidence that the decedent's expectation of surviving his action of driving while intoxicated was not unreasonable, even examining the insurer's decision to deny benefits under the more deferential arbitrary and capricious standard of review, since the insurer did not present "any evidence" that could support its decision that there was no accident. *Id* at 902.

---

[21] This view was also expressed by District Judge Krugler in *Precopio*, at page 47.

46

The *West* court focused on statistical proof[22] submitted by the beneficiary in reaching its decision. 171 F.Supp.2d at 904. The statistics, compiled by the Federal Bureau of Investigation stated that there were 1,033,000 arrests for driving while intoxicated. *Id.* The court noted that not every intoxicated driver is arrested for such offense "in any given year, let alone every time he or she is [driving while] intoxicated." *Id.* In the same year, there were 42,065 deaths in motor vehicle crashes, 40.9%, or 17,218 were alcohol-related. *Id.* The court further reasoned that, if driving while intoxicated were "highly likely to occur," the number of deaths should be much higher, given the extremely greater number of arrests for drunk driving. *West*, 171 F.Supp.2d at 904.

> What "common knowledge" should actually tell a person driving while intoxicated is that he or she is far more likely to be arrested for driving while intoxicated than to die or be injured in an alcohol-related crash, and far more likely to arrive home than to be either arrested, injured, or killed.

*Id.* The court acknowledges, and the plaintiff agrees, that driving with an elevated blood alcohol content is "irresponsible and dangerous, because the risks that come with it are preventable by the use of proper judgment." *Id.* Death from such an activity, however, no matter how irresponsible and dangerous, is not highly likely, or even probable, and is therefore accidental under federal common law and the

---

[22] *See also Critchlow*, 378 F.3d at 258 (quoting *Padfield*, 290 F.3d at 1127) ("Because death by autoerotic asphyxiation is statistically rare, his expectation of survival certainly was reasonable.").

47

accidental death insurance policy under which the decedent, Peter Glynn, was insured by the defendant, Bankers Life and Casualty Company, in this case. *Id.*

The defendant has not offered any evidence, in its possession at the time it denied the plaintiff's claim, that the decedent's driving with an elevated blood alcohol content made his death highly likely, or even probable. Instead, Mr. Krol states that at the time he denied the plaintiff's claim, he did not have any knowledge regarding drunk driving deaths, and, further, no statistics were involved in his decision to deny the plaintiff's claim. *See* Exhibit K at 104.

The plaintiff, however, offers expert, statistical proof, as was offered in both *Potter* and *West*, which demonstrates the insignificant probability, assuming he was impaired at the time of his death, of the decedent being killed while driving with an elevated blood alcohol content. Exhibit O at 33; Exhibit P at Table 2. This demonstrates that death from driving with an elevated blood alcohol level is not highly likely, or even probable. In fact, Mr. Krol, the defendant's corporate designee, agrees that something would have to be at least more likely than not to qualify as "highly likely."[23]

> Q. Okay. And if the statistics indicated that the chance of were one in 10 million of someone driving intoxicated and dying, would that be highly likely in your opinion?
> …
> A. One in 10 million.
> Q. Would you consider that highly likely?

---

[23] The plaintiff does not concede that being "more likely than not" qualifies an event as highly likely of occurring.

48

> A. My opinion, no.
> Q. Okay. What sort of probability would we look at to determine that something was highly likely, in your opinion?
> …
> A. Over Half.
> Q. Okay. 51-49?
> A. You can say that, I guess.

*See* Exhibit K at 42. Further, Mr. Krol's working definition of "accident" at the time he denied the plaintiff's claim was something unforeseen or unexpected, *Id* at 93, and he agrees that the decedent's death satisfied this definition. *Id* at 103-04. It must be that Mr. Krol, the defendant's corporate designee, would find that an event with a chance of 50 out of 10 million, or even that of 772 out of 10 million, would not qualify as highly likely, and, therefore, such occurrence would be considered by him to be accidental.

Dr. Pandina, the defendant's sole expert, agrees that people who drive while intoxicated, unless attempting suicide, do not expect nor intend to die by doing so. *See* Exhibit F at 141-42. The following is excerpted from the deposition of Dr. Pandina:

> Q. And those folks that are drinking and driving, is it your understanding that they don't expect to die because of it?
>
> . . .
>
> A. There are studies that look at people's expectancies, likelihood of a crash and so on. Even if they know they're impaired, that's part of the impairment of judgment. I don't think anybody except those people who have an intention to commit suicide, get behind the wheel of a car whether they are sober or not, and intend or expect to have a collision.

49

*Id.* Since Dr. Pandina agrees that individuals driving while under the influence, unless attempting suicide, do not expect to be involved in accidents or die by doing so, it may be stated that Dr. Pandina agrees that Peter Glynn's death was accidental under federal common law and ERISA.

Moreover, Dr. Pandina, defines the objective standard that this Court should use in analyzing whether Peter Glynn's conduct, assuming he was operating his vehicle while intoxicated, was an accident. In fact, Dr. Pandina believes that alcohol creates an "impairment in judgment, number one, with regard to your ability to handle any driving situation." Exhibit F at 137. The intoxicated driver overestimates his ability to drive. *Id* at 138 ("Q. In other words, the person overestimates his or her ability to drive, basically. . . A. Generally speaking, yeah."). Therefore, the objective standard should take into consideration that individuals driving while intoxicated, as a group, do not believe that they are unreasonable in believing that they will be able to operate their vehicles without being involved in accidents, including fatal accidents, despite their intoxicated state. *See Critchlow*, 378 F.3d at 257 (citing *Padfield*, 290 F.3d at 1126)[24] ("the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.").

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Q. But at some point, judgment becomes so impaired so that the person believes that he or she can handle the road conditions on a familiar road?

A. Even on an unfamiliar road, otherwise people wouldn't drive and drink.

Exhibit F at 139-140. Therefore, Dr. Pandina's testimony has established the objective standard that should be used to analyze whether Peter Glynn, assuming he operated his vehicle while intoxicated, was reasonable in expecting to survive such action. Since Peter Glynn, assuming his intoxication, would believe, just as Dr. Pandina, an expert on such subject, testified that generally all individuals driving while intoxicated believe, that he would be able to safely arrive at his destination without incident, his belief was reasonable.

The fact is that the Peter Glynn, even assuming he did in fact have an elevated blood alcohol level, was still statistically much more likely to arrive safely at his destination, or to be arrested, than he was to die in the manner he did. *See, West*, 171 F.Supp.2d at 904. Courts holding that deaths resulting from driving while intoxicated are not accidental have misapplied the *Wickman* test, or simply made a "moralistic conclusion" instead of conclusion based on the evidence, which demonstrates that being killed while driving intoxicated is not highly likely, or even probable. The decedent, based on the statistical probability of his being involved in a fatal car accident, was not unreasonable in expecting to

---

[24] The *Padfield* court was applying the *Wickman* test.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

reach his destination on the night he was killed.  Further, Mr. Krol's denial of the plaintiff's claim, stating that the decedent's death was highly likely, while not having any evidence of the statistical probability of deaths from driving with an elevated blood alcohol content, was arbitrary and capricious.

In fact, Bankers Life as been found to have abused its discretion in the Federal District Court of New Jersey based on very similar actions in denying a claim for benefits under a policy like that of Peter Glynn's that was also part of an ERISA plan. *Precopio v. Bankers Life*, CV 01-5721 (D.N.J. 2004) (Kugler, D.J.). More specifically, the *Precopio* court noted that Bankers Life failed to appropriately apply *Wickman*, stated that federal common law was uniform with regard to this issue when in fact it was not, and that their employees denying such claims had no understanding as to why drunk driving deaths are accidents. *Id* at 45, 47.  The fact that Bankers Life failed to investigate into the cause of the accident, other than obtaining the decedent's blood alcohol level was also noted to be significant, in that it in effect created a "secret exclusion" in the decedent's policy. *Id* at 48-49.  Bankers Life has acted in that same manner for which it was criticized in *Precopio*, and such conduct should not be tolerated.

Perhaps the leading case in support of the defendant's argument that, under ERISA's federal common law, the decedent's death was not accidental is *Cozzie v. Metropolitan Life Ins. Co.*  140 F.3d 1104 (7th Cir. 1998).  *Cozzie*, however, is at odds with the binding precedent in the Second Circuit of *Critchlow*,

and misapplies the *Wickman* test. Furthermore, *Cozzie* does not support the defendant's denial of benefits, based not on an expressed exclusion to coverage under the policy, but instead solely on the decedent's reported blood alcohol content. 140 F.3d at 1110-1111.

In *Cozzie*, the decedent was killed in a car accident.[25] *Id* at 1106. It was later determined that the decedent was intoxicated at the time of his death. *Id.* The *Cozzie* court, although holding that the decedent's accident was not accidental, expressed concern with its result. *Cozzie*, 140 F.3d at 1110. The court stated:

> We do not mean to suggest that [the insurer] could sustain a determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law, could reasonably be construed as not accidental. States obviously have the authority to proscribe conduct that, although not inherently dangerous, is sufficiently risky that the general security is enhanced by its proscription. The plan fiduciary cannot interpret the plan in such a way as to make the coverage meaningless.

*Id.* A per se rule that any death involving an individual driving with an elevated blood alcohol content at the time of his death is at odds with federal common law, even according to *Cozzie*. *Id.* The *Precopio* court similarly stated that

> [t]he *manner* in which Bankers Life denied [the plaintiff's] claim- a conclusory statement that death . . . from driving while intoxicated is not accidental, without any consideration of the facts- equates to a representation that all drunk driving fatalities are automatically excluded

---

[25] Please note, that despite its holding to the contrary, the *Cozzie* court itself refers to the decedent's death as a car accident ("Mr. Cozzie was killed in a car accident.") 140 F.3d at 1106.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

from coverage under an ERISA-governed plan (and *not* excluded under a policy *not* governed by ERISA).

(emphasis in original) at 47.

*Cozzie* also noted in its analysis that "the absence of an explicit exclusion must be given significant weight in any review of the reasonableness of a decision by the fiduciary to deny coverage." 140 F.3d at 1111. In fact, the *Cozzie* court warned the drafters of insurance policies about denying benefits not based on any specific exclusions in the policy, stating "[n]evertheless, we caution that plan drafters would be well advised to demonstrate significant circumspection in attempting to require these general plan terms to bear too much weight." *Id* at 1111.

The defendant admits that Peter Glynn's reported blood alcohol level was the only relevant information to Bankers Life and Casualty Company's decision to deny benefits to the plaintiff. *See* Exhibit K at 32. The defendants denial, in effect, was pursuant to its policy which constitutes a per se denial of all claims, under ERISA plans, which involved a decedent killed while operating a motor vehicle with a reportedly elevated blood alcohol level at the time of his death, without any further investigation. The defendant, Bankers Life, established an exclusion to coverage under this ERISA plan that was not expressed in the policy's language.

54

*Cozzie* does not support "the determination that all deaths that are causally related to the ingestion of alcohol, even in violation of law," are not accidents. 140 F.3d at 1110. Mr. Krol, the defendant's corporate designee, confirms the defendant's policy of denying ERISA claims in circumstances such as the decedent, while paying benefits to beneficiaries of decedents killed in the same circumstances, who have accidental death policies in non-ERISA plans. *See* Exhibit K at 24. The defendant, Bankers Life, has not even met its burden that Peter Glynn's accident was a result of his alleged intoxication, which the defendant believes excludes coverage under the applicable policy under ERISA. *See infra* Part III(E).

Further, the defendant admits that in non-ERISA plans, the first step in deciding whether to deny benefits is to look at the exclusions of the policy, and that no exclusion for deaths resulting from driving while intoxicated was involved in the decedent's policy. *See* Exhibit K at 91. However, the defendant fails to follow such procedure when an ERISA plan is involved. *See* Exhibit K at 90-91.

The defendant, through its corporate designee, admits that once it was established that the decedent was reported to have an elevated blood alcohol content, Bankers Life and Casualty Company did not consider the payment of the benefits of this accidental death policy to the plaintiff. *See* Exhibit K at 32. In fact, other than the reported blood alcohol percentage of the decedent, no other facts, including those

related to the cause of the accident, were necessary in its determination, according to the defendant. *Id.*

Cozzie itself, despite holding that, in that particular case the decedent's death was not accidental, does not support the actions of the defendant. The defendant currently denies claims for deaths resulting from a decedent's driving with a blood alcohol content, that is reported to have been elevated, on such fact alone, when the plan involved is an ERISA plan. *Id.* This despite the fact that no policy exclusion is included for driving while intoxicated. *Id* at 90-91. *Cozzie* cautioned insurance companies, as the drafters of policies, against relying on exclusions not expressed in the contract for insurance. 140 F.3d at 1111. The defendant, Bankers Life and Casualty Company, denies claims, relying on an exclusion, allegedly provided by federal common law under ERISA, that is not included in the decedent's policy, which Bankers Life and Casualty Company drafted. If the defendant did not wish to pay benefits in circumstances such as this, it had the power to add an exclusion to its policies. *See, e.g., Cozzie,* 140 F.3d 1111; *Todd,* 47 F.3d at 1456-57.

Further, a direct conflict of interest existed in this case. The defendant, Bankers Life and Casualty Company, was acting as both the insurer and the administrator of the decedent's plan; therefore, the defendant had a financial incentive to deny the plaintiff's claim. Although the existence of a conflict of interest does not determine which standard of review to use in reviewing an

56

administrator's denial of benefits, such a conflict is a factor in determining whether there is an abuse of discretion. *See Firestone v. Bruch*, 489 U.S. at 115.

The defendant's corporate designee, at the time he denied the plaintiff's claim, defined an "accident" as something unforeseen or unexpected, *See* Exhibit K at 93, and Mr. Krol agrees that the decedent did not intend, nor likely foresee his death on the night of his accident. *Id* at 103-104. The defendant's expert agrees that Peter Glynn's death was accidental, since there is no allegation that he was committing suicide. *See* Exhibit F at 141-42. The defendant pays claims under the same alleged factual circumstances involving Peter's death under policies with the same language as his policy, which are not covered by ERISA. Exhibit K at 24. Indeed, the defendant has yet to establish that Peter Glynn was intoxicated at the time of his accident, or that alcohol caused this accident. Further, the defendant, while acting under a direct conflict of interest, denied the plaintiff's claim for benefits without, any statistical evidence demonstrating that the probability or likelihood of the operator of a motor vehicle with an elevated blood alcohol level of being killed in a motor vehicle accident is highly likely. *See* Exhibit K at 103-104. However, the plaintiff offered expert statistical proof with regard to the chance of the decedent being killed, assuming he was intoxicated, which demonstrates that such a risk was extremely low. Exhibit O at 33; Exhibit P. Despite this, the defendant still denied the plaintiff's claim for

RISCASSI & DAVIS, P.C. • ATTORNEYS-AT-LAW • 131 OAK STREET • P.O. BOX 261557 • HARTFORD, CT 06126-1557 • (860) 522-1196

benefits.  The denial was based solely on the decedent's reported blood alcohol level.  The defendant's decision cannot be upheld, under any standard of review.

E.     FORENSIC TOXICOLOGY DEMONSTRATES THAT NO CONCLUSION CONCERNING IMPAIRMENT CAN BE DRAWN FROM THE BLOOD ALCOHOL CONTENT REPORTED BY THE MEDICAL EXAMINER

The sole fact relied on by the defendant in denying the plaintiff's claim for benefits in this case, the blood alcohol content of Peter Glynn's blood that was reported by the medical examiner, is an unreliable measure of the decedent's alleged level of intoxication at the time of his accident and death.  Other than this reported blood alcohol level, there is no evidence of any kind that demonstrates that Peter Glynn consumed alcohol on the day of his accident.  There was no evidence that he purchased alcohol, nor was there any evidence of alcohol at the scene of the accident.  Furthermore, the blood alcohol content reported by the medical examiner does not establish, by itself, with any measure of medical scientific certainty, the level of impairment, if any, of Peter Glynn at the time of his accident.

Bankers Life does not claim that the decedent's death was not covered by the language of the terms of the applicable policy.  In fact, the defendant continues to pay claims for deaths resulting from drunk driving under the same policy language in plans not covered by ERISA.  Rather, the defendant now seeks to use ERISA to exclude an otherwise covered event.  Therefore, it is the

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

defendant's burden to demonstrate that the decedent was excluded from coverage under the policy,[26] requiring that Bankers Life demonstrate at a minimum that Peter Glynn was intoxicated, and such intoxication caused his accident, and his death. The defendant's denial was without evidentiary support and should be overturned. The defendant, despite the fact various tissues were taken from Peter Glynn's body, and the fact that procedures existed that would have allowed the determination as to his level of intoxication, if any, instead simply refused to pay benefits to plaintiff, based solely on this single fact, without any further investigation.

Nobody witnessed Peter Glynn drinking prior to his accident. Peter's sister, Theresa Jones, stated that Peter visited her at her home, prior to his accident on June 8, 2001, from about 3:45 p.m. until about 5:00 p.m. Exhibit G at 8. Ms. Jones stated that she did not detect that Peter had consumed any alcohol, nor did she provide or observe him drinking any alcoholic beverages. *Id* at 19. Other than the approximate time that Peter left her home, any further opinion about his whereabouts and his itinerary after he left her home and prior to his accident would call for her speculation. *Id.*

---

[26] The Federal District Court of New Jersey, in *Precopio v. Bankers Life*, CV 01-5721 (2004) (Kugler, D.J.), stated that, since Bankers Life pays benefits on claims made under plans not covered by ERISA, while at the same time denying claims involving alcohol under the same policy which were covered by ERISA, that such amounted to a "secret exclusion" of all claims involving alcohol under ERISA plans. *See Precopio*, at 47-48.

RISCASSI & DAVIS, P. C.   •   ATTORNEYS-AT-LAW   •   131 OAK STREET   •   P. O. BOX 261557   •   HARTFORD, CT 06126-1557   •   (860) 522-1196

The defendant has not offered any further evidence with regard to the time and/or place where Peter Glynn allegedly consumed alcoholic beverages. There was no evidence at the scene of accident, for example, the presence of any alcoholic beverages and/or empty containers. Exhibit C. Furthermore, the defendant was unable to determine, through its own investigation, any nearby location where the decedent may have purchased alcohol. Exhibit E at 3. The defendant's expert agrees that evidence of the "drinking pattern" of the decedent prior to his death would be a factor considered in determining alcohol ingestion, and the affect of such ingestion, if any, on that person. Exhibit F at 24.

"The concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol." *See* Exhibit I at page 7, Paragraph 28 (quoting "Postmortem Alcohol Production in Fatal Aircraft Accidents" Canfield, D.V., Kupiec, T., and Huffne, E.; *Journal of Forensic Sciences* Vol. 38, (1993), pp. 914-917. Indeed, the defendant's denial of the plaintiff's claim under the decedent's policy was based solely on the reportedly elevated blood alcohol content of Peter Glynn, which was based on one single blood sample that was taken from Peter Glynn's heart during autopsy, and hours after his death. *See* Exhibit I at Page 4, Paragraphs 12 and 13.

The defendant cannot establish, based only on the aforementioned blood sample, that Peter Glynn was intoxicated at the time of his death. Dr. Soper states

60

that "[t]he interpretation of possible postmortem alcohol production is one of the most significant toxicological issues facing any laboratory involved in postmortem analysis." Exhibit I at 5, Paragraph 20. In this case, it simply cannot be determined with any degree of medical certainty that the decedent ingested alcohol prior to his death or whether the alcohol was produced through other biological processes. *Id* at 10, Paragraph 45. Since the blood alcohol level reported by the medical examiner is insufficient as an indication of the decedent's level of intoxication at the time of the accident, the defendant should not be allowed to rely on such in denying the plaintiff's claim, especially where there is no expressed exclusion in the policy.

Moreover, the defendant, if it chose to do so, could have more definitively established the decedent's level of intoxication at the time of this accident, instead of blindly denying the plaintiff's claim based on this single reported number. Dr. Soper reports that there exist at least two approaches that would likely allow the determination of whether the blood alcohol content is valid or a result of postmortem production. Firstly, the ratio of alcohol found in the decedent's blood could be compared to that of other tissue specimens taken from his body. *See* Exhibit I at 5, Paragraph 21. Additionally, other bodily fluids, which have been determined to be "relatively free from the possibility of postmortem alcohol production," specifically urine and vitreous humor, may be analyzed to more definitively establish that the reported blood alcohol content is correct. *Id* at 6,

61

Paragraph 22. Although the medical examiner took tissue samples from the decedent's body including urine, vitreous, gastric contents, liver, and brain, none were analyzed for the presence of alcohol, and the defendant, despite its reliance on one single fact, failed to seek to confirm this finding prior to denying the plaintiff's claim, or at any point in this dispute. *Id* at 4, Paragraph 12.

In fact, to avoid making an erroneous finding that an individual killed while operating a plane was intoxicated, Dr. Soper states the following procedure, which his department at the Federal Aviation Administration follows:

> (a) Urine or vitreous fluid is always used as an initial preference for analysis, if available. In these cases, blood is only analyzed if a positive finding is made in another tissue; (b) All ethanol findings must be documented by positive gas chromatography (GC) on two separate types of GC columns; (c) All positive findings must be confirmed by a second (immunoassay) method; (d) At least 2 and preferably 3-5 tissue types should demonstrate expected ethanol ratios, and finally (e) If a single tissue type exhibits a negative reading, the case will be documented as "postmortem ethanol production."

*See* Exhibit I at 7, Paragraph 29. This extensive procedure is further evidence of the unreliable results that may be attained from a single postmortem blood sample, without additional supporting tissues.

A journal article relied on by Dr. Soper in the formulation of his opinions with regard to this case, illustrates this point more precisely. *Id* at 5, Paragraph 18 (citing "Postmortem Alcohol Production in Fatal Aircraft Accidents" Canfield, D.V., Kupiec, T., and Huffine, E.; *Journal of Forensic Sciences* Vol. 38, (1993), pp. 914-917.). This article examined 975 cases during 1989-90. *Id* at 6,

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Paragraph 24.  In this period, seventy-nine of the 975 cases (8%) had positive alcohol findings.  *Id.*  Of those cases where alcohol was found, twenty-one (27%) were determined to have been as a result of postmortem production of alcohol, as opposed to the ingestion of alcohol, "based on the finding of ethanol in blood, but not in urine, or vitreous humor."  *Id* at Paragraph 25.  It is of note that two cases involved postmortem alcohol production in excess of 0.15%.  *Id.*  Another twenty-two cases (28%) were ruled to be the result of alcohol ingestion, "due to the fact that blood ratios were similar to that found in other tissues."  Exhibit I at 6, Paragraph 26.  Furthermore, in 45% of those cases studied, a "determination of the origin of the ethanol could not be made."  *Id* at Paragraph 27.  Therefore, the article, of which Dr. Soper relies and agrees, determines that "[t]he concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol."  *Id* at 7, Paragraph 28.  Simply stated, no determination can be made with regard to Peter Glynn's level of impairment, if any, at the time of his death, based solely on this blood sample.

In fact, Dr. Soper also noted that the decedent's diabetes and/or elevated blood glucose level could have contributed to his body's postmortem production of alcohol in this case.  *See* Exhibit I at 10, Paragraph 45.  On April 14, 2000, Peter Glynn's blood sugar was found to be 317 mg/dl.  *Id* at 7, Paragraph 31.  Furthermore, Peter reported having found his blood sugar to be in excess of 400

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

mg/dl previous to that time. *Id.* In May of 2000, Peter Glynn was prescribed Glucophage, with an "impression of Type 2 diabetes." *Id* at Paragraph 32. Dr. Soper states that one can assume from the fact that there is no record of Peter's compliance with a treatment regimen for diabetes, that on the date of his accident, Peter's blood sugar was elevated. *Id* at 8, Paragraph 33. Dr. Soper states that "[g]lucose is a primary nutrient involved in [postmortem alcohol] production." *Id* at Paragraph 35. Therefore, the decedent's diabetes and/or elevated blood sugar could have contributed to an increased postmortem alcohol production.

The conditions under which Peter Glynn's body was kept after his death and prior to the analysis of his single blood sample, along with the amount of time that passed between his death and such analysis, also decrease the reliability that the single blood sample is, with a reasonable medical degree of certainty, indicative of Peter's level of intoxication, if any, at the time of his accident. *See* Exhibit I at 8, Paragraphs 36-39. Peter is believed to have died at about 7:45 p.m. on June 8, 2001; however, his autopsy was completed on June 9 at 1:30 p.m., and his blood sample was not received by the laboratory until June 11, 2001, over two days after his death. *Id* at Paragraph 37. The exact conditions under which Peter's body was kept are unknown. *Id* at Paragraph 36. Moreover, Dr. Soper states that "[e]ven assuming that blood tubes contained sodium fluoride; we have already noted that similarly treated tubes of blood in our laboratory have been capable of producing postmortem alcohol." *Id* at Paragraph 39. This single blood

64

sample is insufficient evidence to make the determination, with any degree of medical certainty, that Peter Glynn was intoxicated at the time of his accident, and the defendant should not be allowed to rely simply on this sole fact in denying benefits due to the plaintiff.

The testimony of the defendant's expert, Robert Pandina, Ph.D., does not conflict with that of Dr. Soper's, with regard to the possibility of postmortem alcohol production. In fact, Dr. Pandina stated that, absent other evidence with regard to of various facts, this blood alcohol level is nothing other than an assumption. Exhibit F at 90. Dr. Pandina agrees that many factors make the decedent's reported blood alcohol level uncertain. Exhibit F at 90-91. Among these factors are: (1) nobody observed the decedent's drinking prior to death, see Exhibit F at 65; (2) possible blood pooling in the decedent's heart where the sample was taken, *Id* at 88-89 ("Because pooling can give you a higher concentration than you would find in other parts of the body? A. It's possible.); (3) the reliance on a single blood sample without any other samples to compare, *Id* at 94 ("In any sample . . . One would have anomalies that might affect entire areas and they might not effect in other areas"),); (4) the possible diffusion of alcohol, due to trauma during the accident, into the area where the single blood sample was taken, *Id* at 67-68 ("Looking at the physical findings in the autopsy, including the injury to the chest area, and the obvious injury to the back and contusions to the chest itself, and the blood in the lungs, are you able to tell me

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

whether or not there was any diffusion into the heart? . . . A. I'm not able to answer that."); (5) the lack of the ability to know whether the decedent had reached equilibrium, Exhibit F at 40 ("[I]n a cadaver to determine equilibrium, where would you want to take samples? A. I'd like to have samples from vitreous humor, obviously arterial blood. Stomach would be helpful. Brain tissue would be helpful . . . ."; and (7) the possibility that the blood alcohol level may have been achieved through the body's postmortem processes, rather than through ingestion prior to his death. *Id* at 33 ("Would you agree that all experts . . . recognize that postmortem production of ethanol can occur? A. I believe so, yes."), *Id* at 45 ("And what about diabetes? A. It also goes to the question of whether the ethanol was produced postmortem. Q. Correct? A. To some extent.") 99, 115 -16 ("There are studies out there that show rigorous postmortem alcohol."). Therefore, the decedent's blood alcohol level, reported by the medical examiner, and based solely on a single sample taken from the decedent's heart during his autopsy hours after his death, is unreliable in establishing the alcohol concentration throughout Peter Glynn's body with any degree of medical certainty at the time of his accident.

Indeed, Dr. Pandina admits that it is "impossible" for him to say with any certainty that Peter Glynn's blood alcohol concentration was not lower than the 0.17% reported. Exhibit F at 121. Further, he states that it is possible that Peter's blood alcohol level could have been 0% at the time of his death. *Id.* Indeed, Mr.

RISCASSI & DAVIS, P. C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Pandina states that it is possible that many variables could have affected the source of the alcohol reflected in the reported 0.17% value, *Id* at 110-11. The defendant cannot demonstrate, based solely on the single blood sample that the medical examiner analyzed, that Peter Glynn was intoxicated at the time of his accident and subsequent death. *Id* at 115. Therefore, the defendant is unable to meet its burden with regard to its attempt to exclude coverage under the decedent's policy, and the plaintiff's claim should be paid pursuant to the contract.

The defendant, Bankers Life, has failed to meet its burden of proving its "secret exclusion" that it is alleging applied to the decedent Peter Glynn under his policy and covered by ERISA. Nobody can testify as to observing or providing any alcoholic beverages to the decedent on the night of his accident. Furthermore, the sole evidence of Peter's alleged intoxication, the blood sample reported by the medical examiner, is scientifically unreliable, on its own, in establishing the alleged intoxication of Peter Glynn at the time of his accident. Since there is no reliable evidence to support the defendant's decision to exclude coverage on Peter Glynn's policy, the plaintiff's claim should be paid.

## VI.    CONCLUSION

For the foregoing reasons, the plaintiff respectfully requests that his Motion for Summary Judgment be GRANTED. Additionally, the plaintiff requests that this Court order the defendant, Bankers Life and Casualty Company, to pay the plaintiff, Philip Glynn, $420,000, the amount payable under the above

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

referenced accidental death policy, along with reasonable attorney's fees and costs

of this action.

PLAINTIFF,
PHILIP GLYNN

By _Everett H Mad_

Everett H. Madin, Jr.
Federal Bar No.: CT 12297
RISCASSI & DAVIS, P.C.
131 Oak Street
Hartford, CT 06106
Ph: 860-522-1196
Fax: 860-246-5847

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed via First Class
Mail, postage pre-paid, on this 17th day of March, 2005 to the following counsel
of record:

John Shaban, Esq.
Whitman, Breed, Abbott & Morgan
100 Field Point Road
Greenwich, CT 06830

Andrew Muscato, Esquire
Skadden, Arps, Slate, Meagher, & Flom, LLP
Four Times Square
New York, NY 10036-6522

_Everett H Madin_

Everett H. Madin, Jr.

68