# EXHIBIT I

<u>DECLARATION OF JOHN W. SOPER, Ph.D., DABFT, DABCC (CT), DABCC (CC)</u>

I hereby state, under penalty of perjury, that the following statements are true and correct.

1. My name is Dr. John W. Soper. I have over 31 years of experience, at the doctoral level, in Forensic Toxicology, Clinical Toxicology, Clinical Chemistry, and Biochemistry. My forensic experience includes 14 years in post-mortem and 7 years in work place drug testing, with job duties ranging from analyst to Director. I have been personally certified as a Diplomate for over 18 years and have been directly involved in obtaining Laboratory Accreditation from all three agencies in the US involved in certifying laboratories involved in Forensic Drug Testing. I am qualified as an Expert witness in hearings before the National Transportation Board, by the criminal courts in the State of Oklahoma, the Oklahoma Board of Medical Licensure, the Oklahoma Board of Nursing, and by Workmen's Compensation boards in the States of Oklahoma and Texas.

2. I am a Diplomate of the American Board of Forensic Toxicology (DABFT), and of the American Board of Clinical Chemistry in the sub-specialties of Clinical Toxicology (DABCC-CT) and Clinical Chemistry (DABCC-CC). The American Board of Bioanalysis (ABB) has awarded me certificate # 5706 as a Certified Laboratory Director (CLD). I am a full member of the American Academy of Forensic Sciences (AAFS), the Society of Forensic Toxicologists (SOFT), the International Association of Forensic Toxicologists (TIAFT), and the Southwest Association of Toxicologists (SAT). I am also a Team Lead Inspector for the College of American Pathologists (CAP).

3. I hold a PhD in Biochemistry from the University of Arkansas for Medical Sciences, with an NIH pre-doctoral Fellowship. I served as a Mellon and NIH post-Doctoral Fellow in the Department of Physiological Chemistry at the Johns Hopkins School of Medicine. I also held the rank of Instructor in the Department of Physiology at the Mount Sinai School of Medicine in New York City, and in the Department of Chemistry at the US Naval Academy. Following those appointments I served as a Clinical Associate in the Clinical Chemistry Department at the University of Maryland Hospital. My mentor was Dr. Thomas Koch, former President of the American Board of Clinical Chemistry. I also served four years as a Toxicologist in the State of Maryland Medical Examiner's Office, working under Dr. Yale Caplan, current President of the American Board of Forensic Toxicology, and Distinguished Fellow of the AAFS.

4. Following my tenure in Maryland I became the Laboratory Director for National Drug Assessment (NDA) in Oklahoma City, Oklahoma. While I was Director, my laboratory was one of only five labs in the US co-certified by both the National Institute of Drug Abuse (NIDA) and the College of American Pathologists (CAP) on their very first lists of Certified Labs. I served as the Responsible Person, and the Laboratory Director, respectively for those agencies.

5. The Federal Aviation Administration's Civil Aerospace Medical Institute (CAMI) in Oklahoma City, Oklahoma presently employs me as a research chemist. In my present capacity, I function as the CAP Scientific Director. In that role I have also been responsible for carrying out all inspection activities required to have our Bioaeronautical Sciences Research Laboratory awarded accreditation by the American Board of Forensic Toxicology (ABFT)

6. I have been awarded the "Group Superior Accomplishment Award" by the FAA's Drug Abatement Division for my services as an Expert witness in review of cases involving alleged drug usage or tampering with specimens submitted for drug analysis.

7. I have also been awarded a "Special Act Award" by the Aerospace Medical Research Division for my role in allowing CAMI to become the only lab in the world to obtain dual accreditation by both the American Board of Forensic Toxicology (ABFT) and the College of American Pathologists (CAP).

8. I have examined the Autopsy findings for Peter Glynn, ME Case # 01-07155, as prepared by the Office of the Chief Medical Examiner for the state of Connecticut on July 26, 2001.

9. The records indicate that Mr. Glynn was a 40 year old male, involved in a fatal automobile accident in Bristol, CT. on June 8, 2001.

10. Mr. Glynn was the sole occupant of the vehicle, and no other vehicles or persons were involved in the accident. The death was reported by the Bristol police department at 19:45 on the evening of the 8th.

4

11. Dr. V. Mirabelli pronounced death at 20:35 and the body was transported by the O'Brien Funeral Home of Forestville, CT to the OCME in Farmington, CT for autopsy.

12. Autopsy was begun at 11:30 AM on the morning of the 9th. The following specimens were taken for Toxicologic analysis: Blood, Cardiac (110 ml); Urine (100 ml); Vitreous Fluid (3 ml); Gastric Contents (100 ml); Liver (113 g); and Brain (100 g). Postmortem examination was completed at 1:30 PM.

13. The above samples were received from Dr. Malka Shah on the morning of June 11, and identified with Laboratory number L01-0667.

14. A laboratory report was issued on June 22, 2001 which indicated that blood was analyzed for the following agents: ethanol and other common volatiles, acidic and basic drugs, carbon monoxide, cocaine and/or cocaine metabolites and opiates.

15. The laboratory report further stated that urine was analyzed for the presence of salicylates.

16. The only positive finding noted was ethanol, found at a concentration of 0.17%. The procedure used for analysis was gas chromatography. No other collected tissues were analyzed for ethanol in the case.

17. The cause of death was listed as head injuries, and manner of death was listed as accident, with ethanol intoxication as an additional significant condition. These comments are noted on page 7 of the postmortem report, signed on July 7, 2001.

18. In addition to my review of the post mortem report provided by the OCME, I have also reviewed the following additional documents: (a) "Postmortem Alcohol Production in Fatal Aircraft Accidents" Canfield, D.V., Kupiec, T., and Huffine, E.; *Journal of Forensic Sciences* Vol. 38, (1993), pp. 914-917, and (b) Medical records for the deceased.

19. In the aforementioned article particular attention is given to the possibility of postmortem alcohol production following death. The authors quote "..specimens of human tissue containing micro-organisms, particularly specimens taken from corpses, may contain ethanol produced by microbial fermentation, and extreme caution should be exercised when assessing the significance of postmortem ethanol….Severe damage to the body often exposes specimens to microorganisms that can produce ethanol under the proper circumstances (temperature, time and nutrients)."

20. The interpretation of possible postmortem alcohol production is one of the most significant toxicological issues facing any laboratory involved in postmortem analysis. Two significant approaches to this situation are put forth by the authors, and are currently widely practiced in many medical examiner/coroners laboratories.

21. The first approach is to examine the ratio of ethanol in blood to that of other specimens. One should expect to find comparable levels in other tissues as found in blood.

22. A second approach is to examine urine or vitreous humor. Both of these fluids, especially vitreous humor, are relatively free from the possibility of postmortem alcohol production. In addition, if ethanol found at autopsy is truly from ingested alcohol, a useful estimate of the state of absorption may be achieved by analysis of these particular specimens.

23. In our laboratory at the Civil Aerospace Medical Institute we receive blood samples in 10 ml vacutainers containing sodium fluoride (to retard bacterial growth), in addition to an anticoagulant. These samples are then refrigerated and sent to our laboratory by overnight air. These collection practices are essentially the same as practiced by Medical Examiner offices all over the country.

24. In the aforementioned paper, all cases exceeding the amount of alcohol allowed under FAA guidelines (0.04%) were examined for the possibility of postmortem ethanol production. In the period from 1989 to 1990 a total of 79 out of 975 cases (8%) were found to have positive ethanol findings.

25. Twenty-one of these 79 cases (27%) were found to represent postmortem ethanol formation, as based on the finding of ethanol in blood, but not in urine, or vitreous humor. In two of the cases, the postmortem concentrations exceeded 0.15%.

26. In another twenty-two of these cases (28%) a ruling of ingestion was made, due to the fact that blood ratios were similar to that found in other tissues.

27. In the remaining 45% of the cases a determination of the origin of ethanol could not be made since vitreous humor or urine was not submitted in those cases.

28. A final conclusion reached by the authors is as follows: "The concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol."

29. While not presuming to suggest what other laboratories should do, we follow the following guidelines in our postmortem ethanol analysis: (a) Urine or vitreous fluid is always used as an initial preference for analysis, if available. In these cases, blood is only analyzed if a positive finding is made in another tissue; (b) All ethanol findings must be documented by positive gas chromatography (GC) on two separate types of GC columns; (c) All positive findings must be confirmed by a second (immunoassay) method; (d) At least 2 and preferably 3-5 tissue types should demonstrate expected ethanol ratios, and finally (e) If a single tissue type exhibits a negative reading, the case will be documented as "postmortem ethanol production."

30. A second set of documents examined were the medical records produced for Mr. Glynn in the period from June 19, 1998 to August 14, 2000.

31. Pertinent findings from these records indicate that a random blood sugar of 317 mg/dl was obtained on April 14, 2000. The patient reported that he had earlier checked himself on a friend's machine and had obtained a reading of over 400. The patient further noted that he had a family history of diabetes.

32. The patient's physician, Dr. Michael Liftman, noted an impression of Type 2 diabetes, prescribed Glucophage, and referred the patient to the Bristol Hospital Wellness center for an appointment on May 17, 2000.

8

33. No record of patient compliance with a diabetes treatment program is recorded, and it may be reasonably assumed that at the time of his fatal accident over one year later his random blood glucose was still elevated.

34. Possible contributing factors with regard to a positive blood ethanol may be stated as follows:

35. As stated in the aforementioned article, postmortem ethanol production is always a possibility in traumatic death. Glucose is a primary nutrient involved in this production, and the victim may be reasonably assumed to have a greater than normal glucose level to facilitate this process.

36. A second factor required for ethanol production is a temperature conducive to bacterial growth. Although we do not know the exact conditions in which the body was transported and stored, we may assume that at least several hours of temperatures consistent with optimal microbial growth passed before autopsy was completed.

37. A final factor involved in postmortem production is time. We note that the accident occurred sometime prior to 19:45 on the evening of June 8, autopsy was completed at 13:30 on June 9 and the laboratory did not receive specimens until the morning of June 11.

38. The exact time of ethanol analysis is not noted, although we do know that analysis was concluded prior to report generation on June 22, 2001.

39. Even assuming that blood tubes contained sodium fluoride; we have already noted that similarly treated tubes of blood in our laboratory have been capable of producing postmortem alcohol.

40. The most significant concern with regard to the analytical results is that adequate amounts of ideal specimens for examination of alcohol, with a low probability of post mortem production were available; but the findings were based on a single tissue type.

41. A final general comment is that ethanol present in any postmortem case may well be a mixture of both ingested and artifactually produced alcohol. It would be very difficult to sort out relative contributions from both sources.

42. Furthermore, even if the value were presumed to be solely due to ingestion, the absence of other tissue levels does not allow a determination to be made regarding the stage of absorption.

43. I have previously cited comments from work performed at the Civil Aerospace Medical Institute, and published in a paper entitled "Postmortem Alcohol Production in Fatal Aircraft Accidents". It is appropriate at this time to repeat the final conclusion reached by the authors: "The concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol."

44. In my own present position at this Institute, our standard operating procedures would not permit me to issue an interpretative report based on a single positive finding. This is especially forbidden by our procedures in the event that other suitable samples are available, as they were in this case.

45. Therefore, in the absence of other biological sample data, and especially considering the possibility that an elevated glucose level might increase the possibility of postmortem production, no conclusion can be drawn as to whether, or how much ethanol Mr. Glynn may have ingested.

I certify, under penalty of perjury, that the foregoing statements are true and correct.

Executed on this 3rd day of February 2005.

_John W. Soper, PhD, DABFT_ 
John W. Soper, PhD, DABFT

On Feb. 3, 2005, the above person appeared before me and swore to the foregoing statement.

_Christy Moberly_     My Commission expires: Oct 22, 2005
Notary Public #01017680