final decision-maker on Precopio's claim for benefits, this court reviews the plan language to determine if discretion was granted to Bankers Life.

While the SPD does not specifically state that Bankers Life has discretion to evaluate claims for accidental death benefits, the SPD does state generally: "Plans covered by ERISA have, by law, 90 days from the date on which a claim is filed to *evaluate and process* the claim." (Riband Aff., 4/8/04, Ex. "B,", SPD at 176) (emphasis added). If a claim is denied, the SPD imposes specific obligations upon Bankers Life:

**If Your Claim is Denied**

If your claim for a benefit is denied in whole or in part, you (or your beneficiary) will be notified in writing by the Administrator for that benefit Plan. This written notice will include:

- A specific reason(s) for the denial;

- References to Plan provision(s) on which the denial is based;

- A description of any additional material or information that is necessary to process the claim; and

- An explanation of how to appeal the decision.

You or your authorized representative may review all documents related to any denial of benefits. If you disagree with the denial, you have 60 days from the receipt of the original denial to request a review. This request should be in writing and sent to the Administrator for that benefit Plan. Refer to the chart beginning on page 173 for the mailing address for each Plan.

The reviewer will issue a decision within 60 days. If more time is needed, the law allows the reviewer a 60-day extension as long as you are notified in advance of the need and reasons for the delay. You will be notified in writing of the final and binding decision on your claim, the reason for the decision and any applicable Plan provisions.

---

Company," and "Administered By: Bankers Life and Casualty Co., 666 Old Country Road, Suite 300, Garden City, NJ 11530." (Riband Aff., 4/8/04, Ex. "B," SPD, at 174).

> See *Your Rights Under ERISA* on page 177 for information on legal action you can take if you feel your right to a benefit has been improperly denied.

(Id.)

The determination of whether the Plan confers discretion on Bankers Life is complicated by the different nature of the two independent grounds upon which Bankers Life denied Precopio's claim—that Precopio was not an employee of Biosense at the time of the accident, and that Precopio's death was not accidental. Courts make a distinction between an administrator's decision based on *fact-finding* versus interpretation of plan terms (*i.e.*, where facts are not in dispute and recovery of benefits is dependent solely on the administrator's interpretation of plan terms). In Luby, the Third Circuit surveyed the split in the federal courts about whether the Firestone *de novo* review rule applied to both kinds of determinations—a determination of the facts underlying the claim, as well as a determination of whether the plan's terms authorize payment under those facts—and concluded that just like denials based on plan interpretation, denials based on fact-finding are subject to a *de novo* review unless administrators are granted discretion to decide disputed issues of fact. Luby, 944 F.2d at 1183-84. As the court explained:

> Plan administrators are not governmental agencies who are frequently granted deferential review because of their acknowledged expertise. Administrators may be laypersons appointed under the plan, sometimes without any legal, accounting, or other training preparing them for their responsible position, often without any experience in or understanding of the complex problems arising under ERISA, and . . . little knowledge of the rules of evidence or legal procedures to assist them in factfinding.

Id. at 1183.

14

Thus, "an ERISA plan administrator's decision as to entitlement [of benefits] based solely on factual determinations is to be reviewed *de novo*," unless the plan specifically confers discretion upon the administrator in that area. Id. Although a plan may grant an administrator discretionary authority in some areas, a plan's failure to specifically grant discretionary authority to the administrator to decide disputed issues of fact results in a *de novo* review of an administrator's factual findings. 944 F.2d at 1180-81. See also Jones v. United States Life Ins. Co., 12 F. Supp. 2d 383, 387-88 (D.N.J. 1998) (reviewing the plan language separately for administrator's fact-finding authority and for plan interpretation to discern whether review of administrator's factual determination should be *de novo*).

In Mitchell v. Eastman Kodak Co., 113 F.3d 433 (3d Cir. 1997), the Third Circuit, recognizing the distinction made by Luby between fact-finding and plan interpretation, emphasized that a court's search for discretionary language regarding an administrator's fact-finding authority must be very specific: "[T]he appropriate standard of review here depends on 'whether the terms of this Plan grant the Administrator discretion to act as a finder of facts' to decide whether Mitchell was 'totally disabled' by CFS . . . ." 113 F.3d at 438. The court found that the following language *did* confer discretionary language upon the administrator to make such a factual finding and, thus, the court applied an arbitrary and capricious standard of review: "In reviewing the claim of any participant, the Plan Administrator shall have full discretionary authority to determine all questions arising in the administration, interpretation and application of the plan. In all such cases, the Plan Administrator's decision shall be final and binding upon all parties." Id.

15

The <u>Mitchell</u> court also cited the following Third Circuit precedent as examples of what language would be found to confer discretionary authority on an administrator to make factual findings: <u>Nazay v. Miller</u>, 949 F.2d 1323 (3d Cir. 1991) (applying arbitrary and capricious standard to plan administrator's fact-based decision where plan provided administrator with "discretion and authority to interpret and construe the provisions of the Plan, to determine eligibility to participate in the Plan . . . and to decide such questions as may arise in connection with the operation of the Plan"); <u>Stoetzner v. United States Steel Corp.</u>, 897 F.2d 115 (3d Cir. 1990) (applying arbitrary and capricious standard to administrator's factual determination where plan provided that "[the administrator] shall . . . decide all questions arising out of and relating to the administration of [the plan] . . . The decisions of the [administrator] shall be final and conclusive as to all questions of interpretation and application of [the plan] and to all other matters arising in the administration thereof."); <u>see also</u> <u>Scarinci v. Ciccia</u>, 880 F. Supp. 359 (E.D. Pa. 1995) (applying arbitrary and capricious standard to administrator's mixed fact- and plan-interpretation-based decision to deny short-term disability benefits under plan that required employee to provide "satisfactory" evidence of disability to administrator with discretionary authority "to . . . determine conclusively for all parties all questions arising in the administration of the Plan").

Here, Bankers Life's denial of Precopio's claim was based on two different grounds: (1) that Precopio was not an employee of Johnson & Johnson on the date of the accident; and (2) that Precopio's death was not accidental because he was driving while intoxicated. The first ground for denial is based on a finding of fact: whether Precopio was an employee of Biosense on the date of the accident was disputed, and the resolution depended upon a review of conflicting

16

employment documentary evidence, not simply an interpretation of a plan term. The second ground for denial, however, is based purely on interpretation of the plan term for "accident," and the facts used to make that determination were undisputed. Accordingly, because of the differing nature of the two grounds for Bankers Life's denial of Precopio's claim, this court is instructed by Luby and Mitchell to search the plan language not only for a grant of discretion to determine eligibility generally, but also for discretion to make factual findings.

### a. Determination That Precopio Was Not an Employee: De Novo Review

Neither the language and supporting arguments proffered by Defendants nor the court's own review of the Plan language demonstrate that the Plan gives Bankers Life discretion to decide disputed issues of fact, *i.e.*, whether Precopio was a Biosense employee at the time of his death. There is no language in the plan similar to the language recognized in Mitchell as conferring discretionary authority to decide factual disputes. Nor is there any language indicating, as in the cases cited by Mitchell, that Bankers Life had discretion to "determine eligibility," to "decide such questions as may arise in connection with the operation of the Plan," to "decide all questions arising out of and relating to the administration" of the Plan, or to "determine conclusively for all parties all questions arising in the administration of the Plan."

It is not only the absence of relevant language in the plan, but also what Bankers Life actually did (or didn't do), that leads this court to conclude that Bankers Life had no discretion to engage in fact-finding. In fact, as communicated to the Precopios in its denial letter, Bankers Life did *not* engage in any fact-finding—it simply relied on Johnson & Johnson for the answer of whether Precopio was a Biosense employee. ("Johnson & Johnson maintains all records regarding eligibility for coverage. They tell us that at the time of his death on September 19,

17

1999, Mr. Precopio was no longer covered under this plan having voluntarily ended his employment as of September 3, 1999. Johnson & Johnson tells us that if Mr. Precopio did any work relating to his employment with Biosense Webster, Inc. after September 3, 1999, it was neither at their behest nor with their consent. So, I'm sorry, but the policy will not permit payment of benefits." (Pl. Ex. "G," Claim File, at BLC-73).

Similarly, in its denial of the Precopios' appeal, Bankers Life supported its decision by saying simply: "Johnson & Johnson denies that Mr. Precopio was in their employ at the time of his death. In regard to your request for details supporting our denial, Johnson & Johnson had indicated that they have previously presented your firm with all the documentation relevant to Mr. Precopio's termination of employment with Biosense Webster, Inc." (Pl. Ex. "G," at BLC-77).

Moreover, as discovery in this case has revealed, Bankers Life accepted Johnson & Johnson's conclusion without question, even though Johnson & Johnson changed its position and the Johnson & Johnson documents that Bankers Life relied on contained conflicting information. On February 15, 2001, the Johnson & Johnson Benefit Service Center submitted a report to Bankers Life regarding the status of Precopio's employment. (Pl. Ex. "G," Claim File, at BLC-21-22). Within that report itself is contradictory information about Precopio's employment status. In two different places, the report states that the last day Precopio worked for Biosense was September 18, 1999. In another section, the report states that Precopio was terminated effective September 4, 1999.

One month later, on March 20, 2001, the Johnson & Johnson Benefit Service Center submitted a "corrected" report to Bankers Life and back-dated it to the date of the earlier report.

18

(Pl. Ex. "G," Claim File, at BLC-40-41). The "corrected" report no longer states that the last day Precopio worked for Biosense was September 18, 1999; instead, the last day of work is consistently listed as September 3, 1999. The fax cover page accompanying the "corrected" report states: "The following documents titled Johnson & Johnson, ET AL and Statement of employer are to cancel any preceding documents sent for Mr. Thomas Precopio." (Pl. Ex. "G," Claim File, at BLC-39) Handwritten at the top of the fax by the Bankers Life claims examiner is: "'NEW' eligibility info from J&J." (Id.; Pl. Ex. "E," William Blessing Dep., at 99-100). A follow-up letter, written by Marsha Schwartz of Johnson & Johnson to William Blessing of Bankers Life, states:

> The claim forms originally sent to you by the Benefit Service Center were not completed properly and revised forms were faxed to you today with originals being sent by mail. I am summarizing some of the information for you below, which should clarify the circumstances in question.
>
> Apparently when Mr. Precopio left Johnson & Johnson, he informed his supervisor of his termination verbally. He did not hand in a letter of resignation. It appears that this termination information was not communicated and updated in a timely manner, and therefore resulted in paychecks continuing after date of termination.
>
> Once the information was brought to the attention of local Human Resources and payroll, payroll adjustments were made and the proper dates were noted on the appropriate systems to reflect his termination date of September 3, 1999.

(Pl. Ex. "G," Claim File, at BLC-82).[5]

---

[5] In addition to the contradictory information contained in the documents that Johnson & Johnson forwarded to Bankers Life, there is also contradictory information in the documents that Johnson & Johnson did *not* forward to Bankers Life, but which formed the basis for the reports that Johnson & Johnson prepared for Bankers Life's review. In Precopio's personnel file are two different copies of the same form entitled "Leaves, Termination, Retirement or Death of an Employee," apparently completed by Biosense. One copy of the form, dated May 16, 2000 and identified as "New," states that Precopio died as an employee of Biosense. (Pl. Ex. "A," Personnel File, at J609). The other copy of the same form—dated several months earlier, on February 24, 2000, but identified as a "Correction"—states that Precopio did *not* die as an

19

Bankers Life apparently accepted the change without question and one month later, Bankers Life issued its denial letter to the Precopios.

The Precopios disputed the factual finding in their appeal, but there is no indication that Bankers Life considered the foundation of the plaintiffs' argument that Precopio was still employed by Biosense at the time of his death.[6]

Although it is perfectly reasonable for an insurer to look to an employer's records for a determination of whether a particular insured was actually employed at the time of a covered incident, Bankers Life took its reliance upon Johnson & Johnson's determination a few steps past the point of reasonableness. Despite learning of the Precopios' factual dispute with Johnson & Johnson's conclusion, despite receiving documents from Johnson & Johnson that themselves demonstrated internal confusion or inaccuracy over the status of Precopio's employment, and despite learning that Precopio's last paycheck and premium deduction covered the period in which he died, Bankers Life did no independent investigation to verify Johnson & Johnson's conclusion. Plaintiffs have produced evidence showing that Bankers Life neither investigated nor understood the factual basis for Johnson & Johnson's conclusion that Precopio was not an employee at the time of his death. (Pl. Ex. "E," Blessing Dep., at 97-113).

---

employee of Biosense and instead lists his effective date of termination as September 4, 1999. (Pl. Ex. "A," Personnel File, at J657). Johnson & Johnson did not forward either one of these Biosense forms to Bankers Life.

[6] The Precopios' attorney explained to Bankers Life that although Precopio had accepted a new position and begun work for IVT in September 1999, he continued to work for Biosense in order to effectuate an orderly transition on his various ongoing projects. His only immediate goal for IVT was to showcase IVT's new product at the TCT Symposium, after which he planned to return his attention to the completion of his projects for Biosense. (Pl. Ex. "G," Claim File, Letters from James G. Rosenberg to William Blessing and Johnson & Johnson, at BLC-44-46, BLC-47-48, BLC-75).

20

Bankers Life did not conduct an independent analysis to determine whether Precopio was a covered employee, but rather passed any obligation of fact-finding onto Johnson & Johnson. Because there was no right of appeal to the entity who made the conclusive factual determination (Johnson & Johnson), the Precopios' ability to appeal the factual determination to Bankers Life was a meaningless exercise. It is well-established that "[w]here a trustee fails to act or to exercise his or her discretion, *de novo* review is appropriate because the trustee has forfeited the privilege to apply his or her discretion; it is the trustee's *analysis*, not his or her right to use discretion or a mere arbitrary denial, to which a court should defer." Gritzer v. CBS, Inc., 275 F.3d 291, 296 (3d Cir. 2002) (emphasis added). Because the plan administrator in Gritzer "apparently never made any effort to analyze appellants' claims . . . there simply is no analysis or 'reasoning' to which the court may defer under the arbitrary and capricious standard." Id. at 295-96. See also Moench v. Robertson, 62 F.3d 553, 567 (3d Cir. 1995) (holding that *de novo* review was appropriate "because the record is devoid of any evidence that the Committee construed the plan at all. Thus, this is not a case implicating the arbitrary and capricious standard of review. . . . The deferential standard of review of a plan interpretation 'is appropriate only when the trust instrument allows the trustee to interpret the instrument *and when the trustee has in fact interpreted the instrument.*'").

Like the administrators in Gritzer and Moench, Bankers Life did not engage in *any* analysis to determine whether Precopio was a covered employee. Because Bankers Life did not have discretion to engage in fact-finding and did not, in fact, exercise any discretion, this court need not give deference to Bankers Life's decision to deny Precopio's claim on the ground that Precopio was not an employee of Biosense on September 19, 1999. The court's *de novo* review

of this decision is discussed below in Section 3.

### b. Determination That Precopio's Death Was Not an Accident: Heightened Arbitrary and Capricious Review

The court next turns to Bankers Life's second ground for denial—that Precopio's intoxication behind the wheel rendered his death not an "accident"—and to the Plan's language to determine whether the Plan conferred discretion on Bankers Life to interpret the term "accident" in the 24-Hour Accidental Death program. In contrast to Bankers Life's fact-finding authority, the court concludes, considering the provisions of the Plan in light of all the circumstances, that the Plan *does* confer general discretion upon Bankers Life to interpret Plan terms, although that grant of discretion is not explicit, but implied.

It is undisputed that Bankers Life was the decision-maker. Bankers Life has the authority to "evaluate and process" claims. If a claim is denied, Bankers Life has the obligation to explain the reasons why, with reference to particular Plan terms. It has the authority to deny a claim in part and ask the claimant for further information. Finally, although the Plan does not identify who the "reviewer" might be to whom an appeal is addressed, the Precopios' appeal was directed to Bankers Life, and there is nothing in the SPD that indicates that an entity other than Bankers Life is the one who renders the "final and binding decision." While the language of the Plan does not explicitly grant discretion to Bankers Life to construe Plan terms, the process by which a claimant seeks approval from Bankers Life indicates that Bankers Life has implied discretion to construe Plan terms in determining a claimant's eligibility for coverage.

That conclusion is underscored by what actually happened in this case regarding Bankers Life's second ground for denial based on intoxication. The Precopios' initial claim for benefits

was submitted to Bankers Life. Bankers Life's denial of that claim on the ground of Precopio's intoxication was based solely on Bankers Life's interpretation of "accident" as it has developed under federal case law construing similar plan provisions. Unlike its first ground for denial, Bankers Life did not simply look to Johnson & Johnson for the answer. The Precopios appealed that denial to Bankers Life, and Bankers Life issued a final, binding decision affirming its denial of coverage. The structure of Bankers Life's responsibilities suggests that Bankers Life had discretion to make the final decision regarding the interpretation of the term "accident."

Even though Bankers Life had such discretion, however, because Bankers Life is an independent insurance company who is both administrator and funder for the plan,[7] Bankers Life was acting under a conflict of interest which may have influenced its decision. Accordingly, the court reviews Bankers Life's "accident"-based denial of benefits under a heightened arbitrary and capricious standard, keeping a special lookout for any indications that Bankers Life acted in its self-interest rather than purely to fulfill its fiduciary role. The court's heightened arbitrary and capricious review of Bankers Life's "accident"-based denial is discussed below in Section 4.

### 3. *De Novo* Review of Determination that Precopio Was Not Employee

A court exercising *de novo* review of a plan administrator's factual determination is not limited to the record that was before the administrator. Luby, 944 F.2d at 1184-85. This court

---

[7] The SPD identifies Bankers Life as funder of the accident insurance program. (Riband Aff., 4/8/04, Ex. "B," SPD, at 174). Also, Robert Krol, Bankers Life's Rule 30(b)(6) designee on claim evaluations, testified that although Bankers Life has reinsurance coverage for the policy at issue, Bankers Life would be responsible for paying some portion of Precopio's benefits. (Pl. Ex. "D," Krol Dep., at 72-73). When asked: "Is it fair to say that Bankers Life pays the claims and makes the decisions on the claims regarding the policy at issue?," Krol responded "Yes." (Id. at 73).

concludes that upon *de novo* review of the evidence before Bankers Life, as well as evidence that the Precopios submitted to Bankers Life but Bankers Life did not consider, disputed issues of material fact exist as to whether Precopio, at the time of his death, was an employee of Biosense eligible for coverage under the 24-Hour Accident Insurance program, and, thus, summary judgment for either side is inappropriate.

The analysis begins, as always, with the language of the Plan. The SPD provides that an employee is eligible to receive benefits from the plan's programs if the employee is either a: (1) full-time, active, salaried employee; (2) regular or casual part-time employee who is regularly scheduled to work 19 or more hours per week, each year; (3) temporary, full-time extended employee; or (4) certain type of full-time, active, non-union hourly employee. (Riband Aff., Ex. "B," SPD, at 3, 171). None of these employment categories is defined in the SPD.

The SPD has two provisions governing when coverage ends under the 24-Hour Accident Insurance program, both of which hinge, in this case, on the date Precopio terminated his employment with Biosense. (Id. at 121, 122) ("Your Employee and Dependent Accident Accident Insurance coverage ends *on the date you terminate your employment* with Johnson & Johnson, or retire.") (emphasis added). The Policy has a similar provision, terminating coverage on the earlier of the date ending the period for which the last premium was paid, or the date the employee terminates employment. (Muscato Aff., Ex. "3," Bankers' Group Accident Policy No. SR 84,001B, at BLC-12).

Defendants argue that the evidence indisputably shows that Precopio's last day of work for Biosense was Friday, September 3, 1999, and that he became a full-time employee with IVT on Tuesday, September 7, 1999 (the day after the Monday Labor Day holiday). Among other

24

evidence that is undisputed, Defendants point to an e-mail message dated August 23, 1999, in which Dr. Bruce Given, Precopio's supervisor at Biosense, notified other Biosense employees that Precopio had tendered his resignation: "I just received bad news from Tom Precopio. He has given his two week notice." (Muscato Aff., Ex. "13").

Defendants also point out that Precopio apparently agreed to sacrifice a Johnson & Johnson bonus in the amount of $100,000 that was due to be paid to him on October 1, 1999. Gordon Janko, IVT's vice-president for sales and marketing, wrote in a letter to Precopio dated August 20, 1999, in which he welcomed Precopio to IVT and acknowledging Precopio's sacrifice of the bonus:

> I am extremely happy to welcome you to the Interventional Technologies team, you will be a great addition.
>
> The bonus you are sacrificing from your current employer of one hundred thousand dollars on October 1, is appreciated. The timing of the TCT and the tasks at hand, will pay future benefits for all. In appreciation of your sacrifice, I will over the next two years, in addition to your salary and commission structure, make available an incentive in bonus, stock, or some other method to make up this sum.

(Pl. Ex. "G," Claim File, at BLC-91).

Plaintiffs do not dispute that Precopio began working for IVT on September 7, 1999. They agree that Precopio spent September 7, 8, and 9, 1999 at IVT's San Diego office attending orientation and signing documents designed for new employees; that Precopio spent some part of the following week with IVT colleagues in Boston discussing IVT's preparation for the TCT Symposium; and that IVT paid Precopio's salary beginning September 7, 1999 and reimbursed Precopio's widow for expenses that Precopio incurred the weeks of September 7 and 13, 1999. They contend, however, that although Precopio was working for IVT as of September 7, 1999, he

25

remained a full-salaried Biosense employee at the same time. According to Plaintiffs, as a highly skilled professional in the medical technology field with significant autonomy who set his own schedule and did most of his work on the road, Precopio was not limited to being in only one office for one company at one time. By joining IVT, he did not immediately leave behind his full-time work with Biosense. They argue he intended to help IVT with the symposium later in September 1999 and then return his attention to his ongoing, unfinished projects at Biosense for a limited time. It was not until those unfinished projects at Biosense were resolved later in the fall that he intended to officially resign from Biosense. Plaintiffs point out that Biosense had no specific policy prohibiting employees like Precopio from limited overlapping employment, provided that confidentiality and non-compete agreements were not violated. (Pl. Ex. "C," Heather Hand Dep., at 72). In fact, they argue, when Precopio first joined Biosense in 1996, he was permitted to continue working under a prior consulting agreement for a period of time while he also began work for Biosense. (Pl. Ex. "A," Precopio Personnel File, at J721-722.). Gordon Janko of IVT also testified that IVT had no problem with Precopio finishing up work for Biosense after the symposium.[8] (Pl. Ex. "H," Gordon Janko Dep., at 86-88). Plaintiffs point out that Johnson & Johnson concedes that Precopio was an "exempt professional" who did not perform work on an hourly basis, but rather had discretion in managing his time and activities.

---

[8] Plaintiffs also submitted testimony from various colleagues of Tom Precopio regarding conversations they had with Precopio in which he discussed ongoing projects that he was completing for Biosense through November 1999, even though he was working for IVT. Defendants object to the admission of this testimony, arguing that it is inadmissible hearsay. This court agrees, and has not considered this evidence. The rule in this circuit is that hearsay statements can only be considered on a motion for summary judgment if they are capable of being admissible at trial. See Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995). Plaintiffs have not made a showing that the hearsay statements of Tom Precopio's colleagues about discussions they had with Precopio are admissible at trial.

26

This discretion, argue Plaintiffs, allowed Tom Precopio to manage his time and activities in such a way as to be able to perform his job duties for both Biosense and IVT.

Defendants dismiss this theory, emphasizing that Dr. Given, Precopio's Biosense supervisor, was not aware of any arrangement by which Precopio would continue to work for Biosense after the TCT Symposium, and Given never asked Precopio to finish any projects for Biosense after Precopio went to work for IVT. (Muscato Aff., Ex. "6," Given Dep. at 99). Moreover, argue Defendants, there is evidence that when Precopio agreed to work for IVT, he agreed to work *exclusively* for IVT. On August 26, 1999, Precopio entered an "Employment Confidential Information and Invention Assignment Agreement" with IVT. Paragraph 4 of that agreement provides:

> Conflicting Employment. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations with the Company.

(Muscato Aff., Ex. "23").

Defendants contend that by signing this provision, Precopio agreed not to be employed by any other company. Plaintiffs disagree, contending that by signing this provision, Precopio only agreed not to be employed by any company which competed with IVT. Plaintiffs argue that it is undisputed that Biosense did not compete with IVT. (Pl. Ex. "H," Janko Dep., at 18-19, 89; Muscato Aff., Ex. "6," Bruce Given Dep., at 79). Moreover, argue Plaintiffs, that same IVT employment agreement elsewhere explicitly recognizes that Precopio could have "concurrent employers." (Muscato Aff., Ex. "23," at ¶2).

On September 9, while Precopio was in San Diego at IVT offices, he signed another

27

document which stated: "You are not a party to any employment agreement or other contract or arrangement which prohibits your full-time employment with IVT." (Muscato Aff., Ex. "25"). Plaintiffs argue that Precopio's continued employment relationship with Biosense did not prohibit his full-time employment with IVT.

Plaintiffs have some evidence supporting their position. Chief among this evidence is Biosense's failure to follow any company protocol for employee exit. Heather Hand, a Biosense vice-president of human resources during the relevant time period, testified that certain practices were in place at Biosense governing when an employee terminated his employment. An "Employee Action Form" would be completed by a company manager indicating an employee's termination date. The entry of the information from the Employee Action Form into the company's computer system would trigger notifications to the payroll department to stop issuing the employee paychecks and notifications to the benefit carriers. The company would also try to do exit interviews with employees, during which the company would collect any company property from the employee.

None of these practices were followed with regard to Tom Precopio. He submitted no resignation letter, even though his employment agreement with Biosense stated that he must resign in writing. Nor is there a letter by Biosense confirming his resignation date. No Employee Action Form was completed prior to Precopio's death and, therefore, no directive was given to stop issuing his paychecks. No exit interview was held. No one asked Precopio to return Biosense property in his possession. Precopio's Biosense email address was still active and used by Heather Hand to communicate with him after September 3, 1999. At the time of Precopio's death, Biosense's human resources department did not have notification of his termination. It is

28