undisputed that he was classified as an active employee with Biosense on the date that he died. Biosense was still paying Precopio his full salary on the date he died. Premiums for his accident insurance coverage were still being paid on the day he died.[9]

Tellingly, all of the employee records that Johnson & Johnson submitted to Bankers Life indicating that Precopio had terminated his employment prior to his death were dated several months after his employment had already been brought into dispute, and even those post-death records reflect Johnson & Johnson's internal confusion or inaccuracy as to Precopio's employment status. That Johnson & Johnson could not even get the facts straight as to Precopio's employment status several months after his death, by itself, raises factual questions not only about Precopio's employment status, but also about Johnson & Johnson's motives and its claim of "administrative error."[10]

Defendants argue that even if Precopio had some sort of employment relationship with Biosense after September 3, 1999, he would not have been considered an "eligible" employee

---

[9] Plaintiffs also point out that the week before his death Precopio met in Boston with Dr. Roger Laham, an interventional cardiologist at Beth Israel Deaconess Medical Center, to provide assistance with one of Dr. Laham's ongoing Biosense animal studies. (Muscato Aff., Ex. "12," Laham Dep., at 38-48).

[10] The court notes that Johnson & Johnson explains a lot of things away by claiming "administrative error." First, there are the record keeping blunders—including the back-dating of important documents—in the posthumous employee records regarding Tom Precopio. Second, there is Johnson & Johnson's claimed administrative error in paying Precopio for a time period in which they now claim he was not employed by Biosense. And third, although not related to the underlying facts of this coverage dispute, as discussed above, Johnson & Johnson claimed that a right of appeal to Johnson & Johnson contained in the original SPD was simply a "drafting error." These so-called administrative errors with regard to facts that potentially are dispositive of insureds' important and valuable rights—in an area of law that has been so heavily litigated that the court finds it hard to believe a large multi-national company like Johnson & Johnson would fail to recognize that attention to detail is paramount in protecting one's legal rights—weigh against a judgment as a matter of law in Johnson & Johnson's favor.

covered under the 24-Hour Accident Insurance because he was not working full-time for Biosense. But the SPD does not limit eligibility to full-time employees; eligible employees could also include a "regular or casual part-time employee who is regularly scheduled to work 19 or more hours per week, each year" or a "temporary, full-time extended employee." (Riband Aff., Ex. "B," SPD, at 3, 171).

In sum, Tom Precopio was listed as an active employee of Biosense when he died. Whether the failure of Biosense to process Tom Precopio's termination was a result of Precopio's legitimate ongoing employment relationship with Biosense or was, instead, a result of administrative error by Biosense and Johnson & Johnson is a factual question that this court cannot resolve as a matter of law. Because upon a *de novo* review there is sufficient evidence on both sides to present a genuine issue of material fact as to whether Precopio was an employee of Biosense eligible for accident insurance when he died, this court cannot grant judgment as a matter of law, and summary judgment on Precopio's employment status is inappropriate for either party. See Casey v. Uddeholm Corp., 32 F.3d 1094, 1099 (7th Cir. 1994) (holding that where plan administrator has made no factual determination in denying plan benefits, district court should apply *de novo* standard of review and arrive at its own factual findings in determining whether benefits were properly denied; however, appropriate proceeding for making those findings is bench trial, not disposition on summary judgment motion).

The Johnson & Johnson defendants offer an additional argument in support of their motion for summary judgment on Count One: that they cannot be held liable under Section 502(a)(1)(B) because Bankers Life, as the plan funder and administrator, is the only proper defendant on a claim for recovery of benefits. According to Johnson & Johnson, because actions

30

to recover benefits due under an ERISA plan pursuant to Section 502(a)(1)(B) are equitable in

nature and, therefore, a plaintiff seeking relief under Section 502(a)(1)(B) is asking for specific

performance (*i.e.*, an order directing the plan administrator to determine that the plaintiff is

entitled to benefits and to require payment of those benefits), the court can only order the insurer,

as funder of the accidental death program, to provide the relief requested.

This court disagrees with that analysis and finds that the Johnson & Johnson defendants

are proper defendants in the Precopios' claim under 29 U.S.C. §1132(a)(1)(B). Rather than

focusing on who is in possession of the particular fund from which benefits are paid, ERISA

Section 502(a)(1)(B) confers a right to sue the plan and the plan administrator for recovery of

benefits. See 29 U.S.C. §1132(d)(1); Carducci v. Aetna U.S. Healthcare, 247 F. Supp. 2d 596

(D.N.J. 2003).[11] The Precopios have sued not only the Johnson & Johnson Plan, but also the

Johnson & Johnson Pension Committee as well as Johnson & Johnson itself, as plan

administrators.

A plan can have more than one administrator for purposes of Section 502(a)(1)(B)

liability, and an employer can be considered an administrator notwithstanding the fact that the

employer had named an insurer as plan administrator in the plan documents. See Hamilton v.

---

[11] In Carducci, Judge Simandle recognized that there is a split in the circuits about
whether a plan administrator may be liable under Section 502(a)(1)(B). Some courts believe that
a plan is the only proper defendant on a claim for recovery of benefits; others believe that a
Section 502(a)(1)(B) plaintiff is not limited to naming a plan as a defendant, but may sue a plan
administrator as well. Although the Third Circuit has not yet weighed in on the issue, Judge
Simandle carefully surveyed the reasoning of those courts permitting suit against a plan
administrator, along with Third Circuit precedent on related issues, and came to the conclusion
that a plan administrator is a proper defendant under Section 502(a)(1)(B). 247 F. Supp. 2d at
608. This court agrees with that decision. Accord Vaughn v. Metro. Life Ins. Co., 87 F. Supp. 2d
421, 425-26 (E.D. Pa. 2000) (interpreting Third Circuit precedent "to hold that a fiduciary or plan
administrator may be sued for recovery of benefits under §1132(a)(1)(B)").

31

Allen-Bradley Co., Inc., 244 F.3d 819 (11th Cir. 2001). "[I]f an employer is administering the plan, then it can be held liable for ERISA violations . . . . Proof of who is the plan administrator may come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document." Id. at 824. "The key question on this issue is whether [the employer] had sufficient decisional control over the claim process that would qualify it as a plan administrator . . . ." Id.

Here, the Johnson & Johnson defendants can be held liable on the Precopios' claim for recovery of benefits under Section 502(a)(1)(B). The Johnson & Johnson Employee Benefits Plan is a proper defendant pursuant to 29 U.S.C. §1132(d)(1). And the Pension Committee of the Board of Directors of Johnson & Johnson and Johnson & Johnson itself are proper defendants because there is sufficient evidence demonstrating that each of those defendants was identified as, or acted as, a plan administrator. First, the SPD expressly identifies the Pension Committee of the Board of Directors of Johnson & Johnson as the Plan Administrator and holds the Pension Committee "responsible for making sure that all employee benefit plans operate according to the terms of ERISA and the appropriate documents or contracts." (Riband Aff., Ex. "B," at 171-172). See Curcio v. John Hancock Mut. Life Ins. Co., 33 F.3d 226, 234 (3d Cir. 1994) ("Capital Health, in its employee benefits booklet, labels itself as the plan administrator. It seems obvious to us that a plan administrator has responsibility in the administration of the plan."). Second, Johnson & Johnson can be held responsible for administration of the plan because, as discussed above, it was Johnson & Johnson who made the coverage decision, upon disputed facts, that Tom Precopio was not an employee at the time of his death—a decision that was adopted without question by the designated plan administrator, Bankers Life. Thus, Johnson & Johnson had

32

sufficient decisional control over the claim process and may be held liable for the recovery of benefits under Section 502(a)(1)(B). Accordingly, the Johnson & Johnson defendants are not entitled to judgment as a matter of law on the ground that they are not proper defendants under Section 502(a)(1)(B).

The court now returns to Bankers Life's second ground for denial of benefits: that Precopio's alcohol-related death was not an "accident."

### 4. Heightened Arbitrary and Capricious Review of Bankers Life's Decision that Precopio's Death Was Not an "Accident"

To analyze whether Bankers Life's "accident"-based denial was arbitrary and capricious under heightened scrutiny, the court "look[s] not only at the result—whether it is supported by reason—but at the process by which the result was achieved." Pinto, 214 F.3d at 393. Procedural irregularities call for a more scrutinizing approach. Id. at 394.

The analysis begins with the language of the Plan to see if "accident" or "accidental death" is defined. The SPD provides that "[a]ccident insurance pays a benefit if you die, lose a limb or sight, or suffer a total and permanent disability as a result of an accident." (Riband Aff., Ex. "B," SPD, at 114). The 24-Hour Accident Insurance "pays a benefit whether the accident occurs on or off the job, 24-hours a day." (Id.).

"Accident" is not defined in the SPD. The Policy has only this to say about an "accident": "'Injury' is a bodily injury caused solely by an accident, which results directly and independently of all other causes in a loss covered by this Policy." (Muscato Aff., Ex. "3," at BLC-7). Both the SPD and the Policy exclude specific events from the definition of accident. An alcohol-related

33

death is not among the exclusions:

### Accidents Excluded from Coverage

Benefits are not payable for the loss of life, limb, sight or for a total and permanent disability resulting from:

> A suicide, or any attempt or other act of self-destruction, while sane or insane;
>
> War or any act of war;
>
> An aeronautics or aviation-related accident, except as a passenger or boarding/departing an aircraft;
>
> Vacation travel (unless 24-hour coverage is purchased);
>
> Bodily infirmity, sickness or injury; or
>
> Medical or surgical treatment except due to an injury.

((Riband Aff., Ex. "B," SPD, at 121; Muscato Aff., Ex. "3," at BLC-10).

Traditional rules of contract construction govern a court's review of an employment benefit plan under ERISA. See Int'l Union v. Skinner Engine Co., 188 F.3d 130, 138 (3d Cir. 1999). The interpretation of a plan document is typically a question of law. Where the plan is clear and unambiguous, a court must determine its meaning as a matter of law. Id. A plan term is ambiguous when it is subject to reasonable alternative interpretations. Id. at 142. To decide whether a plan term is ambiguous, a court does not simply determine whether, from its point of view, the language is clear. Rather, the court "hear[s] the proffer of the parties and determine[s] if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings." Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 135 (3d Cir. 1993) (citations omitted). Before making a finding concerning the existence or absence of ambiguity, a court considers the plan

34

language, the meanings suggested by counsel, and the extrinsic evidence offered in support of

each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining

history, and the conduct of the parties that reflects their understanding of the contract's meaning.

Id. Case law interpreting a plan term is also relevant to determining its meaning. Rather than

applying state insurance law which varies widely among jurisdictions, federal courts look to

federal common law when interpreting provisions of plans and policies governed by ERISA. See

Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56-57 (1987).

### a. Federal Common Law of "Accident"

Both parties, and most courts, agree that the First Circuit's opinion in Wickman v.

Northwestern Nat'l Ins. Co., 908 F.2d 1077 (1st Cir. 1990), provides the working standard for

determining what constitutes an "accident" under an accidental death insurance policy governed

by ERISA. The insurance company in Wickman denied accidental death benefits for the insured

who fell, or jumped, forty to fifty feet from a bridge. The decedent's employment-based

accidental death policy defined an "accident" as "an unexpected, external, violent and sudden

event." The insurer claimed that the death was not accidental because Wickman deliberately

climbed over the bridge's guardrail and extended himself from the bridge by one hand and that

he, therefore, must have expected that he would fall and kill himself or, at least, significantly

injure himself. The decedent's widow argued that only if her husband intended to commit suicide

could the incident not have been an accident; otherwise he would not have expected to die. The

First Circuit, "delv[ing] into the metaphysical conundrum of what is an accident," explained that

"[t]he question comes down to what level of expectation is necessary for an act to constitute an

accident; whether an intentional act proximately resulting in injury or only the ultimate injury

35

itself must be accidental." Id. at 1080-85.

That the meaning of "accident" in the area of insurance should be determined from the

expectation of the insured came from Justice Cardozo:

> Probably it is true to say that in the strictest sense and dealing with the region of
> physical nature there is no such thing as an accident . . . . On the other hand, the
> average man is convinced that there is, and so certainly is the man who takes out a
> policy of accident insurance. It is his reading of the policy that is to be accepted as
> our guide, with the help of the established rule that ambiguities and uncertainties are
> to be resolved against the company . . . . When a man has died in such a way that his
> death is spoken of as an accident, he has died because of an accident, and hence by
> accidental means.

Landress v. Phoenix Mut. Life Ins. Co., 291 U.S. 491, 499 (1934) (Cardozo, J., dissenting)

(quoted in Wickman, 908 F.2d at 1085-86).

Drawing from Cardozo's principle "that an accident is what the public calls an accident,"

the Wickman court noted that "[g]enerally, insureds purchase accident insurance for the very

purpose of obtaining protection from their own miscalculations and misjudgments. Thus, the

reasonable expectations of the insured when the policy was purchased is the proper starting point

for a determination of whether an injury was accidental under its terms." Wickman, 908 F.2d at

1088.

From this starting point, the First Circuit held that a court interpreting an accidental death

provision should engage in a two-step inquiry. The first step is subjective/objective, and the

second step is purely objective. First, the fact-finder should attempt to ascertain whether the

insured expected an injury similar in type or kind to that suffered. If the insured did *not* expect an

injury like the one suffered, the fact-finder must then ask whether that expectation was

reasonable. The reasonableness of the insured's expectation "should be made from the

36

perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences."[12] Id. This requirement, the court stated, "will prevent unrealistic expectations from undermining the purpose of accident insurance." Id. (explaining, as an example, that a person participating in a game of Russian roulette, while not expecting or intending that they be killed—instead, "evidently entertaining a fanciful expectation that fate would inevitably favor them"—would not be able to recover benefits for accidental death or injury).

Second, if the evidence is insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of a reasonable person's expectations. "In this analysis, one must ask whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as *highly likely to occur* as a result of the insured's intentional conduct." Id. at 1088 (emphasis added). Once again, if a reasonable person would have expected the injury to occur as a result of the insured's actions, then the resultant injury is not an accident. "This finding equates with the determination either that [the decedent] expected the result, or that a reasonable person in his shoes would have

---

[12] As pointed out by the Wickman court, an insured's expectation that he would not be killed or injured as a result of a particular event could be deemed reasonable, even if uncommon, where that individual's specialized skills and experiences were taken into account. As examples, the court cited Ward v. Penn Mut. Life Ins. Co., 352 S.W.2d 413 (Mo. Ct. App. 1961) (finding "accident" where man fell off top of moving car; he had performed the stunt previously, knew and trusted the driver, was strong, and had good grip); Oldring v. Metro. Life Ins. Co., 492 F. Supp. 994 (D.N.J. 1980) (finding "accident" where owner experienced in use of gun, after having examined the gun and thinking it was empty, pointed and fired the gun at his head, killing himself); and Knight v. Metro. Life Ins. Co., 437 P.2d 416 (Ariz. 1968) (finding "accident" where professional diver died after diving off Coolidge Dam; he previously had completed the same dive without injury).

expected the result, and that any other expectation would be unreasonable."[13] Id. at 1089.

Most federal courts addressing the question of whether a drunk driving death is an "accident" under an ERISA-regulated plan have recognized the applicability of Wickman's framework. Two other Courts of Appeals have addressed this specific issue, both of which held, on summary judgment, that a drunk driving death is not an "accident" within the meaning of an accidental death policy. The Fourth Circuit affirmed a grant of summary judgment in favor of the insurer in Baker v. Provident Life & Accident Ins. Co., 171 F.3d 939 (4th Cir. 1999). There, the insurer had denied accidental injury benefits to an insured who had pled guilty to involuntary manslaughter that had occurred when he was driving drunk. Benefits were denied on the basis of a policy exclusion for "voluntary participation in a felony." The driver had argued that his participation in the felony had been involuntary, by definition. Although not construing the term "accident," the Fourth Circuit said the question before it was the same as that in cases construing "accident," i.e., "what level of expectation is necessary for the consequences of a voluntary act to be voluntary? Must the actor specifically intend the consequences of that act, or is it enough that a reasonable person would foresee those consequences?" 171 F.3d at 942. Noting simply that "[t]he dangers of driving while intoxicated are plain," the court concluded as a matter of law that "a reasonable person in Baker's position would have known that death or serious injury was a *reasonably foreseeable result* of driving while intoxicated." Id. at 943 (emphasis added). With no

---

[13] The Wickman court ultimately concluded that the decedent's death in that case was not an accident. Even though there was no direct evidence that Wickman expected to die as a result of hanging off the bridge, "a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand. Such a [conclusion], given the height of the bridge, the narrow foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on . . . is not clearly erroneous." 908 F.2d at 1089.

38

mention of federal common law that has developed under ERISA, the court instead relied on North Carolina law for its statement of the applicable rule.[14] Not only did <u>Baker</u> fail to mention <u>Wickman</u>, but the Fourth Circuit's standard of "reasonably foreseeable result" is much different than <u>Wickman</u>'s standard of "highly likely to occur."

The other federal circuit court that addressed this issue in the context of ERISA was the Seventh Circuit in <u>Cozzie v. Metropolitan Life Ins. Co.</u>, 140 F.3d 1104 (7th Cir. 1998). The plan administrator had denied accidental death benefits to the beneficiary of an insured who died in a one-car accident caused by the insured's drunk driving. Faced with a plan that did not define "accident," the administrator defined "accident" in its denial letter as "not reasonably foreseeable," and determined that death or serious injury is a reasonably foreseeable consequence of driving a car while intoxicated. <u>Id.</u> at 1108. Repeatedly emphasizing that the court's review was the deferential arbitrary and capricious standard, the Seventh Circuit noted that because the administrator's conclusion had some support in the case law, it was not arbitrary and capricious. <u>Id.</u> at 1108-1111. The case law cited by the Seventh Circuit included <u>Wickman</u> and a line of post-<u>Wickman</u> federal district court cases holding that a drunk driving death is not an "accident."

In that line of federal district court cases, courts following <u>Wickman</u> have granted summary judgment to the insurer on the theory that the insured should have foreseen that death or serious injury would result from drunk driving because the dangers of drunk driving are well-

---

[14] The North Carolina Supreme Court had "stated the general rule that a 'death which is the natural and probable consequence of an act or course of action is not an accident nor is it produced by accidental means, and, if not the result of actual design, [the] insured must be held to have intended the result.'" 171 F.3d at 942 (quoting <u>Allred v. Prudential Ins. Co. of Am.</u>, 100 S.E.2d 226, 230 (N.C. 1957)). The Fourth Circuit, noting that "[a] majority of federal courts have applied this rule to deaths resulting from drunk driving accidents" (citing federal ERISA cases), held that "this same rule" applied to the issue before it. 171 F.3d at 942.

known and widely publicized. See, e.g., Fowler v. Metro. Life Ins. Co., 938 F. Supp. 476, 480 (W.D. Tenn. 1996) (finding, under arbitrary and capricious standard of review, that because "the hazards of drinking and driving are widely known and widely publicized," it was "clearly foreseeable that driving while intoxicated may result in death or bodily harm" and thus administrator's determination that death was not accidental was reasonable); Miller v. Auto-Alliance Int'l, Inc., 953 F. Supp. 172, 176 (E.D. Mich. 1997) (finding that insurer's denial of benefits was reasonable where "given common knowledge and the current opprobrium in the media and legal system for driving while intoxicated, the decedent should have reasonably foreseen that death or serious injury may result from his actions"); Nelson v. Sun Life Assur. Co. of Canada, 962 F. Supp. 1010, 1012 (W.D. Mich. 1997) (finding that because "[a]ll drivers know, or should know, the dire consequences of drunk driving" and because "[a]s a matter of common sense and reasonableness, there can be no question that but for the intoxication, the mishap might well not have happened," denial of benefits was proper); Schultz v. Metro. Life Ins. Co., 994 F. Supp. 1419, 1421 (M.D. Fla. 1997) ("It is just common sense that a driver whose faculties are significantly impaired by alcohol or drugs, or both, risks his life as well as others. The case law is replete with situations in which an insured unwisely and unsuccessfully tempted fate. Denial of benefits is appropriate in such circumstances."); Walker v. Metro. Life Ins. Co., 24 F. Supp. 2d 775 (E.D. Mich. 1997) (applying the Wickman framework under an arbitrary and capricious standard of review and holding that although there was direct evidence that the insured had not intended or expected to die, those expectations were unreasonable in light of the well-publicized dangers of drunk driving).

Several more recent federal district court cases have come to the same result under a *de novo* review. The court in <u>Mullaney v. Aetna U.S. Healthcare</u>, 103 F. Supp. 2d 486 (D.R.I. 2000), ruled that an insured's death resulting from drunk driving and speeding was not an accident. The decedent insured had been driving at a high rate of speed and had a blood alcohol content of over four times the legal limit. Although the ERISA plan documents for the decedent's accidental death insurance coverage did not define "accident," the administrator defined an "accident" in its benefits denial letter as: "an unusual, fortuitous, unexpected or unlooked-for event occurring by chance or arising from unknown causes." 103 F. Supp. 2d at 489. The court, "[a]pplying the rule of <u>Wickman</u>," held that the decedent's death "cannot be deemed an accident." 103 F. Supp. 2d at 494. "Even if it be assumed that Mr. Mullaney himself may not have intended or foreseen any harm in attempting to drive while grossly intoxicated, a reasonable person surely would have known that such conduct would likely result in serious bodily harm or death. Mr. Mullaney's actions clearly fail the <u>Wickman</u> test, and his death cannot be considered 'accidental.'" <u>Id.</u>

Also under a *de novo* review, the court in <u>Poeppel v. Hartford Life Ins. Co.</u>, 273 F. Supp. 2d 714 (D.S.C. 2003), came to the same conclusion with regard to an insured who died when his car hit a tree and whose blood alcohol level was above the legal limit. Like in this case and in <u>Mullaney</u>, the plan did not contain a definition of "accident." Quoting substantially from <u>Mullaney</u>, and following the Fourth Circuit's holding in <u>Baker</u>, the <u>Peoppel</u> court concluded, on summary judgment, that the insured's death could not be considered "accidental" under the <u>Wickman</u> test. <u>See also</u> <u>Sorrells v. Sun Life Assur. Co. of Canada</u>, 85 F. Supp. 2d 1221, 1234 (S.D. Ala. 2000) (holding the same under *de novo* review and noting "[g]iven the well-

41

documented and well-known effects of intoxication on a person's ability to operate a motor vehicle, and given the absence of evidence of any other cause of the accident, the court concludes that there is no conflicting evidence which would require a trial on the issue").

Not all federal courts follow this line of cases, however. Notable is an opinion by another judge in this district in <u>Metropolitan Life Ins. Co. v. Potter</u>, 992 F. Supp. 717 (D.N.J. 1998). In <u>Potter</u>, a case involving a single-vehicle, alcohol-related accident, after citing <u>Nelson</u>, <u>Miller</u>, <u>Fowler</u> and <u>Cozzie v. Metropolitan Life Ins. Co.</u>, 963 F. Supp. 647 (N.D. Ill. 1997) (affirmed in the decision discussed above), Judge Lifland observed: "While some of these authorities cited <u>Wickman</u>, none of them actually employed the two-pronged test . . . ." <u>Potter</u>, 992 F. Supp. at 729. The <u>Potter</u> court noted that although the insurer's denial letter properly cited <u>Wickman</u> as the relevant authority for interpreting "accident," the letter—which described the death as "foreseeable" and the decedent's drunk driving as "significantly elevat[ing] the risk that harm will occur"—utilized a legal standard that was inconsistent with <u>Wickman</u>. "<u>Wickman</u> requires more than mere foreseeability or increased risk. For death to be deemed accidental under <u>Wickman</u>, it must first be determined that the decedent had an actual expectation of survival. If it is determined that the insured expected to survive, or where there is insufficient evidence of the insured's actual expectations, then it must be determined whether an expectation of survival is objectively reasonable, which it is if death is not '*highly likely to occur* as a result of the insured's intentional conduct.'" 992 F. Supp. at 729 (emphasis added). "A death will be deemed non-accidental under <u>Wickman</u> only where the decedent expected to die, or where a reasonable person in the decedent's shoes would have viewed death as 'highly likely to occur' and that 'any other expectation would be unreasonable.'" <u>Id.</u> Because the court concluded there was

42

insufficient evidence upon which to make a determination upon either prong of the Wickman

analysis, the insurer/administrator was not entitled to summary judgment. Id. 729-30.

The court in West v. Aetna Life Ins. Co., 171 F. Supp. 2d 856 (N.D. Iowa 2001), agreed

with Potter that the Cozzie-Nelson-Miller-Fowler line of cases granting summary judgment to

insurers misapplied Wickman. "Some of these decisions apply a standard involving a far lower

standard of probability, amounting merely to the 'possibility' of injury or death, than the

Wickman test requires." West, 171 F. Supp. 2d at 901. In others, the West court pointed out,

courts granted judgment without any factual evidence whatsoever supporting the "highly likely to

occur" second prong of Wickman:

> [T]he court[s] apparently assumed that intoxication establishes that death or injury
> is "highly likely to occur," in the complete absence of any evidence establishing
> actual probability. As substitutes for actual proof that a drunk driver is so likely to
> be injured or killed that any other expectation is unreasonable, these decisions
> sometimes rely on "common knowledge," "the media," drunk driving laws, or the
> logical, but unproved, assumption that a higher blood alcohol content necessarily
> increases the probability of injury or death while driving to the point that death or
> injury is "highly likely," not just *more* likely, to result.

171 F. Supp. 2d at 901. Consequently, "decisive and consistent" as the Cozzie-Nelson-Miller-

Fowler line of cases was, because the West court found that they improperly applied the

Wickman test, it did not find them persuasive. Id. at 902.[15]

With that review of the federal common law of the definition of "accident" in an

accidental death benefits policy governed by ERISA, this court now turns to Bankers Life's

denial of Precopio's claim on the ground that his death was not an "accident" under the terms of

---

[15] After a bench trial, the West court held that the insurer/administrator's determination
that the decedent's death was not an accident was unreasonable, resulting in a breach of fiduciary
duty, and the court ordered the administrator to pay the beneficiary benefits plus pre-judgment
interest. 171 F. Supp. 2d at 905-06.

the Policy and Plan.

### b. *Bankers Life's Interpretation of "Accident"*

As noted, neither the SPD nor the Policy defines "accident." Nor did Bankers Life define

"accident" in its letter denying benefits. The denial letter, dated June 20, 2001, merely deferred to

case law:

> [F]ederal courts in applying federal common law to claims for accidental death and
> dismemberment benefits under ERISA plans have uniformly held that death or
> serious injury resulting from driving while intoxicated is not accidental. The test to
> be applied in determining whether an occurrence constitutes an "accident" is
> "whether a reasonable person, with background and characteristics similar to the
> insured, would have viewed the injury as highly likely to occur as a result of the
> insured's intentional conduct." <u>Wickman v Northwestern National Life Insurance
> Company</u>, 908 F.2d 1077 (1st Cir. 1990).
>
> If you wish to appeal this decision, you may do so within 60 calendar days after
> receipt of this letter . . . .

(Pl. Ex. "G," Claim File, at BLC-73).

Precopio appealed Bankers Life's "accident"-based denial, contending that Bankers Life's

reliance solely on <u>Wickman</u> did not support the denial since <u>Wickman</u> did not involve an insured

who was driving while intoxicated. (Pl. Ex. "G," Claim File, at BLC-76). In response, Bankers

Life stated:

> With respect to your point that the case I cited, <u>Wickman v. Northwestern National
> Life Insurance Company</u>, 908 F.2d 1077 (1st Cir. 1990), did not involve driving
> while intoxicated, following are several cases that do. Federal courts in applying
> federal common law to claims for accidental death benefits under ERISA plans have
> uniformly held that death or serious injury resulting from driving while intoxicated
> is not accidental. Examples include <u>Cozzie v. Metropolitan Life Insurance Company</u>,
> 140 F.3d 1104 (7th Cir. 1998) and <u>Walker v. Metropolitan Life Insurance Company</u>,
> 24 F. Supp. 2d 775 (E.D. Mich. 1977). Other courts have also held that death or
> serious injury resulting from driving while intoxicated is not accidental. <u>See Cates
> v. Metropolitan Life Insurance Company, Inc.</u>, 14 F. Supp. 2d 1024 (E.D. Tenn.
> 1996), <u>aff'd</u>, 149 F.3d 1182 (6th Cir. 1998) and <u>Shultz v. Metropolitan Life Insurance</u>

Company, 994 F. Supp. 1419 (M.D. Fla. 1998).

So, even if Mr. Precopio were eligible for coverage which we dispute, no benefits would be payable.

(Pl. Ex. "G," Claim File, at BLC-78).

This court has little trouble concluding that Bankers Life abused its discretion in the process by which it reached its decision. The term "accident" in the SPD was undefined. Neither the structure of the SPD or Policy, any bargaining history, nor the conduct of the parties adds any meaning to the term "accident." The term is ambiguous, as there are reasonable alternative interpretations of whether "accident" encompasses death while driving intoxicated.

Because "accident" is ambiguous, the discretion granted to Bankers Life to interpret a plan term could be exercised by looking to federal common law to aid in interpretation. However, Bankers Life's reliance on federal common law was flawed in several respects. First of all, in citing Wickman as authority for the appropriate legal "test," Bankers Life stated the test wrong, focusing only on Wickman's second step and ignoring the first. Second, Bankers Life inaccurately stated that federal courts "uniformly" hold that death or serious injury resulting from driving while intoxicated is not accidental. As discussed above, federal courts are not "uniform" in this conclusion, and in so stating, Bankers Life should have been aware of the Potter case, from this district. Third, Bankers Life claim examiners had no real understanding of why drunk driving deaths are considered an "accident." Both Bankers Life's Rule 12(b)(6) corporate designee on claim evaluations, Robert Krol, and the particular claim examiner who denied Precopio's claim, William Blessing, testified that the legal standard used to deny claims for accidental benefits for drunk driving deaths under policies governed by ERISA came from the

45