UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

PHILIP GLYNN                          :
                                      :
    Plaintiff,                        :
                                      :
V.                                    :    CIVIL ACTION NO.:
                                      :    302CV1802 (AVC)
                                      :
BANKERS LIFE AND                      :
CASUALTY COMPANY,                     :
                                      :
    Defendant                         :    April 7, 2005

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO STRIKE THE DECLARATION OF ROBERT J. PANDINA

The declaration of Robert J. Pandina is legally insufficient, because the opinions are expressed without any degree of medical or scientific certainty; therefore, his declaration should be stricken. Moreover, substantively, the opinions and/or statements of Dr. Pandina, including those contained in his Declaration, dated March 17, 2005, at Paragraphs 7 through 9, and all references to such statements that are contained in the defendant's Memorandum of Law dated March 24, 2005, including the last paragraph on page 12 through the end of the first full paragraph on page 13 of the same, should be stricken as they contain nothing but guesswork, speculation, and conjecture, and are not based on the use of any scientific calculation or methodology. Indeed, Dr. Pandina himself admits that his opinions with regard to the level of intoxication, if any, of Peter Glynn at the time of his accident are assumptions. Additionally, Dr. Pandina's current

statements contradict his former deposition statements. For these reasons, the above cited statements and/or opinions of Dr. Pandina should be stricken.

## I. **STANDARD**

The determination to admit or exclude expert testimony is within the discretion of the district court. *See e.g. Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d. Cir. 2002). "A district court's discretion to admit expert testimony is controlled by [Federal] Rules 702, 703, and 403 of the Federal Rules of Evidence." *See e.g. U.S. v. Dukagjini*, 326 F.3d 45, 51 (2d. Cir. 2003).

In determining whether to admit or exclude expert testimony, the district court must first decide whether such testimony is relevant. *See Amorgianos*, 303 F.3d at 265. "Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered," and utilize Federal Rule of Evidence 702 in doing so. (internal quotations omitted) *Id* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). The court must determine whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *U.S. v. Cruz*, 363 F.3d 187, 192 (2d. Cir. 2004) (citing *Daubert*, 509 U.S. at 597)

Federal Rule of Evidence 702 states:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the

product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"Thus, when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. Expert testimony which is "speculative or conjectural" should be excluded. *See e.g. Air Disaster at Lockerbie Scotland*, 37 F.3d 804, 824 (2d Cir. 1994), *cert. denied*, 115 S. Ct. 934 (1995). "Expert testimony should be excluded if the witness is not actually applying expert methodology." *Dukagjini*, 326 F.3d at 54. "The flexible inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science . . . ." *Amorgianos*, 303 F.3d at 267.

## II.  ARGUMENT

The statements and/or opinions of the defendant's sole expert, Robert J. Pandina, should be stricken, including Paragraphs 7 through 9 of his Declaration, along with the text of the defendant's Memorandum of Law dated March 24, 2005 from the last paragraph of page 12 through page 13,[1] should be stricken, since those statements are merely guesswork based on the reported blood alcohol level,

---

[1] Note that the plaintiff believes that the paragraph beginning on the bottom of page 13 should also be stricken, as such relies on inadmissible evidence, which was not adopted nor relied on by the defendant's expert in formulating his opinions in this case. The plaintiff will file a separate Motion to Strike briefing this issue.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

which even the defendant's expert acknowledges is uncertain. On its face, Dr. Pandina's declaration is legally insufficient, because his opinions are not expressed with any degree of medical or scientific certainty, and are thus insufficient as expert testimony. Moreover, Dr. Pandina, at his deposition, discussed a multitude of variables that affect the scientific validity of the single blood sample on which the defendant relies in denying the benefits payable to the plaintiff. Furthermore, Dr. Pandina's acknowledgements with regard to the uncertainties related to the lack of validity of a blood sample taken from a deceased do not contradict those opinions of the plaintiff's expert in this case.

    A.    **Dr. Pandina's declaration should be stricken because he does not state his opinions with any degree of medical or scientific certainty**

Dr. Pandina's declaration is legally insufficient, on its face, as expert testimony. Therefore, his declaration should not be considered by this Court. An affidavit that is conclusory, without reference to the facts and/or reasons for such conclusions, is legally insufficient. *See* FRCP 56(e); *Cf. Iacobelli Const., Inc. v. County of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994).

Dr. Pandina, in his declaration, does not state his opinions with any degree of medical or scientific certainty. In fact, he expressly states that his opinions with regard to Peter Glynn and this case are assumptions. *See* Declaration of Robert J. Pandina at Paragraph 7 ("Assuming"). Such an admitted assumption should not be considered by the Court as expert testimony, given that his opinion

is not expressed in terms conveying any level of medical or scientific certainty. Without the requisite expression of medical or scientific probability, his statements should be excluded.

### B. Dr. Pandina's declaration is substantively insufficient

Furthermore, Dr. Pandina's declaration is based on the reported blood alcohol of Peter Glynn. However, Dr. Pandina acknowledges that it is "impossible" for him to now determine the actual blood alcohol level, or, more importantly, the brain alcohol level of Peter Glynn, if any such level existed, at the time of his accident. Despite this, Dr. Pandina still expresses opinions, in the form of a series of assumptions, with regard to the level of impairment of Peter at the time of his accident.

At his deposition, Dr. Pandina testified to the fact that he did not know whether Peter Glynn had reached "equilibrium"[2] at the time of his accident. *See* depo of Robert Krol, attached to Plaintiff's Memorandum of Law dated March 17, 2005 as Exhibit K at 91 ("Q. You don't know whether he reached equilibrium or not. A. That's correct."). Indeed, there is no way that Dr. Pandina, or anyone else, could determine whether Peter was in equilibrium at the time of his accident, because to do so requires the analysis of various other tissue samples, not just a single blood sample taken from the decedent. *Id* at 39-40; Declaration of John W.

---

[2] "In equilibrium, the brain alcohol levels, theoretically, when everything is in equilibrium, there should be little difference between arterial and venous blood"

Soper, attached to Plaintiff's Memorandum of Law dated March 17, 2005 as Exhibit I at Paragraphs 20-22, 29, 40, 42 ("the absence of other tissue levels does not allow a determination to be made regarding the stage of absorption"), and 45. Indeed, because of the multitude of factors that are unknown in this case, it is "impossible," based solely on the single blood sample on which Dr. Pandina relied in making his opinions, to determine the level of impairment of Peter at the time of his accident. *See* depo of Robert J. Pandina at 110-11, 121; Declaration of John W. Soper at Paragraphs 44-45. Such factors include the fact that (1) nobody observed Peter drinking on the day of his accident, (2) the possibility of pooling of blood in the decedent's heart where the sample of blood was taken, (3) the lack of other tissue samples to compare the blood alcohol content with, (4) the possibility of diffusion due to injuries to Peter's chest during the accident, (5) the lack of the ability to now determine whether Peter, assuming he did drink alcohol, had reached equilibrium, and (6) the possibility of postmortem alcohol production, further combined with the fact that Peter had diabetes, which increases the likelihood of postmortem production. *See* Plaintiff's Memorandum of Law filed on or about March 17, 2005, at 65-66.

In fact, what experts in the field of toxicology actually state is that "[t]he concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol." *See* Declaration of John W. Soper at Paragraph 28 (quoting "Postmortem

6

Alcohol Production in Fatal Aircraft Accidents" Canfield, D.V., Kupiec, T., and Huffne, E.; *Journal of Forensic Sciences* Vol. 38, (1993), pp. 914-17). Indeed, Dr. Pandina is somewhat familiar with this research; he testified to the fact it was "impossible" for him to say that Peter's alcohol content was not lower than the reported level, and in fact could have been 0%. *See* depo of Robert J. Pandina at 121. Still, despite this concession, Dr. Pandina still predicts the alleged level of impairment of Peter at the time of his accident, based only on that reported blood alcohol content, which he knows may not actually be indicative of the actual impairment, if any, of Peter at the time of the accident. Since the lone fact on which Dr. Pandina relies in formulating his opinions in this case is admittedly insufficient and/or uncertain, his opinions are speculation, assumption, and guesswork, which should not be admitted as expert testimony. *See* FRE 702; FRE 703.

Despite the deposition testimony by Dr. Pandina that he could not determine Peter's intoxication at the time of his accident because of the various factors of which he spoke, he now provides a statement that contradicts that prior testimony, in Paragraph 7 of his Declaration. Dr. Pandina now states to this Court that:

> Assuming that Peter Glynn began to drink alcohol at 5:30 p.m. and that he consumed his last drink such that his BAC would have been at peak or descending at the time of the accident, i.e., his last drink was not later than 7:00 p.m., at his 334 pound weight, it is my opinion that he would have had to consume 22 ounces of 80 proof distilled spirits (or some other

7

consumption of the alcohol equivalent) in that time for him to obtain a BAC of 0.17%.

So, despite all of the factors that Dr. Pandina himself acknowledges make a determination of whether Peter was in equilibrium impossible, assuming he drank any alcohol at all, he now states to this Court his "expert" opinion is that Peter's blood alcohol content was either "at peak or descending" at the time of his accident. In fact, there is no sufficient basis for the determination that Peter began to drink, if he did at all, at 5:30 p.m.[3]

Additionally, other than again assuming that the blood alcohol content was indeed correct, there is no rational basis for a statement concluding when Peter may have had his last drink, let alone establishing a specific time. Yet, Dr. Pandina, despite his knowledge as to the uncertainty of the blood sample, still states his opinion as to the time period during which Peter allegedly drank, and, further, posits from this the amount, and proof, of the alcohol he allegedly consumed. There is absolutely no scientific basis for these conclusions, given that the medical reliability of the fact on which Dr. Pandina relies, the blood alcohol report, is known to be uncertain by experts in the field such as the plaintiff's expert, Dr. Soper, along with Dr. Pandina himself.

---

[3] In fact, Ms. Jones was only able to provide approximate times that Peter visited at her home that night. Furthermore, she did not speculate, unlike Dr. Pandina, as to what he may have done after leaving her home, and the times that those things were done. *See* depo of Theresa Jones attached to Plaintiff's Memorandum of Law dated March 17, 2005 as Exhibit G at 17-19.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

Furthermore, since there is no reliable scientific basis for which Dr. Pandina can express a medical opinion with the required level of certainty, his statements with regard to the impairment of an individual with a blood alcohol level of .17% merely add to the speculation as to the ability of Peter to drive on the night of his accident. Once again, without any further investigation into the factual circumstances of this case, the defendant relies solely on the reported blood alcohol level in its denial of the accidental death benefits that are due to the plaintiff.[4] Such report is inadequate for any expert, let alone Dr. Pandina, to determine Peter's actual impairment and/or intoxication, if any at all, at the time of his accident. Therefore, such statements, and all references thereto, should be stricken.

Under FRE 403, the prejudice and/or confusion of the issues that Dr. Pandina's statements may cause is abundantly clear. Indeed, defense counsel itself appears to be confused by the issues in this case. In fact, its Memorandum of Law dated March 24, 2005, includes a bullet point, which states that "[b]ecause a Reasonable Person Would Not Have Driven with a 0.17 BAC" that the defendant is entitled to summary judgment. *See* Memorandum at 11. However, this

---

[4] Indeed, the defendant was recently criticized by the Federal District Court of New Jersey for non-payment in similar circumstances as to those alleged in the death of Peter Glynn due to, among other things, its lack of investigation into facts, other than the alleged blood alcohol content of the decedent, that may have caused the decedent's accident. *See Precopio v. Bankers Life and Casualty*

misstates the law applicable under *Wickman*. It is not soley the reasonable person standard, but *Wickman* requires an analysis of whether such person, with the background and experiences would believe his death to be "highly likely."[5]

In fact, the Second Circuit, under the *Wickman* test, holds that deaths that are "statistically rare," or where the "activity [performed by the decedent] ordinarily has a nonfatal outcome," are accidental pursuant to federal common law under ERISA. *See Critchlow v. First UNUM Life Ins. Co.*, 578 F.3d 246, 258 (2d Cir. 2004). Not surprisingly, despite the binding effect of the Second Circuit's opinion in *Crichlow*, and, more specifically, the Second Circuit's analysis of the *Wickman* test contained in that opinion, the defendant has failed to direct the Court to the existence of that opinion in the litigation of this matter. Just as its client has mistakenly applied the law to this case in denying the plaintiff's benefits, defense counsel continues to do so.

In fact, it must again be noted to this Court that, although in the litigation of this matter they continue to claim otherwise, it can be assumed that the defendant, the defendant's counsel, and the defendant's sole expert in this case all

---

*Company*, 01-5721 (D.N.J. 2004) (Kugler, D.J.), attached to the Plaintiff's Memorandum of Law dated March 17, 2005, at p 45-51.
[5] The defendant does state the *Wickman* test correctly at other points of its memorandum; however, it never applies any facts, such as statistics, to Peter's death in order to establish that his death, even assuming his intoxication, was highly likely to have occurred. In fact, Robert Krol admitted that it was not highly likely that Peter would be killed, even assuming his driving while

believe that Peter Glynn died in an accident. Dr. Pandina, the defendant's sole expert in this case, stated that Peter Glynn was involved in an "accident." *See* Declaration of Robert J. Pandina at Paragraph 7 *supra*. Moreover, Dr. Pandina stated that, even assuming that an individual is driving while intoxicated, unless that person is attempting to commit suicide, he does not intend or expect to die. *See* depo of Robert J. Pandina at 141-42. Furthermore, the defendant pays accidental death benefits to individuals that are determined to have been killed as a result of their driving while intoxicated under policies with the same language as that issued to Peter Glynn, provided those individuals' insurance policies were not "protected" by ERISA. *See* depo of Robert Krol, attached to the Plaintiff's Memorandum of Law dated March 17, 2005 as Exhibit K at 24-25. Not surprisingly, the defendant's counsel also stated that Peter's death was an "accident" in its most current brief. *See* Defendant's Memorandum of Law dated March 24, 2005 at p. 12. Indeed, the plaintiff agrees with the defendant, defendant's counsel, and Dr. Pandina on the specific point that, whether Peter was killed while driving drunk or not, his death was an accident.

### III. **CONCLUSION**

For the foregoing reasons, the plaintiff's Motion to Strike should be GRANTED.

---

intoxicated. *See* depo of Robert Krol attached to Plaintiff's Memorandum of Law dated March 17, ,2005 as Exhibit K at 42.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P.O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

PLAINTIFF,

By _____
Everett H. Madin, Jr.
Federal Bar No.: CT 12297
RISCASSI & DAVIS, P.C.
131 Oak Street
Hartford, CT 06106
Ph: 860-522-1196
Fax: 860-246-5847

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, first-class postage prepaid, to all counsel of record on the above date:

Andrew Muscato, Esq.
Skadden Arps Slate Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6522

John T. Shaban, Esq.
Whitman Breed Abbott & Morgan LLC
100 Field Point Rd.
Greenwich, CT 06830

_____
Everett H. Madin, Jr.

RISCASSI & DAVIS, P.C.  •  ATTORNEYS-AT-LAW  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196