### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

---------------------------------------------x
                      :

PHILIP GLYNN,               :     CIVIL NO. 3-02CV1802 (AVC)

     Plaintiff,          :

v.                          :

BANKERS LIFE AND CASUALTY CO.,  :

     Defendant.         :     APRIL 15, 2005
---------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, defendant Bankers Life and Casualty Company ("Bankers") respectfully submits the within memorandum of law in opposition to Plaintiff's motion for summary judgment[1] on his claim brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

Plaintiff's decedent, Peter Glynn (the "Decedent"), died on June 8, 2001 in a single car rollover. As directed by Conn. Gen. Stat. §14-227c, the Connecticut Medical Examiner examined a sample of the Decedent's blood and determined that the Decedent had a blood alcohol content of 0.17%. The Decedent was driving while intoxicated, well in excess of the posted speed limit of 25 m.p.h., when he lost control of his vehicle, a Mazda Miata convertible. The Bristol Police Department determined that the Decedent "caused his own death." Plaintiff's Exhibit C at 9 (D066).

---

[1]     Bankers' time to oppose Plaintiff's motion for summary judgment was extended by agreement of the parties through and including April 15, 2005. Bankers refers to Plaintiff's memorandum of law in support of his summary judgment motion as "Pb."

The Decedent's employer, Johnson & Johnson ("J&J") maintained an employee benefits plan (the "Plan") that included Group Accident Policy No. SR84,0001 (the "Policy") issued by Bankers. Plaintiff is not entitled to benefits under the Policy because, under ERISA case law, the Decedent's death, resulting from drunken driving, was not accidental.

Plaintiff cites to a decision of the United States District Court for the District of New Jersey, entitled *Precopio v. Bankers Life and Casualty Company, the Pension Committee of the Board of Directors of Johnson & Johnson, Johnson & Johnson Employee Benefits Plan Accident Insurance, and Johnson & Johnson*, Civil. No. 01-5721 (D.N.J. Aug. 10, 2004) (Kugler, J.), to bolster his motion for summary judgment. See Pb at 2, 28, 29, 52, 53, 59 n. 26; Plaintiff's Exhibit R. In *Precopio*, the court denied Plaintiff's motion for summary judgment "[b]ecause questions of material fact remain as to whether [the decedent's] death was an 'accident' under federal common law." Plaintiff's Exhibit R at 54; *see also id* at 52 ("In this case, genuine issues of material fact exist as to whether Precopio's death was an 'accident' under federal common law, and those facts must be determined by the fact-finder.") But, according to the *Precopio* court, Bankers may have "reach[ed] the correct result." Id. at 52.

The *Precopio* court found that the J&J ERISA plan conferred discretion upon Bankers, stating "that the Plan does confer general discretion upon Bankers Life to interpret Plan terms, although that grant of discretion is not explicit, but implied." *Id.* at 22. The Court also found that the Johnson & Johnson defendants were proper defendants in the action because "[a] plan can have more than one administrator for purpose of Section 502(a)(1)(B) liability, and an employer can be considered an administrator

2

notwithstanding the fact that the employer had named an insurer as plan administrator in the plan documents." Id. at 31.

## COUNTERSTATEMENT OF THE FACTS

**A.    The Decedent Died Because He Was Driving While Intoxicated and Speeding.**

No one knows where the Decedent was going to, or coming from, at 7:45 p.m. on the evening of June 8, 2001 when he lost control of his vehicle on Wolcott Street, Bristol, Connecticut. Declaration of Andrew Muscato (the "Muscato Decl."), Exhibit 1, Peter Glynn deposition transcript, T58-11 to T60-16. No one knows why the Decedent lost control of his vehicle other than "he was operating [the vehicle] with a blood alcohol content above the limit of 0.10 as set forth by the State of Connecticut as 'prima facia evidence of operating under the influence of intoxicating liquor'," and "he was operating his vehicle in excess of the posted speed limit of 25 miles per hour."[2] Plaintiff's Exhibit C, Bristol Police Report at 9 (D066). In fact, the Bristol Police determined that the Decedent's vehicle "was traveling a minimum speed of 42.34 miles per hour" (id.), and noted that his blood alcohol content was 0.17% (id. at 8 (D065)); Plaintiff's Exhibit N at D077).

The Bristol Police investigated the accident scene and found "no marks of braking . . . prior to losing control on the curve." Plaintiff's Exhibit C at D063. "The vehicle was found to be in good mechanical condition." Id. at D065. Thus, the Decedent "caused his own death", according to the Bristol Police, by operating his vehicle while above the

---

[2]    Plaintiff suggests without evidence that (1) the Decedent was driving towards a shopping mall (Pb at 2), and (2) the Decedent swerved to avoid an animal or another vehicle (Pb at 3).

blood alcohol limit of 0.10 and in excess of the posted speed limit.  Plaintiff's Exhibit C

at 9.  The Bristol Police concluded that the Decedent's actions violated Connecticut law:

- driving while intoxicated in violation of Conn. Gen. Stat. § 14-227a

- driving with unreasonable speed in violation of Conn. Gen. Stat. § 14-218a

- making a restricted turn in violation of Conn. Gen. Stat. § 14-242.

Plaintiff's Exhibit C at 9, D066 and D059.[3]

## B.    Bankers Properly Denied the Claim Under ERISA

On March 4, 2002, Bankers denied Plaintiff's claim for accidental benefits

because the Decedent "had a blood alcohol content of 0.17 at the time of his death", and

under ERISA, "death resulting from driving while intoxicated is not accidental."

Plaintiff's Exhibit T at D087.  Except for one decision from each of the Districts of New

Jersey and Iowa, the strong majority of federal courts have held that death from driving

intoxicated is not accidental.  See Point IIIC, *infra*.

## C.    Plaintiff Prevented Further Analysis of the Decedent's Tissue Specimens.

At the time that Bankers denied Plaintiff's claim for benefits, the Decedent's other

tissue samples – urine and vitreous vapor—were still preserved by the Connecticut

Medical Examiner's Office.  Plaintiff's Exhibit N at D077.  ("Unless notified in writing,

the tissue specimens retained in this case will be destroyed one year after the date of this

report.")  Plaintiff had until June 22, 2002 to notify the Medical Examiner's Office to

preserve the Decedent's other tissues for testing.  Instead, Plaintiff filed this action and

did not challenge the Medical Examiner's toxicology analysis that concluded the

Decedent had a blood alcohol concentration of 0.17%.

---

[3]       Had the Decedent lived, he may have been charged with those violations.

4

## ARGUMENT

### I.     STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is a harsh remedy, *FLLI Moretti Cereali S.p.A. v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir. 1977), that "should be cautiously invoked so that no person will be improperly deprived a trial of disputed factual issues." *See* 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2712, at 216. All inferences drawn from the facts must be viewed in the light most favorable to the party opposing summary judgment, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and all doubts must be resolved in favor of the non-moving party. *R.G. Group. Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984); *FLLI Moretti*, 563 F.2d at 565.

A summary judgment motion is not a substitute for trial on disputed facts: "[T]he court cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried." 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2712, at 205-06; *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir. 1987). Accordingly, "a party moving for summary judgment is not entitled to a judgment merely because the facts [the party] offers appear more plausible than those tendered in position, or because it appears that the adversary is unlikely to prevail at trial." 10A Charles Alan Wright et al., *Federal Practice & Procedure* § 2725, at 432 (citing *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 245 (2d Cir. 1984)); *Am. Int'l Group Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981).

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Matsushita*, 475 U.S. at 586 (quoting Fed. R. Civ. P.

56(c)). The moving party bears the burden to establish that no material facts are in dispute. *Matsushita*, 475 U.S. at 586 n.10; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The substantive law of the action determines which facts are "material." "Disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Summary judgment will not be granted if the dispute is "genuine", i.e. "there is sufficient evidence favoring the nonmoving side for [the fact-finder] to return a verdict for that party." *Id.* at 249.

## II.    A GENUINE, MATERIAL FACTUAL ISSUE EXISTS AS TO WHETHER THE DECEDENT WAS INTOXICATED PRECLUDING A GRANT OF SUMMARY JUDGMENT.

Plaintiff argues that "there is no evidence of any kind that demonstrates that Peter Glynn consumed alcohol on the day of his [death]." Pb at 58, *see also* Pb Point III E. He argues that "[t]he Defendant cannot demonstrate, based solely on the single blood sample that the medical examiner analyzed, that Peter Glynn was intoxicated at the time of his death." Pb at 67.

Plaintiff offers several unsubstantiated reasons for his conclusion that the Defendant was not intoxicated. First, in reliance upon airplane crash fatalities subject to the jurisdiction of the Federal Aviation Authority, Plaintiff claims that ethanol may have been created postmortem in the Decedent's body. *See* Pb at 60 to 67. Second, Plaintiff claims that the Decedent was treated for diabetes and that "the Decedent's diabetic and/or

6

elevated glocal glucose level" contributed to his body's production of alcohol. Pb at 63 to 64.[4]

Third, Plaintiff contends that the Decedent's body was kept under such poor conditions as to invalidate the accuracy of the Medical Examiner's blood toxicology analysis. Pb at 64. The record is devoid of any facts establishing the conditions under which the Decedent's body was maintained prior to his autopsy and blood sample.

Put another way, Plaintiff has placed into factual dispute, "the sole evidence of Peter's alleged intoxication, the blood sample reported by the medical examiner, [as] scientifically unreliable, on its own, in establishing the alleged intoxication of Peter Glynn at the time of his [death]." Pb at 67.

A.    **Plaintiff Has Known for Four Years That
       The Decedent Was Intoxicated When He Died.**

Almost four years ago, on June 22, 2001, the Connecticut Medical Examiner issued its Toxicology Report that states: (1) specimens submitted for analysis included blood, urine, and vitreous samples; (2) only the blood sample was tested for the presence of ethanol; (3) "[b]lood was analyzed for the presence of ethanol [which] was found at a concentration of 0.17%"; and (4) "tissue specimens retained in this case will be destroyed one year after the date of the report." Plaintiff's Exhibit N at D077. Plaintiff waited until

---

[4]    Plaintiff's expert, John W. Sofer, Ph.D., relies upon hearsay medical records from an unknown medical provider (and not produced as part of the motion record) to assert, as hearsay, that "a random blood sugar of 317 mg/dl was obtained on April 14, 2000 [ a year before the Decedent's death]." Plaintiff's Exhibit I, ¶ 31; Pb. at 63. Dr. Sofer also relies upon the Decedent's hearsay statement, "The patient reported that he had earlier checked himself on a friend's machine and had obtained a reading of over 400." *Id.* Dr. Sofer also asserts, after a purported review of the Decedent's medical records, that in 2000, the Decedent was diagnosed with diabetes. Plaintiff's Exhibit I, ¶ 32; Pb at 63. But this contradicts Plaintiff who denied under oath that his son, the Decedent, developed diabetes. Muscato Decl., Exhibit 1, T29 - 18 to T30 – 9. The proffered medical records and Decedent's statements are hearsay under Federal Rule of Evidence 801 because they are out-of-court statements offered to prove the truth of the matter asserted. *See* Fed. R. Evid. 801(c). Hearsay is not admissible on Plaintiff's motion for summary judgment. *See Feingold v. New York*, 366 F. 3d 138, 155 n.17 (2d Cir. 2004); *see also Raskin v. Wyatt Co.*, 125 F. 3d 55, 66 (2d Cir. 1997).

2005, after the destruction of the Decedent's tissue specimens before challenging the
accuracy of the 2001 Toxicology Report.

The facts establish that Plaintiff had considered challenging the blood test earlier
in this litigation and decided as a matter of strategy not to challenge it: during discovery,
Bankers had asked Plaintiff whether he contended that the Decedent's blood alcohol
levels were incorrect. In his April 17, 2003 response to that interrogatory, Plaintiff stated
that he "may contend that the blood alcohol levels were incorrect as stated in the
toxicology report" and that "[t]his will be the subject of expert opinion which will be
disclosed in the appropriate time." Muscato Decl., Exhibit 3, Answer to Interrogatory
No. 10.[5]  Apparently, Plaintiff believes that his summary judgment motion is the
appropriate time to raise the issue.

Although, from the outset, Plaintiff understood that one blood sample was used to
analyze the Decedent's blood when he received the Toxicology Report and submitted it to
Bankers, and understood that Bankers denied his claim because the blood analysis
established that the Decedent was driving while intoxicated,[6] he made no effort to request

---

[5]     Bankers' Interrogatory No. 10 asked Plaintiff whether he contended that the Toxicology Report's
blood alcohol level was incorrect:

> 10.     Do you contend that the decedent's blood alcohol levels were incorrect as stated
> in the Toxicology Report issued by the State of Connecticut, Office of the Chief Medical
> Examiner, M.E. Case No. 1-07155, regarding deceased Peter Glynn, dated June 22, 2001.

He answered:

> The plaintiff will certainly demonstrate that the blood alcohol content of the decedent
> does not directly correlate to the blood alcohol content of the decedent prior to his death.
> This will be the subject of expert opinion which will be disclosed in the appropriate time.

Muscato Decl., Exhibit 1, Plaintiff's Answer to Defendant's Interrogatory No. 10.

[6]     On May 18, 2004, Bankers' Robert Krol testified that Bankers' denial was premised upon the
Decedent's blood alcohol level as reported by the single blood sample.  Muscato Decl. Exhibit 2, T32-3 to –
7, T36-10 to –14, T40-13 to –24, T65-2 to –8; T89-17 to –24.

8

analysis of additional tissue samples while they still existed. Plaintiff waited until January 2005 to challenge the Medical Examiner's 2001 findings because he knew that analysis of those samples would confirm the Decedent's intoxication.

Furthermore, Plaintiff's "scientific literature" is based upon aircraft crashes.[7] Because aircraft accidents can occur in remote places, the bodies of the deceased may be exposed to the elements, delaying the collection of tissue specimens, and thus alcohol results can be skewed. Plaintiff's scientific literature states that postmortem ethanol production is possible because of those delays: "Collection and shipment of specimens from these accidents are sometimes delayed and the possibility of postmortem ethanol production does exist." Muscato Decl., Exhibit 4 at 915. Automobile fatalities such as the Decedent's do not involve the recovery of bodies from remote places.

Plaintiff's calculated failure to preserve the samples for the challenge he now makes constitutes spoliation.

"Spoliation is . . . the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). "It has long been the rule that spoliators should not benefit from their wrongdoing." *Id.* A district court has broad discretion in crafting a proper sanction for spoliation. *Id.* The Second Circuit recommends that "[t]he sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore 'the

---

[7]   A copy of the article cited by John Plaintiff's aircraft expert, "Postmortem Alcohol Production in Fatal Aircraft Accidents," by Dennis V. Carfield, Ph.D., Thomas Kuprie, M. Ed., and Edwin Huffine, M.S., is attached as Exhibit 4 to the Muscato Decl.

9

prejudiced party to the same position he would have been in absent the wrongful destruction of evidence of the opposing party.'" *Id.*

Why did Plaintiff allow the Decedent's tissue samples to be destroyed? Now, after the destruction of the Decedent's tissue samples, Plaintiff wants to argue theoretically the accuracy of the reported blood alcohol level when he had an opportunity to actually analyze existing tissue samples. Plaintiff's failure to protect the tissue samples constitutes spoliation.

**B.    Under Connecticut Law, Only One Blood Sample**
       **Is Required To Determine Intoxication.**

Connecticut law requires "the investigation of any motor vehicle accident resulting in a fatality." See Conn. Gen. Stat. § 14-227c. In such instances, Connecticut law mandates the chief medical examiner, or any associate medical examiner, to "order that a blood sample be taken from the body of any operator or pedestrian who dies as a result of such accident." *Id.* This sample "shall be examined for the presence and concentration of alcohol . . . by the Office of the Chief Medical Examiner":

> As part of the investigation of any motor vehicle accident resulting in a fatality, the Chief Medical Examiner, Deputy Chief Medical Examiner, an associate medical examiner, a pathologist as specified in section 19a-405, or an authorized assistant medical examiner, as the case may be, shall order that a blood sample be taken from the body of any operator or pedestrian who dies as a result of such accident.
>
> Such blood samples shall be examined for the presence and concentration of alcohol by the Division of Scientific Services within the Department of Public Safety or by the Office of the Chief Medical Examiner.

*Id.*[8] Therefore, to this day, Connecticut law requires only a single blood sample to determine whether a vehicle operator was driving while intoxicated: "a blood sample be

---

[8]    Since the Decedent's death, Conn. Gen. Stat. § 14-227c was repealed and restated effective October 1, 2003, and repealed and restated again effective October 1, 2004. The first restatement simply

taken from the body of any operator or pedestrian who dies as a result of such accident."

*Id.* (emphasis supplied).

Here, the single sample of the Decedent's blood, analyzed for the concentration of alcohol, satisfied the requirement of Connecticut law to determine intoxication.

## C. Factual Issues As to the Decedent's Intoxication Preclude a Grant of Summary Judgment to Plaintiff.

Thus, there are two sets of facts before this Court. First, before this Court are the facts upon which Bankers denied Plaintiff's claim – that the Decedent was driving intoxicated, with a blood level concentration of 0.17%, in violation of Connecticut law, as determined by an autopsy on the Decedent's body during which a blood sample was drawn and analyzed pursuant to Connecticut law.

Second, before this Court are Plaintiff's proposed new set of facts, concluding that there is no proof that the Decedent was intoxicated because the blood test was "scientifically unreliable." Pb at 67. Plaintiff claims that post mortem ethanol was created in the Decedent's body because (1) the Decedent was diagnosed with diabetes; (2) the Decedent had elevated blood glucose levels; and (3) the Decedent's body was not kept under proper conditions prior to the recovery of the blood sample and its subsequent chemical analysis.[9]

As set forth below, this factual dispute is material because under ERISA, it may effect the outcome of the lawsuit; and this factual dispute is genuine because there is sufficient evidence on this issue favoring non-moving Bankers to return a verdict in favor

---

changed the word "fatality" to "death of a person" and denominated that paragraph as part (a) of the statute. The second restatement left part (a) unchanged.

[9]     No admissible evidence has been proffered by Plaintiff to establish these facts.

of it. *Liberty Lobby*, 477 U.S. at 248, 249. This Court may not resolve the factual

dispute. *See Donahue*, 834 F.2d at 58. As a result, this Court is precluded from granting

Plaintiff's motion for summary judgment.

## III.    THE SUBSTANTIVE LAW FAVORS BANKERS.

ERISA regulates employee welfare benefit plans, including those plans that

provide benefits in the event of death through the purchase of insurance. *Pilot Life Ins.*

*Co. v. Dedeaux*, 481 U.S. 41, 44 (1987) (quoting 29 U.S.C. § 1002(1)). ERISA plans are

administered by fiduciaries. 29 U.S.C. § 1102(a)(1); *Nazay v. Miller*, 949 F.2d 1323,

1329 (3d Cir. 1991). Under ERISA, a "fiduciary" is a person with any discretionary

authority or responsibility in the administration of a plan:

> Except as otherwise provided in subparagraph (B), a person is a fiduciary
> with respect to a plan to the extent (i) he exercises any discretionary
> authority of discretionary control respecting management of such plan . . .
> or (iii) he has any discretionary authority or discretionary responsibility in
> the administration of such plan.

29 U.S.C. § 1002 (21)(A).

Plaintiff's claim arises under Section 502(a)(1)(B) of ERISA that states:

> A civil action may be brought –
> (1) by a participant or beneficiary –
>
> . . . .
> (B)    to recover benefits due to him under the terms of his plan, to
> enforce his rights under the terms of the plan, or to clarify his rights to
> future benefits under the terms of the plan.

29 U.S.C. § 1132(a)(1)(B).

Here, Plaintiff claims accidental death benefits where the established facts are that

his Decedent was driving while intoxicated (blood alcohol content of 0.17%), and

speeding (almost twice the posted legal limit), and as a result lost control of his

convertible automobile in a series of sharp curves. As a fiduciary of the PLAN, Bankers denied the claim in reliance upon ERISA common law.

A.   **Standard of Review of ERISA Fiduciary's Denial of Benefits.**

An ERISA plan administrator's denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989). Where the plan confers upon its administrator the discretionary authority to determine eligibility for benefits, courts will not disturb the administrator's ultimate conclusion unless it is "arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995). Under an arbitrary and capricious standard, a court may not substitute its judgment for that of the plan administrator. Id. at 442. The reviewing court may overturn a decision to deny benefits only if the decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.*; *Larsen v. Prudential Ins. Co. of Am.*, 151 F. Supp. 2d 167, 172 (D. Conn. 2001); *see also Bowman Transp. Inc. v. Arkansas – Best Freight Sys. Inc.*, 419 U.S. 281, 285 (1974) (when applying an arbitrary and capricious standard, the reviewing court must ask whether "there has been a clear error of judgment.").

"Substantial evidence [i]s such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator] and requires more than a scintilla but less than a preponderance." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995). In cases where both the claimant and the administrator "offer rational, though conflicting, interpretations of plan provisions, the [administrator's]

13

interpretation must be allowed to control." *Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92-93 (2d Cir. 2000).

Furthermore, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller*, 72 F.3d at 1071.

When reviewing the denial of benefits plan by an insurer that both determines benefit eligibility and pays those benefits from its own funds, the Court of Appeals for the Second Circuit advises courts to weigh that conflict as a factor in determining whether the insurer abused its discretion. *Jordan v. Retirement Comm. Rensselaer Poly.*, 46 F.3d 1264, 1274 (2d Cir. 1995). The insurer-administrator's reasonable interpretation of the plan will stand unless the claimant can show not only the existence of a potential conflict of interest but that the conflict affected the reasonableness of the administrator's decision. *Pagan*, 52 F.3d at 443; *see also Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1259 (2d Cir. 1996).

**B.    The Arbitrary and Capricious Standard Applies Because Bankers Had The Discretion to Determine Eligibility for Benefits Under the Plan and Policy.**

To invoke the highly deferential "arbitrary and capricious" standard, the Court of Appeals for the Second Circuit does not require ERISA plans to use "magic words such as 'discretion' and 'deference'." *Jordan*, 46 F.3d at 1271. The grant of discretion may be either explicit in the terms of the plans or implied from the plan's language. *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1180 (3d Cir. 1991). For example, courts have held that the phrases "when Prudential determines" and "when Prudential decides" in ERISA plan provisions covering benefits eligibility conferred discretion upon the administrator. *See, e.g., Larsen,* 151 F. Supp. 2d at 172; *see also*

14

*Pagan*, 52 F.3d at 441-42 (holding that discretion was granted to the plan administrator pursuant to plan provisions such as the administrator "shall serve as the final review committee . . . for the review of all . . . claims by participants."); *Kocsis v. Standard Ins. Co.*, 142 F. Supp. 2d 241, 251-52 (D. Conn. 2001).

Here, the arbitrary and capricious standard applies because Bankers had discretion to deny Plaintiff's claim for benefits under the 24-Hour Accident Policy.[10] The Plan's summary plan description ("SPD") unequivocally names Bankers as the decision maker on claims under the accident insurance plan:

| Plan Name | Plan Number | Insured By | Administered By |
|---|---|---|---|
| Accident Insurance | 503 | Bankers Life and Casualty Company | Bankers Life and Casualty Co. 666 Old Country Road Suite 300 Garden City, NY 11530 |

The SPD reflects Banker's discretion to deny Plaintiffs' claim for benefits:

> If you disagree with a claim decision or want to provide additional information to Bankers Life & Casualty, you can apply for a claim review. You request a review of the claim by Bankers Life & Casualty within 60 days after you receive the claim denial notice. You must state the reason you believe the claim was improperly denied, and submit any data, questions or comments you feel are appropriate on your behalf. **Bankers Life & Casualty will evaluate your claim** within 30 business days of the receipt of the request and send a decision to you in writing.

Bankers' Disputed Issue of Material Fact 5, Krol Aff., Exhibit B, SPD at 144 (emphasis supplied).

---

[10]    Bankers' Disputed Issue of Material Fact 5, Affidavit of Robert Krol in support of Bankers' motion for summary judgment (the "Krol Aff."), Exhibit B, SPD at 144, 203.

Furthermore, the SPD refers to Bankers' decision on a claim as "final and

binding":

> If your claim for a benefit is denied..., you will be notified in writing **by the Administrator** for that benefit plan [here, Bankers].
>
> ....
>
> .... If you disagree with the denial, [you may request a review] in writing and **sent to the Administrator** for that benefit plan [ here, Bankers].
>
> **The reviewer** will issue a decision within 60 days.
>
> ... you will be notified in writing of the **final and binding decision** on your claim.

Bankers' Disputed Issue of Material Fact 5, Krol Aff., Exhibit B, SPD at

204 (emphasis supplied).

There can be no doubt that the SPD's use of the above language, i.e., that

"Bankers Life & Casualty will evaluate your claim," "[i]f your claim . . . is denied . . .

you will be notified in writing by [Bankers as] Administrator for that benefit Plan," "you

. . . [may] request a review . . . in writing and sent to [Bankers as] Administrator for that

benefit Plan," and "you will be notified in writing of the final and binding decision on

your claim," confers discretion upon Bankers as plan accident benefit administrator. *See*

*Larsen*, 151 F. Supp. 2d at 172; *see also*, *Mario v. P&C Ford Markets, Inc.*, 313 F.3d

758, 763 (2d Cir. 2002)(plan language referring denial claims for benefits to P&C for

resolution "is sufficient under our cases to trigger the 'arbitrary and capricious' standard

of review").

As Plaintiff acknowledges, the *Precopio* court found that the J&J ERISA plan

conferred upon Bankers the discretion to determine eligibility for benefits under the

Policy, stating that "the Plan <u>does</u> confer general discretion upon Bankers Life to

16

interpret Plan terms, although that grant of discretion is not explicit, but implied."
Plaintiff's Exhibit R at 22 (emphasis in original).

Furthermore, Bankers in fact exercised its discretion in denying Plaintiffs' claim
and issued the final and binding decision thereon. Muscato Decl., Exhibit 2, Krol
Deposition, T67-6 to 18 ("Bankers is the ultimate authority on whether or not the claim is
denied? Yes."). *See* Bankers' Disputed Issue of Material Fact 5.

## IV.   GENUINE, MATERIAL FACT ISSUES EXIST AS TO WHETHER THE DECEDENT'S DEATH WAS ACCIDENTAL.

Benefit provisions of an ERISA regulated life insurance program are interpreted
under principles of federal common law. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-
57 (1987). Rather than applying state insurance law which varies widely among
jurisdictions, federal courts look to federal common law when interpreting provisions of
plans and policies governed by ERISA. *See Pilot Life Ins. Co.,* 481 U.S. at 56-57.

Plaintiff plucked a few sentences from *Pilot Life Insurance Co. v. Dedeaux*, 481
U.S. 41 (1987); *Lifson v. INA Life Ins. Co. of New York*, 333 F.3d 349 (2d Cir. 2003);
*Feifer v. Prudential Insurance Co. of America*, 306 F.3d 1202 (2d Cir. 2002); *Fay v.
Oxford Health Plan*, 287 F.3d 96 (2d. Cir. 2002); and *Masella v. Blue Cross & Blue
Shield of Connecticut*, 936 F.2d 98 (2d Cir. 1991), for the purpose of asserting that state
law governs the Policy, although issued as part of J&J's ERISA Plan.

To the contrary, those cases state that federal common law govern the Plan and
Policy and not state law. *See Lifson*, 333 F.3d at 352 ("Although this suit is largely a
contract dispute, it arises under section 502(a)(1)(B) of ERISA.  In claims under section
502(a)(1)(B), we apply federal common law, not state law, in interpreting the

beneficiary's entitlement."); *Feifer*, 306 F.3d at 1210 ("In interpreting plan terms for purposes of claims under § 1132(a)(1)(B), we apply a federal common law of contract, informed both by general principles of contract law and by ERISA's purposes as manifested in its specific provision."); *Fay*, 287 F.3d at 104 ("ERISA plans are construed according to federal common law."); *Masella*, 936 F.2d at 107 ("Since this is an ERISA case, we are not necessarily bound by the 'hornbook rule of contract interpretation' that 'ambiguities are to be construed against the insurer'.").

In 2001, the Second Circuit made it clear that "in ERISA cases, state law does not control. Instead, general common law principles apply." *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 84 n.5 (2d Cir. 2001).

## A.   Application of the *Wickman* Standard Determines Whether Death While Driving Intoxicated is Not an Accident.

Plaintiff agrees that the opinion of the Court of Appeals for the First Circuit in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990), provides the standard under federal common law in this District for determining when a particular event is an "accident" for purposes of an accidental death benefits plan governed by ERISA. *See* Pb at 36-39 (applying *Wickman*).

The *Wickman* standard is both subjective and objective. It requires the fact-finder to ascertain whether the insured subjectively expected an injury similar in type to the one that occurred, and if he did not, whether his belief was reasonable. Where the insured's subjective expectations cannot be ascertained because of death, the fact-finder then engages in an objective analysis of a reasonable person's expectations: whether a reasonable person, with background and characteristics similar to the insured, would have

18

viewed the injury as highly likely to occur as a result of his intentional conduct.

*Wickman*, 908 F.2d at 1088.

If the reasonable person would have expected the injury to occur as a result of the

insured's actions, then the resultant injury is not an accident. "This finding equates with

the determination either that [the decedent] expected the result, or that a reasonable

person in his shoes would have expected the result, and that any other expectation would

be unreasonable."[11]  *Id.* at 1089.

## B.  Genuine, Material Issues of Fact Exist in Applying the *Wickman* Standard in this Case.

Here, the Court must ask whether the Decedent subjectively lacked an expectation

of death from driving while intoxicated. *Wickman*, 908 F. 2d at 1088. Bankers contends

that the evidence is insufficient to accurately determine the Decedent's subjective

expectation. The Bristol Police observed the lack of any evidence that the Decedent

attempted to brake before careening down the hill and crashing:

> The scene was also examined for evidence of braking.
> There were no marks in the roadway to indicate that the
> operator had applied the brakes prior to losing control on
> the curve.

Plaintiff's Exhibit C at 6 (D063). Query: why didn't the Decedent attempt to brake?

Plaintiff proffers the deposition of Bankers' Robert Krol in a vain attempt to

establish that the Decedent's death "was not intended", "unforeseen" and "unexpected."

*See* Pb at 37-38. Reviewing the record, there is no evidence that Robert Krol ever spoke

---

[11]     The *Wickman* court ultimately concluded that the decedent's death in that case was not an accident. Despite no direct evidence that Wickman expected to die as a result of hanging off the bridge, the court acknowledged that "a reasonable person in Wickman's shoes would have expected to die or be seriously injured as a result of climbing over the guardrail and hanging on with only one hand. . . . [especially] given the height of the bridge, the narrow foothold, that Wickman possessed no extraordinary gymnastic, acrobatic, or other athletic skills, and the absence of evidence that would have enabled him to hold on." 908 F.2d at 1089.

to or met the Decedent. Those portions of Robert Krol's deposition testimony regarding

whether the Decedent's death was not intended, unforeseen and unexpected are

inadmissible under Fed.R.Evid. 602 because Krol has no personal knowledge as to the

Decedent's state of mind or whether the Decedent intended, foresaw or expected his own

death. Therefore, that proffer is not properly before this Court and should be stricken

because inadmissible hearsay cannot be considered on Plaintiffs' summary judgment

motion. *See Fashion Boutique of Short Hills. v. Fendi USA*, 314 F.3d 48, 55 (2d Cir.

2002); *Hollander v. Am. Cynamid Co.*, 999 F. Supp. 252, 255-56 (D. Conn.), *aff'd*, 172

F.3d 192 (2d Cir. 1999).[12]

But what was the Decedent's state of mind on the day and night he died? The

facts establish that the Decedent was a socially-isolated, morbidly-obese loner without a

girlfriend or friends. Krol Aff., Exhibit B at D0222, D067, D070. Although advancing

into middle age, the Decedent lived with his father for eight years. Was he depressed,

despondent, or in a such a state of mind that his death may not have been unintended, not

unforeseen or not unexpected? *See* Krol Aff., Exhibit B, at D067, D070, D022; Bankers'

Rule 56(a) 2 Statement, Disputed Issue of Material Fact 1. After an investigation, the

---

[12]    Plaintiff also proffers the deposition of Bankers' Robert Krol in an effort to disguise speculation as
fact, i.e. that *if* the Decedent had and individual policy not part of any ERISA plan and *if* he had died while
driving intoxicated, then Bankers would have paid benefits on that nonexistent policy. See Plaintiff's Rule
56(a)1 Statement, ¶ 19. That proffer is inadmissible under Fed.R.Evid. 402 and those paragraphs are
improper under Local Rule 56(a)3. Reviewing the record, there is no evidence that the Decedent purchased
a non-ERISA policy. Therefore, Plaintiff's Statement, ¶ 19 is pure speculation. Local Rule 56(a)(3)
requires that each statement by Plaintiff "must be followed by a specific citation to (1) the affidavit of a
witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."
Robert Krol's deposition testimony regarding whether a policy that never existed is speculative and
inadmissible on this summary judgment motion because it is speculation. Therefore, Plaintiff's Statement,
¶ 19 is not properly before this Court and should be disregarded because inadmissible hearsay cannot be
considered on Plaintiffs' summary judgment motion. *See Amnesty Am. v. Town of West Hartford*, 361 F.3d
113, 131 n.12 (2d Cir. 2004) (On the summary judgment motion, "[s]ome of the affidavits contain[ed]
hearsay statements and speculation, however, and as these elements of the affidavits would be inadmissible
at trial, the district court was free to disregard them.")

Police concluded that "[The Decedent] caused his own death." Krol Aff., Exhibit B, at

D066; Disputed Issue of Material Fact 2. The person who was closest to him, his father,

stated that the Decedent was a secret drinker - - Plaintiff would find empty vodka bottles

in the trash "[a]nd that made me aware that he was doing some drinking....Whatever

drinking he did, he did it on his own." Muscato Decl., Exhibit 1, T39-8 to T40-21, T43-9

to –23. And, the Decedent made no attempt to brake his vehicle before the crash.

Plaintiff's Exhibit C at 6 (D063). Therefore, the Decedent's subjective expectation cannot

be determined.

C.     **Genuine, Material Factual Issues Preclude Summary
       Judgment Under *Wickman* Because A Reasonable Person
       Might Not Have Driven with a 0.17 BAC.**

       Even if Plaintiff could prove that the Decedent did not believe that he could be

seriously injured or killed by driving at almost twice the speed limit downhill through a

series of sharp curves while intoxicated, then the Decedent's belief would be

unreasonable. Under *Wickman*, if the insured's belief is unreasonable, then the injury will

not be considered an accident. *Wickman*, 908 F.2d at 1089. "If the insured did not

believe that the result would occur, we must consider whether such an estimation can be

considered reasonable. If the expectations of the insured were objectively unreasonable,

then injuries or death resulting therefrom are not accidental." *Cozzie v. Metropolitan Life

Ins. Co.*, 140 F.3d 1104, 1110 (7th Cir. 1998).

       Here, under *Wickman*, where the decedent's subjective expectations cannot be

ascertained, the standard applied by courts is the reasonable person, and not a statistical

analysis, as Plaintiff argues. The inquiry is whether a reasonable person, with

background and characteristics similar to the Decedent's, would have viewed the injury as

highly likely to occur as a result of his intentional conduct. *See Wickman*, 908 F.2d at
1088.

Here, the Decedent died of foreseeable injuries sustained when he lost control of
his Mazda Miata convertible while driving (1) highly intoxicated with a blood alcohol
content of 0.17%,[13] (2) down a hill with a series of sharp curves, (3) at almost twice the
posted legal speed limit (Material Fact 16).[14]  The Decedent should have known the
inherent dangerousness of his reckless driving, especially in light of his driving a
convertible, top down, without a roll-over bar. "A reasonable person in the decedent's
shoes would have known that driving while intoxicated at twice the legal limit was highly
likely to result in serious injury or death." *Walker*, 24 F. Supp. 2d at 782.  Thus, the
Decedent's death cannot be characterized as "accidental" because a reasonable person
with the Decedent's background and experience would have known that injury was highly
likely to occur as a result of his intentional conduct in driving too fast while intoxicated.

Assuming that the Decedent began to drink alcohol at 5:30 p.m., and that he
consumed his last drink such that his BAC would have been at peak or descending at the
time of the accident, i.e. his last drink was no later than 7:00 p.m., at his 334 pound
weight, he would have had to consume 22 ounces of 80 proof distilled spirits (or some
other consumption of the alcohol equivalent) in that time for him to obtain a BAC of
0.17%. Declaration of Robert J. Pandina, Ph.D. in support of Bankers' motion for
summary judgment ("Pandina Decl."), ¶ 7.  BACs in the 0.17% range indicate acute

---

[13]     In 2001, operating a motor vehicle with a blood alcohol content of 0.10% or more violated
Conn.Gen.Stat. § 14-227a.

[14]     The Police calculated that the Decedent's automobile was "traveling a minimum speed of 42.34
miles per hour" in an area with a posted 25 MPH speed limit.  That speed violated Conn.Gen.Stat. § 14-
218a, Traveling unreasonably fast.

22

intoxication, resulting in debilitating impairments in multiple domains of functioning including without limitation:  perceptual-motor coordination required for integration of sensory input and behavioral outflow; cognitive processing required for comprehension and decision-making; and affective processing required for emotion appreciation and expression; and at this level, the skills required to operate a motor vehicle are significantly impaired.  Pandina Decl., ¶8.

Most individuals with BACs of 0.17% experience symptoms of intoxication that would alert them to the fact that they are impaired, such as visual distortions including double vision, difficulty with eye-hand coordination and difficulty walking and standing as well as a general sense of being under the influence.  Therefore, the Decedent would have been aware that he was intoxicated and that, as a result of his intoxication, his ability to operate a motor vehicle was impaired at the time he was operating his motor vehicle on June 8, 2001. Pandina Decl., ¶9.

Under *Wickman,* a reasonable person who suddenly experienced visual distortions including double vision, difficulty with eye-hand coordination, difficulty walking and standing, would have believed that serious injury or death was likely to occur if he drove his automobile.  No doubt, he would have sought medical assistance instead of driving at almost twice the speed limit downhill through a series of sharp curves.

Indeed, other experts agree that, with a 0.17 BAC, the Decedent would have had difficulty walking and standing, his judgment and perception would have been severely impaired and he could expect to experience a blackout. *Blood Alcohol Level and You: Behavior by Numbers*, http://www.factsontap.org/yourbody/ BALandU.htm.[15]  A driver

---

[15]    Many colleges and universities use the same information, advising students that at a blood alcohol level of .14% to .17%, "You could have difficulty talking, walking, or even standing.  Your judgment and

23

with a blood alcohol content of .15% is 380 times more likely to die in a single vehicle crash than a nondrinker. Zador, P.L., Krawchuk, S.A., & Voas, R.B. (2000), Relative Risk of Fatal Crash Involvement by BAC, Age, and Gender.[16]

The two Courts of Appeals that have addressed the specific issue before this Court both held that within the meaning of an accidental death policy governed by ERISA, a drunk driving death is not an "accident." The Court of Appeals for the Fourth Circuit affirmed a grant of summary judgment in favor of the insurer in *Baker v. Provident Life & Accident Insurance Co.*, 171 F.3d 939 (4th Cir. 1999). Relying on the line of post-*Wickman* cases that hold death while driving drunk to be not accidental, the court concluded as a matter of law that "a reasonable person in Baker's position would have known that death or serious injury was a *reasonably foreseeable result* of driving while intoxicated." *Id.* at 942-943 (emphasis added).

In *Cozzie v. Metropolitan Life Insurance Co.*, 140 F.3d 1104 (7th Cir. 1998), the Court of Appeals for the Seventh Circuit reviewed a case where, like here, the plan administrator had denied accidental death benefits to the beneficiary of an insured who died in a one-car rollover caused by the insured's drunk driving. Like the J&J plan here, the plan in *Cozzie* did not define "accident." *Id.* at 1109. The plan administrator "determined accidental death benefits were not payable because Robert Cozzie did not

___

perception are severely impaired. You may become more aggressive, and there is an increased risk of accidentally injuring yourself or others. This is the point when you may experience a blackout." See, e.g., *Blood Alcohol Level: Let's put it all out on the table*, http://www.csub.edu/UnivServices/CounselBAL2.htm; *What Your BAC Means*, http://www.nd.edu/~uec/yourbac.html; *Blood Alcohol Content Calculator-The Police Notebook*, http://www.ou.edu/oupd/bac.htm. Under Fed.R.Evid. 201, this Court may take judicial notice of these facts.

[16]     Report HS-809-050, Washington D.C., U.S. Department of Transportation, National Highway Traffic Safety Administration, statistical chart reprinted at http://www.madd.org/stats/0,1056,4839,00.html and htpp://www.ou.edu/oupd/bac.htm. Under Fed.R.Evid. 201, this Court may take judicial notice of these facts.

have an 'accident'." *Id.* at 1108. The lower court had concluded that the insurer was reasonable when it defined an "accident" as "not reasonably foreseeable." The Seventh Circuit noted the insurer's definition did not contradict the ERISA plan because the term "accident" was undefined in the plan. *Id.* at 1109. The Seventh Circuit also found that the insurer's interpretation was "consistent with the goals of the plan." *Id.* The court examined *Wickman* and the line of post-*Wickman* federal district court cases holding that a drunk driving death is not an "accident." *Id.* at 1109-10. Using the deferential arbitrary and capricious standard, and applying those decisions, the Seventh Circuit held that the insurer's definition of "accident" was not unreasonable. *Id.* at 1110.[17]

The *Critchlow* decision is inopposite because that court found the cause of that decedent's death, autoerotic asphyxiation, to be no more dangerous an activity than extreme-sports such as cliff rappelling, rock climbing, and sky-diving. *Critchlow v. First UNUM Life Ins.*, 378 F.3d 246, 262, 263 (2d Cir. 2004) ("We thus see no difference between engaging in autoerotic asphyxiation and engaging in hazardous extreme-sport activities."). Bankers submit that the many differences between driving while intoxicated and cliff rappelling, rock climbing, and sky-diving while sober make *Critchlow* irrelevant here. See id. at 262.

---

[17]    Since *Wickman*, the majority of federal courts have held that death or serious injury from drunk driving is not accidental. *See, e.g., Fowler v. Metro. Life Ins. Co.*, 938 F. Supp. 476, 480 (W.D. Tenn. 1996); *Miller v. Auto-Alliance Int'l, Inc.*, 953 F. Supp. 172, 176 (E.D. Mich. 1997); *Nelson v. Sun Life Assur. Co. of Canada*, 962 F. Supp. 1010, 1012 (W.D. Mich. 1997); *Schultz v. Metropolitan Life Ins. Co.*, 994 F. Supp. 1419, 1421 (M.D. Fla. 1997); *Walker v. Metro. Life Ins. Co.*, 24 F. Supp. 2d 775 (E.D. Mich. 1997) (applying the *Wickman* framework under an arbitrary and capricious standard of review and holding that although there was direct evidence that the insured had not intended or expected to die, those expectations were unreasonable in light of the well-publicized dangers of drunk driving); *but see King Ex. Rel. Schanus v. Hartford Life & Acc.*, 357 F.3d 840 (8th Cir. 2004); *Metropolitan Life Ins. Co. v. Potter*, 992 F. Supp. 717 (D.N.J. 1998); *West v. Aetna Life Ins.* Co., 171 F. Supp. 2d 856 (N.D. Iowa 2001).

Furthermore, a decedent does not have to intend to die for his death to be intentional. *Nelson v. Sun Life Assurance Co.*, 962 F. Supp. at 1013. Put another way, "[w]hile [the decedent] did not intend to die, his expectations were unreasonable given his condition. It is just common sense that a driver whose faculties are significantly impaired by alcohol . . . risks his life as well as others [by driving drunk]. . . . Denial of benefits is appropriate in such circumstances." *Schultz*, 994 F. Supp. at 1421. Here, assuming for the purposes of this motion that the Decedent subjectively expected to survive his driving while intoxicated at an unreasonable speed, down a series of sharp curves, then his expectation simply was unreasonable. As a result, Bankers did not act arbitrarily and capriciously in denying benefits under the Plan to plaintiff.

## D.     Courts Do Not Require an Express Intoxication Exclusion to Deny Benefits Under ERISA.

Courts have rejected the argument that the denial of benefits is arbitrary and capricious where the insurance plan does not expressly exclude benefits because of an insured's intoxication. *See, e.g., Cozzie v. Metropolitan Life Ins.*, 963 F. Supp. 647, 648, 654 (N.D. Ill. 1997), *aff'd*, 140 F.3d 1104 (7th Cir. 1998) (upholding denial of benefits where plan did not specifically exclude from coverage death caused by driving while intoxicated); *Morton v. Smith*, 91 F.3d 867 (7th Cir. 1996) (upholding denial of benefits where insured injured himself after jumping off roof of bar while intoxicated); *Schultz*, 994 F. Supp. at 1422 (upholding denial of benefits where plan did not specifically exclude from coverage death caused by driving while intoxicated); *Fowler*, 938 F. Supp. at 480; *Nelson*, 962 F. Supp. at 1012 (W.D. Mich. 1997); *Cates v. Metropolitan Life Ins. Co.*, 14 F. Supp. 2d 1024 (E.D. Tenn. 1996), *aff'd*, 149 F.3d 1182 (6th Cir. 1998).

26

The Seventh Circuit in *Cozzie* observed that although the plan there did not contain an intoxication exclusion, it did "exclude other conduct – notably suicide, attempted suicide, and purposely self-inflicted injury." *Id.* at 1111. That court stated that "given the amount of alcohol ingested here and the exclusion of any other cause for the accident, we cannot say that it was arbitrary and capricious for MetLife to determine that this particular vehicular death was no 'accident'." *Id.* Here, as in *Cates*, the Policy contains express exclusions for "suicide" and "self-destruction." *See* Plaintiff's Exhibit J, Policy at D010. Paraphrasing *Cates*, "given the amount of alcohol ingested here, [this Court should not] say that it was arbitrary and capricious for [Bankers] to determine that this particular vehicular death was no 'accident'." *See* 14 F. Supp. 2d at 1111.

E.    ***Wickman* Requires a Subjective/Objective Analysis and Not Statistics.**

A review of the *Wickman* decision demonstrates that the court never referred to statistics as establishing an insured's expectations under the objective/subjective test. *See, generally*, 908 F.2d at 1088. The courts in *Potter* and *West* added that gloss to *Wickman*, and Bankers submits that those decisions do not properly apply the Wickman standard.

F.    **Bankers' Decision Passes the Arbitrary and Capricious Standard of Review.**

Bankers' exercise of its discretion under the Plan to deny the claim was not arbitrary or capricious, i.e., its decision to deny the claim was <u>not</u> "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan*, 52 F.3d at 442; *Larsen*, 151 F. Supp. 2d at 172. Substantial evidence existed demonstrating that the Decedent died of foreseeable injuries sustained when he lost control of his Mazda Miata

27

convertible while driving (1) highly intoxicated with a blood alcohol content of 0.17% (Plaintiff's Exhibit N, at D077), (2) down a hill with a series of sharp curves (Plaintiff's Exhibit C, at D062), (3) at almost twice the posted legal speed limit (Plaintiff's Exhibit C, at D066).[18]

The conclusion of Plaintiff's expert, Mehdi Mostaghimi, Ph.D, that the probabilities of an alcohol related fatal accident for an alcohol impaired driver is about one in ten million"[19] is nonsense because in his July 23, 2004 affidavit submitted to this Court, Mostaghimi swore that the probability was "about one in a million." (Muscato Decl., Exhibit 5 at 2.). A driver with a blood alcohol content of .15% is 380 times more likely to die in a single vehicle crash than a nondrinker. Zador, P.L., Krawchuk, S.A., & Voas, R.B. (2000), Relative Risk of Fatal Crash Involvement by BAC, Age, and Gender.[20]

Bankers fully complied with the requirements for claims procedures as set forth in ERISA, that state:

> In accordance with regulations of the Secretary, every employee benefit plan shall–
>
> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

---

[18]     The Police calculated that the Decedent's automobile was "traveling a minimum speed of 42.34 miles per hour" in an area with a posted 25 MPH speed limit (Plaintiff's Exhibit C, at D066). That speed violated Conn.Gen.Stat. § 14-218a, Traveling unreasonably fast.

[19]     Plaintiff's Exhibit P, at 2.

[20]     Report HS-809-050, Washington D.C., U.S. Department of Transportation, National Highway Traffic Safety Administration,  statistical chart reprinted at http://www.madd.org/stats/0,1056,4839,00.html and htpp://www.ou.edu/oupd/bac.htm. Under Fed.R.Evid., this Court may take judicial notice of this fact.

(2) afford a reasonable opportunity to any participant
whose claim for benefits has been denied for a full and fair
review by the appropriate named fiduciary of the decision
denying the claim.

29 U.S.C. § 1133.

In denying the claim, Bankers relied upon the Plan and the Policy. At the time it
made its decision, it had reviewed its entire Glynn claim file. In its denial letter dated
March 4, 2002, Bankers notified Plaintiff that the Policy did "not permit payment of
benefits" because "[f]ederal courts, in applying federal common law to claims for
accidental death and dismemberment benefits under ERISA plans, have uniformly held
that death resulting from driving while intoxicated is not accidental." Bankers notified
Plaintiff that an appeal could be made within 60 days by writing to Bankers. Plaintiff
was invited to "[i]nclude any documentation that you feel supports this claim."

When a plan administrator has written to a claimant with updates on his claim and
had fully laid out its reasons for denying his claim, responded to his letter, and invited
him to call with further questions, the claimant received a full and fair review of his
claim. *Goldstein v. Johnson & Johnson*, 251 F.3d 433 (3d Cir. 2001). Similarly, in this
case, Plaintiff was given a full and fair review of this claim.

Therefore, Plaintiff is not entitled to summary judgment because Bankers'
exercise of its discretion under the Plan to deny the claim was not arbitrary or capricious.
Bankers' decision to deny the claim was not "without reason, unsupported by substantial
evidence or erroneous as a matter of law." *Pagan*, 52 F.3d at 442; *Larsen*, 151 F. Supp.
2d at 172.

Several additional principles apply here. First, in cases where both the claimant
and the administrator "offer rational, though conflicting, interpretations of plan

provisions, the [administrator's] interpretation must be allowed to control." *Pulvers,* 210 F.3d 89 at 92-93. Second, under the arbitrary and capricious standard, "a district court's review . . . is limited to the administrative record." *Miller,* 72 F.3d at 1071. *See* Bankers' Rule 56(a) 2 Statement, Disputed Issue of Material Fact 4. Third, when reviewing the denial of benefits plan by an insurer that both determines benefit eligibility and pays those benefits from its own funds, the Court of Appeals for the Second Circuit advises courts to weigh that conflict as a factor in determining whether the insurer abused its discretion. *Jordan,* 46 F.3d at 1274. The insurer-administrator's reasonable interpretation of the plan will stand unless the claimant can show not only the existence of a potential conflict of interest but that the conflict affected the reasonableness of the administrator's decision. *Pagan,* 52 F.3d at 443; *see also Sullivan,* 82 F.3d at 1259.

## G.    Under A *De Novo* Review, Bankers' Decision Is Correct.

Under a *de novo* review, Bankers' denial of Plaintiff's claim is correct. Recent federal district court cases have upheld an insurer's denial of death benefits under a *de novo* review. In *Mullaney v. Aetna U.S. Healthcare,* 103 F. Supp. 2d 486 (D.R.I. 2000), the court ruled that an insured's death resulting from drunk driving and speeding was not an accident. There, the decedent insured had been driving at a high rate of speed and had a blood alcohol content of over four times the legal limit. Although the ERISA plan documents for the decedent's accidental death insurance coverage did not define "accident," the court, "[a]pplying the rule of *Wickman,*" held that the decedent's death "cannot be deemed an accident." 103 F. Supp. 2d at 494. "Even if it be assumed that Mr. Mullaney himself may have intended or foreseen any harm in attempting to drive while grossly intoxicated, a reasonable person surely would have known that such conduct

30

would likely result in serious bodily harm or death. Mr. Mullaney's actions clearly fail the *Wickman* test, and his death cannot be considered "accidental." *Id.*

Also under a *de novo* review, the court in *Poeppel v. Hartford Life Insurance Co.*, 273 F. Supp. 2d 714 (D.S.C. 2003), came to the same conclusion with regard to an insured who did when his car his a tree and whose blood alcohol level was above the legal limit. Like *Mullaney*, the plan did not contain a definition of "accident." Quoting substantially from *Mullaney*, and following the Fourth Circuit's holding in *Baker*, the *Poeppel* court concluded that the insured's death could not be considered "accidental" under the *Wickman* test. *See also Sorrells v. Sun Life Assur. Co. of Canada*, 85 F. Supp. 2d 1221, 1234, (S.D. Ala. 2000) (holding the same under *de novo* review and noting "[g]iven the well-documented and well-known effects of intoxication on a person's ability to operate a motor vehicle, and given the absence of evidence of any other cause of the accident, the court concludes that there is no conflicting evidence which would require a trial on the issues"); *Nelson*, 962 F. Supp. at 1013 (upholding the denial under a *de novo* standard and finding that the policy exclusion for self-inflicted injuries applied because voluntary intoxication seriously impaired the decedent's judgment and ability to control his vehicle).

## V.   GENUINE, MATERIAL FACTUAL QUESTIONS EXIST AS TO WHETHER PLAINTIFF FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES, BARRING HIS CLAIM.

Before filing suit in federal court under ERISA, a claimant seeking the payment of benefits under an ERISA-governed plan must first exhaust the internal administrative remedies provided by the plan. *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 592 (2d Cir. 1993) ("The doctrine of exhaustion of administrative remedies provides

'that no one is entitled to judicial relief for a supposed or threatened injury until the

prescribed administrative remedy has been exhausted'" (citation omitted). The

requirement of exhaustion of remedies applies in ERISA cases. *Id.* at 594; *see also*

*Millane v. Becton Dickinson & Co.*, 84 F. Supp. 2d 282, 288 (D. Conn. 1999) (granting

summary judgment to the defendant dismissing the complaint because of the plaintiff's

failure to exhaust administrative remedies under an ERISA-governed retirement plan).

In *Kennedy*, a case decided after *Firestone*, the Second Circuit explained that the

primary purposes of the exhaustion requirement are to

   (1)    uphold Congress' desire that ERISA trustees be responsible
for their actions, not the federal courts;

   (2)    provide a sufficiently clear record of administrative action
if litigation should ensue; and

   (3)    assume that any judicial review of fiduciary action (or
inaction) is made under the arbitrary and capricious
standard, not *de novo*.

589 F.2d at 594; *Millane*, 84 F. Supp. 2d at 288.

Here, Bankers notified Plaintiff that an appeal could be made within 60 days by

writing to Bankers. Plaintiff was invited to "[i]nclude any documentation that you feel

supports this claim." (Plaintiff's Exhibit K). But Plaintiff never provided further

documentation. Bankers' Rule 56(a) 2 Statement, Disputed Issue of Fact 3.

Here, on his motion for summary judgment, Plaintiff ignores the Plan and the

SPD. Although the SPD names "The Pension Committee of Johnson & Johnson as the

Plan Administrator," Plaintiff did not sue that entity or appeal any denial of benefits to it.

*See* SPD at 200, attached as Exhibit E to the Declaration of Andrew Muscato, Esq. In

Support of Defendant's Motion for Summary Judgment. In the *Precopio* case, relied

upon by Plaintiff, Precopio also sued J&J. The *Precopio* court found that J&J were

32

"proper defendants" because a plan can have more than one administrator, and an employer can be considered an administrator notwithstanding the existence of another, named plan administrator. Plaintiff's Exhibit R at 31-32.

Here, assuming *arguendo* that Bankers did not have the discretion to deny Plaintiff's claim, a position with which Bankers vehemently disagrees, then some entity had to have that discretion. Although Plaintiff sought a claim review from Bankers, there is no evidence on the record that he appealed Bankers' denial to Johnson & Johnson. If Plaintiff failed to exhaust administrative remedies, then his failure would result in a judgment granted to Bankers. *See Kennedy*, 989 F.2d at 596 (affirming grant of judgment dismissing the complaint for failure to exhaust ERISA-plan remedies); *Millane*, 84 F. Supp. at 288 (granting of summary judgment dismissing complaint for failure to exhaust ERISA-plan remedies).

Therefore, this Court should deny Plaintiff's motion for summary judgment because genuine, material factual issues that exist as to whether Plaintiff exhausted his administrative remedies.

## CONCLUSION

Because genuine, material factual issues exist as to whether Peter Glynn was intoxicated when he died, whether Peter Glynn subjectively expected to survive driving while intoxicated, whether Plaintiff's decedent's death while driving intoxicated was not an accident, and whether Plaintiff exhausted his administrative remedies, Bankers respectfully requests that this Court deny Plaintiff's motion for summary judgment and preserve the factual issues for trial.

33

THE DEFENDANT
BANKERS LIFE AND CASUALTY
COMPANY

BY

John T. Shaban, ct14075
Whitman Breed Abbott & Morgan LLC
100 Field Point Rd.
Greenwich, CT 06830
203-869-3800 (telephone)
203-869-1951 (facsimile)
jshaban@wbamct.com

and

Andrew Muscato ct15073
Skadden, Arps, Slate, Meagher &
Flom LLP
Four Times Square
New York, New York 10036
212-735-3000 (telephone)
212-735-2000 (facsimile)

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Memorandum of Law in Opposition to

Plaintiff's Motion for Summary Judgment was sent by first class mail, postage prepaid, on April

14, 2005 to the following:

    Everett H. Madin, Jr., Esq.
    Riscassi and Davis, P.C.
    131 Oak Street
    Hartford, CT 06106

_____
John T. Shaban

61821