UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - - - - - - - - - -  x
PHILIP GLYNN,                                        :
                                                     :
                    Plaintiff,                       :
                                                     :
        v.                                           :   CIVIL ACTION NO.:
                                                     :   02-CV-1802 (AVC)
BANKERS LIFE AND CASUALTY                            :
COMPANY,                                             :
                                                     :
                    Defendant.                       :   APRIL 13, 2005
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - -  x
```

## DECLARATION OF ANDREW MUSCATO, ESQ. IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Andrew Muscato, Esq., declare under penalty of perjury that the following is true and correct:

1. I am counsel to Skadden, Arps, Slate, Meagher & Flom, LLP with offices at Four Times Square, New York, New York. I am an attorney of the States of New Jersey and New York, admitted pro hac vice for the defendant Bankers Life and Casualty Company ("Bankers").

2. I make this Declaration in opposition to Plaintiff's motion for summary judgment.

3. Attached hereto as Exhibit 1 is a true copy of relevant portions of the transcript of the deposition of Plaintiff Philip Glynn dated October 26, 2004.

4. Attached hereto as Exhibit 2 is a true copy of relevant portions of the transcript of the deposition of Bankers' Robert Krol dated May 18, 2004.

5. Attached hereto as Exhibit 3 is a true copy of relevant portions of Plaintiff's answers to interrogatories.

6. Attached hereto as Exhibit 4 is the article "Postmortem Alcohol Production in Fatal Aircraft Accidents", Canfield, D.V., Kuipiec, T., and Huffine, E., printed in *Journal of Forensic Sciences*, Vol 38 (1993), referred to by Plaintiff in his brief at pages 6 and 63, and in his Exhibit I, Declaration of John W. Soper, Ph.D., at 5, ¶¶ 18 to 28.

7. Attached hereto as Exhibit 5 is the Affidavit of Plaintiff's statistical expert, Medhi Mostaghimi, Ph.D., dated July 23, 2004, and submitted to this Court in support of Plaintiff's first motion for summary judgment.

Andrew Muscato, Esq.

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Declaration of Andrew Muscato, Esq. in

Opposition to Plaintiff's Motion for Summary Judgment was sent by first class mail, postage

prepaid, on April 14, 2005 to the following:

Everett H. Madin, Jr., Esq.
Riscassi and Davis, P.C.
131 Oak Street
Hartford, CT 06106

John T. Shaban



61808

# Exhibit 1

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - X

PHILIP GLYNN,                          :

        Plaintiff,       :

      VS.                          :   NO. 3-02CV1802 (AVC)

BANKERS LIFE & CASUALTY CO., :

        Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - X

**⊓ COPY**

D E P O S I T I O N

THE VIDEOTAPED DEPOSITION OF

PHILIP GLYNN, taken on behalf of the Defendant,

before Kevin Lombino, Registered Professional

Reporter, Notary Public within the State of

Connecticut License Number 00191, on the 26th

day of October, 2004 at 10:56 a.m. at the

offices of RisCassi and Davis, PC, 131 Oak

Street, Hartford, Connecticut.

2

1              A P P E A R A N C E S

2

3   FOR THE PLAINTIFF:

4           RISCASSI AND DAVIS, PC
            131 Oak Street
5           PO Box 261567
            Hartford, CT  06126-1567
6
                BY: EVERETT MADIN, JR., ESQ.
7

8   FOR THE DEFENDANT:

9           SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
            Four Times Square
10          New York, NY  10036-6522

11              BY: ANDREW MUSCATO, ESQ.

12
    ALSO PRESENT:
13
                Greg Jacques, Videographer
14

15

16

17

18

19

20

21

22

23

24

25

                GOLDFARB AND AJELLO (203) 972-8320

29

1    A.   Okay.

2        Q.   -- you review the transcript that you furnish

3   that name --

4        A.   Yes.

5        Q.   -- and have put it into the transcript.

6        A.   Well, I think it's on the application because

7   it's my recollection is that they asked for a list of

8   doctors that he had seen.  And my recollection -- and I

9   haven't looked at that since I gave the attorney the

10  file -- but I haven't looked at anything since after the

11  accident.  So my recollection is that those doctors' are

12  on there.

13       Insert:_____

14       Q.   Do you recall when Peter was first diagnosed

15  with gout?

16       A.   No.  I would have to guess it was somewhere in

17  the later '90s, '97, '98 maybe, something like that.

18       Q.   Do you recall how often Peter sought medical

19  care?

20            MR. MADIN:  For that condition?

21       Q.   For that condition or any condition.

22       A.   I think that gout condition flared up perhaps

23  maybe once a year.  And he'd get attention for that and

24  he'd get some kind of medication that he took for it.

25  And then I would have to guess in the late '90s, seems to

GOLDFARB AND AJELLO (203) 972-8320

1  me he wasn't feeling too good and he went to the doctors'
2  and I think there was a possibly that he might be
3  developing diabetes. And I think he took some medication
4  for it and he purchased one of those little testers that
5  he had and he'd take the blood test and stuff like that.

6         And my recollection is that kind of a scare or
7  false thing, and every time he did the testing, his blood
8  was whatever normal sugar range that is should be and so
9  that I don't think he developed diabetes.

10      Q.  Was Peter taking medication for diabetes?
11      A.  My recollection is yes, and I don't know the
12  name of it.

13      Q.  Was he taking insulin in some form?
14      A.  No, none at all. It may not have not even
15  been. My recollection is that he may have been taking
16  something for -- to control his whatever, cholesterol
17  like Lipitor or something like that. I seem to remember
18  something else. But he did not take anything that I know
19  of of the insulin family or anything like that.

20      Q.  Do you recall if Peter was taking any other
21  medications at the time of his death?
22      A.  I don't recall any medications that he was on at
23  the time of his death.

24      Q.  Was there a regular pharmacy that Peter went to
25  to fill prescriptions?

GOLDFARB AND AJELLO (203) 972-8320

1    A.   No, I don't know where he went to get his
2 prescriptions filled.  Want me to guess?

3    Q.   Did he go to a place where you've had
4 prescriptions filled?

5    A.   No, he did not go where I have my prescriptions
6 filled as far as I know.

7    Q.   Well, do you have a belief as to where he went
8 for prescriptions?

9    A.   I'll make a guess, okay?  It's my guess is that
10 he went to a pharmacy that was near the doctor's office.
11 It was a pharmacy at the time called the Arrow Pharmacy.

12    Q.   How do spell that?

13    A.   A-r-r-o-w.  It's been bought out.  I don't know,
14 the Arrow -- they had a chain of drugstores and I think
15 it's been -- it's no longer the Arrow Pharmacy.  I think
16 it's Beacon Pharmacy, B-e-a-c-o-n.  There's several of
17 them in the Bristol, Plainville area.

18    Q.   And that is also on Collins Road?

19    A.   Yeah, yeah.

20    Q.   Do you recall whether Peter had to change any of
21 his dietary habits as a result of being diagnosed with
22 gout?

23    A.   He tried a serious effort to lose weight.  And,
24 again, my recollection is that he was successful; he lost
25 some weight.

33

1  or he had been heavier?

2      A.   I think it was always around that for while we
3  lived together.  He was a big guy.

4      Q.   Did he ever enroll in any type of diet program?

5      A.   Somewhere along the line, there was literature
6  that I saw and I think the company he worked for
7  encouraged some kind of weight loss, weight training
8  program.  I saw some literature in the house and my
9  recollection is that he wasn't actively involved in
10  anything like that, you know, like a health club or
11  anything like that.

12      Q.   Did he ever join Weight Watchers for instance?

13      A.   Not to my knowledge, no.  He had a computer that
14  we shared and there were a lot of web sites that he had
15  investigated to look at weight reduction and a couple of
16  sites that he had for -- look at, you know, how do you
17  handle diabetes and stuff like that somewhere in the late
18  '70s, but as far as joining a club or being enrolled in
19  it, I don't think he was.

20      Q.   Did Peter wear glasses?

21      A.   No.

22      Q.   As far as you know, did he have any problems
23  with his vision?

24      A.   No, no.  Just as an aside, on his job he had to
25  wear I believe safety glasses because of the machinery.

38

1  it I don't recall.

2      Q.  Was Peter hospitalized in 1995?

3      A.  No, I think he went in on a, like, a ER kind of

4  visit kind of thing.  I don't think he was hospitalized.

5      Q.  Other than having the surgery in 1998 or 1999,

6  was Peter ever hospitalized?

7      A.  Not while we lived together and not to my

8  knowledge, no.

9      Q.  Is there any history of alcoholism in your

10  family?

11      A.  In my family?

12      Q.  Yes.

13      A.  My father drank a lot.  My mother didn't.

14  That's about it.

15      Q.  Have you ever suffered from alcoholism?

16      A.  Well, the answer is definitely no.  I went over

17  with Attorney Madin a report that was prepared by

18  apparently one of your investigators.  I think it was a

19  fellow that visited me November after the accident.  And

20  in that report, it was a statement, seemed to be

21  misconstrued, it said I was an alcoholic or something but

22  that is definitely wrong.

23          I don't know where that statement came from as

24  Mr. Madin reviewed that with me this morning and I never

25  saw that statement other than he had a copy of it.  And I

39

1   never drunk in my life.  I am not a drinker.  I do not
2   drink any -- well, while we lived together, I never
3   bought any beer or liquor or wine or anything from the
4   refrigerator.  Never had anything in the house.  I do not
5   drink.

6       Q.   Was there a time when you did drink?

7       A.   Not at all.

8       Q.   Are you familiar with Peter's drinking habits?

9            MR. MADIN:  I object to the form of the

10           question.  And, again, it assumes there is some

11           sort of drinking habit involved but --

12      Q.   Well, I'm not suggesting any particular --

13   whether the habit is not to drink or to drink or any

14   particular quantity.  But as his father, were you aware

15   that there was a time when Peter began to drink alcoholic

16   beverages?

17      A.   Could you rephrase the question?  I am -- when

18   he began to drink alcoholic?  Do you mean how old was he

19   when he began to drink?  I don't know.  I don't

20   understand the question.

21      Q.   Okay.  I will ask another question.

22           Did there come a time when you became aware that

23   Peter drank alcoholic beverages?

24      A.   I'm thinking of the time frame of when he lived

25   with us and when he didn't live with us, okay.  And when

GOLDFARB AND AJELLO (203) 972-8320

40

1   he lived with us, I was not aware that he used alcoholic

2   beverages. And when he didn't live with us, I don't know

3   what the heck he did, okay? And when he didn't live with

4   us and got married, I don't know what he did, okay?

5        Now, when we resided together as man and son, he

6   never drank in front of me to my knowledge, okay? And I

7   was aware that he did some drinking as I indicated to the

8   investigator at Bristol where we live, we had to separate

9   the -- the trash with bottles and cans and stuff like

10  that, and that went on every two weeks. And sometimes I

11  took it out; sometimes he took it out; and once in a

12  while, I would see an empty bottle of vodka. And that

13  made me aware that he was doing some drinking.

14       But there wasn't any bottles in the

15  refrigerator, nothing that I could see. I don't know

16  where he kept the stuff. He had his own room and that

17  was his domain, so to speak. And he knew because we

18  talked about it that I had a dislike for drinking, and I

19  didn't drink in his presence and he never poured a drink

20  in my presence either. So whatever drinking he did, he

21  did it on his own.

22       Q.   Do you recall when you had the conversation or

23  conversations with him about drinking?

24       A.   No, not particularly. But once in a while, we'd

25  talk and I'd say that I don't care for any one drink,

41

1   that's all.  And I think he understood it because my

2   whole life was spent as an nondrinker.  My wife, too.

3       Q.   Is there a particular reason why you have those

4   feelings about drinking

5           MR. MADIN:  Objection to form.  Do you

6           understand the question?  And I assume the

7           feelings, you mean for himself that he didn't

8           drink?

9           MR. MUSCATO:  Yes.

10      A.   Probably two.  Number one, I can't stand the

11  taste or smell or odor of alcohol.  I just -- and a

12  couple of time, I had the taste either make me very flush

13  or very sick so I can't -- it just doesn't appeal.  It

14  just doesn't appeal to me.

15          And number two, as I mentioned, my father drank

16  a lot and there was a lot of upsets in the home when I

17  was a child, and I guess I just said to myself that I'm

18  not going to go down that road.  And I didn't; thank God

19  for that.

20      Q.   Did you communicate those thoughts to Peter at

21  sometime?

22      A.   Yeah, we had some discussions about that, yeah.

23      Q.   Did you tell Peter about your experiences with

24  your father?

25      A.   Yeah, I think he knew it.  Well, not -- he knew

42

1  it, yeah.

2      Q.   Was your father alive after Peter was born?

3      A.   Peter was born in 1961; my father died in 1976,

4  so there was a period of time where they were both

5  alive.  My father stopped his drinking because he had

6  some medical conditions about the time of Peter's birth

7  about.  He had some heart attacks or something like

8  that.  But my recollection is that my father stopped

9  drinking somewhere in the early '60s.

10             MR. MADIN:  Can I get five minutes?

11             MR. MUSCATO:  Sure.

12             THE VIDEOGRAPHER:  Going off record at

13        12:05.

14             (Discussion held off the record.)

15             THE VIDEOGRAPHER:  We are back on record at

16        12:14.

17      Q.   Mr. Glynn, we are continuing with your

18  deposition.  Had your father ever been in an accident

19  while -- after he had been drinking?

20      A.   Not to my knowledge.

21      Q.   While Peter was alive, did the family have

22  get-togethers?

23      A.   My family?

24      Q.   Yes.

25      A.   Yeah, we had picnics, stuff like that.  I mean,

GOLDFARB AND AJELLO (203) 972-8320

1  my mother and father and stuff like that.

2      Q.   What about with your children?

3      A.   Do you mean -- meaning me and my children?

4      Q.   Yes.

5      A.   Well, yeah, we would have birthday parties and

6  stuff like that.

7      Q.   Was alcohol served on those occasions?

8      A.   No, no, basically a nondrinking family.

9      Q.   Do you recall how often you noticed an empty

10  vodka bottle in the recycling?

11     A.   No.  As I say, we took the stuff out according

12  to the recycling thing.  We took it out every two weeks.

13  Sometime he took it out; sometimes I took it out.  But on

14  occasion, I would see an empty bottle.  I couldn't recall

15  whether it was once, one time or once every other time,

16  but I would see a bottle of vodka.

17     Q.   So it would be every two to four weeks?

18     A.   That we took it out, yeah.

19     Q.   That you'd see a vodka bottle?

20     A.   Yeah, probably, yeah.

21     Q.   Did you ever ask Peter why he was drinking

22  vodka?

23     A.   No.

24     Q.   And in 2001, was Peter mentally upset by

25  anything?

58

1      Q.   Now, you mentioned that Teresa told you that
2   Peter had visited her for about a half hour over June 8,
3   2001?
4      A.   That's right, yeah.
5      Q.   When did she first tell you that?
6      A.   That I don't recall.  It seems to me it was
7   after the funeral, but I'm not sure.
8      Q.   Was it this year?
9      A.   No, no, it was -- it was -- it was right after
10  the funeral.  Seems to me.
11     Q.   Did you make an effort in June of 2001 to
12  determine Peter's whereabouts on the evening that he
13  died?
14     A.   Would you explain that?
15     Q.   Well, did you seek to find out where Peter had
16  been in the time before he died?
17     A.   Yeah.  I was curious.
18     Q.   Who did you speak to about that?
19     A.   I don't recall whether -- how the conversation
20  came up.  But the upstairs family that lives there in our
21  little place that I have told me that they had noticed
22  that Peter had gone out about 6 o'clock.  Now, I don't
23  know if I inquired of that or they volunteered the
24  information to me.
25            But the time of his death, he had been home.

59

1 | When he came home, I don't know. I guess -- my guess
2 | would be maybe 4:30 or so or whatever. He had gone out
3 | about 6 o'clock. And then the daughter gave me my
4 | information somewhere along the line that he had visited
5 | her, so that took care of the time. I don't know when he
6 | got out of work, 3:30, 4 o'clock and visited the daughter
7 | which is nearby his place of employment. And I think he
8 | was there about a half hour and then whatever. Not more
9 | than a 15-minute drive to where I live, and I found that
10 | out. And then I guess he left the house from the
11 | neighbors about 6 o'clock. From there I don't know.

12 |      Q.   Which neighbor told you that Peter left the
13 | house about 6 o'clock?

14 |      A.   The family, the woman upstairs.

15 |      Q.   What is her name?

16 |      A.   I am not sure of her real name but she's called
17 | "Mickey." I don't know what her first name really is.
18 | And her last name -- I will spell it. It's Paradis, it's
19 | P-a-r-a-d-i-s. And they have lived upstairs basically
20 | since we moved in. The house was renovated.

21 |      Q.   What is her husband's name?

22 |      A.   It's got a funny spelling, but it's basically --
23 | I don't think it's right, but it's basically Jeff and I
24 | don't know how that's spelled but it's not spelled how it
25 | sounds. But I don't know how it's spelled.

60

1      Q.   Approximately how old are the Paradises?

2      A.   Right now?  I think probably 35 I would say.

3  They are nine years ago.  I think they were just

4  married.  They had a kid when they moved in.

5      Q.   Did Mrs. Paradis tell you whether she had a

6  discussion with Peter at the time of his leaving the

7  house?

8      A.   Well, that I don't recall.  But there was an

9  occasion that they saw him leave.  I don't know if they

10  talked to him or not.

11      Q.   Did she express to you any observations she had

12  made of Peter at the time he left the house?

13      A.   No.

14      Q.   Did she say that he seemed to be in a hurry?

15      A.   No, just indicated that he left about that

16  time.  Can I take a break?

17            MR. MUSCATO: Certainly.

18            THE VIDEOGRAPHER:  Going off record at

19        12:48.

20            (Lunch recess was taken.)

21            THE VIDEOGRAPHER:  Back on record at 1:29.

22      Q.   Mr. Glynn, we are back on record at your

23  deposition.  You had mentioned that the Mazda Miata was

24  totaled?

25      A.   Um-hum.

# Exhibit 2

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PHILIP GLYNN,

        Plaintiff,

  vs                               Civil Action 302 CV 1802

BANKERS LIFE AND CASUALTY COMPANY,

        Defendant.

**DEPOSITION OF**

**ROBERT KROL**

May 18, 2004
10:00 a.m.

333 West Wacker
Chicago, Illinois

Sandra Drechsler, Certified Shorthand Reporter,
Registered Professional Reporter, and Notary Public



**setdepo**
sd
**Streamlined · Centralized · Standardized**
*The Evolution of Deposition Management*

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

2

# APPEARANCES

1

2

3     **ON BEHALF OF THE PLAINTIFF**

4     **RISCASSI & DAVID**

5     BY:  EVERETT H. MADIN, JR., ESQUIRE

6            131 Oak Street

7            P.O. Box 261557

8            Hartford, Connecticut  06126-1557

9            (860) 344-5297

10

11    **ON BEHALF OF THE DEFENDANT**

12    **SKADDEN ARPS SLATE MEAGHER & FLOM, LLP**

13    BY:  ANDREW MUSCATO, ESQUIRE

14           One Newark Center

15           Newark, New Jersey  07102-5297

16           (973) 639-6800

17

18    **ALSO PRESENT:**

19    CONSECO Services, LLC

20    ROBERT E. BURKETT, JR.,

21    Senior Vice President, Legal

22

23

24



**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

32

1    understood it to be, correct?

2        A.    Yes.

3        Q.    Were there any facts at all in the

4    information you received that you determined

5    were relevant to the denial of the claim

6    other than the blood alcohol content?

7        A.    No.

8        Q.    Why then did you retain Research

9    Service Bureau, if all you really needed to

10   look at was the blood alcohol content?

11       A.    We wanted to make sure we had as

12   much facts as possible, and Research Service

13   was contracted to get the additional

14   information that might be out there.

15       Q.    But would any of the facts that

16   they turned up have altered your decision,

17   given the blood alcohol content?

18       A.    Possibly. I really don't know.

19       Q.    Give me an example of a fact that

20   would have changed your decision.

21           MR. MUSCATO:    Objection to the

22   form of the question.

23       BY MR. MADIN:

24       Q.    You can answer.



sd setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www·setdepo·com

36

1    A.    Research Service Bureau.

2    Q.    Research Service Bureau.    And just

3    tell me if there are any facts within their

4    reports that were material your decision.

5    A.    All of it was taken in account.

6    There's nothing specific that I could point

7    to.

8    Q.    Could I have that back?

9    A.    Sure.

10    Q.    But again, so the conclusion of

11    the matter is that the material factor in

12    your opinion was the blood alcohol content,

13    is that correct?

14    A.    That was the primary factor.

15    Q.    Did the fact that the autopsy

16    concluded that Mr. Glynn's death was

17    accidental have anything to do with your

18    decision?

19    MR. MUSCATO:    Objection to the

20    form of the question.

21    BY MR. MADIN:

22    Q.    You can answer that, sir.

23    A.    I'm not sure what you want.

24    Q.    Do the conclusions of a medical



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

38

1    medical examiner's report?

2              MR. MADIN:    Not at this time.

3        BY MR. MADIN:

4        Q.      Did your investigative service make

5    any determinations about whether Peter Glynn,

6    Peter Glynn's death was intentional or

7    suicidal?

8        A.      They never make opinions.

9        Q.      And that is certainly not the

10   basis of your denial, is it?

11       A.      What they said?

12       Q.      No.    There's no claim here, is

13   there, that Mr. Glynn intended his own death?

14       A.      No.

15       Q.      Okay.   Did your investigative

16   service uncover any evidence regarding Mr.

17   Glynn's drinking habits?

18       A.      Yes.

19       Q.      What did they find?

20       A.      He routinely consumed vodka.

21       Q.      And did they talk to dram shops

22   and bars in the area?

23       A.      I believe so.   I don't recall.

24       Q.      Do you recall what they found with



setdepo
sd
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

40

1    A.    Not that I know of.

2    Q.    And did anyone that you folks

3    contacted indicate that they thought Peter

4    Glynn had a drinking problem?

5         MR. MUSCATO:    Objection to the

6    form of the question.

7         THE WITNESS:    Not that I know of.

8    BY MR. MADIN:

9    Q.    Okay.    Would a pattern of alcohol

10   abuse play any part in your decision to deny

11   a claim generally?

12   A.    No.

13   Q.    In your opinion what was it about

14   Peter Glynn's blood alcohol content that

15   indicated to you that his death was not

16   accidental?

17   A.    Well, his blood alcohol was almost

18   twice the legal limit, so he was obviously

19   legally intoxicated.

20   Q.    What was the legal limit at that

21   time in Connecticut?

22   A.    Point 10.

23   Q.    What was his alcohol content?

24   A.    Point 17.



sd setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

43

1    be more than that, in your opinion?  I'm

2    trying to get your understanding of highly

3    likely.   75-25?

4         A.     Let's stick with 51-49.

5         Q.     Okay.  And if you were wrong about

6    that, would you also be wrong about denying

7    Mr. Glynn's claim?

8              MR. MUSCATO:  Objection to the

9    form of the question.

10         BY MR. MADIN:

11         Q.     You can answer that, sir.

12         A.     It's not my decision to deny these

13    things.  It's just I have the initial

14    opinion.

15         Q.     Okay.  Let's take it at that

16    level.  If you were wrong about the

17    statistics, and in fact Mr. Glynn's death was

18    not highly likely, in your opinion, would you

19    have been wrong to deny the claim?

20              MR. MUSCATO:  Objection to the

21    form of question.

22              THE WITNESS:  My opinion doesn't

23    matter.  It's the ERISA rules and regulations

24    that apply to this situation.  My opinion is



**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

65

1    A.    Okay.

2    Q.    And obviously you have indicated

3 that given the blood alcohol content level

4 there were really no facts that were going to

5 change your opinion, correct?

6    A.    No.

7    Q.    Is that correct?

8    A.    Yes.

9    Q.    Okay.  Was there anything else

10 that Mr. Glynn could have done to change your

11 mind?

12         MR. MUSCATO:    Objection to the

13 form of the question.

14         THE WITNESS:    No.

15    BY MR. MADIN:

16    Q.    Okay.  Do you have an

17 understanding of the specifics of the group

18 plan at issue in this case that is with

19 Johnson & Johnson?

20    A.    I don't know what you want.

21    Q.    Do you have an understanding of

22 the group plan itself?

23    A.    I understand the coverage under the

24 policy.  Is that what you mean?



**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1   Hewitt, H-e-w-i-t-t.

2       Q.    Who was Hewitt?

3       A.    I don't really know.  They are

4   like the middleman between Johnson & Johnson

5   and Bankers.

6       Q.    Do you know whether Bankers had

7   within itself the discretion to deny a claim?

8       A.    Well, we deny claims based on file

9   -- on the facts of the loss.  We make that

10  decision.

11      Q.    Is there someone else other than

12  Bankers that also has the ability to make

13  that decision?

14      A.    No.

15      Q.    All right.  Bankers is the

16  ultimate authority on whether or not the

17  claim is denied?

18      A.    Yes.

19      Q.    And do you know whether the --

20  strike that.  Is it your understanding that

21  Johnson & Johnson gave the authority to deny

22  claims to Bankers Life?

23          MR. MUSCATO:   Objection to the

24  form of the question.



Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

89

1    written definition of the word "accident" that

2    you know of?

3          A.    Not that I know of.

4          Q.    Do you know whether an accident is

5    defined within the policy we have marked as

6    Exhibit 7?

7          A.    It is not.

8          Q.    Did Mr. Blessing have a definition

9    of accident in 2001?

10         A.    No.

11         Q.    Did you have a definition of an

12   accident in 2001?

13              MR. MUSCATO:    Objection to the

14   form of the question.

15              THE WITNESS:    No.

16         BY MR. MADIN:

17         Q.    Okay.  And is it fair to say that

18   the definition of the word accident is not

19   really important to you, given the blood

20   alcohol content level of Mr. Glynn, is that

21   true?

22              MR. MUSCATO:    Objection to the

23   form of the question.

24              THE WITNESS:    I would say yes.



# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PHILIP GLYNN,                          :
                                       :
         Plaintiff,                    :        CIVIL ACTION NO.:
                                       :        302CV1802 (AVC)
v.                                     :
                                       :
BANKERS LIFE AND                       :
CASUALTY COMPANY                       :        MARCH 27, 2003

## PLAINTIFF'S RESPONSES
## TO INTERROGATORIES DATED APRIL 17, 2003

The plaintiff hereby responds to the defendant's interrogatories and requests for
production dated April 17, 2003:

1.    Identify each person having knowledge of any facts relating to this case and, for
each person, set forth his or her area of knowledge and identify any attach any and all related
documents.

**ANSWER:**

The identity of each person having knowledge of the facts is presently not known in this
case. Nevertheless, the plaintiff has knowledge of facts regarding the decedent and the
decedent's whereabouts on the day of the accident. In addition, the plaintiff believes that
neighbors saw the decedent leave his home the evening of the accident around 6:00 p.m. At
this point, the plaintiff is aware that either Mickey Paradis and/or Jeff Paradis of 14 Putnam
Street in Bristol, Connecticut may have seen the decedent leave his home. As more witnesses
become identified, this interrogatory will be supplemented in accordance with the F.R.C.P. 26..

**ANSWER:**

The plaintiff does not understand what is being sought by this interrogatory. Any clarification by the defendant would be appreciated. Nevertheless, the plaintiff is unaware of any non-privileged oral communications except as disclosed in response to interrogatory No. 6.

9.     State whether the decedent's driver's license has ever been revoked or suspended. If so, state:

   a.     the date of revocation or suspension;
   b.     the place of revocation or suspension; and
   c.     the reasons for the revocation or suspension.

**ANSWER:**

Plaintiff is not aware that the decedent's driver's license had ever been revoked

10.     Do you contend that the decedent's blood alcohol levels were incorrect as stated in the Toxicology Report issued by the State of Connecticut, Office of the Chief Medical Examiner, M.E. Case No. 1-07155, regarding deceased Peter Glynn, dated June 22, 2001. If so, state the factual basis for your contention. Identify and attach all related documents.

**ANSWER:**

The plaintiff may contend that the blood alcohol levels were incorrect as stated in the toxicology report.

The plaintiff will certainly demonstrate that the blood alcohol content of the decedent does not directly correlate to the blood alcohol content of the decedent prior to his death. This will be the subject of expert opinion which will be disclosed in the appropriate time.

# Exhibit 4

*Dennis V. Canfield,*[1] *Ph.D; Thomas Kupiec,*[1] *M.Ed.; and*
*Edwin Huffine,*[1] *M.S.*

# Postmortem Alcohol Production in Fatal Aircraft Accidents

**REFERENCE:** Canfield, D. V., Kupiec, T., and Huffine, E., "Postmortem Alcohol Production in Fatal Aircraft Accidents," *Journal of Forensic Sciences*, JFSCA, Vol. 38, No. 4, July 1993, pp. 914–917.

**ABSTRACT:** During 1989 and 1990, the Civil Aeromedical Institute received specimens from 973 victims of fatal aircraft accidents. The maximum concentration of ethanol allowed under FAA regulations (0.04%, 40 mg/dL) was exceeded in 79 of these cases (8%). It was determined based on the distribution of ethanol in urine, vitreous humor, blood, and tissue that 21 of the positive cases (27%) were from postmortem alcohol production. Twenty-two of the positive cases (28%) were found to be from the ingestion of ethanol. In 36 cases (45%), no determination could be made regarding the origin of the ethanol. In two cases, postmortem alcohol production exceeded 0.15% (150 mg/dL).

The opinion held by some toxicologists that postmortem alcohol production can be inferred from the presence of acetaldehyde, acetone, butanol, and other volatiles was found to be incorrect. Several cases with postmortem ethanol had no other volatiles. Volatile compounds were found in several cases where no ethanol was present. In addition a case was found in which the relative ethanol concentrations in blood, bile, and vitreous humor were solely consistent with the ingestion of ethanol, but acetaldehyde, acetone, and 2-butanol were also found in blood. This clearly indicates that the presence or absence of other volatiles does not establish postmortem ethanol production.

**KEYWORDS:** toxicology, postmortem alcohol, aircraft accidents, ethanol

Ethanol found in the blood of a pilot is a significant factor in determining the possible cause of an aircraft accident. However, the interpretation of ethanol in postmortem specimens is complicated by the presence of ethanol produced after death. Previous authors [7,6] have pointed out the dangers of interpreting ethanol in postmortem samples. Corry [7] warns the forensic scientist to "bear in mind that specimens of human tissue containing micro-organisms, particularly specimens taken from corpses, may contain ethanol produced by microbial fermentation, and that extreme caution should be exercised when assessing the significance of postmortem ethanol."

Many papers have been published on postmortem ethanol production [1–15]. In these papers various procedures for determining postmortem ethanol production have been proposed. The presence of volatiles other than ethanol has been suggested [2] as an indicator of postmortem ethanol. The ratio of ethanol in blood to other specimens has been proposed [5,6] as another way of differentiating between ingested and postmortem

Received for publication 27 July 1992; revised manuscript received 9 Nov. 1992 and 15 Jan. 1993; accepted for publication 19 Jan. 1993.

[1] Manager, Toxicology and Accident Research Laboratory; Senior Forensic Chemist; and Forensic Chemist, respectively, Forensic Toxicology Research Section, Civil Aeromedical Institute, Federal Aviation Administration, Department of Transportation, Oklahoma City, OK.

synthesis of ethanol. Several investigators [5,6,12] have shown that vitreous humor and urine do not suffer from postmortem ethanol production to any significant extent. Therefore, finding ethanol in urine or vitreous humor would generally indicate the ingestion of ethanol. Vitreous humor will normally have about 12% [5] more ethanol than blood if the system is in the postabsorptive phase. Ethanol in urine will normally be about 25% [16] or greater than the level of ethanol found in blood assuming no ethanol ingestion for at least 20 min prior to sample collection. Levels of ethanol above certain concentrations have been used by some to infer the presence of ingested ethanol. In several cases concentrations such as 0.02% (20 mg/dL), 0.15% (150 mg/dL) and 0.20% (200 mg/dL) have been suggested [7,8,9] as maximum levels of ethanol for postmortem ethanol production.

The Forensic Toxicology Research Section (FTRS) at the Civil Aeromedical Institute (CAMI) receives specimens from most of the fatal aircraft accidents that occur in the United States. Collection and shipment of specimens from these accidents are sometimes delayed and the possibility of postmortem ethanol production does exist. Severe damage to the body often exposes specimens to microorganisms that can produce ethanol under the proper circumstances (temperature, time, and nutrients). A study was undertaken to determine the incidents of postmortem ethanol in specimens received by the laboratory.

## Method

Specimens were collected by local pathologists and placed in evidence containers provided by the FAA Forensic Toxicology Research Section. Blood is submitted in 10 mL vacutainers containing 25 mg of sodium fluoride and 20 mg of potassium oxalate. These samples were refrigerated and shipped to CAMI by overnight air. Upon receipt the specimens were inventoried and prepared for analysis by a contract laboratory, the Armed Forces Institute of Pathology. The results of these tests were sent to the FTRS, the data were scanned with a SCANTRON optical card reader into a computer program developed by the Forensic Toxicology Research Section for storing, retrieving, and analyzing toxicology data. Of the various recommendations in the literature, we postulated postmortem ethanol was optimally inferred from the absence of ethanol in urine and/or vitreous humor coupled with a positive ethanol in blood or tissue. All cases with a blood alcohol concentration equal to or more than 0.04% (40 mg/dL) were considered positive, as defined by Federal Aviation Regulation 14 CFR 91.11.

In 1989 and 1990, the Forensic Toxicology Research Section reviewed ethanol test results from 975 aviation fatalities to determine the extent of postmortem ethanol production. Volatiles were identified and quantitated by the contract laboratory using headspace gas chromatography.

Methanol, acetone, 1-propanol, acetaldehyde, t-butanol, 1-butanol, 2-butanol, 2-propanol, and isobutanol were screened at an LOD of 1 mg/dL.

## Results

The maximum concentration of ethanol allowed under FAA regulations 0.04% (40 mg/dL) was exceeded in 79 of the 975 cases (8%). Twenty-one of the 79 cases (27%) were determined to be from postmortem ethanol production based on the finding of ethanol in blood but not in vitreous humor or urine. In two of these cases, postmortem ethanol production exceeded 0.15% (150 mg/dL). Twenty-two of the positive cases (28%) were found to be from the ingestion of ethanol based on the ratio of ethanol in blood, urine, and vitreous humor. No vitreous humor or urine was submitted in 36 positive alcohol cases (45%), therefore no determination could be made regarding the origin of the ethanol found in blood or tissue (Table 1).

TABLE 1—*Analysis of source of postmortem alcohol in 975 cases.*

| Description | 1989 | 1990 | Total |
|---|---|---|---|
| Total cases | 461 | 514 | 975 |
| Total cases ≥ 0.04% (40 mg/dL) | 39(8%) | 40(8%) | 79(8%) |
| Postmortem ethanol | 13(33%) | 8(20%) | 21(27%) |
| Ingested ethanol | 8(21%) | 14(35%) | 22(28%) |
| Unknown origin for ethanol | 18(46%) | 18(45%) | 36(45%) |

Volatiles other than ethanol were found in 13 cases with postmortem ethanol, 9 cases with ingestion of ethanol, 33 cases with ethanol of an unknown origin, and 14 cases without any ethanol (Table 2).

## Discussion and Conclusions

Vitreous humor and urine were submitted in only 55% of the positive cases. Therefore, only 28% of these cases could be clearly identified as containing ingested ethanol and 27% as postmortem ethanol. The number of confirmed positive cases with ingested ethanol is much smaller than we anticipated. We must increase the awareness of local pathologists and investigators to the need for collecting and submitting urine, vitreous humor, and other specimens to aid in differentiating between postmortem and ingested ethanol.

The presence or absence of volatiles, other than ethanol, does not of itself provide sufficient information needed to determine the origin of ethanol found in most postmortem samples. Table 2 shows that other volatiles can be found when there is no postmortem ethanol production. Postmortem ethanol can be found in cases where no other volatiles were found.

It has been suggested by some [1,8,9] that one can assume the ingestion of ethanol when the ethanol concentration exceeds certain levels, such as 0.020% (20 mg/dL), 0.150% (150 mg/dL), or 0.200% (200 mg/dL). The data collected in this study show that postmortem ethanol concentrations occasionally exceed these values. The concentration of ethanol in postmortem blood, in the absence of additional information, cannot be used with any degree of certainty to verify the ingestion of ethanol. The number of unknown variables in the production of postmortem ethanol makes it difficult to state unequivocally that the ethanol level in a specimen is above that which would be expected from a postmortem specimen. Specimens from 1989 and 1990 showed postmortem ethanol ranging in concentration from our cutoff of 0.01% (10 mg/dL) to 0.18% (180 mg/dL). In 1991 this laboratory analyzed a case with postmortem ethanol in excess of 0.30% (300 mg/dL) in blood and no ethanol in vitreous humor or urine.

TABLE 2—*Relationship of ethanol origin and presence of other volatiles.*

| Description | 1989 | 1990 | Total |
|---|---|---|---|
| EPV | 10 | 3 | 13 |
| EIV | 6 | 3 | 9 |
| EUV | 23 | 10 | 33 |
| NEV | 3 | 11 | 14 |

EPV = Postmortem ethanol and other volatiles.
EIV = Ingested ethanol and other volatiles.
EUV = Unknown origin of ethanol and other volatiles.
NEV = Other volatiles and no ethanol.

## References

[1] Corry, J. E. L., "A Review Possible Sources of Ethanol Ante- and Post-mortem: Its Relationship to the Biochemistry and Microbiology of Decomposition," *Journal of Applied Bacteriology*, Vol. 44, 1978, pp. 1–56.

[2] Stone, B. B. and Rooney, P. A., "A Study Using Body Fluids to Determine Blood Alcohol," *Journal of Analytical Toxicology*, Vol. 8, 1984, pp. 95–96.

[3] Nicloux, M., "Dosage of Alcohol in Putrefied Blood and Tissues," *Comptes Rendus des Séances, Société de Biologie* (Paris), Vol. 121, 1935, pp. 1301–1309.

[4] Nicloux, M., "Neoformation of Ethyl Alcohol in Human Cadavers in View of Putrefaction," *Comptes Rendus des Séances, Société de Biologie* (Paris), Vol. 121, 1936, pp. 975–979.

[5] Caplan, Y. H. and Levine, B., "Vitreous Humor in the Evaluation of Postmortem Blood Ethanol Concentrations," *Journal of Analytical Toxicology*, Vol. 14, 1990, pp. 305–307.

[6] Harper, D. R., "A Comparative Study of the Microbiological Contamination of Postmortem Blood and Vitreous Humour Samples Taken for Ethanol Determination," *Forensic Science International*, Vol. 43, 1989, pp. 37–44.

[7] Nell, P., Mills, A. J., and Prabhakaran, V. M., "Evaluation of Vitreous Humor and Urine Alcohol Levels as Indices of Blood Alcohol Levels in 75 Autopsy Cases," *Canadian Society of Forensic Sciences*, Vol. 18, 1985, pp. 97–104.

[8] Boguiz, M., Gurminska, M., and Markiewicz, J., "Studies of the Formation of Endogenous Ethanol in Blood Putrefying In Vitro," *Journal of Forensic Medicine*, Vol. 17, 1970, pp. 156–168.

[9] Spitz, W. U. and Fisher, R. S., *Medicolegal Investigation of Death*, Charles C Thomas, Springfield, IL, 1980, pp. 567–568.

[10] Falconer, B. and Falconer, C., "Postmortal Blood Alcohol in Various Parts of the Vascular System," *Blutalkohol*, Vol. 10, 1973, pp. 328–335.

[11] Luvoni, R. and Marozzi, E., "Ethyl Alcohol Distribution in The Various Organs and Fluids of Cadavers," *Journal of Forensic Medicine*, Vol. 15, 1968, pp. 67–70.

[12] Davis, G. L., Leffert, R. L. and Rantanen, N. W., "Putrefactive Ethanol Sources in Postmortem Tissues of Conventional and Germ-Free Mice," *Archives of Pathology*, Vol. 94, 1972, pp. 71–74.

[13] Blume, P. and Lakatua, D. J., "The Effect of Microbial Contamination of the Blood Sample on the Determination of Ethanol Levels in Serum," *American Journal of Clinical Pathology*, Vol. 60, 1973, pp. 700–702.

[14] Russell, A. B., "Post-Mortem Blood Alcohol Survey in Some Australian States," *The Medical Journal of Australia*, Vol. 2, 1971, pp. 948–951.

[15] Blackmore, D. J., "The Bacterial Production of Ethyl Alcohol," *Journal of the Forensic Science Society*, Vol. 8, 1968, pp. 73–76.

[16] Bisconti, A. and Valentine, T., "Blood Alcohol Concentration Determined from Urine Samples As Practical Equivalent or Alternative to Blood and Breath Alcohol Tests," *Journal of Forensic Sciences*, Vol. 30, No. 1, 1985, p. 194.

Address requests for reprints or additional information to
Dennis V. Canfield, Ph.D.
FAA. AAM 610
P.O. Box 25082
Oklahoma City, OK 73125-5066

# Exhibit
# 5

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PHILIP GLYNN,
Plaintiff,                                     :
                                               :
                                               :
v.                                             :        Civil No. 3:02CV1802(AVC)
                                               :
BANKERS LIFE AND CASUALTY                      :
COMPANY,                                       :
Defendant                                      :        JULY 19, 2004

## AFFIDAVIT

The undersigned being duly sworn, hereby deposes and says:

    1.    I am of legal age and believe in the obligation of an oath or affirmation;

    2.    I make this affidavit based upon my personal knowledge;

    3.    I am currently a Professor of Economics and Decision Sciences at Southern Connecticut State University;

    4.    In 1987, I received my Ph.D. in Systems Engineering from the University of Virginia;

    5.    I am a past President of the Connecticut Chapter of the American Statistical Association;

    6.    I have experience and expertise as a decision analyst with substantial applied work in economic problems and probability assessment;

    7.    I have reviewed various studies and statistics for the year 2001, including those from the National Highway Traffic and Safety Administration;

8.      I have prepared an expert report entitled "Calculation of Probabilities for Alcohol Related Fatalities in Auto Accidents," which was disclosed to the defendant on October 24, 2003, in the plaintiff's expert disclosure;

9.       I have come to the conclusion that the probability of an alcohol related fatal accident for an alcohol impaired driver and non-driver per 20 vehicle miles traveled is about one in a million for both the United States and Connecticut.

Mehdi Mostaghimi, Ph.D.

Subscribed and sworn to, before me, at _____ this 23rd day of _____, 2004.

Notary Public
My commission expires:

HENRY T BAUM JR
MY COMMISSION EXPIRES 03 / 31 / 2009