UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

PHILIP GLYNN,

    Plaintiff,

vs.        CIVIL ACTION NO. 302CV1802 (AVC)

BANKERS LIFE AND CASUALTY
COMPANY,

    Defendant.

**DEPOSITION OF**

**ROBERT PANDINA, Ph.D.**

**CORRECTED VERSION**

December 9, 2004
11:22 a.m.

Offices of Center of Alcohol Studies
607 Allison Road
New Brunswick, New Jersey

Brenda J. Rissmeyer, Certified Shorthand Reporter, Notary Public



setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

2

# APPEARANCES

1
2
3   FOR THE PLAINTIFF
4   RISCASSI AND DAVIS, P.C.
5   BY:  EVERETT H. MADIN, JR., ESQUIRE
6        131 Oak Street
7        P.O. Box 261557
8        Hartford, Connecticut 06126
9        860-522-1196
10
11  FOR THE DEFENDANT
12  SKADDEN, ARPS, SLATE, MEAGHER & FLOW, L.L.P.
13  BY:  ANDREW MUSCATO, ESQUIRE
14       Four Times Square
15       New York, New York 10036
16       212-735-3000
17
18
19
20
21
22
23
24
25



**setdepo**
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1   material in studies that have been done by
2   the federal government?
3       A.    At some pint, I'm sure I have.
4       Q.    Have you recently?
5       A.    Not that I can recall.
6       Q.    If their findings were different
7   than your recollection of the process, would
8   you defer to the government's findings?
9           MR. MUSCATO:    Objection to the
10  form of the question.
11      A.    The answer is, not without a
12  thorough review of their findings to make a
13  determination as to how they arrived at their
14  conclusions and methodologies, to read other
15  scientific literature that exists would be
16  consistent with their findings.  As I think
17  we all understand, science is not -- seldom
18  has unanimity in much of its findings.  And
19  certainly one has to consider any new
20  findings in light of the existing scientific
21  literature.
22      Q.    Would you agree that all experts,
23  such as yourself, in the field recognize that
24  postmortem production of ethanol can occur?
25      A.    I believe so, yes.



sd setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

40

1    Q.    How do you find that out?
2    A.    You need to look at all of the
3 things being equal. It's helpful to look at
4 the concentration of alcohol in other bodily
5 tissues or fluids.
6    Q.    Vitreous humor being one such
7 example?
8    A.    Vitreous humor would be -- assuming
9 that there hasn't been destruction of the eye
10 itself.
11   Q.    How about urine, useful in other
12 circumstances?
13   A.    Not really. It's urine by itself
14 is extremely difficult to interpret. The
15 variability in the ratios of urine to urine
16 alcohol to alcohol and other bodily tissues
17 and fluids is probably the most variable of
18 figures we have. So it's -- I personally
19 consider it down at the bottom of the list
20 in terms of its use.
21   Q.    In an ideal world in a cadaver to
22 determine equilibrium, where would you want to
23 take samples?
24   A.    I'd like to have samples from
25 vitreous humor, obviously arterial blood.


setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

1   testimony, that he had no history of alcohol
2   or drug abuse. I believe there's another --
3       Q.   Can I see that report?
4            Thank you.
5            I just want to stop you there for
6   a minute, Doctor, at the investigator's report
7   of Bankers Life. And I guess you would
8   agree with me that Bankers Life, through
9   their investigation, failed to turn up any
10  evidence of drinking at all?
11           MR. MUSCATO: Objection to the
12  form of the question.
13      A.   Maybe you are speaking be on the
14  day of the incident.
15      Q.   Yes, uh-huh.
16      A.   That's correct. There is no
17  indication in the record that there was any
18  evidence of drinking in that report.
19      Q.   There is no indication in that
20  report that he ever had a problem at work
21  with alcohol, correct?
22           MR. MUSCATO: Objection to the
23  form of the question.
24      A.   I don't -- there is no notation
25  that I recall of having any problem of any



sd setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

67

1      MR. MUSCATO: Objection to the
2  form of the question.
3      A.   It would depend on what you mean
4  by reason.
5      Q.   Give me a definition.
6      A.   I don't think it's my place to
7  give you a definition of recent. That's a
8  compound question. I think you need to ask
9  me the question you are going to ask me that
10 I can answer. I can't answer that the way
11 you phrased it.
12     Q.   All right. Let me try again,
13 then.
14          Looking at the physical findings in
15 the autopsy, including the injury to the
16 chest area, and the obvious injury to the
17 back and contusions to the chest itself, and
18 the blood in the lungs, are you able to tell
19 me whether or not there was any diffusion
20 into the heart?
21     A.   Do you mean of blood or of
22 alcohol?
23     Q.   Of alcohol.
24     A.   I'm not able to answer that.
25     Q.   Why not?



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

68

1  A.    There would be no way, in my mind,
2  of knowing from at least the materials in
3  front of me, whether the extent or nature,
4  whether the nature of the diffusion was
5  extensive, whether there was penetration in
6  the heart.  There's indication that the heart
7  was, as I recall, that it was intact.  There
8  is no way I can make that determination.
9  Q.    Okay.  Do we know whether Mr.
10 Glynn had reached equilibrium?
11       MR. MUSCATO:  Objection to the
12 form of the question.
13 A.    Based on --
14 Q.    Based on the toxicological
15 analysis.
16 A.    Nothing in the toxicological
17 analysis alone, no.
18 Q.    So we don't know if he had reached
19 equilibrium or not?
20 A.    His blood alcohol level could have
21 been rising, assuming he drank within ten,
22 15, 20 minutes of the crash.
23 Q.    Such that his brain alcohol level
24 may have been substantially lower than the
25 sample taken, correct?


setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

88

1  pooling that occurred, at least based on some
2  of the autopsy report. But whether or not
3  or how the sample was drawn, I don't know
4  whether whoever drew the sample took this
5  into account when the sample was drawn.
6      Q.    Because pooling can give you a
7  higher concentration than you would find in
8  other parts of the body?
9           MR. MUSCATO:  Objection to the
10 form of the question.
11     A.    It's possible. It's possible.
12 Not all the time, but we talked about that?
13     Q.    It's certainly a well known fact.
14          MR. MUSCATO:  Objection to the
15 form of the question.
16     A.    It is certainly a well known
17 phenomenon.
18     Q.    We're not arguing about the
19 medicine here, are we?
20     A.    We're not arguing about the
21 medicine. We're arguing only about the
22 certainty. It's not -- in other words, we're
23 not arguing about the possibility. We're
24 arguing about the probabilities and about
25 unknown quantities, for example, what



1  percentage influence you might have on such.
2      Q.   But pooling would have some effect?
3      A.   It could have some effect, yes.
4      Q.   And again, if it was taken from
5  the right side, there could have been a
6  higher level of postmortem ethanol production
7  than the left side, correct?
8           MR. MUSCATO:   Objection to the
9  form of the question.
10     A.   There could be a higher proportion,
11 yes.
12     Q.   I'm not trying to be tricky here.
13 It's just that we really don't know how the
14 body was kept or where it was -- do we --
15 before all these tests were taken?
16     A.   I'm not certain about -- it
17 depends on what you mean by "we."  To be
18 perfectly honest with you, if you are asking
19 whether or not it's indicated in any of these
20 reports, there's sparse information.
21     Q.   Do you know whether the funeral
22 home did anything with the body before
23 transporting it?
24     A.   There is no indication that they
25 did or didn't, only that they transported it.


setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

94

1     A.    Blood, a heart and vitreous.
2     Q.    You've actually got three there,
3  three sources.
4     A.    That's correct.
5     Q.    And why is that more useful than
6  just one source?
7           MR. MUSCATO:  Objection to the
8  form of the question.
9     A.    Provides more information with the
10 possibilities of determining whether or not
11 blood alcohol level was rising, and whether
12 or not the blood alcohol level was consistent
13 with what one would expect, ratio wise, in
14 various rising or falling stages.
15    Q.    Because with one sample, you could
16 have any number of anomalies that may affect
17 that, correct?
18          MR. MUSCATO:  Objection to the
19 form of the question.
20    A.    It depends on the sample.  It
21 depends on the condition of the sample.  It
22 depends on a particular tissue that you're
23 looking at.  In any sample, for that matter,
24 in even samples of blood drawn from different
25 areas.  One would have anomalies that might



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

115

1  Q. It could. It could mean he wasn't
2  impaired at all?
3      MR. MUSCATO: Objection to the
4  form of the question.
5  A. Council, anything is possible.
6  Q. And there are studies out there
7  that indicate that with microbial
8  contamination, and elevated glucose, that
9  postmortem production can be quite vigorous;
10 isn't that true?
11     MR. MUSCATO: Objection to the
12 form of the question. If you have a
13 particular study that can show that a
14 postmortem ethanol production based on
15 microbacterial action could create a .17 blood
16 alcohol level, present it to him to comment.
17 Q. First of all, you have to answer
18 my question. Isn't it true that there's
19 studies out there that indicate, under those
20 circumstances that I just outlined, that there
21 can be vigorous postmortem ethanol production?
22 A. There are studies out there that
23 show rigorous postmortem alcohol. And there
24 are also studies that question those studies
25 in terms of whether or not they represent



sd setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

extreme cases or cases in which it is likely to have occurred in scenarios such as the one we're talking about.

Simply saying, on these issues, there are a number of questions. Is there agreement? No. Are there cases? Yes.

Q. Now, let's turn to the other side of my original question, which was quite some time ago at this point.

The .17 -- if equilibrium was not reached, if there was diffusion, if other things like that occurred, also may not reflect the degree to which Mr. Glynn was impaired in his driving while he was alive?

MR. MUSCATO: Objection to the form of the question.

Q. Is that true?

A. That's possible, yes.

Q. So I think the threshold question is, whether given all the variables and information you don't have, whether we can state what the effect of that .17 was on Mr. Glynn's driving. Isn't that true?

MR. MUSCATO: Objection to the form of the question.

121

1  Q. I would suggest the FAA studies
2  and also Dr. Canfield's studies.
3        So in an extreme case, perhaps,
4  the ethanol level was zero when he died,
5  depending on what you find in the studies.
6  A. Anything is possible, Counselor.
7  Q. Okay. Or it may be that he had
8  some alcohol before he died and the true
9  blood alcohol content would be adjusted
10 downwards; isn't that true?
11 A. It's possible.
12 Q. And when I was just talking before
13 about these things being unknowable, what I
14 meant is it's really impossible for you to
15 sit here today and say that the level may
16 not be lower than .17; isn't that true?
17       MR. MUSCATO: Objection to the
18 form of the question.
19 A. That's correct.
20 Q. And I understand that the third
21 part of your opinion is the effect that the
22 .17 has on someone driving.
23 A. That's correct.
24       (A brief recess is then taken.)
25 Q. I want to clarify and discuss just



setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

137

1  with at .17?
2         You talked about that they would
3  be more likely to take risks.  I want to
4  explore that a little bit, what you meant by
5  that.
6     A.   You get an impairment in judgment,
7  number one, with regard to your ability to
8  handle any driving situation.  There are some
9  literature although there is not a lot of
10 literature that suggests that familiar
11 circumstances, the confidence that is given by
12 familiar circumstances, feeds the tendency to
13 take higher risks to feel as though you can
14 handle circumstances and situations.  Yet at
15 the same time, your reaction time, your
16 attention to the task, your ability to adjust
17 to road conditions, your ability to judge
18 speed, all become impaired. So there is a
19 tendency to drive faster at those blood
20 alcohol levels, and that exacerbates the
21 problem.  Because in a sober state, the
22 faster you drive, the more difficult the
23 task.  So basically, as task difficulty
24 increases, you get a deterioration in general
25 abilities.  And when you add alcohol to the


setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management
Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

138

1  system, the ability is impaired further by
2  the alcohol in several different domains.
3  One is what we call simple psychomotor
4  performance and less able to perform tasks.
5         Another is what we call the
6  affective arena, judgment relative to the
7  nature of the risk. And then of course, the
8  judgment having to do with risk taking.
9     Q.    In other words, the person
10 overestimates his or her ability to drive,
11 basically. Am I understanding that correctly?
12    A.    Generally speaking, yeah. The
13 ability to handle any situation that comes
14 along, irrespective of the fact that they're
15 getting feedback that they're not keeping it
16 between the white lines.
17    Q.    Judgment in that respect is
18 impaired, that is judgment to determine what
19 is beyond their capabilities?
20    A.    Even though they're getting
21 feedback based on the driving performance.
22    Q.    Is that an affect of the alcohol?
23 In other words, that inability to process the
24 feedback?
25    A.    To some extent, yeah. But the

setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

139

1  question is -- there's a debate as to whether
2  or not the inability to process the feedback,
3  or whether or not it's simply ignoring or
4  overriding the feedback. There is a
5  difference in the literature.
6       Q.   But in some respect, the alcohol
7  impairs the person's judgment so that they do
8  things in driving that they would not
9  otherwise normally do, if sober?
10      A.   That would be appear to be the
11 case. Yet it's also true that they know that
12 there is an awareness that judgment is
13 impaired.
14      Q.   An awareness at the time or an
15 awareness prior to drinking?
16      A.   No. Well, the answer is it
17 depends on the level. It could be both. If
18 you sit down and drink a quart of vodka and
19 then get in the car and expect not to be
20 impaired, I think that's completely
21 unreasonable, I think.
22      Q.   But at some point, judgment becomes
23 impaired so that the person believes that he
24 or she can handle the road conditions on a
25 familiar road?


setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

140

1   A.   Even on an unfamiliar road,
2   otherwise people wouldn't drive and drink.
3   Q.   And it happens.
4        Do you have any statistics on the
5   frequency of which people drive and drink?
6   A.   I do.  I don't have them in my
7   head.
8   Q.   Do you have a general recollection
9   or not at all?
10  A.   I don't think it would be fair to
11  make a characterization without looking at
12  those data.  There are data available with
13  regard to frequency of drinking and driving.
14  There's also difficulty in collecting that
15  data, obviously because it's typically either
16  dependent on self-report or on very
17  specialized studies having to do with roadside
18  stops, but there are data available.
19  Q.   Can you take a swat at it.
20  A.   There are two different kinds of
21  studies that are out there.  One there is
22  dependent on apprehension, data which is
23  difficult to evaluate because of differential
24  enforcement, differential density of police
25  officers on the road.


setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

141

1          Then there are also data based on
2  road blocks in which immunity is offered when
3  people offer or are tested. These studies
4  that I was involved with early on, studies
5  that still occur, but are obviously reasonably
6  rare because of the expense involved in doing
7  the studies.
8          But we also have computer models
9  that we use to make estimates based on all
10 of these data. The point is, there are data
11 available that come from a variety of
12 sources.
13    Q.    And those folks that are drinking
14 and driving, is it your understanding that
15 they don't expect to die because of it?
16         MR. MUSCATO:  Objection to the
17 form of the question.
18    A.    I don't know what people expect.
19    Q.    Well, you've indicated that you
20 were aware of some studies. I didn't know
21 if that was part of it or not.
22    A.    There are studies that look at
23 people's expectancies, likelihood of a crash
24 and so on. Even if they know they're
25 impaired, that's part of the impairment of



setdepo — Streamlined · Centralized · Standardized — The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

142

1  judgment.  I don't think anybody except those
2  people who have an intention to commit
3  suicide, get behind the wheel of a car
4  whether they are sober or not, and intend or
5  expect to have a collision.  On the other
6  hand, significant proportion of people get
7  behind the wheel of a car are having symptoms
8  of intoxication, which are clearly significant
9  to them, that they are in an impaired state.
10      Q.      And part of the effect of the
11 alcohol is to enable them to not be able to
12 appreciate the risk; isn't that true?
13      A.      Well, interestingly enough, there
14 is data on both sides.  Some people don't
15 appreciate the risk and some people appreciate
16 the risk and say, they've got to get home.
17 They're going to do it anyway.  The reports
18 typically are, yeah, I knew I was drunk, but
19 I had to get home, and so I took a chance.
20      Q.      Drunk driving is not a rare
21 occurrence, is it?
22      A.      Drunk is not a rare occurrence.  I
23 guess it depends on your definition of rare.
24 But it's certainly a frequent -- it's -- I
25 think it's difficult to put a quantitative


sd setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

146

# CERTIFICATE

I, BRENDA J. RISSMEYER, a Certified Shorthand Reporter, License #30XI00150300, and Notary Public of the State of New Jersey, do hereby certify that prior to the commencement of the examination, ROBERT J. PANDINA, Ph.D. was duly sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

/S/ Brenda J. Rissmeyer
Notary Public of the State of New Jersey
My Commission expires October 29, 2004.
Dated: December 14, 2004

setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management
Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com