UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PHILIP GLYNN | : |
| | : |
|     Plaintiff, | : |
| | : |
| V. | :   CIVIL ACTION NO.: |
| | :   302CV1802 (AVC) |
| | : |
| BANKERS LIFE AND | : |
| CASUALTY COMPANY, | : |
| | : |
|     Defendant | :   April 25, 2005 |

**PLAINTIFF'S REPLY BRIEF IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT DATED MARCH 17, 2005**

I.  THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

Despite the defendant's claim to the contrary in its opposition, this case is uniquely well suited for disposition by summary judgment. No case cited by plaintiff or defendant has the facts that this case possesses. The only issue in this case is whether Peter Glynn's death was an accident within <u>this particular policy</u>. Unlike any other case, the following factual scenario exists here: (1) it is admitted by the defendant, through its corporate designee, Robert Krol,[1] that Bankers Life

---

[1] Robert Krol is the defendant's corporate designee. *See* Pl.'s Exhibit L. His statements are admissible against the defendant in this case as admissions of a party-opponent. *See* FRE 801(d)(2). Given that Mr. Krol was the person handling the plaintiff's claim, his statements with regard to the denial of benefits, including stating that the defendant never claimed that Peter intended his death, are properly admissible. Furthermore, the working definition that Mr. Krol was using at the time he denied this claim is admissible, especially given that Mr. Krol

routinely pays accidental death claims involving impaired drivers pursuant to the exact same accidental death policy at issue in this case <u>except</u> when the policy is part of an employee benefits package, and, further, the defendant, until a few years ago, paid such claims, including those under ERISA plans; *See* Def.'s Local Rule 56(a)(2) Statement at Paragraph 18; Pl.'s Exhibit K at 24-25; this demonstrates conclusively that the defendant considers this type of death to be accidental pursuant to the policy; (2) it is admitted that there is no exclusion in the policy for impaired drivers; *Id* at Paragraph 13; (3) it is admitted by the defendant that Peter's death was neither intended nor expected; *See* Plaintiff's Exhibit K at 103-04; (4) it is admitted by the defendant that there is no evidence of Peter Glynn ingesting any alcohol on the evening of his death; *See* Def.'s Local Rule 56(a)(2) Statement at Paragraph 21; (5) there is <u>uncontraverted</u> statistical evidence that Peter Glynn, if impaired, had a 772 in 10 million chance of dying in an automobile accident on the evening he died, and, when calculated using the relative risk² provided by the defendant's sole expert, this risk is reduced to a 50 in 10 million chance; *See* Pl.'s Exhibit O at 33, 40-41; Pl.'s Exhibit P at Table 2;

---

agrees that Peter's death was an accident under the policy's language. *See* Pl.'s Exhibit K at 93, 103-04.
² The Court should note that the defendant's expert stated that the risk of an individual being killed while driving intoxicated is actually 25 times the risk of an individual that is not intoxicated. *See* Pl.'s Exhibit F at 100. This <u>directly</u> conflicts with the statement by the defendant that an intoxicated individual's relative risk is 380 times that of a non-intoxicated individual. *See* Def.'s Memo of Law dated April 15, 2005 at 28.

2

(6) experts for both parties acknowledge that it is impossible to determine, with any scientific probability, whether Peter was impaired on the evening that he died; See Pl.'s Exhibit F at 33, 65-68, 88-89, 94, 99, 115-16, 121;[3] Pl.'s Exhibit I at 10, Paragraph 45;[4] (7) defendant's sole expert acknowledges that people who drive while impaired have no expectation of injury. See Pl.'s Exhibit F at 141-42.

Accordingly, the facts are known, uncontradicted, and sufficient for this Court to grant the plaintiff's motion for summary judgment.

## II.    THE DEFENDANT'S CLAIM OF SPOLIATION IS WITHOUT MERIT

The defendant's argument regarding spoliation of tissue samples obtained and possessed by the State of Connecticut Medical Examiner is spurious for the following three reasons. First, pursuant to the terms of the contract, the plaintiff provided an authorization to the defendant within two months of Peter's death. See Exhibit A. The authorization, drafted by the defendant, permits the defendant the unfettered opportunity to obtain any medical information it desired. Consequently, the defendant could have accessed and tested the samples held by

---

[3] Note that the plaintiff has moved to strike the declaration of Robert Pandina.
[4] Despite the defendant's contentions, see Def.'s Memo of Law dated April 15, 2005, see also Def.'s Local Rule 56(a)(2) Statement at Paragraph 25 and 26, the opinions of the plaintiff's expert, John W. Soper, Ph.D., are stated with the requisite degree of certainty for admission as expert testimony. See Pl.'s Exhibit F at Paragraph 45. Furthermore, the plaintiff agrees that the statements of Dr. Pandina, the defendant's sole expert in this case, did not "state any conclusion to a medical certainty" with regard to the reliability of the decedent's blood alcohol level. Id at Paragraph 26. Therefore, the plaintiff's evidence with regard to the decedent's reported blood alcohol level is unopposed.

the medical examiner as easily or perhaps more easily than the grieving plaintiff. Second, the medical examiner had disposed of the samples on or about June 22, 2002, <u>several months</u> before there was a lawsuit filed. The plaintiff's action was commenced on September 10, 2002. Further, the samples were never within the possession of the plaintiff but were always within the possession and control of the State of Connecticut.

III.   THE PLAINTIFF EXHAUSTED HIS REMEDIES

The plaintiff exhausted all administrative remedies <u>as set forth by the defendant</u>. Moreover, the defendant must be found to have waived any right it may have had to even raise this issue. After the plaintiff initially filed his claim, he requested a copy of the entire plan. In contravention of ERISA law, the defendant refused, and only sent selected pages. *See* Pl.'s Exhibit Q at #7 and 8, p. 3-4; Depo of Robert Krol attached as Exhibit B at 56-58; Exhibit C attached. The provided pages did not contain sufficient information regarding the full steps required. Nevertheless, the plaintiff requested, by letter and telephone, that he be told how to perfect his appeal. The information was provided by the defendant and then followed completely by the plaintiff. *See* Pl.'s Exhibit Q at #9 and 10, p. 4. Consequently, if there is some defect in the plaintiff's exhaustion of remedies, it is entirely the fault of the defendant.

Moreover, any further appeal would have been futile. As stated by the defendant's designee, the only information that was considered in this claim was

RISCASSI & DAVIS, P. C.  •  *ATTORNEYS-AT-LAW*  •  131 OAK STREET  •  P. O. BOX 261557  •  HARTFORD, CT 06126-1557  •  (860) 522-1196

the blood alcohol content. *See* Pl.'s Exhibit K at 32. Since any attempted further administrative proceedings were futile, the plaintiff need not exhaust. *See e.g. Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d. Cir. 1993).

Furthermore, under this plan, the language with regard to the appeals process was not mandatory; therefore, <u>no exhaustion was even required</u> under this plan. The following quoted language was found by the Second Circuit to be "opaque","grossly uninformative", and to inadequately direct the plaintiff with regard to an ERISA appeals process:

> If you remain dissatisfied and wish to appeal, you should, within 90 days of the date the claim was denied . . . write a letter to the plan administrator asking for a review.

*Burke v. Kodak Retirement Income Plan*, 336 F.3d 103, 108 (2d. Cir. 2003). The court found that "should" did not equate with "must"; therefore, since the administrator had not provided the requisite mandatory direction in the appeals process, the plaintiff was denied her "full and fair review." *Id* at 109.

Likewise, in the instant case, under Peter Glynn's plan, a complainant is not unambiguously mandated to seek the appeals process prior to seeking judicial intervention. The applicable language states "[i]f you disagree with a claim decision or want to provide additional information to Bankers Life & Casualty, **you <u>can</u> apply for a claim review**." *See* Pl.'s Exhibit Q #3 at p. 2. "Can" is not mandatory. In fact, "can" is used interchangeably with "may," more commonly to denote <u>possibility</u>. *See* Merriam-Webster Online Dictionary, viewed at

5

http://www.m-w.com. The only statement in this section of the plan using any mandatory language requires that "if" the claimant files an appeal with Bankers Life, which is not mandatory, only then "must [he] state the reason" for seeking an appeal. *See* Pl.'s Exhibit Q at #3 at p. 2. Since the administrative appeals process was not unambiguously required, there is no need for exhaustion.

IV.   THE STATEMENTS CONTAINED IN PETER'S MEDICAL RECORDS ARE ADMISSIBLE EVIDENCE

The defendant erroneously states that the decedent's medical records, and his statements in those records are inadmissible hearsay. *See* Def.'s Memo of Law dated April 15, 2005 at n. 4. Even assuming that such statements are hearsay, these statements by Peter are admissible. The medical records themselves are admissible. *See* FRE 803(6). Further, the statements of Peter Glynn, to his medical provider, who recorded such statements, are also admissible. *See* FRE 803(4). Therefore, there is no hearsay issue, and the statements may be admitted.

Furthermore, Dr. Soper is an expert witness. Since he is an expert, Dr. Soper may reasonably rely on hearsay statements in formulating his opinions. Federal Rule of Evidence 703 states that the "facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Therefore, the defendant's arguments against the admissibility of such statements are without merit.

V.    THERE IS NO ISSUE OF MATERIAL FACT AS TO WHETHER THIS IS AN ACCIDENT UNDER *CRITCHLOW* AND *WICKMAN*

6

The defendant blithely disregards the binding precedent that exists in the Second Circuit with regard to the analysis of the *Wickman* test. The Second Circuit of Appeals, in *Critchlow*, stated that deaths from an "activity [that] <u>ordinarily</u> [have] a nonfatal outcome," or which are "<u>statistically rare</u>," are accidental under the *Wickman* test. *See Critchlow v. First UNUM Life Ins.*, 378 F.3d 246, 258 (2d Cir. 2004). Therefore, the defendant's conclusion that statistics cannot be used under the *Wickman* test is without merit, and in contradiction with the Second Circuit Court of Appeals' analysis.

Moreover, the plaintiff has offered expert statistical evidence, which the defendant has not opposed with any evidence, which demonstrates that Peter's death was not even probable, let alone "highly likely." *See* Pl.'s Exhibit O at 33; Pl.'s Exhibit P at Table 2. The defendant has admitted that Peter Glynn did not intend his own death. *See* Pl.'s Exhibit K at 38.

The defendant agrees that, unless a person with the background and experiences of Peter Glynn believed that his death was "<u>highly likely</u>" to occur on that night, his death was accidental. *See* Def.'s Memo of Law at 18-19. However, other than its own conclusions and assumptions, the defendant has <u>no evidence</u>, statistical or otherwise, which demonstrates that an individual who is driving while impaired is "highly likely" to die. Conversely, the plaintiff submitted statistical evidence demonstrating that Peter's chance of being killed that night

7

was 772 in 10 million (or as low as 50 in 10 million). *See* Pl.'s Exhibit O at 33; Pl.'s Exhibit P at Table 2; *supra* n. 2. Indeed, Robert Krol, the defendant's corporate designee, states that in order to be "highly likely," an event must have a greater chance of occurring than of not occurring. *See* Pl.'s Exhibit K at 42. Furthermore, the defendant admits that no statistics or other evidence that such a death was indeed "highly likely" to occur was in possession of Bankers Life at the time it denied plaintiff's claim, and had no bearing whatsoever on this denial. *Id.* The truth is, the defendant had no basis for denying this claim.

VI. **FEDERAL COMMON LAW UNDER ERISA MUST INTERPRET INSURANCE CONTRACTS USING "COMMON-SENSE CANONS OF CONTRACT INTERPRETATION"**

The defendant completely misinterprets the plaintiff's argument with regard to the interpretation of the terms of Peter Glynn's accidental insurance policy. *See* Def.'s Memo of Law dated April 15, 2005 at 17-18. Benefit provisions of an insurance policy in an ERISA plan are interpreted under federal common law. However, in contradiction to the defendant's assertions, both the United States Supreme Court and the Second Circuit Court of Appeals allow this Court to use common-sense, state law principles in interpreting insurance policies in ERISA plans. *See e.g. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56-57 (1987); *Lifson v. INA Ins. Co. of New York*, 333 F.3d 349, 352-353 (2d Cir. 2003); Pl.'s Memo of Law dated March 17, 2005 at part III(A).

It must be stated again, ERISA does <u>not</u> change the terms of an insurance contract in an ERISA plan. Furthermore, as stated by the Second Circuit: "If there are ambiguities in the language of an insurance policy that is part of an ERISA plan, they are to be construed against the insurer." *Critchlow v. First UNUM Life Ins. Co.*, 378 F.3d 246, 256 (2d Cir. 2004).

## VII. THE DEFENDANT'S DISPARAGEMENT OF PETER GLYNN IN THIS CASE IS APPALLING

The defendant corporation, through its counsel, has continually disparaged Peter Glynn throughout this litigation with conclusory statements that are offensive, inflammatory, and, most importantly, irrelevant to any decision that this Court needs to determine. Peter received numerous awards from his employer in the months prior to his death for his "commitment, dedication and hard work" on an "outstanding team" which "routinely exceed[ed] its planned production requirements", and for "going beyond his normal job duties" and "taking on . . . extra responsibilities without seeking help or praise." *See* Champion Award Certificate, Champion Award Recipient Description, Quality Recognition letter, and Employee of the Month Nomination form attached as Exhibit D; Pl.'s Exhibit Exhibit A at 13 ("presented him a special award that they said is very, very stringently given to—not given very often to superior people at Johnson & Johnson. They gave him a tremendous award."). The defendant has <u>no basis</u> for its assertions that Peter may have intended his death. Indeed, Mr.

9

Krol has admitted that Peter did not intend his death. *See* Pl.'s Exhibit K at 38. The defendant's attempt to create a question of fact with regard to whether Peter may have intended his death is preposterous.

Additionally, even if this Court were to find that Peter's subjective expectation was in dispute, that is not material to the decision in this case. *Wickman* itself involved a situation where the decedent's subjective intent was unknown. 908 F.2d 1077, 1080 (1st Cir. 1990).[5] Therefore, even if Peter's subjective state of mind were in factual dispute, the plaintiff is still entitled to summary judgment because Peter's death was not "highly likely" to occur. *Id* at 1088 ("if the fact-finder, in attempting to ascertain the insured's actual expectation, finds the evidence insufficient to accurately determine the insured's subjective expectation, the fact-finder should then engage in an objective analysis of the insured's expectations").

VIII.   CONCLUSION

The plaintiff respectively requests this Court to grant his Motion for Summary Judgment.

---

[5] The decedent was discovered to be holding onto the guardrail of a bridge with one hand prior to falling. It was unknown whether the decedent was attempting suicide.

10

                              PLAINTIFF,
                              PHILIP GLYNN


                           By_____
                              Everett H. Madin, Jr.
                              Federal Bar No.: CT 12297
                              RISCASSI & DAVIS, P.C.
                              131 Oak Street
                              Hartford, CT 06106
                              Ph: 860-522-1196
                              Fax: 860-246-5847

## **CERTIFICATION**

      This is to certify that a copy of the foregoing was mailed via First Class Mail, postage pre-paid, on this 25th day of April, 2005 to the following counsel of record:

John Shaban, Esq.
Whitman, Breed, Abbott & Morgan
100 Field Point Road
Greenwich, CT 06830

Andrew Muscato, Esquire
Skadden, Arps, Slate, Meagher, & Flom, LLP
Four Times Square
New York, NY 10036-6522

                              _____
                              Everett H. Madin, Jr.