# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PHILIP GLYNN,

    Plaintiff,

vs                                        Civil Action 302 CV 1802

BANKERS LIFE AND CASUALTY COMPANY,

    Defendant.

**DEPOSITION OF**

**ROBERT KROL**

May 18, 2004
10:00 a.m.

333 West Wacker
Chicago, Illinois

Sandra Drechsler, Certified Shorthand Reporter,
Registered Professional Reporter, and Notary Public



**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

23

```
 1    A.    Yes.
 2    Q.    Have you paid death claims
 3  involving intoxicated driver in ERISA cases?
 4    A.    In the past, yes.
 5    Q.    When did that policy change?
 6    A.    Seven, eight years ago.
 7    Q.    Was there a particular claim that
 8  caused that policy to be changed?
 9    A.    No.
10    Q.    What brought about the policy
11  change? Was there a, I mean, some written
12  procedures passed out or what happened?
13    A.    To my best recollection, legal just
14  made a statement that from now on, ERISA
15  makes a difference.
16    Q.    Okay. And from that point seven
17  or eight years ago forward, have you
18  continued to pay identical claims in non-ERISA
19  claims?
20    A.    Yes.
21    MR. MUSCATO:  Objection to the
22  form of the question.
23    MR. MADIN:  Let me fix the
24  question. What's wrong with the question?
```



sd setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

32

1  understood it to be, correct?
2  A. Yes.
3  Q. Were there any facts at all in the
4  information you received that you determined
5  were relevant to the denial of the claim
6  other than the blood alcohol content?
7  A. No.
8  Q. Why then did you retain Research
9  Service Bureau, if all you really needed to
10 look at was the blood alcohol content?
11 A. We wanted to make sure we had as
12 much facts as possible, and Research Service
13 was contracted to get the additional
14 information that might be out there.
15 Q. But would any of the facts that
16 they turned up have altered your decision,
17 given the blood alcohol content?
18 A. Possibly. I really don't know.
19 Q. Give me an example of a fact that
20 would have changed your decision.
21        MR. MUSCATO: Objection to the
22 form of the question.
23        BY MR. MADIN:
24 Q. You can answer.

38

1  medical examiner's report?
2          MR. MADIN: Not at this time.
3     BY MR. MADIN:
4     Q.   Did your investigative service make
5  any determinations about whether Peter Glynn,
6  Peter Glynn's death was intentional or
7  suicidal?
8     A.   They never make opinions.
9     Q.   And that is certainly not the
10 basis of your denial, is it?
11    A.   What they said?
12    Q.   No. There's no claim here, is
13 there, that Mr. Glynn intended his own death?
14    A.   No.
15    Q.   Okay. Did your investigative
16 service uncover any evidence regarding Mr.
17 Glynn's drinking habits?
18    A.   Yes.
19    Q.   What did they find?
20    A.   He routinely consumed vodka.
21    Q.   And did they talk to dram shops
22 and bars in the area?
23    A.   I believe so. I don't recall.
24    Q.   Do you recall what they found with

```
 1   regard to the dram shops and bars?
 2        A.    What you're looking for is whether
 3   or not they determined he was drinking that
 4   day?  Is that what you're looking for?
 5        Q.    No.  No.  I'm just looking for
 6   any patterns of drinking.  You indicated to
 7   me that you thought that they determined that
 8   he would drink vodka.
 9        A.    Yes.
10        Q.    And I want to explore that with
11   you a little more.
12        A.    Okay.
13        Q.    How often would he drink vodka?
14        A.    We don't know.  The information we
15   received was from his father.
16        Q.    Did any of the dram shops or bars
17   have any knowledge of Peter Glynn?
18        A.    Not that I know of.
19        Q.    He wasn't a customer that you
20   could find?
21        A.    Not that I know of.
22        Q.    Did anyone at his place of
23   employment indicate that he had a drinking
24   problem?
```


**setdepo**
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

40

1   A.   Not that I know of.
2   Q.   And did anyone that you folks
3   contacted indicate that they thought Peter
4   Glynn had a drinking problem?
5        MR. MUSCATO:   Objection to the
6   form of the question.
7        THE WITNESS:   Not that I know of.
8   BY MR. MADIN:
9   Q.   Okay.   Would a pattern of alcohol
10  abuse play any part in your decision to deny
11  a claim generally?
12  A.   No.
13  Q.   In your opinion what was it about
14  Peter Glynn's blood alcohol content that
15  indicated to you that his death was not
16  accidental?
17  A.   Well, his blood alcohol was almost
18  twice the legal limit, so he was obviously
19  legally intoxicated.
20  Q.   What was the legal limit at that
21  time in Connecticut?
22  A.   Point 10.
23  Q.   What was his alcohol content?
24  A.   Point 17.



setdepo

Nationwide Schedu
Toll Free: 1.800.451.
Facsimile: 1.888.451.

41

```
 1        Q.     But what about that suggests to
 2   you that the death was not accidental?
 3        A.     Well, a person who is legally
 4   intoxicated, under ERISA, who dies in a car
 5   crash, it's not an accidental death.
 6        Q.     Is that because in your opinion
 7   the death is likely to occur?
 8        A.     Highly likely.
 9        Q.     It's highly likely?
10        A.     Yes.
11        Q.     Okay.  What are the statistics of
12   an intoxicated driver dying in a car
13   accident?
14        A.     I have no idea.
15        Q.     Did you do any research?
16        A.     No.
17        Q.     How do you know it's highly likely
18   that such a person would die?
19        A.     Based on conversations I had with
20   my legal department.
21        Q.     So the highly likely standard came
22   from legal?
23        A.     That's pretty much my opinion.
24        Q.     Well, is it your opinion or is it
```



setdepo
Streamlined · Centralized · Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

42

1  an opinion that came from legal?
2       A.    I would say it's my opinion.
3       Q.    Okay.  And if the statistics
4  indicated that the chance of were one in 10
5  million of someone driving intoxicated and
6  dying, would that be highly likely in your
7  opinion?
8            MR. MUSCATO:  Objection to the
9  form of the question.
10           THE WITNESS:  One in 10 million.
11     BY MR. MADIN:
12      Q.    Would you consider that highly
13  likely?
14      A.    My opinion, no.
15      Q.    Okay.  What sort of probability
16  would we look at to determine that something
17  was highly likely, in your opinion?
18           MR. MUSCATO:  Objection to the
19  form of the question.
20           THE WITNESS:  Over half.
21     BY MR. MADIN:
22      Q.    Okay.  51-49?
23      A.    You can say that, I guess.
24      Q.    More than that?  Would it have to



setdepo — Streamlined · Centralized · Standardized
Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376

1  be more than that, in your opinion?  I'm
2  trying to get your understanding of highly
3  likely.  75-25?
4     A.     Let's stick with 51-49.
5     Q.     Okay.  And if you were wrong about
6  that, would you also be wrong about denying
7  Mr. Glynn's claim?
8          MR. MUSCATO:  Objection to the
9  form of the question.
10    BY MR. MADIN:
11    Q.     You can answer that, sir.
12    A.     It's not my decision to deny these
13 things.  It's just I have the initial
14 opinion.
15    Q.     Okay.  Let's take it at that
16 level.  If you were wrong about the
17 statistics, and in fact Mr. Glynn's death was
18 not highly likely, in your opinion, would you
19 have been wrong to deny the claim?
20         MR. MUSCATO:  Objection to the
21 form of question.
22         THE WITNESS:  My opinion doesn't
23 matter.  It's the ERISA rules and regulations
24 that apply to this situation.  My opinion is


sd setdepo
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

Nationwide Scheduling
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com

104

1      MR. MUSCATO: Objection to the
2  form of the question.
3      BY MR. MADIN:
4      Q.    You can answer.
5      A.    I agree.
6      Q.    You don't know what the statistics
7  are regarding driving while intoxicated?
8      A.    No.
9      Q.    Does anyone at Bankers Life know
10 what the statistics show with regard to
11 driving while intoxicated?  Do you know?
12     A.    I don't know.
13     Q.    Okay.  And whatever the numbers
14 show, they played no part in your decision to
15 deny Mr. Glynn's claim, is that true?
16     A.    Correct.
17     Q.    And you do cite ERISA regulations
18 as being a component of your decision to deny
19 this claim, but you don't know what those
20 regulations are, correct?
21     A.    Correct.
22     Q.    You also cite ERISA cases as being
23 uniform in denying such claims but you do not
24 know what any of the cases are, is that



```
 1   correct?
 2        A.    Correct.
 3        Q.    And all of that would have been
 4   true back in 2002 when this claim was denied,
 5   correct?
 6        A.    Correct.
 7            MR. MADIN: I'm done again.
 8            MR. MUSCATO: Okay. I have no
 9   further questions.
10            MR. MADIN: All right. We're
11   done.
12            THE REPORTER: Signature? Is it
13   waived or will he reserve and read?
14            MR. MUSCATO: He will reserve and
15   read.
16            THE REPORTER: Do you want this in
17   a week?
18            MR. MADIN: I don't really need it
19   in a week. Regular delivery is fine.
20            THE REPORTER: Do you want a copy?
21            MR. MUSCATO: Yes, please.
22            (Whereupon, at 12:25 p.m., the
23   signature of the witness having been reserved
24   the witness being present and consenting
```



**setdepo**
Streamlined • Centralized • Standardized
The Evolution of Deposition Management

**Nationwide Scheduling**
Toll Free: 1.800.451.3376
Facsimile: 1.888.451.3376
www.setdepo.com